1

```
1                    UNITED STATES BANKRUPTCY COURT
                   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3                                   .  Chapter 11
     IN RE:                         .  Case No. 23-10763 (DJB)
                                    .
4    Stream TV Networks Inc., et al.
                                    .
5                                   .
              Debtors.             .
6                                   .  Monday, April 14, 2025
                                    .  10:30 a.m.
7    . . . . . . . . . . . . . . .

8                        TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE DEREK J. BAKER
9                  UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES:

11   For the Debtors:          Michael Vagnoni, Esquire
                               OBERMAYER
12                             1500 Market Street
                               Suite 3400
13                             Philadelphia, Pennsylvania 19102

14

15

16   (APPEARANCES CONTINUED)

17   Audio Operator:           Gauri Patel, ECRO

18   Transcription Company:    Reliable
                               1007 N. Orange Street
19                             Wilmington, Delaware 19801
                               (302)654-8080
20                             Email:  gmatthews@reliable-co.com

21   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
22

23

24

25
```

702

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:        STEVEN COREN, Esquire
                                COREN & RESOURCES, P.C.
3                               2001 Market Street
                                Two Commerce Square, Suite 3900
4                               Philadelphia, Pennsylvania 19103

5  For Rembrandt:               Andrew Demarco, Esquire
                                DEVLIN LAW FIRM, PLLC
6                               1526 Gilpin Avenue
                                Wilmington, Delaware 19806

7
                                -and-
8
                                Christopher Michaels, Esquire
9                               BROWN AND MICHAELS, P.C.
                                118 North Tioga Street
10                              Ithaca, New York 14850

11
   For SSG Advisors:            Jeffrey Kurtzman, Esquire
12                              KURTZMAN STEADY LLC
                                555 City Avenue, Suite 480
13                              Bala Cynwyd, Pennsylvania 19004

14 For VSI:                     Adam Swick, Esquire
                                AKERMAN LLP
15                              500 W. 5th Street, Suite 1210
                                Austin, Texas 78701
16
                                -and-
17
                                John Thompson, Esquire
18                              AKERMAN LLP
                                750 9TH Street NW Suite 750
19                              Washington, D.C. 20001

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                          PAGE

3    Agenda
     Item: MOTION OF VISUAL SEMICONDUCTOR, INC. FOR
4          ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

5

6

7

8                                 EXHIBITS

9

10   Exhibits S1-S10                                    46

11

12                                WITNESSES

13

14   SCOTT VICTOR
15        Cross examination by Mr. Thompson            13
          Cross examination by Mr. Michaels            21
16        Redirect examination by Mr. Kurtzman         42
          Recross examination by Mr. Thompson          43

17   CHARLES BUD ROBERTSON
18        Direct examination by Mr. Swick             146

19   RAFAEL ZAHRALDDIN
          Direct examination by Mr. Swick             231
20        Cross examination by Mr. Coren              241
          Redirect by Mr. Thompson                    260

21

22

23

24

25

```
 1              (Proceedings commenced at 10:30 a.m.)

 2              THE CLERK:  Okay.  This is the Monday, April 14,

 3    2025 calendar for Judge Derek Baker.  10:30 list has a few

 4    matters for the Stream TV Network's case, including the

 5    adversary, Rembrandt 3D Holding, versus Trustee Homony.

 6              THE COURT:  All right.  Good morning.  Let's take

 7    appearances.  I guess I'll start with -- I'll start on the

 8    far -- on my far left, and then we'll go across and get

 9    anyone who's on the phone.

10              MR. VAGNONI:  Good morning, Your Honor.  Michael

11    Vagnoni on behalf of William Homony, Chapter 11 Trustee.

12              THE COURT:  Good morning.

13              MR. COREN:  Good morning, Your Honor.  Steven

14    Coren, special counsel for the trust.

15              THE COURT:  Good morning.

16              MR. KURTZMAN:  Good morning, Your Honor.  Jeffrey

17    Kurtzman, Kurtzman Steady, for SSG Advisors, LLC.

18              THE COURT:  Good morning.

19              MR. THOMPSON:  Good morning, Your Honor.  John

20    Thompson of Akerman, LLP, on behalf of VSI.

21              THE COURT:  Good morning.

22              MR. MICHAELS:  Good morning.  Chris Michaels from

23    Brown and Michaels, P.C., on behalf of Rembrandt 3D Holding,

24    Limited.

25              THE COURT:  Good morning.
```

```
 1              MR. DEMARCO:  Good morning, Your Honor, Andrew
 2   Demarco, Devlin Law Firm, also here for Rembrandt.
 3              THE COURT:  Good morning.
 4              MR. SWICK:  Good morning.  Adam Swick with
 5   Akerman, on behalf of Visual Semiconductor.  Pleasure to be
 6   before you, Your Honor.
 7              THE COURT:  Good morning.  All right.  Anyone else
 8   need to enter an appearance?
 9              MR. SWICK:  I was just saying we do have our
10   witness, Nicole.  She just appeared in remotely, so she --
11              THE COURT:  I see that.
12              MR. SWICK:  Yep.
13              THE COURT:  So before we get started, I'm
14   guessing, right, we probably won't get to your witness
15   probably until sometime at least an hour, right?
16              MR. SWICK:  I think that's probably right, Your
17   Honor.
18              THE COURT:  All right.  So if she wants to do
19   something else and dial back in in an hour, that's totally
20   fine with me.
21              MR. SWICK:  Okay.  So, Nicole, there are two
22   motions that you're not necessarily here for.  So when the
23   motion for administrative expense comes on, I'll let you know
24   when to dial by again, okay?
25              MS. MANEEN:  Okay.  Thank you.
```

```
1              THE COURT:  Okay.  Is there anyone on the phone who
2   needs to enter an appearance or on the Zoom?  Excuse me.
3              MR. WALLACE:  Your Honor, this is Neil Wallace.
4   I'm counsel for Rembrandt.  I'm just watching.
5              THE COURT:  Okay.  Great.  Good morning.
6              MR. WALLACE:  Good morning, sir.
7              THE COURT:  All right.  I want to, again, thank
8   the parties for the status conference that we had a couple
9   weeks ago, as well as for all of the briefing and the
10  paperwork.  I do think it's probably the right approach to
11  take the SSG motion first, sort of address that, because I
12  think based on at least the status conference, that was a
13  somewhat isolated issue.
14             And then we'll talk about the motion to dismiss
15  and then we'll turn to the administrative claim.  Does that
16  sound like the right approach by the parties?
17             MULTIPLE VOICES:  Yes, Your Honor.
18             THE COURT:  Is there anything that the parties
19  need to update me on relative to any of those motions?  Okay.
20  All right.  So I'll turn the podium over then to Mr.
21  Kurtzman.
22             MR. KURTZMAN:  Thank you, Your Honor.  Again,
23  Jeffrey Kurtzman on behalf of SSG Advisors, LLC.  At the
24  preliminary status conference, I advised Your Honor that I
25  intended to proceed by way of an offer of proof.  Mr. Victor
```

1    is in the Courtroom and available for cross-examination.  So

2    with Your Honor's permission, I would simply proceed.

3                THE COURT:  That's fine.

4                MR. KURTZMAN:  Okay.  If called as a witness, Mr.

5    Victor would testify on direct examination as follows:  He is

6    a founder and managing director of SSG Advisors, LLC, which

7    I'll refer during the presentation this morning to as SSG.

8                SSG is a preeminent investment banking firm with a

9    national and international reputation for investment banking

10   services, including financings and asset sales for

11   financially challenged companies.  SSG has provided advisory

12   services in hundreds of transactions, including with respect

13   to the sale of assets under Section 363 of the Bankruptcy

14   Code.

15               Mr. Victor's experience is extensive, having

16   served as SSG's primary professional in hundreds of

17   transactions, including in this and other courts nationwide.

18               At the request of the Chapter 11 Trustee in these

19   cases, SSG agreed to serve as the Trustee's investment banker

20   to market and sell the Debtor's assets.

21               On September 20, 2024, this Court entered an order

22   approving SSG's retention as the Trustee's banker and that

23   appears at Docket No. 741.

24               Immediately following its retention, SSG commenced

25   the process of preparing a teaser as well as more

1   comprehensive marketing materials and to compile a list of

2   prospective purchasers for the Debtor's assets, including the

3   Debtor's equity interests in various subsidiary entities.

4          In addition, SSG compiled a virtual data room

5   consisting of diligence materials, which would assist

6   potential buyers in evaluating an acquisition of all or some

7   portion of the Debtor's assets.

8          SSG contacted approximately 550 potential buyers,

9   of which two signed non-disclosure agreements and obtained

10  access to the data room.  The two interested parties were

11  Visual Semiconductor Inc., one of the objecting parties, and

12  a company known as Continental Advisory Services.

13         Ultimately, only one party submitted a bid for the

14  assets, which was SeeCubic, the stalking horse bidder.  In

15  part based on Mr. Victor's testimony at a sale hearing

16  conducted by Judge Chan on December 4, 2024, and Mr. Victor's

17  declaration in support of the proposed sale, which was filed

18  at Docket No. 852, this Court approved the Trustee sale of

19  the Debtor's assets to SeeCubic, finding that the transaction

20  reflected in the asset purchase agreement met all of the

21  standards arising under Section 363.

22         A transcript of the sale hearing appears at Docket

23  No. 878.

24         On December 9, 2024, Judge Chan entered the sale

25  order.  That's at Docket No. 876, expressly overruling the

1    respective objections filed by Rembrandt and VSI.

2            On January 8th, 2025, Judge Chan docketed her

3    memorandum opinion with respect to the sale order.  That's at

4    Docket No. 916.  Judge Chan found, specifically based on Mr.

5    Victor's declaration and his testimony at the sale hearing,

6    that the sale was the product of the Trustee's sound business

7    judgment.  And that finding appears at Pages 15 and 16 of the

8    opinion.

9            In carrying out its duties and responsibilities as

10   the Trustee's investment banker, SSG, at all times, acted

11   solely in accordance with the instructions of its client and

12   under the supervision of Judge Chan.

13           Notwithstanding its interest in maximizing the

14   sale proceeds, SSG took into consideration and discussed with

15   the Trustee and his professionals information provided by

16   Rembrandt concerning that entity's alleged proprietary

17   technology.

18           In that regard, one, the Trustee's sale pleadings

19   contained an explicit representation that Rembrandt's

20   intellectual property license would not be assumed and

21   assigned to any buyer.  Two, Mr. Victor and SSG incorporated

22   information provided by Rembrandt in its marketing materials,

23   which is reflected in Mr. Victor's declaration in support of

24   the sale.

25           And three, the sale order itself carved out from

```
 1   the injunction provisions Rembrandt's right to pursue
 2   infringement claims against the buyer, which were therefore
 3   specifically preserved.
 4           SSG's activities in these cases were consistent
 5   with its activities in other bankruptcy engagements and were
 6   at all times subject to oversight, both by the Trustee and
 7   this Court.
 8           Notwithstanding the objector's argument that SSG
 9   acted with gross negligence or recklessness or engaged in
10   willful misconduct, the record of these proceedings
11   demonstrates that time and again VSI and Rembrandt advanced
12   arguments identical to those being used here to frustrate the
13   Trustee's sale efforts.
14           Time and again, including in the sale order and
15   her opinion, those arguments were rejected by Judge Chan, who
16   refused to be misled just as those parties are attempting to
17   mislead the Court today in the context of the indemnification
18   application.
19           The joint objection to the extent that it's even
20   comprehensible, Your Honor, suggests that SSG had a duty to
21   VSI and Rembrandt to abandon the sale efforts based on claims
22   that proprietary technology was embedded in the Debtor's
23   assets.
24           However, SSG didn't take direction from VSI and
25   Rembrandt.  It took direction from the Trustee and this
```

1    Court.

2              In addition, the sale order expressly affords

3    Rembrandt the right to bring an infringement action against

4    the asset purchaser, thereby preserving its rights against

5    the only possible defendant, which is SeeCubic.

6              At no time during this engagement did SSG or its

7    employees act outside the scope of the matter for which they

8    were retained.  As noted in SSG's pending application,

9    Rembrandt has sued SSG and five of its employees, including

10    Mr. Victor, for patent infringement.  It did so without

11    seeking prior leave of this Court in violation of the Barton

12    Doctrine.

13              The SSG defendants have a right to defend

14    themselves in that action, and that right includes the right

15    of indemnification, as specifically provided in SSG's

16    retention application and order.  Mr. Victor utterly rejects,

17    and he believes that the Court can plainly see based on this

18    record that none of the disqualifying conduct is present

19    here.

20              The objectors argue that SSG's conduct was knowing

21    or reckless because Rembrandt sent it threatening emails.

22    But the fact was and remains that SSG was tasked with a job

23    by the Trustee and this Court, and it did that job in the

24    face of unfounded threats and accusations leveled by the

25    objecting party.  In short, SSG chose professionalism in the

1    face of intimidation.

2            Based upon all of the foregoing, Your Honor, Mr.

3    Victor submits that SSG is entitled to indemnification under

4    the clear language of the SSG retention application and order

5    frivolous arguments to the contrary notwithstanding.

6            And as I indicated, Mr. Victor is available for

7    cross-examination.

8            THE COURT:  Thank you, Mr. Kurtzman.

9            MR. KURTZMAN:  Thank you, Your Honor.

10           THE COURT:  Anyone wish to cross-examine Mr.

11   Victor?

12           MR. THOMPSON:  Yes, Your Honor, we do.  But we

13   have some opening statements if Your Honor would accept them.

14           THE COURT:  I'll take them more in --

15           MR. THOMPSON:  Okay.

16           THE COURT:  -- closing arguments, all right?

17           MR. THOMPSON:  Yes, Your Honor.

18           THE COURT:  Thank you.  So I'll ask Mr. Victor to

19   come forward.

20           (Witness sworn)

21           THE CLERK:  Please state your name for the record.

22           THE WITNESS:  J, the initial, Scott Victor,

23   V-I-C-T-O-R.

24           THE CLERK:  Please state your address for me,

25   business address.

713

 1         THE WITNESS:  5 Tower Bridge, West Conshohocken,

 2   PA, Suite 420, 19428.

 3         THE COURT:  You may proceed, counsel.

 4   CROSS-EXAMINATION

 5   By MR. THOMPSON:

 6   Q    Good morning, Mr. Victor.

 7   A    Good morning.

 8   Q    SSG gets retained in bankruptcy cases to assist debtors

 9   in the marketing and sale of the estate assets under 363 of

10   the Bankruptcy Code on a pretty regular basis, right?

11   A    Very regular and Trustees, as well.

12   Q    Okay.  Roughly how many times has SSG been retained

13   back as investment banker to a bankruptcy estate for purposes

14   of doing a 363 sale?

15   A    At least 200.

16   Q    So it's fair to say that you have a great deal of

17   experience and so does SSG; is that right?

18   A    Yes.

19   Q    SSG has a process that it employs to engage in the

20   marketing and sale of assets under 363 of the Bankruptcy

21   Code; does it not?

22   A    Yes.

23   Q    And that process includes a review of the debtor's

24   assets to be sold, correct?

25   A    Yes.

1  Q     And that process includes the setup of a data room for

2  prospective buyers to engage in due diligence, correct?

3  A     Correct.

4  Q     That process -- when you have a data room, that process

5  includes the execution of non-disclosure agreements by any

6  prospective bidders that want to see those critically

7  important due diligence documents for the debtors in the

8  sale, correct?

9  A     Correct.

10  Q     And in this case, you actually had bidders execute

11  NDAs, right?

12  A     Yes.

13  Q     And you do that because you want to make sure as the

14  investment bankers for a particular case that no essential or

15  confidential information, proprietary information to the

16  Debtors is leaked or otherwise exposed to the marketplace, to

17  other competitors, et cetera?

18  A     Sure.

19  Q     Do you know whether Rembrandt's technology was

20  contained in the California servers, that is, computer

21  servers of Stream TV?

22  A     Have no idea.  These are mystery servers that no one

23  seems to have.

24  Q     Okay.  Do you know whether Rembrandt's technology was

25  contained in the SeeCubic BV servers that were maintained in

1   Netherlands?

2   A     We specifically asked.  And on a management call with

3   one of the parties that signed an NDA, the SeeCubic BV

4   engineers specifically denied they had any Rembrandt

5   technology on their servers.

6   Q     Did you know that the license agreement from Rembrandt

7   to Stream included not only Rembrandt's patents but also its

8   trade secrets?

9   A     I had seen that settlement agreement as well as the

10  other one which never went into effect.

11  Q     I'm asking a different question.  Did you know, as a

12  matter of fact, in the matter of your inquiry that you just

13  testified to about the investigation of assets, whether

14  Rembrandt's technology, specifically its patents and its

15  trade secrets, were incorporated in the license from

16  Rembrandt?

17  A     I read the settlement agreement, and I just don't know

18  whether there is any Rembrandt technology.

19  Q     You're not aware of Rembrandt technology?

20  A     No.

21  Q     What did you do to investigate the assets that were

22  being sold by SSG in connection with the Stream TV --

23  A     Sure.

24  Q     -- 363 sale?

25  A     The assets were primarily whatever hard assets exist at

1  the Stream TV level as well as the equity interest that

2  Technoveda had in a series of non-Debtor subsidiaries,

3  including SeeCubic, NV, in The Netherlands.

4  Q    As part of the process in any March sale, SSG takes

5  part in the development of an asset purchase agreement; is

6  that correct?

7  A    Not often, but sometimes.

8  Q    You're aware of what's on the asset purchase agreement?

9  A    Yes.

10  Q    You are aware of what was on the asset purchase

11  agreement in this sale of Stream TV asset?

12  A    Yes, I was.

13  Q    Did that include IP assets?

14  A    It included IP assets, but it specifically excluded any

15  IP or trade secrets of Rembrandt, specifically.

16  Q    How would you know what that means if you didn't know

17  what Rembrandt's IP was?

18  A    Well, I'm not sure Rembrandt has any IP that Stream had

19  and certainly, SeeCubic NV, but the asset purchase agreement

20  was quite specific, as it often is.  It either assumes

21  intellectual property that the debtor has or it excludes it.

22  In this particular case, it was quite clear that it was

23  excluded from the purchase.

24  Q    Well, that's not correct, is it?  Because intellectual

25  property was included, expressly included.  Stream's

```
 1   intellectual property was expressly included as an asset on

 2   the list of assets to be assigned in the asset purchase

 3   agreement.

 4   A     Stream's, but not Rembrandt's.

 5   Q     Point taken.  But how do you know that Stream's

 6   intellectual property was transferred in connection with this

 7   sale without Rembrandt's property in it?

 8   A     It's not my job to know.  It's counsel's job.  My job

 9   is to represent the Trustee, follow the Court's directive,

10   report to the Court, if necessary, and our job was to sell

11   assets.  It's your job as counsel to either VSI or Rembrandt

12   to determine if improper assets were being sold, and you

13   raised multiple objections over multiple hearings, each of

14   which was denied.

15   Q     But you said that's counsel's role.  That's not your

16   role.

17   A     It's not our role.

18   Q     Okay.  Is it your role --

19   A     Most of our cases involve the sale or transfer of

20   intellectual property or licenses.

21   Q     I was going to ask you that question, but I thank you

22   for volunteering it --

23   A     Yeah.

24   Q     -- Mr. Victor.

25   A     Most of them.
```

1    Q    And when you do that, when you actually transfer market

2    and sell intellectual property assets, what process do you

3    undertake, SSG undertake, to do that, I'll say, responsibly?

4    A    If it's an asset of the estate that we're selling, we

5    sell it.  If it's not an asset for the estate, it can't be

6    sold, and someone, be it IP counsel, Debtor's counsel, and

7    objector's counsel will object to it.

8    Q    You spoke about IP counsel.  Was there IP counsel in

9    this case?

10   A    SSG certainly didn't have one.  It wasn't our function.

11   Q    Okay.  Did you ever speak to SSG counsel, or I'm sorry,

12   did you or SSG ever speak to IP counsel in connection with

13   this case?

14   A    Yes.  The Trustee did have IP counsel.

15   Q    So you did speak to that counsel?

16   A    Yes.

17   Q    When did you speak to that counsel?

18   A    Several times over the course of this sale process.

19   Q    When's the first time you spoke to them?

20   A    Probably September.

21   Q    Okay.  When after that?

22   A    October, November.

23   Q    Okay.  So you --

24   A    But there were questions --

25            THE COURT:  Counsel, we can't have overtalking.

```
 1  So --

 2            THE WITNESS:  There were questions that came up

 3  about IP, and there was IP counsel involved.

 4  By MR. THOMPSON:

 5  Q    Okay.  Is it your understanding that IP counsel was of

 6  the view and provided an opinion with respect to the assets

 7  that were sold?

 8  A    I don't recall what IP's opinion -- what IP counsel's

 9  opinion was.

10  Q    Have you ever seen a written opinion by IP counsel?

11  A    I have not.

12  Q    Have you asked the Trustee whether a written opinion

13  was provided by IP counsel?

14  A    I don't remember.

15  Q    You don't remember whether you asked?

16  A    I don't remember if I even asked.  I certainly haven't

17  seen one, but I don't even remember if I asked if there was a

18  written opinion.

19  Q    Do you typically request an IP counsel's written

20  opinion or opinion of any sort?

21  A    Never.

22  Q    You never do?

23  A    Not once.

24  Q    So have you ever had a challenge as to whether you are

25  selling -- whether SSG is engaged in selling intellectual
```

1   property assets that may not be assets of the estate?

2   A    Certainly not in this context, no.  There have been

3   many occasions where there's a licensor or alleged owner of

4   intellectual property that will engage in negotiations with

5   the debtor or the buyer or both about the transfer of the

6   license or the IP.  Never involves SSG.

7   Q    It never involves SSG?

8   A    Ever.

9   Q    Does it involve SSG -- strike that.  Is that because

10  the involvement with counsel, that is debtor's counsel,

11  happens before the retention of SSG -- for the negotiations

12  that you referred to?

13  A    Not at all.  Sometimes it happens during the course of

14  the sale process.  Most often it does.  Certainly not before

15  we get engaged, sometimes it does.  But it's very common for

16  counsel for a buyer, counsel for a licensor, counsel for an

17  IP holder, and counsel for the debtor to negotiate what's

18  being transferred.  Happens every day.

19  Q    Okay.  But in that circumstance, you would take the

20  representation from IP counsel as definitive as to what as to

21  the assets that you were selling on behalf of the estate; is

22  that right?

23  A    In every case for the past 42, I've never seen anything

24  like this, where we're being sued for selling assets that the

25  Court approved, that we were directed by the Chapter 11

1  Trustee.  So this is certainly a first.

2  Q    Okay.

3        MR. THOMPSON:  Your Honor, I have no further

4  questions, but I believe Mr. Michaels does.

5        THE COURT:  Okay.  Great.

6  CROSS EXAMINATION

7  BY MR. MICHAELS:

8  Q    Good morning.

9  A    Good morning.

10  Q    I'll try not to go over the same ground you just

11  covered with Mr. Thompson.

12  A    That would be good.

13  Q    But you mentioned that you participated in, I believe

14  you said, hundreds of sales?

15  A    Hundreds, yes.

16  Q    What percentage of those sales included intellectual

17  property?

18  A    I'd say most of them.

19  Q    Most of them.  How many times did you conduct a sale

20  where an owner of intellectual property provided you notice

21  that continuing with that offer to sell and sale would be an

22  infringement of their intellectual property?

23  A    You are the very first.  Congratulations.

24  Q    I appreciate it, and this is not a distinction that

25  Rembrandt was looking to have.

1    A      Well, it does.

2    Q      But in this context, you mentioned -- let me back up a

3    second.  In your cross-examination, you mentioned that there

4    was another agreement.  You're aware of the -- you said you

5    were aware of the Rembrandt/Stream settlement agreement and

6    then the other agreement.

7    A      Yes.

8    Q      What was the other agreement you're referring to?

9    A      I believe the original settlement agreement that

10   resulted from Rembrandt's litigation against Stream in the

11   District Court of New York was settled in 2021.  Of course,

12   Stream never abided by any of it, never paid any of the

13   monies.

14        Rembrandt never declared default, but yet there was

15   another settlement, an amended settlement, I believe, in '23,

16   after Stream's bankruptcy, that was never submitted to the

17   Court, so it was never binding.  But there was a second one

18   that I read.

19   Q      If it wasn't submitted to the Court, how did you become

20   aware of it?

21   A      It was part of the record in multiple litigations that

22   you have instituted.

23   Q      Right.  So when you say it was part of the record, I

24   think what you're referring to is that VSI included it as

25   part of its disclosure statement in the process of submitting

1  for a reorganization plan, i.e., it submitted it to the

2  Court?

3  A     I don't think so.  No.  I don't think so at all.

4  Q     You're saying that as far as you know --

5  A     It was somewhere, long before the disclosure statement.

6  I don't know when it was ever filed in this case because

7  there was never funding for the plan.  So it was illusory.

8  Q     So which are you saying is illusory, the amendment or

9  the original settlement agreement?

10  A     Well, I think the original settlement agreement and the

11  amendment were illusory, but Stream's potential for a plan of

12  reorganization was illusory because they had no funds.

13  Q     So when you say that the original settlement agreement

14  that you referred to in 2021, are you aware that that was

15  based on a term sheet negotiated before a federal magistrate

16  judge?

17  A     Yes, I read that.  I read that in your pleadings, yes.

18  Q     So are you suggesting that Magistrate Parker

19  participated in some collusive or illusory conduct?

20  A     Not at all.

21  Q     How about Shadron Stastney, who initialed and executed

22  every page of those terms in 2019, was he participating in

23  collusive conduct?

24  A     Not to my knowledge.

25  Q     Are you aware of any difference between the terms

1  negotiated before Magistrate Parker with Shadron Stastney and

2  the 2021 settlement agreement that was eventually signed by

3  Mathu Rajan?

4  A    I did not study him close enough.  And if I did, I

5  certainly don't remember them now, so I don't know how close

6  they were to the actual settlement agreement that was

7  executed in '21.

8  Q    Rembrandt has submitted on multiple occasions that they

9  were financially substantially identical and that the

10  agreement negotiated with Shadron Stastney before a federal

11  magistrate judge --

12  A    But yet Stream never -- but yet Stream never --

13           THE COURT:  Mr. Victor, let Mr. Michael ask his

14  question first, please?

15           THE WITNESS:  Yes.

16  By MR. MICHAELS:

17  Q    So and what basis are you suggesting that Magistrate

18  Parker, DLA Piper, Rembrandt, Shadron Stastney were illusory,

19  in some collusive illusory negotiation?  What is your basis

20  for such a statement?

21  A    Well, I never said illusory.  I never said it was

22  fraudulent in any way, but there were payments to be made by

23  Stream to Rembrandt under the 2021 settlement agreement that

24  were never made.

25           There were hundreds of TV monitors of different types

 1  that were to be manufactured by Stream that were to be given

 2  by Rembrandt, which Rembrandt valued at literally hundreds of

 3  millions of dollars.  That was illusory because Stream had

 4  zero possibility of producing those machines.  They had no

 5  funds.

 6  Q      Have you ever seen an UltraD TV produced by Stream?

 7  A      No.

 8  Q      You've never looked at one of the Streams?  Are you

 9  aware that they were in the marketplace and for sale to the

10  public?

11  A      No.  I believe that there were models and tests out

12  there, but I don't believe there was any commercialization at

13  all.

14  Q      Are you aware of the evidence that Rembrandt has

15  submitted where it purchased such a TV prior to bringing its

16  2016/2017 Southern District of New York complaint and

17  evaluated in full?

18  A      No.  I don't recall.

19  Q      So to take it you've not read that complaint in the

20  Southern District Of New York as a result of --

21  A      Oh, I did.  Yes.

22  Q      Well, that included a reference to having purchased in

23  the marketplace that TV so that it was on sale.  Are you --

24  A      Well, I know that Stream currently has a model because

25  when Continental Advisors signed an NDA and got access to the

1   data room, they told me they had seen a demonstration by Mr.

2   Rajan and Stream.  So he apparently still has one.

3   Q     So as part of that settlement process, Stream provided

4   Rembrandt three display -- in addition to the one that you

5   previously purchased, three displays for evaluation by our

6   technical team.  When you say they were capable of producing

7   a TV, where did those TVs come from?

8   A     I don't know.  I assume they were made by third parties

9   because there's no manufacturing.  There were no employees.

10  There was nothing at Stream.

11  Q     I have an iPhone.  Did Apple build the iPhone?

12  A     Someone in Asia built that iPhone for Apple.  Yes.

13  Q     It's an Apple iPhone.

14  A     Correct.

15  Q     The Stream --

16  A     They have the license.

17  Q     In all descriptions of this technology, are you aware

18  that the base LCD TV is built by any of a number of LCD

19  manufacturers?  There's a lens package and then a bunch of

20  software and assembled similar to an Apple assembles its

21  iPhone under its design and direction?

22  A     If you say so, yes.

23  Q     Okay.  So it's not that you're denying that there are

24  TVs in the world branded as Stream TV, all UltraD TVs.

25  You're just saying that it wasn't physically built within the

1  corporation here in Pennsylvania.  It was built by some Asian

2  manufacturer who assembled it under contract with Stream.

3  A     There were test models.  Again, never commercialized.

4  Q     How does the test model differentiate -- how is that

5  differentiated from a TV for sale in commerce?

6  A     Easy.  One's a test, one's developing the technology,

7  transferring 2D technology to 3D technology, and one is

8  actually commercializing it with a plant probably in Asia for

9  mass scale production.  Completely different things.

10 Q     Completely different things.  And the end result of

11 this, can you take a TV that is built by what you're saying

12 is a test model and a TV that's built by mass production and

13 tell the difference?

14 A     I'm not an engineer, but probably yes.

15 Q     How would one go about differentiating a test model

16 from a production model?  What would be different?

17 A     Well, a test model for anything is a test to see if the

18 technology works, to work out kinks in the technology, be it

19 software, algorithms, the lens, many different things.

20 That's just not commercialization.

21 Q     So what size -- what number of TVs would have to be

22 produced where it could be something other than a test model?

23 A     Thousands at least.

24 Q     You do know that Stream produced upwards of 5,000 TVs.

25 So by your own definition --

1    A     Where are they?

2    Q     They've been sold into the marketplace.

3    A     I mean, we were under contract and we were negotiating

4    with somebody to buy 500 that have been sold to a

5    distributor, right?  I mean, these are out there.  They were

6    sold to commercial entities who were distributing as of, you

7    know, Best Buy.  Now, these are TVs that are sold in the

8    high-end markets.  But the --

9            MR. KURTZMAN:  Your Honor, is this a question?

10           THE COURT:  I'm waiting.

11   By MR. THOMPSON:

12   Q     So I'm trying to ascertain that currently Mr. Victor

13   has operated -- you've operated under a belief that Stream

14   did not produce in a commercial way.  Yet by your own

15   definition, you would agree that 5,000 -- would you agree

16   that 5,000 TVs plus would be commercial production?

17   A     No, that's not why I'm here.  Why I'm here is to -- and

18   why I was here -- was to market the assets for sale, which is

19   what we did.

20   Q     So you said you were aware of Rembrandt license

21   agreement and that you were aware of the term sheet

22   negotiated before Magistrate Judge Parker?

23   A     Yes.

24   Q     To your knowledge, did that term sheet, did that

25   license agreement include a license to Rembrandt's trade

1    secrets and Rembrandt's patents?

2    A    The patents?  Yes.  Trade secrets?  I just don't

3    remember.

4    Q    So you were aware that at the time, the parties

5    negotiated to obtain a license -- for Stream to obtain a

6    license to Rembrandt's patent.  Do you remember approximately

7    how much value Stream offered in that negotiation?

8    A    In the 2021 settlement agreement, I think Stream was to

9    pay Rembrandt $2.5 billion dollars, another cash payment

10   sometime later, and to produce literally thousands of -- two

11   different types of screens for Rembrandt.

12   Q    You say thousands.  If I told you that that amount was

13   3 million, would you consider that to be off?

14   A    That's a lot.

15   Q    And in those documents, do you recall that Shadron

16   Stastney had represented during those negotiations that the

17   average margin on the at cost TVs was $400?

18   A    I have seen that in pleadings, yes.

19   Q    So you sell businesses for a living, $400 times 3

20   million TVs, is my math correct that it's $1.2 billion worth

21   of value?

22           MR. KURTZMAN:  Judge, we're now substantially

23   beyond the scope of direct, and counsel is arguing with the

24   witness instead of asking him questions?

25           THE COURT:  I'll allow the question.

1    THE WITNESS:  It's a lot, but I believe it's

2    completely illusory.  But sure.

3    By MR. MICHAELS:

4    Q    You're suggesting that Shadron Stastney gave an

5    illusory number of $400 when he tried to encourage --

6    A    No.  What's illusory was Stream's ability to produce

7    those televisions.

8    Q    Are you aware that that settlement agreement gave

9    Rembrandt a license back -- granted Rembrandt a license to be

10   able to manufacture its own TVs so long as it obtained a

11   license from Phillips?

12   A    I don't recall.

13   Q    Okay.  So even if you don't recall, even though we've

14   put you on notice of these things and you say it's the only

15   time you've ever received such a notice, you're saying you

16   don't remember that Rembrandt has stated it has these rights,

17   that it licensed these rights that are not allowed to be

18   transferred.  Do you remember that we told you that before

19   you conducted the sale?

20   A    Oh, yes.  You threatened me several times.

21   Q    Did you seek your own counsel from independent patent

22   counsel not representing the Trustee before you proceeded

23   with this offer to sell and sale?

24   A    Absolutely not.

25   Q    Are you aware of any form of intent requirement with

1    respect to the infringement of a patent?

2    A    No.  First time I've ever been accused of infringing a

3    patent.

4    Q    So if an engineer at Apple invent something on their

5    own and sells it and it turns out Samsung has a patent that

6    covers that, does the fact that they did so innocently have

7    any impact on their patent infringement?

8                  MR. KURTZMAN:  Objection.  Calls for legal

9    conclusion, Your Honor.

10                  THE COURT:  Sustained.

11                  MR. MICHAELS:  I'll withdraw.

12   By MR. MICHAELS:

13   Q    What steps did you personally take to ensure that the

14   assets that were excluded from the sale by the judge in the

15   order were not included in the sale?

16   A    We reviewed carefully the language of the asset

17   purchase agreement and were satisfied, based upon the

18   statements made by the buyer, what was written in the asset

19   purchase agreement, and what was stated in open court at the

20   sale hearing, that the buyer was not acquiring any of

21   Rembrandt's technology, and that technology was specifically

22   excluded from the sale.

23   Q    So we all agree that it was excluded from the sale.

24   What I asked you is what step or steps did you take to make

25   sure that the assets that were protected by a restraining

1   order, that were excluded from the sale by Judge Chan were

2   actually not included in the assets that were being

3   transferred to SeeCubic?

4   A      Not my job.

5   Q      Not your job.  So the answer is none.

6   A      None.

7   Q      Right.

8   A      And we made sure the we made sure the asset purchase

9   agreement excluded any asset that contained Rembrandt

10  technology and statements from counsel on the record at the

11  sale hearing on December 4th.  That was sufficient.  I cannot

12  go into a server which I never saw or even knew existed and

13  determine if there was any source code from anyone other than

14  Stream.

15  Q    So you said you were familiar with that list of assets

16  that were sold, right?

17  A      Yeah.

18  Q     Are you familiar with the fact that it included in the

19  list of assets source code on a server at SeeCubic BV?

20  A      Yes.  And the SeeCubic BV engineers specifically stated

21  time and time again that there was no Rembrandt technology or

22  source codes in their servers.

23  Q     Which engineer was that?

24  A     Patrick Toon was the lead engineer, and there were

25  several others I couldn't even pronounce on the phone.

1  Q      Is Dr. Barenbrug one of those?

2  A      Say again?  I

3  Q      Is Dr. Barenbrug one of the engineers that represented

4  to you?

5  A      I don't recall.  I dealt primarily with Patrick Toon.

6  Q      In the list of assets that we were asked to mark up, do

7  you recall that Rembrandt specifically pointed to 175 trade

8  secrets that it had documentation for that were disclosed to

9  at least Dr. Barenbrug?

10  A      Well, certainly, you had -- based upon Judge Chan's

11  order from the bid procedures hearing, you requested and VSI

12  requested the opportunity to comment on a list of assets that

13  we would post in the data room, and you did, both of you,

14  where you made all sorts of allegations and certainly chilled

15  bidding for anybody who may have been interested.

16  Q      That's interesting.  So you say a chilled bidding.

17  A      Well, you certainly threatened everyone.

18  Q      Right.  So what you're saying is the companies in the

19  marketplace would not touch this with a ten-foot pole given

20  the allegations of IP infringement that were involved, yet

21  you felt it appropriate for you to go -- and SSG to go

22  forward with the sale despite industry experts and companies

23  saying, I'm not touching this.

24  A      Well, actually, I would say something different.  I

25  would say that no one was touching this asset because of the

1  years of acrimonious litigation between Rembrandt, Stream and

2  the Hawk parties.  That's why no one would touch it.

3  Q    At what point did you decide not to take Rembrandt up

4  on its offer to go in and say, look, just take it out, right?

5  We will facilitate the process just like this provided in the

6  Phillips license, that when the license ends, we're going to

7  have a quick audit, engineer-to-engineer audit, process and

8  remove our technology.

9  A    Because the Court rejected your request multiple times

10  to do just that.

11  Q    The Court demanded that -- you say she rejected it, but

12  you do agree the sell order said it excluded all of

13  Rembrandt's assets.

14  A    Yes.

15  Q    Okay.

16  A    And so is the APA.

17  Q    Well, I'm asking you why you did not follow an industry

18  standard practice of going through an end-of-license audit to

19  make sure the technology has been removed, just like it's

20  provided in the Phillips (inaudible).

21  A    Really?  Is that -- are you stating that that is an

22  investment banking industry standard?  And I can tell you

23  it's not.

24  Q    We're talking about intellectual property.

25  A    No.  We're talking about investment banking.  We're

1  talking about my role as an investment banker.

2  Q     Yes --

3  A     My role as an investment banker is not to listen to

4  you.  You're not the client.  My job as the Trustee's

5  investment banker or the Debtor's investment banker is to go

6  at the direction of my client and the Court, period.

7  Q     If there was a bag of money with Bank of America

8  sitting on it and your Trustee said, hey, please go pick up

9  that bag of money and bring it back to me.  Or more better

10  yet, deliver it over to SeeCubic.  Do you believe that's a

11  reasonable action and the normal action of an investment

12  banker?

13              MR. KURTZMAN:  Objection, Your Honor.

14              THE COURT:  What's the basis of the objection?

15              MR. KURTZMAN:  Hypothetical.  It has no relevance

16  to the subject matter or the questioning.

17              THE COURT:  Do you have a response?

18              MR. MICHAELS:  I think it's highly relevant in

19  that we are -- the simplistic hypothetical that I'm giving is

20  an exact corollary to our situation.  We have pointed

21  exactly -- list off a 75 trade secrets, name, rank, and seal.

22  We identified the documents where those trade secrets were

23  included and who they were transferred to and said, we want a

24  process to take it out.  And I'm asking the witness, why

25  didn't he take -- why -- what steps did he take to take out

1    those trade secrets listed in that documentation?

2            THE COURT:  And I think he testified that that's

3    not within the purview of an investment banker to do it.

4            MR. MICHAELS:  Which is what led to the question

5    of would he have the same answer if it was as much more

6    simple example of a bag of money sitting there with Bank of

7    America.  In this case, there's -- the bag of money is

8    Rembrandt's trade secrets documented through emails back and

9    forth with the engineer who --

10           THE COURT:  Well, I think the question that you

11   asked was, how would he think differently if there was a bag

12   of money that said Bank of America on it and the Trustee told

13   him to go pick it up?  If you're trying to sort of liken the

14   question, I think the question would be, what would you do if

15   there was a bag of money that said Bank of America on it and

16   the Trustee said sell that?  You can ask them that question,

17   but that's not the same question.

18   By MR. THOMPSON:

19   Q    Well, I'll ask you exactly the question.  Do I need to

20   restate the question, or can we go with what the judge's

21   exact language?

22   A    If the Trustee and the Court determined that that bag

23   of money that said Bank of America on it belonged to the

24   estate, it would be an asset that's for sale that the Court

25   would subsequently approve.

37

1    Q      Did the Court ever make the determination that the

2    trade secrets and patents listed by Rembrandt belong to the

3    estate?

4    A      No.  No court ever has.

5    Q      Okay.  So to go back to the question the judge

6    articulated, no judge has said that that bag of money

7    belonged to the estate, but the Trustee is telling you to go

8    sell it.

9    A      Actually, quite the contrary.  Judge Chan in court on

10   December 4th and in her subsequent written opinion said the

11   assets being sold are the assets, and Rembrandt has the right

12   to pursue the buyer.  Have at it.

13   Q      Well, I agree that we have the right to pursue those

14   claims, and, hence, we have told in no uncertain terms, we

15   all agree the assets were excluded.  We put SSG on notice,

16   and yet you can --

17   A      You say the assets were excluded.  Judge Chan didn't

18   rule the assets were excluded.  Whatever assets there were,

19   they were sold.  To the extent you have trade secrets or

20   hidden source codes or whatever, you have the right to pursue

21   the buyer, just like in any other case involving licenses and

22   patents and intellectual property.

23   Q      So, Mr. Victor, you said they aren't excluded.  Are you

24   suggesting --

25   A      The Rembrandt intellectual property was specifically

738

1  excluded in the APA and the order.

2  Q     Yes.  Absolutely.  And we are alleging that the assets

3  sold included that anyway.

4  A     That's why you have litigation.

5  Q     Okay.  Exactly.  And so moving on, is your motion for

6  SSG, if you're seeking indemnification for SSG, does that

7  include the cost of defense for the five individuals

8  involved?

9  A     Absolutely, yes.

10  Q     Are those individuals independently represented from

11  SSG?

12  A     They are not.

13  Q     Are you aware, as speaking as SSG, that the individual

14  employees and SSG, but let's talk about the -- referencing

15  the five individuals, that they stand accused of assisting in

16  the transfer of trade secrets over Rembrandt's objection, and

17  that is a ten year felony under 18 USC 1832?

18  A     Is there a question in there?

19  Q     Are you aware that that potentially has criminal

20  liability for all --

21  A     So you've threatened me.

22  Q     So what I'm asking is, if any of those individuals --

23  do you understand that if any of those individuals take the

24  fifth, that in a civil context, it could have potential

25  liability for SSG?

 1          MR. KURTZMAN:  Objection.  Calls for a legal

 2   conclusion, Your Honor.

 3          THE COURT:  Sustained.

 4   By MR. THOMPSON:

 5   Q    If any of those individuals provide a testimony that

 6   would be adversary to SSG, would SSG cease covering their

 7   legal expenses?

 8   A    No.

 9   Q    Have you received any budget with respect to the cost

10   of providing a defense to the allegations of Rembrandt?

11   A    No.

12   Q    The scope of the indemnification you're seeking, do you

13   expect it to be $10,000, $10 million, where are we in what

14   you expect this to cost?

15   A    I really have no idea.

16   Q    Do you believe that SeeCubic, Inc. owes an

17   indemnification for these causes of action?

18   A    Under the terms of the asset purchase agreement and

19   order, they do.  They owe it to the Trustee and the estate,

20   yes.

21   Q    And so have you sought reimbursement from SeeCubic?

22   A    The Trustee has written an indemnification demand

23   letter to SeeCubic, yes.

24   Q    To your knowledge, has that been paid?

25   A    I don't think anything's been presented to SeeCubic

40

 1  yet.

 2  Q    All right.  How do you reconcile that with your answer

 3  to the previous question?

 4  A    Oh, easy.  The Chapter 11 Trustee, Mr. Homony, wrote a

 5  letter to SeeCubic, saying that we've been sued, and he is

 6  therefore requesting indemnification pursuant to the terms of

 7  the asset purchase agreement in the order.

 8  Q    And you're saying that is it your understanding they

 9  have not responded?  Is that what you -- is that how you

10  answered the second --

11  A    No.  I don't think any bill has been sent to them.

12  Q    Oh, you're saying the demand for indemnification was

13  provided, but it did not include a specific request for

14  payment.

15  A    Correct.

16  Q    I apologize for misunderstanding.  So if this

17  indemnification request is met, you're expecting that the

18  legal cost of the five individuals that are employed by SSG

19  and SSG will be covered by the estate?

20  A    Yes.  That's what our engagement agreement provides,

21  the retention application and the retention order.

22  Q    Do you understand that that indemnification would

23  include coverage for criminal acts?

24  A    I haven't gotten a knock on the door from the

25  District -- the Department of Justice yet, so I'm not worried

1  about it.

2  Q    Would it include coverage for willful and grossly

3  negligent acts?

4  A    It would depend.  If there was a final decree by a

5  court of competent jurisdiction, not subject to further

6  appeal, that would be an exemption from the indemnification.

7  Q    So if Rembrandt prevailed to -- the Court's final

8  jurisdiction -- in a willful infringement claim, a claim of

9  misappropriation of trade secrets and was successful, you're

10 saying that that conduct would not be covered by a claim

11 of -- your indemnification provision?

12 A    Again, legal conclusion, which I can't speak about, but

13 the indemnification provision in the order provides that

14 absent a final decree, not subject to further appeal by a

15 court of competent jurisdiction, that SSG was engaged in

16 gross negligence, willful misconduct, fraud, whatever, that

17 would be a prohibition to indemnification after the fact.

18 But in the meantime, defense costs are paid.

19 Q    So you agree that under some circumstance, it could

20 be -- you might be have to pay all that money back.

21 A    Yes, sir.  We'll see.

22 Q    Do you have the financial wherewithal within SSG to

23 cover 10, $15 million with the legal expenses and pay it

24 back?

25 A    I believe we do.

1   Q     Okay.  Let me just check my notes.  Looking good.

2   Thank you very much.

3              THE COURT:  Mr. Kurtzman, before you ask

4   questions, Mr. Victor, I have two lines of questioning.  The

5   first is, has the Trustee submitted any opposition to SSG's

6   request for indemnification?

7              THE WITNESS:  No.  The Trustee supports it, Your

8   Honor.

9              THE COURT:  And has SSG submitted their final fee

10  application?

11             THE WITNESS:  Not yet.  Pending this.

12             THE COURT:  Thank you.  That's all I had.

13             MR. KURTZMAN:  Very briefly, Your Honor.

14  REDIRECT EXAMINATION

15  By MR. KURTZMAN:

16  Q     Mr. Victor, counsel asked you whether SSG analyzed the

17  Rembrandt intellectual property interest in connection with

18  its engagement as the Trustee's investment banker, correct?

19  A     Yes.

20  Q     Did SSG enter into an engagement agreement with the

21  Trustee with respect to the investment banking engagement?

22  A     Yes.

23  Q     Did the engagement agreement set forth any affirmative

24  duties by which SSG is required to analyze specific

25  intellectual property rights as they related to either

1  Rembrandt, VSI, or any other part?

2  A     Of course not.  It never would.

3  Q     Were counsel's arguments regarding Rembrandt's

4  intellectual property rights raised before Judge Chan at any

5  prior proceedings?

6  A     Multiple proceedings.

7  Q     What happened?

8  A     Always rejected by Judge Chan.

9  Q     Thank you.

10          MR. KURTZMAN:  Thank you.  Nothing further, Your

11  Honor.

12          THE COURT:  Recross?

13          MR. THOMPSON:  Yes.

14  RECROSS EXAMINATION

15  By MR. THOMPSON:

16  Q     Mr. Victor, you just responded to questions from your

17  counsel with respect, or I'm sorry, from the Court with

18  respect to the Trustee's, Chapter 11 Trustee's, objections,

19  if any, and you said there were none.

20  A     Um-hum.

21  Q     Was there an objection by the U.S. Trustee to this

22  request for indemnification?

23  A     I haven't seen one.

24  Q     Okay.  Was there any informal objection?

25  A     Not to my knowledge.

1    Q       Any inquiry from the U.S. Trustee's Office?

2    A       Nothing to my knowledge.

3    Q       Are you aware of Capstone's original retention or

4    attempted retention in this case?

5    A       I am.

6    Q       Have you reviewed the documents associated with that?

7    A       I have not.

8    Q       What's your understanding of why Capstone was not

9    retained?

10   A       My understanding is that Capstone would not -- would

11   only take on the assignment for the Trustee if there was a

12   limitation of liability, and our engagements do not have a

13   limitation of liability in chapter proceedings.

14   Q       Okay.  Was there a question about specifically, gross

15   negligence and willful misconduct in connection with their

16   retention?

17   A       With respect to whose, Capstone's?

18   Q       With Capstone's knowledge.

19   A       No, I think it was just a general limitation of

20   liability, which is common language in an investment banking

21   engagement agreement that have a limitation of liability.

22   Our non-bankruptcy cases always have one.  But many, many,

23   many, many years ago, the U.S. Trustee objected to limitation

24   of liability, and we never submit limitations of liability in

25   chapter proceedings.

1  Q    Are you aware that the U.S. Trustee at that time

2  expressed a concern specifically about gross negligence and

3  willful misconduct with respect to the limitation of

4  liability in that engagement agreement?

5  A    Not at all, no.

6  Q    You're not aware?

7  A    No.

8            MR. THOMPSON:  Thank you, Your Honor.

9            THE COURT:  Anything further, Mr. Michaels?

10           MR. MICHAELS:  No.  Thank you.  I'm good.

11           THE COURT:  Okay.  Thank you very much, Mr.

12  Victor.

13           THE WITNESS:  Thank you, Your Honor.

14           THE COURT:  Mr. Kurtzman, do you have further

15  witnesses?

16           MR. KURTZMAN:  No further witnesses, Your Honor.

17  I don't know if this is the appropriate time to offer a brief

18  argument, but I'm prepared to do so if the Court would

19  permit.

20           THE COURT:  Well, before I take argument, do you

21  have -- you want to move your exhibits in?

22           MR. KURTZMAN:  I do, Your Honor.  I would move the

23  admission of all of the exhibits in the binder, which

24  consists of Exhibits S-1 through S-10.

25           THE COURT:  And those are the exhibits that were

1  identified on your exhibit list at Docket No. 994?

2          MR. SWICK:  That is correct, Your Honor.

3          THE COURT:  Okay.  Is there any objection to the

4  Court receiving the exhibits that were identified on the

5  Exhibit list, 994?

6          MR. THOMPSON:  No objection, Your Honor.

7          MR. MICHAELS:  On behalf of Rembrandt, we move

8  similarly for our exhibits to be entered.

9          THE COURT:  I'm going to get to you in a minute.

10          MR. MICHAELS:  Okay.

11          THE COURT:  Do you have any objection to the SSG

12  exhibits?

13          MR. MICHAELS:  I'm sorry, Your Honor.  I answered

14  no.  I do not.

15          THE COURT:  Okay.  All right.  Thank you, Mr.

16  Kurtzman.

17          (Exhibits S1-S10 entered into evidence.)

18          THE COURT:  I'll hear if they have witnesses.

19          MR. MICHAELS:  Rembrandt does not have any

20  witnesses.

21          THE COURT:  Okay.

22          MR. THOMPSON:  VSI has no witnesses, Your Honor.

23          THE COURT:  Okay.  At that point, would you like

24  to move in your exhibits?

25          MR. THOMPSON:  Yes, please.

 1           THE COURT:  And those are the exhibits that were

 2    on your docket or your exhibit list, 999; is that correct?

 3           MR. THOMPSON:  Yes, Your Honor.

 4           THE COURT:  Okay.  Do you have any objection to

 5    the Court receiving the exhibits that were identified on

 6    exhibit list, 999.

 7           MR. KURTZMAN:  No.

 8           THE COURT:  All right.  The Court will receive all

 9    of the exhibits that were on the two exhibit lists.  And at

10    this point, I'll turn it over to Mr. Kurtzman for closing

11    arguments.

12           MR. KURTZMAN:  Thank you again, Your Honor.  I'd

13    like to start by congratulating you on taking the bench and

14    by offering my condolences on having inherited this case.

15           In connection with the Trustee's retention of SSG

16    as its investment banker, SSG bargained for and received the

17    right to seek indemnification from the Debtor's estates if it

18    was sued for matters within the scope of its engagement.

19           SSG along with five of its employees has, in fact,

20    been sued in a patent infringement case pending in the

21    district court.  Consistent with the U.S. Trustee guidelines,

22    SSG has a right to indemnification except in a very limited

23    circumstances in which it acted recklessly with gross

24    negligence or engaged in willful misconduct.  None of those

25    limiting factors is present here.

1          These cases present a record which is difficult to

2     fully absorb, but we're confident that Your Honor has

3     familiarized himself with the relevant history.  The Trustee

4     was appointed by Judge Coleman based on a variety of bad

5     acts, including self-dealing by the Debtor's prior

6     management.

7          Under the Trustee stewardship, the cases moved

8     forward for the first time toward a process by which the

9     Debtor's assets could be monetized for the benefit of

10    creditors.  The Trustee reached out to SSG to assist in that

11    process, understanding that SSG had substantial experience in

12    the marketing and sale of assets under Section 363.  This was

13    not SSG's first rodeo.

14         It did hear what it's done in hundreds of other

15    bankruptcy engagements, which was to confer with its client,

16    evaluate the assets to be sold, prepare a teaser and

17    marketing materials, identify prospective buyers, and engage

18    in outreach to buyer prospects.  It acted on the specific

19    instructions of its client and under the direct supervision

20    of this Court.

21         It was not a rogue actor making and executing

22    decisions in a vacuum.  SSG's activities in these cases and

23    those of the five employees who have been sued personally

24    were capable and effective as evidenced by the fact that the

25    sale process has resulted in substantial cash proceeds for

1  the estate.

2         By any objective measure and certainly in

3  comparison to the trajectory of the cases under the Debtor's

4  prior management, the sale process was a success.  Judge Chan

5  recognized that fact in approving the sale and in her

6  detailed memorandum opinion and we suspect that having

7  reviewed the record, you recognize it, as well.

8         The basis of the objection, as I understand it, is

9  that SSG and its employees were warned by VSI and/or

10  Rembrandt that assets could not be sold to a third-party

11  buyer because doing so would violate certain proprietary

12  rights or interests held by those parties.

13         They claim that in not acquiescing to threats, SSG

14  was grossly negligent.  But that's not how this process

15  works, Judge.  We operate in an adversary system in which

16  movants and respondents seek specific relief, are afforded

17  the opportunity to lodge objections, hearings are conducted,

18  and judges decide.  And that's precisely what happened here.

19         The arguments against SSG's indemnification

20  rights, they are the same reheated, recycled arguments that

21  have been raised and rejected so many times now that they've

22  become rote.

23         It was not SSG's role, as Mr. Victor testified,

24  nor the role of its employees to adjudicate VSI and

25  Rembrandt's intellectual property rights.  That role fell to

1  Chief Judge Chan who understood the issues raised and made

2  decisions accordingly, including that the successful bidder

3  would not be insulated from infringement claims,

4  notwithstanding the applicability of Section 363(f) and (m).

5          And all of that said, I want to make the record

6  clear that the Trustee and SSG heard the concerns of

7  Rembrandt very clearly and took appropriate steps to address

8  those concerns in all of the materials relating to the sale.

9          First, I would point the Court to Paragraphs 26

10  and 27 of the Trustee sale motion, which is Exhibit S-3 in

11  the binder.  Those paragraphs describe the Rembrandt

12  technology license and state explicitly that the Trustee does

13  not intend to sell or assign it.

14          Referring to the sale order, which is Exhibit S-5,

15  Paragraph 12 recites and I'll quote, "For the avoidance of

16  doubt, Rembrandt is not an enjoined party with respect to

17  claims it purports to have against the buyer related to

18  Rembrandt intellectual property alleged to be part of the

19  transferred assets."  That appears on Page 20 of the sale

20  order.

21          In the stalking horse APA, which is attached to

22  the sale order, the parties explicitly excluded, as Mr.

23  Victor testified, Rembrandt intellectual property in Sections

24  2.3(j) and (k) from assets being conveyed to the buyer.

25          On December 3rd, 2024, Mr. Victor filed a

1   declaration in support of the proposed sale in which he

2   confirmed that Rembrandt had, in fact, been afforded the

3   opportunity to provide information regarding the list of

4   assets being offered for sale and such information was

5   included, in fact, in the asset list filed with the Court.

6   That's in Paragraph 26 of Mr. Victor's declaration, which is

7   Exhibit S-8 in the binder.

8             So with all of that as background, I won't stand

9   here and argue that the positions adopted by VSI and

10  Rembrandt in opposition to the indemnification application

11  are mean-spirited and petty, although they are.

12            I'll note instead that they misperceive how the

13  bankruptcy process is supposed to work, which is that

14  professionals are expected to perform the services for which

15  they're engaged, notwithstanding threats, notwithstanding

16  intimidation, notwithstanding the institution of frivolous

17  litigation.

18            And those arguments, the objecting parties'

19  arguments, simply ignore everything in the record reflecting

20  that the positions being advanced today are stale, having

21  been addressed in pleadings in the APA and in hearings

22  conducted by Judge Chan.

23            So if we want the bankruptcy process to continue

24  to function, Your Honor, we should not reward the threateners

25  and punish the threatened.

1          Finally, we note that the objecting parties have

2     the burden to demonstrate that SSG acted in a way that was

3     mostly negligent or reckless, not our burden to disprove

4     them.  The definition of gross negligence is an extreme

5     departure from a standard of reasonable care.

6          The definition of willful misconduct is an act in

7     wanton disregard of one's duties.  There is not a shred of

8     evidence in the record as a whole or in today's proceedings

9     which even suggests that SSG acted improperly unless those

10    standards are somehow reformulated to provide that an estate

11    professional owes a duty to a disgruntled creditor whose

12    primary purpose is to chill a sale.

13         We respectfully submit that this Court should

14    overrule the joint objection and enter an order granting the

15    application.

16         THE COURT:  Thank you, Mr. Kurtzman.

17         MR. KURTZMAN:  Thank you, Your Honor.

18         MR. THOMPSON:  Your Honor, again, John Thompson of

19    Akerman, on behalf of VSI.  Your Honor, Let me open by saying

20    what this contested matter is expressly not about.  This is

21    not about whether SSG is entitled to indemnification under

22    the terms of the retention order and its retention agreement,

23    the order as issued by this Court.  That's not what this is

24    about.

25         We're perfectly fine to acknowledge that SSG, if

1   it falls within the ambit of the words in that

2   indemnification and the order, that they're entitled to

3   indemnification.

4           What we're talking about here is whether the

5   indemnification they seek is really an expansion of the scope

6   of that indemnification agreement and hence, an expansion of

7   the scope of the order issued by this Court, specifically

8   with regard to whether SSG's conduct constituted reckless,

9   misconduct, willful misconduct or gross negligence.

10          By its motion, SSG seeks to expand that scope, and

11  it shouldn't -- the Court should not permit it.  It shouldn't

12  permit it for at least three reasons.

13          The first is SSG went into this with eyes wide

14  open, knowingly.  I think it's been established on a cross-

15  examination, SSG was fully aware of the risks incumbent in

16  its conduct of the marketing and sale of these assets with

17  specificity.  And I'll let Mr. Michaels address that

18  specificity.

19          Second, it ends up having a material impact on all

20  creditors, including both unsecured creditors and

21  administrative expense creditors in this case, of which

22  there's a meaningful number and amount.

23          And finally, I want to refer the Court to my last

24  set of questions to Mr. Victor with respect to the U.S.

25  Trustee's objections to the previous investment banker that

1    was employed in this case or attempted to be employed by the

2    Trustee.

3           The U.S. Trustee was significantly concerned about

4    the limitation of liability that Mr. Victor testified to.  He

5    had, albeit, not a full understanding of it, but a limited

6    understanding.  I would say that it is indeed correct that

7    that limitation of liability was both not standard, non-

8    standard, right, and unacceptable both to the US Trustees

9    office and ultimately to the Court.

10          The time between the engagement or attempted

11   engagement of Capstone and the ultimate engagement of SSG was

12   at least eight weeks, and I think it may have been more than

13   that, Your Honor.  There was obviously a considerable amount

14   of frustration by those professionals who were looking at

15   this case and worried about the potential.

16          The litigious nature, perhaps, some of the things

17   that Mr. Victor was testifying to.  I would say also there

18   was a real concern, at least as far as an observer could have

19   of what the U.S.  Trustee did, that the U.S. Trustee's office

20   had a considerable concern about the potential liabilities

21   associated with an investment banker's engagement and

22   especially the limitation of liability with respect to that

23   investment banker.

24          I would say here, Your Honor, especially given the

25   knowledge that was possessed by SSG in connection with sale

1   of these assets, it was irresponsible, at best, reckless and

2   indeed, perhaps, even willful misconduct to engage in the

3   sale of assets that, at least it was on active notice,

4   contained the intellectual property of a third party that was

5   not part of the property of the estate.

6           THE COURT:  So, Mr. Thompson, can I ask couple

7   questions on that?

8           MR. THOMPSON:  Sure, Your Honor.

9           THE COURT:  I want to start with the question

10  about -- let's, I guess, start at the end.  If the investment

11  banker is tasked with selling the debtor's assets and the

12  Court identifies in a sale order that says we're selling the

13  debtor's assets and only the debtor's assets, why should the

14  investment banker have to engage in any further analysis of

15  what's being sold?

16          MR. THOMPSON:  Your Honor, I would ordinarily take

17  the premise of your question, of course, but I think the

18  problem is in the premise.

19          THE COURT:  Okay.

20          MR. THOMPSON:  This case, if it suffered from

21  nothing else, it suffered greatly from a dearth of evidence.

22  I happened to participate, and I know this is a long answer,

23  Your Honor, but I hope it's helpful for you.

24          I happened to participate in the AVI's views from

25  the bench.  I went to -- I was there as an advisory board

1   member of the most recent one.

2          There was a -- I won't attribute any particular

3   comment to any particular judge, but there was a resounding

4   call for one thing and one thing only among every single

5   panel, every single bankruptcy judge there.  Please give us

6   evidence.  We know that you're all terrific advocates, and

7   you make great arguments on, you know, on closing.  But what

8   we really need to make these determinations are evidence.

9          There was a scrupulous effort on the part of the

10  Trustee and his advisers in this case to diminish the factual

11  evidentiary record in this case to its irreducible minimum.

12  We've got other pleadings on file.  We've said it a number of

13  times.

14          I won't bemoan it to a greater extent except to

15  say that this Trustee did not know, did not understand the

16  assets that he was selling.  We made that point, and we were

17  refused discovery.  We were refused -- we were truncated in

18  our cross-examination and we were unable to put on evidence

19  in our case-in-chief during the sale hearing.  There wasn't

20  even an evidentiary hearing with respect to the bid

21  procedures.

22          So to say -- so to get to your question, Your

23  Honor, with respect to SSG's requested indemnification here

24  for its duties, somebody had to understand what assets were

25  being sold so that it wasn't out there doing damage to third

1  parties.

2              THE COURT:  But why?  That's my question, right?

3  So here's -- let's take this sort of right -- there's that

4  statue right there, right?  I think that's mine.  You think

5  it's yourself.  The Trustee says -- I say, I'm going to sell

6  it.  And you say, but that's mine.  And I say, okay.  But I'm

7  selling, right?  I think it's mine.  I'm going to sell it.

8              MR. THOMPSON:  Yeah.

9              THE COURT:  But by the way, there's a court order

10 that says, just because Baker sells the statute doesn't mean

11 that, you know, your argument about who owns it goes away.

12 And I think that's what I understand the sale order, right?

13 And I'm reading just cold pieces of paper, right?

14             That's what I think the sale order says.  The sale

15 order says, we're not selling any Rembrandt assets.  And, oh,

16 by the way, if Rembrandt wants to sue the person who's

17 getting these assets, who thinks that now they're, you know,

18 infringing on Rembrandt's assets, I don't understand why

19 that's an SSG problem.

20             MR. THOMPSON:  Your Honor, except for the fact

21 that the Third Circuit thinks differently.  In the SLC

22 Capital case, which was cited in the -- I'm sorry.  No,

23 Whitehall Jewelers case, which goes specifically to this

24 issue as to what is necessary for the sale of assets in a 363

25 sale where a consign -- where there was an effort to sell

1  consigned goods.

2         And the Court in Whitehall Jewelers said, you've

3  got somebody else's goods.  You know you've got it.  And they

4  said, well, we couldn't figure out which were which, and

5  therefore, we just sold them.  They said, you got to figure

6  that out before you do the sale.

7         THE COURT:  Consignments are different, though,

8  right?  Because consign -- in consignments, right, there is a

9  principle under the Uniform Commercial Code that says that

10 the asset can actually become titled in the consignee's

11 rights, right?  So in that instance, it's different, right?

12        This is very simple, right?  They either have

13 title or they don't.

14        MR. THOMPSON:  Well, that needs to be figured out

15 beforehand, Your Honor.  SLC Capital, which is the Third

16 Circuit opinion, didn't do that with respect to consigned

17 goods.  The reason Whitehall Jewelers were citing it, they

18 were citing whether the lienholder's rights were being

19 infringed without due process.

20        THE COURT:  But that's a 363(f) problem, which you

21 got protection for in the Court order.

22        MR. THOMPSON:  Your Honor, we didn't, right?

23 Indeed, this was engineered in a manner where we couldn't --

24 where if permitted to do what the Trustee really wanted to

25 do, we would have had no time and no ability to even appeal

1    it.

2              That was the -- I mean, that's the -- I would

3    describe it in vernacular, it wouldn't be appropriate for

4    court, but that's the tricking (phonetic), right, of process,

5    of the 363 process, right?  Jam you.  Jam you on the process

6    and say, it's already all done.

7              THE COURT:  Look, I've been on the receiving end

8    of getting the 363 processes before.

9              MR. THOMPSON:  I know you have, Your Honor.  I

10   know you have, Your Honor.  But there were things that they

11   needed to do to afford the third party that was most injured

12   here, and there were other third parties, frankly, with Leah

13   and Phillips.  It was more than just Rembrandt.  They needed

14   to afford them due process through a full adversary

15   proceeding.

16             You're going to hear argument on it today.  That's

17   what they needed to do.  The Trustee didn't want to do it,

18   and this record is far, far too insufficient by design.  I

19   mean, that was orchestrated, to paraphrase the New York --

20   the North Carolina Supreme Court in a recent decision or

21   relatively recent decision, with, you know, surgical

22   precision.

23             THE COURT:  So okay.  So let me -- let's assume

24   that I agree with you, right?  Let's assume that I agree that

25   the Trustee manipulated a 363 process in a way that was going

1   to limit the ability of the Court to fully understand the

2   scope of the assets that were being sold.  I'll -- for

3   purposes of this argument, let's assume I agree with that.

4   Why is that SSG's fault?

5          MR. THOMPSON:  All Your Honor -- all the point

6   that we're making is to the extent that SSG will, you know,

7   to use the analogy that Mr. Michaels used and that Your Honor

8   so aptly put in, you know, in stark relief, it is as if it

9   says, here's the Bank of America, the Bank of America labeled

10  bag.  The Trustee gives you an order to sell it, and you and

11  SSG looks the other way.

12         THE COURT:  That's not what they did, though.  SSG

13  held up the bag and said, I'm selling the Trustee's interest

14  in the bag.  I don't know if it's somebody else's interest,

15  right?  That's not -- and that's why I'm struggling with why

16  that's an SSG difficulty.  I understand you might --

17         MR. THOMPSON:  Because you can't -- because, Your

18  Honor, you can't be willfully ignorant of the thing that's in

19  the box.  You can't pretend that the diamond in the box,

20  right, is being sold for the value of the blue box that says

21  Tiffany's on it.  It's got to be sold for the value of the

22  diamond in it.  That's a duty that all fiduciaries have,

23  including those that retain -- those agents of the fiduciary

24  that are retained for purposes of selling.

25         THE COURT:  Well, I think the -- they're tasked

1   with creating a process and maximizing the value that comes

2   from that process, okay?  But they're not tasked with

3   figuring out what the asset is.  And at the end of the day,

4   the value of the asset is what a willing buyer is willing to

5   pay for it.

6          MR. THOMPSON:  Your Honor, let me say it this way.

7   We talked with Mr. Victor about his normal processes and the

8   execution of NDAs in connection with providing proprietary

9   and confidential information, some of it incredibly secure,

10  important, right?

11         Would there be any question that if SSG had not

12  engaged in the typical NDA process and allowed a prospective

13  bidder to get information that was ultimately trade secret

14  protected and that it leaked, they wouldn't have a liability

15  for that?  That's against their ordinary process.  I don't

16  think there's any question that would be true.

17         Let's put it -- make it even more aggravated.

18  Let's say that that trade secret had -- because it was a

19  national security related supplier of data, information,

20  code, literally U.S. secrets.  If that happened, could SSG

21  walk away and say that that -- what anybody would define as

22  reckless conduct not to have an NDA signed?  If it

23  constitutes -- that would not constitute reckless conduct?

24         All we're saying is they can't expand the scope

25  for purposes of reckless conduct, willful misconduct, you

1   know, and gross negligence.  That's all.

2          THE COURT:  So, okay.  So let's sort of end on

3   that point.  Or at least let me end my questioning on that

4   point because I've been interrupting you and I apologize.

5          The proposed form of order provides that the Court

6   is going to have -- is going to retain jurisdiction on any

7   matters that arise out of the implementation of the order

8   authorizing the indemnification or the fronting of defense

9   costs by the estate.

10         And SSG hasn't filed a final fee yet.  Don't I

11  have the ability to police that after the fact?  In other

12  words, if you're -- what you're worried about is, is what I

13  heard you start off by saying, this isn't about whether SSG

14  is entitled to the indemnification provided in their

15  retention order.  Okay.

16         That says you're entitled to indemnification

17  unless there's a final determination that you have engaged in

18  willful misconduct or gross negligence or fraud or criminal

19  activity, right?  None of those things have happened yet,

20  right?  But don't I have the ability to implement that after

21  the fact by protecting?

22         And I think Mr. Michaels actually asked this

23  question directly of -- if they get money that they have to

24  ultimately give back, is SSG good for it?

25         MR. THOMPSON:  Your Honor, I would agree with you.

1   But for the experience in this case and counsel for SSG,

2   after much maligning our efforts and motivations in the case,

3   I think maybe I can paraphrase him, We are concerned about

4   things that -- the way things had happened in this case being

5   a closure on issues, right?  Representations that things have

6   all been decided.

7           I talked to you about the dearth of an evidentiary

8   record here, right?  The scrupulous efforts to eliminate any

9   discovery in the case, right?  I just don't want that to be

10  the law of the case, so to speak, Your Honor.  But I take

11  your point.  I believe that you will be open to, you know, to

12  those arguments, when and if they're made.  But I do --

13          THE COURT:  Yeah.  I don't know how that could be

14  law of the case, especially if the Court order says you're

15  not entitled to indemnification if there's been a final

16  finding on all these things and the Court has retains

17  jurisdiction to implement this order and the final fee up.

18  I'm just not sure how that could be law of the case that

19  prevents the Court from reanalyzing that issue.

20          MR. THOMPSON:  Thank you, Your Honor.  I will

21  leave it with your -- with your phrase of reanalyzing it.

22          THE COURT:  Okay.

23          MR. THOMPSON:  That is expressly what this side of

24  the Courtroom doesn't want to be maintained, is a reanalysis

25  of that.

```
 1              THE COURT:  Well, it's their form of order that
 2    says you retained jurisdiction.  So I think it's -- I think
 3    it does allow them to do that, but I understand.
 4              MR. THOMPSON:  I've heard the retention of -- but
 5    it's been, you know, it's been illusory, let me say it that
 6    way.  Thank you.
 7              THE COURT:  Thank you.  Thank you, Mr. Thompson.
 8    I think your colleague -- I don't know if he was going to --
 9    okay.
10              MR. SWICK:  Adam Swick, Akerman, on behalf of VSI.
11    To be very brief, what spurred the objection is that in the
12    motion for indemnification, it says gross negligence, willful
13    misconduct, this is not an issue here.  Our adversary and our
14    complaint, that's really all that's at issue here, all right?
15              Then at the end of the motion, it says we need
16    indemnification in all respects.  And so that's what prompted
17    the objection.
18              THE COURT:  Right.  Mr. Swick, let me ask you that
19    question because I did I did go through this.  So your action
20    has five counts as I read it.
21              MR. SWICK:  Rembrandt's action.
22              THE COURT:  Rembrandt's action.  I'm sorry.
23    Excuse me.  Rembrandt's action.  Maybe I should direct this
24    to you.
25              MR. SWICK:  Mr. Michaels should because I'm not
```

1   the expert on that.

2           THE COURT:  Okay.  Mr. Michaels, then I'll direct

3   it to you.

4           MR. SWICK:  Yeah.  Well, I just wanted it to do

5   that.  And, also, too, I just want -- there's a

6   representation that VSI somehow chilled bidding on this

7   process because in the data room, there was an asset list

8   that was marked up.  The only people that ever signed an NDA

9   to get access to the data room was VSI and its related party.

10  So there was no chill bidding as a result of anything in the

11  data room on behalf of VSI.  Just wanted to correct that.

12          THE COURT:  Understood.  Thank you.  I will say

13  you all made liars out of me because I thought this was going

14  to be a fifteen minute, right, sort of initial presentation,

15  and we're already at an hour ago.

16          MR. MICHAELS:  We've never met attorneys.  Your

17  Honor, Chris Michaels for Rembrandt 3D Holding, Limited.

18  Rembrandt is in the business of intellectual property related

19  to no glasses 3D, right?  We are not in the business of

20  litigation.  We have pursued settlement and mediation at

21  every opportunity.

22          This is not to harangue or any of these

23  allegations of misuse of the judicial process.  We have at

24  all times offered this audit procedure where take it out.

25  Either pay for a license or take it out.  This idea that you

1   get to transfer our intellectual property without

2   compensation is what we have objected to.

3           The Trustee has rejected numerous efforts, and we

4   put in our disclosures, our letter to Judge Chan, all of the

5   communication referenced to each time we said, hey, this is a

6   simple process.  These guys showed up in 2010, 2011, there

7   should have been zero lines of code in your version control

8   system.

9           Let's compare it to Rembrandt's code that existed

10  at that time, and we'll do a compare and a contrast.  It's

11  like versions of a contract, right?  You can -- these are

12  professional version control systems.  Let's look at your

13  development over time and how it differed from Rembrandt's

14  technology.  Let's just go search your code for Rembrandt's

15  use of liveliness or --

16          THE COURT:  Okay.  So this is what I understand

17  from the APA, okay?  I understand the APA -- and the sale

18  order.  Sale order says we're not selling any Rembrandt

19  assets, right?  Rembrandt had the opportunity and did do a

20  very detailed, right, disclosure prior to the sale, right, as

21  part of the bid procedures that said these are all the assets

22  that Rembrandt thinks that they have an interest in, right?

23          The APA says, by the way, right, there are

24  transferred assets.  Transferred assets do not include

25  excluded assets.  Excluded assets are, right, Rembrandt,

1  right, related IP, right?  I mean, I did actually read it,

2  you know, before today, right?

3         So that's what it says.  Okay.  Now the sale order

4  says, I'm approving the sale of the Debtor's assets.  I'm

5  approving the transfer of the assets by the Trustee of the

6  buyer.  The only assets that are transferred are transferred

7  assets.  It doesn't include your assets.

8         I understand that if those assets moved -- okay --

9  if they did, and there's no -- I mean, you know, to Mr.

10  Thompson's point about evidence, I don't have any evidence

11  that it's moving, right?  But if it did, why is that the

12  Trustee's problem?

13         You have your rights to go sue whoever you want --

14         MR. MICHAELS:  Including the Trustee, and if --

15         THE COURT:  Including the Trustee.  If they

16  were -- if the Trustee engaged in a sale of the assets of

17  Rembrandt, but I don't know how you're going to establish

18  that considering every document says it doesn't include that.

19         MR. MICHAELS:  So the list of assets included

20  source code on a server, right?  It included the TVs that

21  Rembrandt showed in pages comparing the patent claims to

22  those TVs, comparing the relatively short general description

23  of the types of trade secrets that were being licensed in the

24  settlement agreement.

25         One of those descriptions was liveliness and

1   borders.  You can go to the TV, turn it on.  This is the

2   level of sophistication that was needed to determine whether

3   or not this asset was included in the sale, right?  Turn the

4   TV on.  Push the menu button.  Is liveliness one of the menu

5   items on the TV? It is.  We have pictures.  It's provided in

6   our papers, right?  That's it.

7         Like, this is not, hey, go become an expert in 3D

8   and computer science and visualizations.  Does the TV include

9   liveliness?  We provided copies of the email back and forth

10  between Dr. Barenbrug and Steve Blumenthal, our founder,

11  where that was developed as part of our assets, right?  No

12  evidence to the contrary that's been submitted, that it's

13  absolutely correct that we've been blocked on all discovery,

14  yet we've had this discovery.

15        Literally, 100 percent of the evidence in this

16  case is that the source code on a secure server, the TVs

17  themselves, the firmware that runs those TVs, all include

18  Rembrandt technology.  100 percent, okay?  Not a --

19        THE COURT:  Let me assume I agree with you.

20        MR. MICHAELS:  Yes.

21        THE COURT:  Let's assume I agree with you.  Why is

22  that a SSG's problem?

23        MR. MICHAELS:  Well, that is because -- and you --

24  you're asking the question that the Amazons, the Best Buys,

25  the Walmarts of the world have asked since the incorporation

1  of 35 USC 271.  I didn't know.  I didn't make the TV.  I'm

2  just selling it.  Yet the Court --

3  THE COURT:  No, no, no, no.  He's not selling it,

4  though.  SSG is not selling it.  The Trustee is selling it.

5  SSG is just creating a process.

6  MR. MICHAELS:  Well, with respect, Your Honor, he

7  constantly referred to SSG as selling.  His testimony is

8  different from what you're just characterizing his testimony.

9  He included as an offer for sale, a sale teaser, and that's

10  why there is an offer for sale, right?

11  He offered it for sale.  He participated in the

12  sale process.  These individuals are listed as contact us to

13  conduct this sale.  And Congress has determined that with no

14  intent requirement whatsoever, that the Best Buys, the SSDs

15  of the world who are offering this for sale, a ton of

16  Amazon's fulfillment is they put it up on their website, you

17  place an order, and it's shipped from some place in China to

18  your doorstep.

19  THE COURT:  Okay.  But fine.

20  MR. MICHAELS:  And they are liable.

21  THE COURT:  Fine.  Best Buy gets sued for that

22  because they sell it.  They sell it.  SSG is not selling

23  anything.  They're nothing more than a broker.  All they're

24  doing, right?  It's look.  I'm going to sell my -- I'm going

25  to sell you my house.  I have a broker who's going to enter

1   into the contract with you to sell the house.  The broker's

2   not selling the house.  I'm selling the house, right?

3              MR. MICHAELS:  And if you look up -- if you type

4   in broker -- you said 35 USC 271, handling of fringe

5   liability, you'll find the brokers are liable.

6              Both Wilson and -- what I should point out is that

7   Judge Moore, Chief Judge Moore, of the federal circuit, when

8   she was a law professor, wrote an article evaluating every,

9   you know, case of finding of patent infringement in The U.S.

10  court systems for 20-plus years.

11             I found that over half of them, when there was a

12  finding of infringement, was found to be willful, i.e.,

13  exceptional, i.e., treble damages, disgorgement of profits,

14  attorney fees, right?  We're looking at, statistically

15  speaking, over a 50 percent chance.

16             And with respect, we've been at this with this --

17  with Stream and we convinced DLA Piper, Armstrong Teasdale,

18  Louis Brisbois, VSI that we should be included in their

19  disclosure statement leading to a reorganization plan.  It's

20  not because they said, hey, what we really want to do is pay

21  Rembrandt $6 million because they're really nice guys.

22             They looked at it and said, we've got to include

23  them or we're screwed, right?  We have DLA Piper, Armstrong

24  Teasdale, Louis Brisbois all making actual determinations as

25  to whether or not Rembrandt should be paid and came to the

1  conclusion they should.

2          Judge Coleman was -- we did put on -- the most

3  evidence that was put on in this case was leading to the TRO.

4  She decided Rembrandt's rights needed to be protected and

5  issued a temporary restraining order.  When they transferred

6  the source code on a secure server from control of Stream,

7  who had a license, right?  At all times, remember I'd said

8  that license is valid.  We can't sue currently for patent

9  infringement.

10          Only until we sued or immediately after control of

11  that server went over to SeeCubic, that's what caused the

12  problem.  The judge said -- and we all agree with the judge

13  excluded Rembrandt's IP.  The issue was when they transferred

14  Rembrandt's IP, the appropriate action after the sale order

15  would have been to write a letter to SeeCubic BV and say,

16  take out all of Rembrandt's technology.

17          And I'm -- with respect to the investigation that

18  was done to call up the -- and by the way, SeeCubic BV at the

19  time was under control of Shadron Stastney, the CEO of

20  SeeCubic.  So to call up the future buyer and say, hey, do

21  you have any of this IP that I'm not allowed to sell you?

22  Nope.  That was the investigation.  That's not reasonable.

23  That is grossly negligent.

24          By his own testimony, this is a unique situation

25  after hundreds of sale processes, right?  Never before has he

1   been accused by a patent infringement or trade secret

2   misappropriation, but his response to it was to proceed as

3   normal.

4               THE COURT:  Okay.  So --

5               MR. MICHAELS:  That's gross negligence.

6               THE COURT:  And you may be right.  Okay.  So let's

7   go through the five counts, right?  Because I read the

8   complaint, you have three counts for patent infringement on

9   three separate patents.  You have a count for

10  misappropriation of defense trade secrets under 18 USC 1836

11  add sec, and you have a breach of contract claim.  Those are

12  the five counts against SSG.

13              MR. MICHAELS:  Yes.

14              THE COURT:  Okay.  And the way I read your prayer

15  for relief, you want a determination of infringement, a

16  determination of misappropriation, an injunction against

17  future acts, which is probably moot because I'm guessing he's

18  not transferring anything from now on, and then actual

19  damages, treble damages, and attorney's fee.  Okay.

20              If and when you win, if there is a determination

21  that there has been gross negligence or willful misconduct in

22  the acts of SSG in that underlying litigation, why don't I

23  have the ability to address that after the fact by requiring

24  on the final fee application return of any advanced

25  indemnification costs?

1          MR. MICHAELS:  I'm trying to answer your question

2    as you've asked it.  You may have that power.  The question

3    is whether or not their fee application today or

4    indemnification for what is alleged is gross misconduct,

5    right?  It isn't that, hey, they had access to something,

6    touched it, and we're upset.  Our objection is that they

7    offered to sell it when they were told not to.

8          THE COURT:  But they're entitled to

9    indemnification, right?  Unless it is judicially determined,

10   the determination having become final, to have arisen from

11   SSG's bad faith, gross negligence, willful misconduct, or

12   fraud.

13         So just because you alleged it doesn't mean

14   they're not entitled to indemnification.  It just means that

15   they have to repay it if it's ultimately determined that

16   that's the case.

17         And I think I have the ability to do that not only

18   based on my inherent authority under 328 of the Code or 330

19   of the Code when they seek a final fee out.  I also have it

20   under this order.

21         MR. MICHAELS:  So I'm not necessarily -- I think

22   you're asking, do I disagree with that, and I don't disagree

23   that you have the power to do that.

24         THE COURT:  Okay.

25         MR. MICHAELS:  Where we depart is whether or not

1    they should be granted indemnification for what is going to

2    be potentially legal fees beyond the cost -- the value put

3    into this estate.  The average cost of defense of a patent

4    infringement case, not including trade secrets, is 5 to $7

5    million, the average.

6            And each of these individual defendants, with

7    respect, it is not appropriate for the corporate attorney to

8    be representing the individuals who can suffer criminal and

9    massive financial liability if they tow the party line and

10   say we didn't have to investigate this.  Because with

11   respect, that is not how any of the patent infringement cases

12   and trade secret cases come down, right?

13           They are going to find in running into a brick

14   wall, they did have a duty to investigate, and they

15   participated over.  They're going to admit they had knowledge

16   of Rembrandt's objections.  They're going to admit they did

17   nothing to try to take it off these servers, and they're

18   going to be sitting with somebody who finally has some

19   understanding of these IP issues to say, you're in a hurt,

20   you know, a world of hurt.

21           If I write Amazon a letter saying, I understand

22   that you've paid $1,000 to, you know, Samsung for this TV

23   that was shipped from Korea, and now, it's here in The United

24   States in one of your warehouses.  But Rembrandt has come at

25   you with an infringement case.  They have to eat that cost.

1   I mean, yes, they can go after Samsung, but they cannot sell

2   it.

3         We can bar them.  We can stop it at the border.

4   The IP rates here are incredible, and they won't.  Amazon has

5   a part of their website for takedown notices.  If you have a

6   trademark, copyright, patent issue, you write them a letter,

7   boom, it comes down.  That's the way the commercial world

8   behaves in a situation like this, right?

9         SSG did not do that, right, by their own

10  statement.  I just proceeded as if it was not a problem, as

11  if I didn't get a takedown notice.  That is not how Best Buy,

12  Amazon, all of the commercial world who are faced with this

13  problem day in and day out, they absolutely positively do not

14  sell.

15        Now, they will do evaluation.  They'll ask the

16  vendor to say, you need to indemnify us.  You need to explain

17  why you're not infringing, right?  And there's a whole

18  process that I've participated in hundreds of times just like

19  Mr. Victor has.

20        They are not behaving the norm.  They have gone

21  grossly -- from the get-go, this is grossly negligent.  It's

22  willful misconduct.  It is -- when it gets compared to the

23  other types of willfulness conduct cases that have gone

24  against defendants, it will be clearly that you were put on

25  notice, you proceeded anyway, the only people you ask are the

 1 | people that would benefit from the sale, right?  That's not
 2 | an appropriate way to respond to this.
 3 |         THE COURT:  Mr. Michaels, can I just interrupt you
 4 | for a minute?  I apologize.  Who is it Al who just joined on
 5 | the Zoom?  Oh, okay.  All right.
 6 |         MR. MICHAELS:  And yeah, I'm finishing up Your
 7 | Honor.  I mean, my closing argument on this is, yes, if we
 8 | think SSG, and I understand the Court's position, as well, I
 9 | can get it back from them later.  I think the real question
10 | is, is it appropriate to grant a defendant in this kind of
11 | situation where they were put on notice and then participated
12 | in a way that deviates substantially from the people who sell
13 | products and sell offers to sell.
14 |         And Amazon would make the very same argument you
15 | just made on their behalf.  I'm not selling it.  It's this
16 | group in China.  Well, the whole point of the sale process is
17 | that SSG is interacting with the planet and offered 500
18 | companies the opportunity to come and buy.  And it is telling
19 | none of them wanted a piece of it because it's public record
20 | that Rembrandt is making these IP claims, and they won't
21 | touch it.
22 |         And I've been telling them that in my letters to
23 | them, which are also part of the record, that there's no way
24 | anybody's going to buy these because no one buys intellectual
25 | property, I mean, companies that are suffering this kind of

 1  grossly obvious trade secret and patent misappropriation.

 2          So we knew it going in.  It all turned out exactly

 3  as I was predicting my letter years ago.  Wrote Hawk Party,

 4  SeeCubic back in 2021.  I wrote everybody basically the same

 5  letter in April.  We included those -- copies in our

 6  complaint.  Said, this is how this is going to turn out.  We

 7  are saying this is -- you sat in a room with us and agreed

 8  this was intellectual property.

 9          I mean, they're saying it's an illusory agreement.

10  Really?  Magistrate Judge Parker entered an illusory term

11  sheet, and then Judge Abrams approved the settlement and

12  dismissal of that case, right?  I mean, I've never been at a

13  case where a judge was accused of participating in some

14  collusion, you know, to create an inappropriate term sheet in

15  settlement of a litigation, under court ordered mediation to

16  boot, right?

17          We have a valid settlement agreement based on

18  terms negotiated with the buyer in this case.  These are not

19  normal circumstances.  I've never seen a case as clear of IP

20  and IP infringement as this case, and yet they proceed and

21  say, oh, oh, shucks.  I was just the getaway driver.  I

22  didn't know -- I didn't look in the bags of the Bank of

23  America, right?

24          THE COURT:  So is there -- admittedly, I am not an

25  IP or patent lawyer.  No offense, Mr. Michaels, but thank

1  God.

2          MR. MICHAELS:  My first time ever --

3          MR. THOMPSON:  Your Honor, he may say the same

4  thing about the rest of us, right?

5          THE COURT:  But is there just -- just for my own

6  understanding, is there a scenario under which you proceed --

7  you pursue your litigation --

8          MR. MICHAELS:  Um-hum.

9          THE COURT:  -- and you win on all five counts, for

10  all of the relief that you have requested except for treble

11  damages, and the reason I'm going to say except for treble

12  damages is this, that the Court says, yes, they violated, you

13  know, they acted in a manner inconsistent with the patent.

14  They violated the Trade Secret Act.  They breached the

15  contract, right?

16          But it wasn't grossly negligent, and it wasn't

17  willfully misconduct, and there was no fraud.  It's just a

18  strict -- essentially, what you were saying earlier, which is

19  essentially, it's a strict liability tort, right?  They

20  didn't do anything knowingly, that there was that sort of

21  going to follow from their actions.  Is there a scenario

22  under which that could happen?

23          MR. MICHAELS:  In the same way that the sun may

24  not rise tomorrow, kind of, of course, yes.  But in reality,

25  in the way this is fleshed out, when my client is accused of

1   patent infringement, roughly 15 minutes later, I'm working

2   with the client to figure out what elements of the patent

3   claims are not infringed that I can argue back to the other

4   side and say, hey, I get your argument, but we're not using

5   XYZ element of your independent claims, and therefore, we

6   don't -- we're not liable for patent infringement.

7           Every -- I mean, thousands of times, I have

8   written that kind of email, you know, opinion, and I raise

9   this in every session, mediation, court hearing.  They have

10  not once given us a single element of a single claim that

11  they are not using of the Rembrandt patent.

12          THE COURT:  Right.  But you're saying you're going

13  to win, right?  I get it.

14          MR. MICHAELS:  Well, that --

15          THE COURT:  But my point is, is there a scenario

16  under which you may win, but you just might not going to

17  finding of --

18          MR. MICHAELS:  I'm actually answering that

19  question.  And so if they win, if they come up with some

20  great argument three minutes before the last day of trial and

21  it prevails, they win, right?  What I'm saying is if they

22  lose, the fact that it is now -- we first brought our claims

23  in 2016 that got removed to federal court in 2017.  It's

24  2025.

25          It's eight years of me saying in front of judges,

1  magistrates, whoever was settling on the other side, you

2  haven't done this.  This is normal behavior.  If you don't

3  actually think you infringe, this is what you send me.  I'm

4  not using XYZ element of this claim.  Therefore, I'm not

5  liable for patent infringement.

6          That is a virtual lock on willful infringement.

7  There is almost no chance.  They haven't done that now.  At

8  quizzed him, what have you done?  Have you talked to a patent

9  attorney, the patent attorney the only way to evaluate a

10  patent infringement claim is to sit down and say, here are

11  the elements of Rembrandt's patent claims, and we are not --

12  we are using -- oh, are we using this one?  Yes.  We're using

13  this one?  Yes.  We're using this one?  Yes.

14          The very fact that they haven't put this in this

15  court record, that they're not using some element of claim,

16  pretty much tells you everything you need to know.  They

17  talked to the patent attorney, pretty much said you got a big

18  problem here or did not make an official opinion.

19          We asked, are you working on an opinion of counsel

20  defense?  Right?  That's a very common thing to ask for in

21  all sorts of financial transactions, mergers, acquisitions,

22  very frequently asked for an infringement, a non-infringement

23  opinion.  They don't have one.  They've talked to a patent

24  attorney who didn't provide one, right?

25          So do I think there's a likelihood that they will

 1  prevail on a non-willfulness but still lose on the patent

 2  infringement?  Absolutely not.  They've deviated from normal

 3  practice and how to respond to these things.  They've talked

 4  to a patent attorney but provided no patent non-infringement

 5  opinion.  They proceeded despite being put on notice and told

 6  by the Court, these are excluded assets, don't sell them.

 7           Being told by a court, there is a restraining

 8  order on SCBV interfering with the Rembrandt license, and

 9  I -- and that was in place after the sale order for months

10  after the sale order.

11           So as SCBV was transferred to SeeCubic, SCBV was

12  subject to a restraining order and that they proceeded in

13  delivering that asset to Stream, even though there was a

14  restraining order in place.  That's also part of our

15  admission in the record, acknowledging -- and Rembrandt's

16  called out in our license agreement and our IP rights are

17  called out directly in that order.

18           So what they're really saying, Your Honor, is even

19  though the judges issued orders excluding Rembrandt's IP

20  rights, issued orders saying you may not interfere with

21  Rembrandt's license.  Oh, shucks.  What did I know?  I asked

22  the people who were buying the asset.  They told me,

23  Rembrandt's IP is not here.  Even though Rembrandt has

24  provided a list of 175 trade secrets listing the actual

25  documents that prove that case, identifying the individual,

1   the date that information was provided, and three issued

2   valid U.S. patents, right?

3        I mean, I just don't -- how much more evidence is

4   there absent, being barred from all discovery?  Let's put

5   these guys on a witness stand, you know?  I mean, you know,

6   we would have been happy to do that.  We asked for that.  And

7   they freaked out.  Absolutely not.  We don't -- that's

8   inappropriate.  We don't want to have these people witness.

9        Think you saw a little bit about how that would

10  have gone.  And as you say, of all the people that are liable

11  here, I don't disagree that Scott Victor and his coworkers

12  and SSG are way down the line of culpability, yet they are

13  still culpable, not say Chris Michaels, not say Rembrandt,

14  but so say Congress.

15       You know, it's 35 USD, 271, it's short, read it,

16  offer for sale.  Doesn't matter if you knew it was patented

17  or not.  It's just did you offer to sell a patented

18  invention?  And they did.  And they did it knowingly.  Thank

19  you, Your Honor.

20       THE COURT:  Okay.  Thank you, Mr. Michaels.  All

21  right.  This matter comes before the Court pursuant to the

22  application of SSG Advisors, LLC for an order pursuant to 11

23  USC Sections 327, 328, and 105(a), determining

24  indemnification rights and authorizing and directing William

25  Homony as Chapter 11 Trustee to indemnify and reimburse the

1  applicant.  That's at Docket No. 964.

2           In addition to the motion, the Court has received

3  and reviewed the following pleadings and responses: the joint

4  objection to the application of SSG Advisors, LLC for an

5  order pursuant to 11 USC Section 327 and 328, and 105(a),

6  determining indemnification rights and authorizing and

7  directing William A. Homony as Chapter 11 Trustee to

8  indemnify and reimburse applicant at Docket No. 986.

9           The Court held a hearing on the motion at which

10  time the Movant and the Respondents presented evidence and

11  made argument.  The evidence consisted of the witness

12  declaration and testimony, including cross-examination of J.

13  Scott Victor as well as the exhibits that were identified,

14  offered, and admitted at the hearing included on the exhibit

15  list at Docket No. 994 and Docket No. 999.

16           Court thanks the parties for their very strong

17  advocacy as well as their well-prepared materials and well-

18  presented oral argument.  The matter is now ripe for

19  disposition.

20           The following constitutes the Court's findings of

21  fact and conclusions of law pursuant to Federal Rule of

22  Bankruptcy Procedure 7052 as incorporated by Federal Rule of

23  Bankruptcy Procedure 9014.  Court has jurisdiction pursuant

24  to 28 USC Section 1334 and the standing order of reference of

25  the Eastern District Of Pennsylvania, as well, because the

1   matter arises in and is related to a case under the

2   Bankruptcy Code.

3          Venue is proper in this district pursuant to 28

4   USC 1408 and 1409.  The matter presented by the motion is a

5   core matter pursuant to 28 USC Section 157(b).  To the extent

6   that the matter is deemed non-core and or the Court is

7   without constitutional authority to render a final decision

8   on the motion, the following constitutes the Court's report

9   and recommendation in accordance with 28 USC Section 157.

10         Based on the record before the Court, proper

11  service of the motion was accomplished and evidenced by the

12  certificate of service at Docket No. 964-5.  Such service is

13  appropriate under the circumstances and complies with federal

14  bankruptcy procedure 2002, 9013, and all local rules.

15         Pursuant to the motion, the Movant seeks an

16  application seeking a determination of entitlement of

17  indemnification pursuant to the amended retention order.  The

18  motion the Movant further asserts that SSG has been sued and

19  intends to seek indemnification.  That's outlined in

20  Paragraph 10 and 11 of the application.

21         In response, the Respondent argues that SSG's

22  assertions that its actions are not exempted under Paragraph

23  2 of the approval order is not correct because the action

24  asserts that SSG's actions pled in the complaint were for

25  willful patent infringement and misappropriation of trade

1    secrets.  They further allege that the actions complained are

2    "felonies" under trade secret law.

3            The Court has reviewed the action at issue

4    including the five counts that are asserted.  Infringement of

5    patent number 8558830, infringement of patent 9521390,

6    infringement of patent 9681114, misappropriation of defense

7    trade secrets at 18 USC Section 1836, et cetera, and breach

8    of contract.

9            Respondent is seeking a determination of

10   infringement, misappropriation, seeking an injunction, actual

11   damages, treble damages, attorney's fees.

12           SSG finally argues that its indemnification is

13   part of its bargain for compensation as part of its

14   engagement.  During oral argument, the Respondent made clear

15   that this was not about whether SSG is entitled to

16   indemnification pursuant to the retention order, rather it is

17   about whether SSG's acts are expanding what SSG is otherwise

18   entitled to under the retention order.

19           On the motion, the Movant bears the burden of

20   proof for the relief requested by a preponderance of the

21   evidence and based on the record before the Court, the Court

22   finds as follows.

23           Indemnification is part of the routine and general

24   engagement of investment bankers pursuant to Paragraph 2 of

25   the retention order at Docket No. 741.  The only time

1  indemnification is not applicable is if there is a breach of

2  contract asserted by the Trustee, if there is bad faith

3  asserted, if there is fraud asserted, if there is willfulness

4  conduct asserted, and if there is gross negligence asserted.

5         With respect to the last four, there must be a

6  determination that a judicial determination has first

7  occurred and that it be a final determination.

8         The objectors here have not shown that any of the

9  exceptions are triggered.  First, the Trustee is not opposing

10 the requested indemnification.

11        Second, none of the prior acts for which there is

12 an assertion have had a prior determination by a court that

13 that they have engaged in bad faith, fraud, willful

14 misconduct, or gross negligence.  And it is unclear to the

15 Court whether these causes of action rise to the level needed

16 for that exception.

17        While the Court is cognizant that there can be an

18 award of damages upon the finding of willful patent

19 infringement, that prior determination based on the totality

20 of the circumstances that the actor acted with full knowledge

21 of the patent and disregard for the patent's protection.

22        Further, the causes of action need to be taken

23 into account.  SSG is an investment banker, merely a broker

24 selling the assets.  SSG is not taking the steps or actions

25 to benefit from exploiting any of the technology that is

1   subject to the patent.

2          The Court can and will retain jurisdiction on

3   ultimate allowance of compensation to SSG, including

4   indemnification, if a later determination is made that

5   addresses any of these former orders or any of these former

6   issues and that can be addressed through disgorgement.

7          In fact, the final decretal paragraph of the

8   proposed order makes that clear.

9          Finally, the Court notes that in the normal

10  course, a request for a determination would ordinarily be an

11  issue presented by Part 7.  However, 1001(a) of the Federal

12  Rules of Bankruptcy procedure provide that the rule should be

13  construed and administered to secure "just, speedy, and

14  inexpensive determinations".

15         Here proceeding by motion under rule 9013 rather

16  than via Part 7 had actually broader service that allowed for

17  more parties to have standing to be heard.  And for those

18  reasons, the Court does not view the procedural necessities

19  of Part 7 to be applicable.

20         So the Court will enter the proposed form of order

21  as submitted with the retention of jurisdiction.  Court

22  otherwise reserves the right to amend or supplement this

23  opinion as permitted by local rule 8003-1, and an appropriate

24  order will issue.  Thank you, parties.

25         MR. KURTZMAN:  Your Honor, may I be excused?

```
 1            THE COURT:  You may.
 2            MR. KURTZMAN:  Thank you, sir.
 3            THE COURT:  Thank you for your time today.
 4            MR. KURTZMAN:  Thank you.
 5            THE COURT:  It is 12:30.  I would intend to
 6   proceed with respect to the argument on the motion to dismiss
 7   on the terms that we had discussed at the pretrial or the
 8   status conference.  15 minutes each of argument, after I give
 9   you my initial thoughts, if that's what the parties intend,
10   or we can take a break now and resume after the break.  Which
11   would the parties like?
12            MR. MICHAELS:  I would prefer to go now, Your
13   Honor.  I've traveled from Florida, and I want to make sure I
14   make my flight back.
15            THE COURT:  Understood.  What time is your flight?
16            MR. MICHAELS:  My flight is this evening.
17            THE COURT:  Okay.
18            MR. MICHAELS:  But given the last one went beyond,
19   I don't want to push it.
20            THE COURT:  Okay.  All right.  So we'll take up
21   the motion to dismiss.  So this is the motion to dismiss in
22   the adversary, Rembrandt 3D Holdings, Limited versus Homony,
23   et al, 24-142.
24            I'll give you my initial preliminary thoughts and
25   comments based on what I had the opportunity to read.
```

1        While I understand that there was an adversary

2   complaint that was filed December 20th, 2024, there are a

3   number of defendants, including the Trustee, the Debtor, Mr.

4   Stastney, who is the alleged CEO of SCI and SCBV, Hawk

5   Investments Limited, SeeCubic, Inc., and SCBV, SeeCubic BV.

6        There are five counts alleged.  First count seeks

7   an injunction and order versus the Trustee.  Second count

8   seeks an injunction and an order against SCBV.  The third

9   count seeks recovery for theft of trade secrets and

10  injunction and order versus Hawk.

11       The fourth count seeks recovery for theft of trade

12  secrets injunction and order against SVI, And count five

13  seeks recovery for theft of trade secrets and injunction and

14  an order regarding Mr. Stastney.

15       The Court notes that the relief sought, which is

16  not separated by account or defendant, first, a finding of

17  misappropriation of trade secrets, a finding that Rembrandt's

18  property is embedded in the Debtor's assets, an award of

19  damages for misappropriation of trade secrets, an award of

20  fees because the case is exceptional, an injunction

21  preventing the sale of the Debtor's assets until the Trustee

22  has determined what assets are Rembrandt and removed, an

23  order requiring the Trustee to remove Rembrandt from the

24  Debtor's assets, and an order requiring the Trustee to

25  transfer source codes to Rembrandt pursuant to section 365(n)

1    of the Bankruptcy Code.

2         Based on the information that the Court was able

3    to glean, the only issues that relate to the Trustee are a

4    finding that Rembrandt's property is embedded in the Debtor's

5    assets, an injunction preventing the sale of the Debtor's

6    assets until the Trustee has determined what assets are

7    Rembrandt and removed, an order requiring the Trustee to

8    remove the Rembrandt assets from the Debtor's assets, and an

9    order requiring the Trustee to transfer source codes to

10   Rembrandt pursuant to 365(n).

11        On the motion to dismiss, the Trustee argues that

12   the claims are barred by the sale order and was mooted by the

13   sale closing.  In the opposition, Rembrandt argues that the

14   motion to dismiss is an improper vehicle to assert res

15   judicata, that it does not address the Trustee's duty to

16   account to Rembrandt, and that the motion seeks to insulate

17   the Trustee from an obligation to separate and marshal non-

18   estate assets.

19        The Court can take judicial notice of the events

20   in the Docket 23-57 and in the main bankruptcy case.  And

21   with that, I'm happy to take argument.

22        MR. COREN:  Thank you, Your Honor.  Steve Coren,

23   Special Counsel for the Trustee.  As I interpret the

24   complaint, and Your Honor is correct, there's a lot of things

25   thrown in which don't really isolate who the claims are

1    against or what the relief is that's requested.

2         The way we interpret the complaint is that it's

3    essentially seeking an injunction to stop something which the

4    Court said should take place and which took place pursuant to

5    a court order, which is on appeal.

6         So to the extent that they challenge the sale

7    order or the actual sale itself, that's on appeal.  It's in

8    the district court right now.  It's been briefed and a

9    decision will render in due course.

10        So the notion that somehow you can't raise re

11   judicata at a motion to dismiss, that is untrue.  While it

12   can be raised as an affirmative defense, where it is clear of

13   record, especially when the matters took place before the

14   same court where this case has been filed, the Court may, in

15   fact, take judicial notice and render a determination.

16        They're asking to enjoin something which has

17   happened already.  They're asking to challenge something

18   which was done pursuant to a court order, which they are

19   challenging in the proper forum, which is the district court.

20        The only thing I would take issue at in terms of

21   the Court's recitation of the facts, and maybe I misheard it,

22   was something in the timing.  The adversary complaint was

23   actually filed before the sale order was (inaudible).  The

24   complaint itself is dated December 2.  The docket has it

25   filed on December 4.

```
 1              So we have an adversary pending, which is trying
 2    essentially to enjoin the sale.  We then have a sale order
 3    proceeding and that issue is decided and that issue is
 4    decided as res judicata and collateral estoppel in terms of
 5    all of the findings of this Court pursuant to which the sale
 6    proceeded and closed.
 7              So the reality is there can be no relief
 8    essentially against the Trustee.  I'm not commenting about
 9    claims against other parties.  And I don't know whether
10    they've responded or they haven't responded.
11              But with respect to the Trustee, the sale order
12    and the closing of the sale order is both a res judicata
13    effect and a mooting effect.  And this Court is no longer in
14    a position to grant the relief that's requested because the
15    Court granted the opposite.
16              And this notion about somehow the Trustee is at
17    risk for having sold Rembrandt property, the Court made a
18    finding that the Trustee was not selling Rembrandt's
19    property.  That is res judicata, as well, and that matter is
20    on appeal in the district court.
21              THE COURT:  Mr. Coren, let me ask you this.  If
22    the allegation is that, notwithstanding the admonition by
23    this Court, the Trustee is not selling a Rembrandt asset, if
24    the Trustee nonetheless transferred a Rembrandt asset, I
25    don't know that the sale order insulates the Trustee from any
```

1    actions that could be brought -- properly brought.

2         MR. COREN:  Well, I think it does.  And as a

3    matter of fact, what Your Honor hasn't been told by the other

4    side is this notion about SeeCubic, a Netherlands entity,

5    having been told some trade secrets and things of that sort.

6    If that is in fact true, that happened many, many, many, many

7    years ago and the Trustee didn't sell that.

8         What the Trustee sold, and you didn't hear that

9    mentioned, was the Trustee sold the equity interest that

10   Technoveda, the Debtor entity, had in downstream non-Debtor

11   entities.  Allegedly, those downstream non-Debtor entities

12   had already gotten this technology.  They had already been

13   told the trade secrets.

14        Well, if that's the case, they've had them for

15   many years and they weren't transferred by the Trustee.  All

16   the Trustee transferred as relates to this downstream entity

17   is Technoveda's equity interest in it.

18        And that's why the Court says, look, Trustee is

19   not selling anything other than equity and a few items that

20   perhaps Stream had.  As far as Technoveda, all it had was

21   equity interest in downstream entities.  What those

22   downstream entities owned, didn't own, what they were told or

23   not told three years ago or five years ago, they've been

24   fighting for years.

25        There's a case pending as a district court in

1  Delaware fighting between these entities and Rembrandt.  So

2  this is not new.

3        But the reality is whatever that action happened,

4  it happened many, many years ago with respect to a non-Debtor

5  entity whose assets were not sold.  The only thing that was

6  sold was the equity in that entity, and that's why there was

7  a right preserved that if you think that entity, the non-

8  Debtor entity has improperly your trade secrets, you're

9  misusing your patents, go sue them.

10        That's not what the Trustee sold.  He barely sold

11 his ownership interest in that entity, and that entity is

12 responsible for whatever that entity may be responsible for.

13        And that, I think, has not been focused on, but I

14 would submit to this Court that based on the findings of this

15 Court, the Trustee is immune from those claims.  And I'll

16 also suggest that the -- nobody quite mentioned that the

17 district court action for which SSG sought and received

18 indemnification was filed in a court without subject matter

19 jurisdiction under the Barton Doctrine.

20        And there is a motion to dismiss that case because

21 that case when you're suing a Trustee and the Trustee's

22 professionals needed to be resolved in this court, not in the

23 district court.

24        So I suspect that case is going to disappear

25 pretty quickly.  And that's all I have to say.  Thank you.

```
 1            THE COURT:  Thank you, Mr. Coren.
 2            MR. MICHAELS:  Thank you.  Chris Michaels for
 3    Rembrandt 3D Holding, Limited.  As a first matter, we've
 4    acknowledged that this was brought under 12(b).  These are
 5    affirmative defenses.  This is not the appropriate time.  The
 6    exceptions to those do not apply.  We clearly -- we all agree
 7    the sale order went through excluding Rembrandt assets.
 8            The allegation against the parties involved is
 9    that despite that direct order and that exclusion of
10    Rembrandt assets as part of that sale, they transferred them
11    anyway, right?
12            To be clear, Shadron Stastney was in control and
13    the sole director of SCBV at the time.  He's the only one
14    that was providing any information back to, hey, this asset
15    I'm going to buy, don't worry about these Rembrandt claims.
16    Give me everything anyway.
17            And that's what the Trustee and SSG and Hawk and
18    everybody relied upon in making this transfer despite the
19    Court saying don't sell their assets, despite the Court
20    providing a TRO saying don't interfere with Rembrandt's
21    license, right?  Stream is the one that has a license.  Do
22    not interfere with that.
23            And if they had not done so, the Trustee could
24    resolve this entire case in 15 minutes.  Type me an email.
25    Hey, these are the trade secrets I've demanded that they be
```

 1   removed.  Here they are.  We're giving them back to you.

 2   We're terminating the license, right?  We're redacting your

 3   license.  And we're done with that portion of the case.

 4   Here's the source code under your title and for your license

 5   in 365(n).  Done, right?

 6             THE COURT:  365(n), though --

 7             MR. MICHAELS:  Yes.

 8             THE COURT:  -- right, only -- as I read it, only

 9   protects the licensee when a license is rejected.

10             MR. MICHAELS:  The settlement agreement with

11   Stream, part of the compensation we received was a license

12   back.  So there was lots of discussion that Stream might not

13   be in a position to make its own TVs.  That was in discussion

14   before Magistrate Parker.  We said, well, we want a license

15   back so that we can fulfill ourselves, our ability to make

16   these TVs.

17             And we're like, let's talk what we really were

18   going to do is have them made, right?  There are lots of, you

19   know, flex or various companies that'll assemble TVs and

20   iPhones, you know, around the world.

21             THE COURT:  So I'm not sure I totally follow that,

22   and maybe that it was just a misunderstanding on my part,

23   which is fine.  So do you -- the Rembrandt licensed

24   technology and trade secrets again, for purposes of the

25   complaint, I'm going to assume all those facts are true --

```
 1              MR. MICHAELS:  Right.

 2              THE COURT:  -- right?  They've licensed trade

 3   secrets to Stream, were they also licensed to SCBV?

 4              MR. MICHAELS:  Not directly.  Stream was allowed

 5   to have -- just like we would have the right, you know, we

 6   got to a Section 10 of that agreement provided a license back

 7   to Rembrandt.  We could go have a flex or whomever make

 8   products for us, right?  And that's the standard in the

 9   industry is to have assemblers put these things together.

10              THE COURT:  So Stream got a license from

11   Rembrandt --

12              MR. MICHAELS:  Yes.

13              THE COURT:  -- that they then -- are you saying

14   sublicense to --

15              MR. MICHAELS:  Well, they had the right to.  It's

16   called a have-made license.  They provided the -- SCBV had a

17   right to have products made and to work on engineering and

18   the firmware that would incorporate that and then transfer it

19   over to places in Asia and here in the States for making

20   chips that drive the TV.  Somebody else was assembling the

21   TVs, and all that gets put together, and they sold the TV

22   that included Rembrandt's technology, under our license,

23   right?  Now --

24              THE COURT:  How did -- that's what I'm asking.

25   And maybe that's the --
```

1          MR. MICHAELS:  Um-hum.

2          THE COURT:  -- that's what I'm -- that's what I

3    understood Mr. Coren to argue, which was SCBV had a direct

4    license from Rembrandt to be able to put that into whatever

5    they were making.

6          MR. MICHAELS:  Stream had a direct license to use

7    who it saw fit to make TVs.  In this case, it included SCBV.

8    During the pendency of this bankruptcy, SCBV had a license

9    from Rembrandt, right?  As soon as they transferred control

10   of our trade secrets and started having -- make use of, offer

11   for sale any of our patented inventions outside of Stream,

12   right, to go to SeeCubic, they started to infringe those

13   assets.  They went outside the settlement agreement.

14         THE COURT:  So let me make sure I understood,

15   right?  Let me make sure I understand.  So Rembrandt had a

16   license with Stream.  Stream then had the right to use SCBV,

17   right, to make the products.

18         But I'm trying to address what Mr. Coren said at

19   the end, which was SCBV had a license with Rembrandt, right?

20   And that didn't move anywhere, right?  That just went --

21   that's still with SCBV, right?  That license is still with

22   SCBV.  What changed was who owned SCBV, right?

23         MR. MICHAELS:  Yes.

24         THE COURT:  Okay.  So that never moved, right?

25   That that always stayed where it was.

```
 1              MR. MICHAELS:  It was there.
 2              THE COURT:  Yep.
 3              MR. MICHAELS:  We sat in a courtroom, and you
 4    know, Mr. Korn brings up that this wasn't litigated, right?
 5    We had an agreement with Bart Barenbrug, and we had an
 6    agreement with Mathu Rajan and Raja Rajan and Stream and his
 7    confidentiality agreements, and trade secrets went back and
 8    forth all the way back in 2010, right?
 9              And the parties separated.  We had no idea they
10    were using our technology until they brought out a TV.  We
11    said, hey, wait a minute.  That's got our stuff on it.  And
12    we sued.  And we went into mediation, and we settled that
13    case.  And the settlement agreement said, these trade secrets
14    had a list, a Schedule A.  These are the list of Rembrandt's
15    trade secrets.  We are licensing these patents, right?
16              And we agreed their TVs were covered, and they had
17    the right to have it made, i.e., as long as SCBV was
18    controlled by Stream,  they had a right to our technology.
19    Now, we argue we're also owed our license fees as they point
20    out.
21              THE COURT:  Yeah.  I think you're -- you keep
22    pushing me back to Stream, and I'm not at Stream.  I'm at
23    SCBV, right?  Did SCBV have a license from Rembrandt to
24    use --
25              MR. MICHAELS:  Yep.  They did.  Stream had a
```

1    license.

2              THE COURT:  Okay.  I got it.

3              MR. MICHAELS:  Had a license --

4              THE COURT:  That's the part I -- okay.

5              MR. MICHAELS:  As long as they control -- so when

6    Apple hires whomever in Asia to make their iPhone, right, as

7    long -- they have a license from Apple for all that

8    technology.

9              And as long as they're making an iPhone for Apple,

10   they're fine.  It's when they go try to make an iPhone for

11   Samsung that, if they try to use Apple's technology, they're

12   absolutely infringed.  They had an absolute right to have the

13   information.  They just didn't have the right to use it for

14   somebody else.

15             And SCBV started using it for SeeCubic, not for

16   Stream.  That's where we went off the rails here.  These

17   parties facilitated that.  They were told -- and they're

18   hiding under a sell order, which said do not sell.  You are

19   not selling Rembrandt's assets.  You are -- we're excluding

20   not just the IP, but the physical assets that hold that

21   source code.

22             They didn't do anything to remove that.  The

23   Trustee would be in a radically different position here if he

24   had come forward and said, here's my letter to SeeCubic on

25   December 3rd or whenever the sale order went through,

1  ordering them to return all of Rembrandt IP, right?  Here is

2  my letter to them ordering to transfer to you the source code

3  so that they can go build their TVs as they negotiated for,

4  right?

5          You took control of Stream's asset and ownership

6  of the code that went into make these TVs.  And all of that

7  discussion with SSG's representative about whether or not

8  5,000 TVs are experimental TVs.  With respect, 5,000 TVs is a

9  production problem, right?  And they had the production code

10  that is on a server in California that in the papers, it's

11  alleged that Shadron Stastney walked into that entity and

12  took all the information and paid, you know, paid -- there

13  was some back bills owed and paid and walked away with all

14  that code, right?

15          So Shadron Stastney, SCBV, SeeCubic have access to

16  Stream assets that it needs to deliver what it owes to

17  Rembrandt, right?  And, again, Rembrandt's claim against the

18  estate was down dramatically with our cooperation, I might

19  add, if they deliver to us what we're owed under Section 10

20  of the license agreement, if they get back our code, take it

21  out.

22          I've described the process.  It's like running a

23  red line in a Word document.  This is not a complicated thing

24  for those that understand how to do it.  They --

25              THE COURT:  So let me ask you this.  I have not

1  found a case outside of IP law that would require a Trustee

2  to marshal non-estate assets.  In fact, I think the

3  Bankruptcy Code says the exact opposite because the

4  Bankruptcy Code actually allows the Trustee to just abandon,

5  right, whatever the Trustee doesn't even believe would be

6  beneficial to the estate.

7          So what's the basis for, right, outside of IP law,

8  right, so I know that's -- I know I'm -- we're,

9  unfortunately, right, we're talking about two very

10 sophisticated, you know, federal statutes, right, that we may

11 be talking right past each other, right?  And I apologize for

12 that.  But under the Bankruptcy Code, right, what is the

13 principle that would require a Trustee, appointed under the

14 code, to marshal non-estate assets for a non-estate entity?

15          MR. MICHAELS:  So IP law has hold.  I'm looking at

16 our --

17          THE COURT:  Yeah.  No, I know.  And that's why

18 it's unfortunate, but I'm asking you about bankruptcy law,

19 and you're asking me about IP law, right?

20          MR. MICHAELS:  Fair enough.  But I mean, we've put

21 it in our papers.

22          MR. THOMPSON:  So, Your Honor, if I may, I can

23 assist here.  I think it's exactly what your Honor is

24 pointing to is that there is a marshaling responsibility for

25 the Trustee.  It's one that he did not conduct.  And so he

1   did --

2              THE COURT:  Yeah, but the assets.

3              MR. THOMPSON:  That's correct, Your Honor.  He

4   didn't do that, and so he couldn't tell what was estate

5   assets and what were not estate assets.

6              THE COURT:  Sure, he did.  He said he took

7   everything that he could get his hands on and said, I'm

8   selling.

9              MR. THOMPSON:  Your Honor, we just vehemently

10  disagree with that intention.  That actually did not happen

11  in any way, shape, or form, and we can demonstrate it.

12             THE COURT:  Okay.

13             MR. MICHAELS:  So the code section that we were

14  referring to was 704(a).  And with respect, as I mentioned

15  just how easy it would be, the Trustee was testifying, and

16  was asked by Mr. Thompson about the production equipment.

17  And he said, having provided evidence that Stream had made

18  that purchase of production equipment for, you know, the

19  their production run in Asia, right?

20             So there was evidence put in that, oh, no, that

21  was transferred to SCBV, right?  And we were calling that a

22  sham transaction as a way to try to get the assets out of the

23  bankruptcy estate.  And the Trustee testified that it was a

24  distinction without a difference, right?  He could order as

25  the controller of 100 percent of the shares of Technoveda, of

1  100 percent of the shares of UltraD cooperative, of 100

2  percent of the shares of SeeCubic BV, he could issue an order

3  saying that the production equipment could be transferred.

4         And the same is true here.  He had the opportunity

5  to order the estate assets.  Now we're not talking about just

6  Rembrandt's IP.  We're talking -- well, technically, we had a

7  license to Stream's IP, the assets of the estate, right?

8  Undeniably, the assets of the estate.

9         Rembrandt is saying this is intellectual property

10  controlled by Stream that would allow Rembrandt to go make

11  its own TVs.

12         THE COURT:  And why can't you do that?

13         MR. MICHAELS:  We argue he can.  And he had a duty

14  to do that.

15         THE COURT:  No, no, why can't you do that, right?

16  Why can't you just use the license that you have to make

17  whatever you want?

18         MR. MICHAELS:  The provision provided for us to

19  have that if Stream -- so all points and purposes, Stream is

20  now saying they can't make TVs, right?  At all points prior

21  to that, prior to the Trustees, the first Trustee or,

22  controller of Stream that said they couldn't make TVs.  Every

23  other time, it was we'll make them for you.  We got it.  We

24  got our vendors.  We're negotiating this.  We're negotiating

25  that.

```
 1              And by the way, you know, this is new information
 2    in the Courtroom that we're hearing for the first time or,
 3    you know, in the last few months, I should argue, is that,
 4    oh, hey, we weren't able to make these TVs.
 5              Well, why not?  I mean, the vendors are creditors
 6    in the estate.  It's not like Bill Homony was going to go,
 7    you know, with hammer and nail and start making LCD panels,
 8    right?  They had a relationship with BOE.  They had the lens
 9    kind of -- you know, and we offered to manage that, right?
10              I used to run -- I was CEO of a flat panel
11    display, developmental flat panel display company.  We had
12    the expertise to manage that process.  People in this
13    courtroom, Mathu Rajan, Bud Robertson, other people had
14    managed that process for Stream to go out and make TVs.
15              And we even offered the pay value into the estate,
16    right?  Not just the have made, but we would, you know, at
17    cost.  But we would have said until we resolve everything, we
18    would have paid at margin.  And, oh, by the way, once you
19    work production for us, you could sell these TVs to others.
20              No takers, right?  I mean, what -- why, right?
21    This was all revenue positive, millions upon millions of
22    dollars of revenue to the estate.  Part of what we asked for
23    is there was a $160 million worth of purchase orders that
24    were brought in with the executives of those companies who
25    were making those orders.  Bang.  We would -- these are
```

```
 1   valid.  We will buy these TVs if made.  We offered to help
 2   facilitate those orders.  All that revenue would have gone to
 3   the estate.  No taker, right?
 4           And part of our quid pro quo, that is, look, we
 5   want to be cooperative with you in working through the
 6   management of this intellectual property.
 7           THE COURT:  Okay.  But I don't understand.  And if
 8   I'm missing it, I apologize.
 9           MR. MICHAELS:  Um-hum.
10           THE COURT:  Why aren't you just making your own
11   TVs with the license you have?
12           MR. MICHAELS:  We don't have access.  We've not
13   misappropriated intellectual property.  We do not have access
14   to the firmware and the source code that would enable us to
15   do that, okay?  We didn't --
16           THE COURT:  And they haven't rejected the license
17   yet?
18           MR. MICHAELS:  As far as I know, they have not.
19           THE COURT:  Okay.  So if and when they reject the
20   license, you'll be entitled to whatever rights you're
21   entitled to under 365(n), right?
22           MR. MICHAELS:  Well, unless they don't have the
23   ability anymore to control --
24           THE COURT:  Oh, no, no, no, right?  365(n) talks
25   about what happens in that situation.
```

```
 1              MR. MICHAELS:  So our complaint, one of the
 2   remedies it seeks, is to force the situation.  Now that
 3   they're saying they cannot provide the TVs, hand over the
 4   code so we can go make our own TVs.  You can satisfy this
 5   provision agreement, which --
 6              THE COURT:  Why don't you file a motion to compel
 7   assumption of rejection of the license?
 8              MR. MICHAELS:  That is one of our options.  We
 9   don't necessarily want the agreement rejected, and we brought
10   this complaint, say, first and foremost.  We're talking about
11   one section of our complaint, right, which is the 365(n)
12   component.
13              We also -- our paramount concern was that we did
14   not want control of our intellectual property being
15   transferred over to SeeCubic's control.
16              THE COURT:  Okay.  So let's deal with that, right?
17   I mean --
18              MR. MICHAELS:  So we have
19              THE COURT:  You say, right, that -- I mean, look.
20   I think we sort of talked about -- I am struggling with what
21   is the obligation of a chapter -- what is the obligation of a
22   trustee appointed under the Bankruptcy Code to marshal the
23   assets of a non-estate party, right?  These are non-estate
24   assets you're talking about.  You want the Trustee to marshal
25   non estate assets and turn them over to you.
```

```
 1              As a matter of bankruptcy law, I just don't see
 2   where that is.  I understand it may be under IP law, and that
 3   may be applicable non-bankruptcy law, and we'll talk about
 4   that at the appropriate time.  Why is that not packaged up as
 5   part of your appeal that's in front of Judge Gallagher?
 6              MR. MICHAELS:  Well, some aspects of it are, but
 7   what we were talking about here is what's before this Court,
 8   which is there was a sale order that said don't transfer
 9   Rembrandt's intellectual property to SeeCubic, right?
10              And Rembrandt waving its arms saying, our software
11   is on those secure servers.  Remove our IP, and that's why we
12   brought this motion is send a letter to SeeCubic saying,
13   return the intellectual property that is Rembrandt's trade
14   secrets.  And, no, it is not good enough that your engineers
15   who are benefiting from this just say, oh, we're not using
16   any of it.
17              This is in the face of -- as I said, we have
18   provided reference to the exact documents, the exact dates,
19   the exact individuals who were party to our trade secrets.
20   One of those trade secrets, out of a 75, is this liveliness
21   function in the TV.  Now I'd asked during our status
22   conference, do you want to see one of these TVs, right?  As I
23   said, we have three of them.
24              We would have brought one in.  I would have turned
25   it on.  I would have showed you liveliness.  We sat in a
```

1    courtroom and determined that's Rembrandt's trade secret,

2    right?  That is the firmware.  And we said, show us that

3    you've taken that out, right, and that you haven't just

4    delivered property that you had in your possession.

5           The consignment case, Whitehall Jewelers, right?

6    That was litigated, and it was held the Trustee had the

7    obligation to remove those consigned goods.  A license is as

8    close to a consigned good as you get.  We gave you access to

9    our trade secrets.  Under a license, they're our property

10   that you've been entrusted to hold.  You need to return it

11   back to us.  You certainly don't have the right to transfer

12   it over to SeeCubic.

13          And I would just finish with what is also clear is

14   the Trustee has an obligation to manage the estate, not to

15   create liability, right?  We sat across from Stream's

16   executives, Mathu Rajan at CEO, Shadron Stastney at CFO, Raja

17   Rajan at COO.  We have Bob Robertson in the back who was the

18   CEO of SCBV.  All of those people will tell you Rembrandt's

19   trade secrets are in the, you know, are in the firmware that

20   goes into those TVs, right?  And they've testified in court

21   to those things.

22          So we have absolute knowledge that it's there.

23   Send it back.  And we offered over and over again to work

24   with him to remove, and he could have avoided what -- Shadron

25   Stastney set the value of this.  $400 times 3 million TVs

1  plus 6 million in cash, right?  We have a -- listen, there's

2  our cap on what our obligations -- I mean, or what our

3  payments from this estate could have been, right, under the

4  license, unless he went and transferred to somebody he wasn't

5  licensed to transfer.

6          And we go back to what's the best, you know,

7  evidence of what the value is?  $1.2 billion, so say Shadron

8  Stastney, then CFO of Stream, now CEO of the buyer.

9          THE COURT:  So -- yeah.  Look.  I mean, this is, I

10 think, one of the -- Mr. Michaels, this is the thing that I

11 sort of struggle with, I think, a little bit is I don't agree

12 as a matter of principle that the sale closing moots whatever

13 litigation you want to bring against the Trustee for a sale

14 of assets that he was not authorized to sell.

15         You're going to have to bring that here, right?

16 You can't bring that somewhere else under the Barton

17 Doctrine.  But if you believe that there is a basis to bring

18 that, why don't you bring it?  Like, I don't understand all

19 of these machinations of tell the Trustee not to sell what

20 they're not allowed to sell.

21         Why not just -- if you think that they're sell --

22 if you think that they sold something that they weren't

23 entitled to sell, bring -- let's -- file a complaint.  Let

24 them answer.  Let's get to discovery, and let's get it

25 decided.  Either they sold it or they didn't, right?  Like,

1    that's the part I'm struggling with, right?  Because I think

2    all of this other stuff, frankly, is a bunch of shadow

3    boxing, right?

4            Like, either they sold it, and they're in

5    violation of what this Court said they were allowed to do, or

6    they didn't.

7            MR. MICHAELS:  Well, Your Honor, with respect,

8    you're both -- they've been saying we did sell it because the

9    sale order protects us, and it's already happened.  And, oh,

10   by the way, we didn't sell it, and the sale order didn't

11   include Rembrandt's assets.  So if they didn't sell it,

12   right, give it back, right?  Let's go through the process

13   that we've outlined in this brief, right?

14           You are --

15           THE COURT:  Why would you be entitled to get it

16   back?

17           MR. MICHAELS:  It's our trade secrets.

18           THE COURT:  Sue them for damages.

19           MR. MICHAELS:  I think that goes to the accept or

20   reject, you know, component that you said.  If they've

21   rejected it, then give it back and we get to have our 365

22   end, which is --

23           THE COURT:  But they haven't rejected it.

24           MR. MICHAELS:  And so if what you're saying is

25   this needs to be brought after the motion to have them assume

1  or reject, right, I understand the argument.  With respect, I

2  don't agree with it.  We brought the case that we thought was

3  appropriate at the time and still do believe is appropriate,

4  and that the remedies requested are things that they can do

5  to avoid a potential $1.2 billion claim against the estate.

6          I mean, it may not have an estate -- maybe he may

7  not have an obligation to marshal non-estate assets, but he

8  does have an obligation to administer the estate in such a

9  way as to avoid a $1.2 claim.

10          THE COURT:  I mean, okay.  That's if you win.  I'm

11  going to stop you right there because your colleagues are

12  totally going nuts over here, and they want to talk to you

13  about something.  So I'm going to let them have the

14  opportunity to talk to you for a minute before I continue my

15  questions.  Mr. Coren, let the two of them speak.

16          MR. COREN:  I was going to say while they're

17  talking, how about if I talk?

18          THE COURT:  No.  That's not how that's going to

19  work.

20          (Inaudible conversation)

21          MR. MICHAELS:  Your Honor, I think we brought this

22  motion, and I started my argument saying Rembrandt has tried

23  to proceed with as little litigation as possible.  I'm a deal

24  guy; I'm not a litigator.  I cut IP deals for a living.

25  That's pretty much what I do.  And so we're looking -- we

1  would much prefer that this Trustee and that all the parties

2  involved handle this as an appropriate IP contract and how it

3  should be responded to, right?

4          I mentioned before, Phillips has a specific audit

5  provision.  There's 23 some licenses that everybody who's

6  using this technology has access to or is working with

7  somebody who has licensed the Phillips technology, right?

8  And it says, when you're done with the license, we audit, we

9  make sure it's out.

10         We proposed the same thing, right?  Rejected --

11         THE COURT:  That was not in your original license.

12         MR. MICHAELS:  In the settlement agreement, it was

13  not in.  It is in the -- we proposed it as a resolution.

14         THE COURT:  Oh, I understand that.  I understand

15  that.  And if the --

16         (Inaudible conversation)

17         THE COURT: -- want to have a settlement discussion

18  or you all want to have a mediation, you want to have a

19  settlement conference, however you all want to proceed, I'm

20  happy to facilitate that, right?  But what I'm struggling

21  with is, right, one of the things that was said earlier

22  today, I don't remember exactly who said it, but, you know, I

23  can only deal with, right, what I'm presented with.

24         And I just wonder if there's a -- if what you're

25  trying to accomplish is a situation where you're saying, I

1  think that the Trustee has transferred an asset that they

2  were not -- that he was not entitled to transfer based on

3  these facts in accordance that I've determined pursuant to my

4  investigation under Rule 9011?  I mean, I hate to say it, but

5  sue them.

6          MR. MICHAELS:  So that is drafted, sitting on a

7  desk, but the -- in trying to avoid that, you know, part of

8  what I'm throwing out, right, is there are actions this Court

9  can take, there are actions the Trustee can take on their

10  own, which literally involve a letter, right?  We are

11  ordering you as a Trustee.  This was an excluded asset into

12  the order.  Take out everything Rembrandt is saying is their

13  trade secrets.  Give it back.  They're licensed under 365(n).

14  Saves the Court immense headache.  It saves all those

15  litigations, all those lawsuits, and I believe is goes with

16  the sale order.

17          THE COURT:  I don't know that I can jump that.  I

18  don't know that I can jump there.  That's, I think, the

19  problem I'm having.  I don't know that I can jump there right

20  away.  I think what I'm struggling with is I understand what

21  your -- what the concern is.  I really do.  I mean, I'm not

22  an IP person other than I know what it stands for, and I use

23  my iPhone, right?  But I am not, like, super technical.

24          But I understand what you're suggesting.  I just

25  don't know that what I have in front of me is going to be

```
 1   able to get you what you want, which is what you've been
 2   talking about, right?  Like, I want a listing of the source
 3   code.  And if -- I don't know that I can order him to do it,
 4   number one.
 5          But number two -- and the reason why I don't know
 6   that I can order him to do it is because I don't see where
 7   that exists under applicable bankruptcy law.  Now, it might
 8   exist under applicable non-bankruptcy law, but we can, you
 9   know, and if there's something that you want to highlight for
10   me on that, we can talk about.
11          But if I can't do that, then the only thing I can
12   do is provide you a forum for redress of what bad acts the
13   Trustee has done if you prove it.
14          MR. MICHAELS:  So if they said, we're a
15   construction company.  We own some trucks in a garage, right?
16   Do you believe that this Court would have the ability to say,
17   give me VIN numbers on those trucks so we know where they
18   are, and we can look up, you know, UCC liens, et cetera?
19          THE COURT:  I do.
20          MR. MICHAELS:  Okay.  How is this any different?
21          THE COURT:  Because you're not asking for the
22   trucks they own.  You're asking for the trucks they don't
23   own.  You're asking me to ask him to get the VIN numbers of
24   the trucks in the garage next door.
25          MR. MICHAELS:  I'm glad you went there because I
```

```
 1   used the example in my brief of Hertz, right?  We are the
 2   equivalent of Hertz in this situation.  There's a rental
 3   contract sitting there, set of car keys with Hertz.  There's
 4   a garage, and they're saying, we just sold the house.
 5           I mean, we don't know nothing about that car
 6   that's sitting there except for that rental agreement we
 7   signed and the keys.
 8           THE COURT:  Um-hum.
 9           MR. MICHAELS:  And I believe this Bankruptcy Court
10   would have in that context, give the car back to Hertz.
11           THE COURT:  Absolutely disagree with you.
12           MR. MICHAELS:  Okay.  Then we are --
13           THE COURT:  That's the fundamental difference.  I
14   do not agree with that.  I do agree that you could sue him
15   for converting your car.  That's the difference.
16           MR. MICHAELS:  And I understand what you're saying
17   is do that as opposed to --
18           THE COURT:  Well, I'm not saying what to do.  I'm
19   just saying I can't give you what I think you're asking for,
20   right, based on this because I don't see where there is a
21   principle under applicable bankruptcy law that says I can
22   compel the Trustee to marshal non-estate assets.  That's what
23   I'm struggling -- I struggled with this all week last week
24   and over the weekend, and I was researching.  And, I mean,
25   that's the part I'm struggling with.
```

 1           MR. MICHAELS:  I think your argument is accurate

 2   with respect.  Well, I understand your argument with respect.

 3   We disagree because I do believe --

 4           THE COURT:  And we're allowed to disagree.  That's

 5   fine.

 6           MR. MICHAELS:  You're making your argument with

 7   respect to Rembrandt's trade secrets.  We have also brought

 8   this issue under 365(n) since they're now saying they can't

 9   and won't make TVs, give us the IP that we're entitled to

10   make our own, that's a Stream asset.

11           THE COURT:  And that, you can compel them to do,

12   but not through this.  There's a different mechanism to do

13   it.  You have to move to compel them to assume or reject the

14   license.

15           MR. MICHAELS:  And you're saying that right only

16   exists if they --

17           THE COURT:  Well, you're a licensee.  365(n) only

18   entitles you to those 365(n) protections in the event of a

19   rejection by the licensor of the asset.

20           MR. DEMARCO:  Your Honor, if I may.

21           THE COURT:  Yes.

22           MR. DEMARCO:  So there's a couple of things that I

23   want to address very quickly.  First off, my understanding is

24   that there was a document filed suggesting that all of these

25   contracts were rejected.  And I believe that was filed some

```
 1   time ago.  Opposing counsel, you correct me if I'm wrong, but

 2   that's my understanding.

 3          The other issue, Your Honor, raised that I want

 4   to -- I feel I need to address because of its particular

 5   import is when it comes to the trade secrets themselves.

 6          If the trade secrets are, you know, in the

 7   possession of someone who is not bound by the license, they

 8   are destroyed.  It's an irreparable harm, so say it the

 9   Supreme Court, Third Circuit, et cetera.  That is something,

10   I think, that distinguishes this property from other

11   potential assets.

12          Your Honor is asking, you know, how can we

13   marshal, non, you know, non-Debtor property?  The fact of the

14   matter is there's control of these.  There are in servers

15   that are controlled by this company, and --

16          THE COURT:  But I looked at your complaint, and

17   Count 1 is the only one against the Trustee, and it doesn't

18   seek damages for trade secrets.

19          MR. DEMARCO:  Well, that's right, Your Honor.  We

20   seek injunctions.  Damages -- so the damages for the trade

21   secrets, what we're trying to do is prevent them from being

22   destroyed.  Damages occur if the genie is already out of the

23   bottle.  Then we're going to try and recoup what we can, but

24   we're seeking to protect it.

25          We can't put that cat out of the bag.  That's what
```

1   protects the value.  It's an irreparable harm that we face.

2              MR. MICHAELS:  And this estate doesn't have any

3   liquidity to cover the damages.  You're right.  I mean,

4   Andrew stated it exactly correct.  And I believe earlier in

5   my closing arguments, I was saying we are trying to prevent

6   this harm.  We do not want more litigation.  I do not get --

7   I'm not pinning a settlement -- I mean, excuse me, a, you

8   know, a judgment for 1.2 billion my wall and saying, yeah, I

9   got precisely $0 from my client, and my fee is (inaudible),

10  right?

11             We're trying to say there's an opportunity here

12  for the Trustee to have done the right thing, which is to --

13  look, you want to buy the assets without Rembrandt's IP?

14  Great.  Take it out, right?  Protect the estate.  You don't

15  marshal the assets of the estate, separate it from non-estate

16  property.

17             I think Whitehall applies here, and we've been

18  citing that all over our brief, beating that drum, is that we

19  are consigned goods.  The argument would be they had no duty

20  as the consignee to have protected the jewels that were put

21  into the rings, right?  Well, it's not our property, right?

22             This is -- they took on a duty of our license, and

23  they went past that.  And I've gone on, and we can go back

24  and forth.  Okay.  Thank you for your time.

25             THE COURT:  Thank you very much.  Yes, Mr. Coren.

```
 1          MR. COREN:  Thanks.  Number one, as your Honor
 2   points out and which is obvious when you read the complaint,
 3   the current complaint is defective.  It was done before there
 4   was a sale order, before all the events that overtook it
 5   occurred.  And I understand that.  They filed that first.
 6   And the reality is it was overtaken and mooted out and res
 7   judicata'd out by the sale order and the sale.
 8          So what should they do?  They should dismiss it
 9   against the Trustee.  If they want to proceed against the
10   other defendants and they have the ability to do that, we're
11   not commenting.  What did they do?  No.  Instead, they want
12   to keep and ask this Court to give relief, which makes no
13   sense and you can't give.
14          Stop a sale, which you have already ordered to
15   occur and which has, in fact, occurred.  It's a non sequitur.
16   Then what do they do?  They bring another lawsuit against the
17   Trustee in the wrong forum.  They bring it into district
18   court.  They violate the Barton Doctrine.  We filed our
19   motion to dismiss.
20          If they really have a claim that they really think
21   they have, they need to bring the right claim in the right
22   court.  And this is the right court.  And I would suggest to
23   Your Honor in terms of this so called license, very shortly
24   the Trustee will be commencing an action to avoid that
25   license.  It's a collusive document.  It's a fraudulent
```

```
 1   transfer.  It's of zero value and the claim is worthless, the
 2   $1.2 claim.  We will tee that up shortly.
 3            That's the right way to do it.  They want to move
 4   for us to reject or whatever.  We're going to be filing an
 5   adversary to avoid it and to do some other things against
 6   Rembrandt and others.
 7            And that will come soon.  But this, we're here
 8   about this complaint, and this complaint is fatally defective
 9   and should be dismissed.
10            THE COURT:  Thank you, Mr. Coren.
11            I'll give you the last word.
12            MR. DEMARCO:  Judge, very briefly on the subject
13   of the Barton Doctrine.  It's come up several times.  Just
14   there's a very clear exception to the Barton doctrine, which
15   is when the Trustee acts ultra vires.  Our allegation is that
16   non-Debtor property has been taken and sold.  That is a
17   classic example of an ultra vires exception to the Barton
18   Doctrine.
19            So, you know, and that's very clear from our
20   pleadings.  Like, this is not something that's coming up for
21   the first time.  I just wanted to raise that here.
22   Obviously, that'll be adjudicated at a totally separate
23   setting.
24            THE COURT:  Not going to be my problem because if
25   you're all suing in a court other than the Bankruptcy Court,
```

1    somebody's going to figure out the application of the Barton

2    Doctrine.  It's not going to be me.  But if it comes back

3    here, we'll deal with it.

4              MR. DEMARCO:  Yes, Your Honor.  I just wanted to

5    address that.

6              MR. COREN:  I forgot to say one thing, Your Honor.

7    I apologize.  We're crossing two issues.  Number one, did we

8    sell their property?  It's pretty clear we didn't sell their

9    property, so says the Court, so say we.

10             The next question is, well, if we didn't sell it,

11   did we transfer it?  Like, that's something different.  But

12   what you're hearing is the transfer, if it occurred at all,

13   had nothing to do with the sale.  It occurred long before in

14   terms of a relationship between Rembrandt, Stream, and the

15   non-Debtor subsidiaries.

16             Whatever they got, they got years ago.  It had

17   nothing to do with the sale.  We didn't transfer anything as

18   part of the sale.  What they want us to do is have Your Honor

19   enter an order to retrieve something we didn't transfer and

20   we didn't sell.

21             THE COURT:  All right.  This matter is pending at

22   Rembrandt 3D, Limited versus Homony, et al, Adversary Number

23   24-142.  This matter comes before the Court pursuant to the

24   Chapter 11 Trustee's 12(b)(6) motion to dismiss for failure

25   to state a claim upon which relief can be granted, which is

1  filed at Docket No. 3 by William A Homony in his capacity as

2  Chapter 11 Trustee of the bankruptcy estates, Stream TV

3  Networks, and Technoveda Media, Inc.

4        In addition to the motion, the Court has received

5  and reviewed the following pleadings and responses.  The

6  Plaintiff, Rembrandt 3D Holdings, Limited's response to

7  Chapter 11 Trustee 12(b)(6) motion to dismiss for failure to

8  state a claim upon which relief can be granted filed at

9  Docket No. 4.

10        The Court held argument on the motion on April

11  14th, at which time the Movant and the Respondent made oral

12  argument.  The Court thanks the parties for their strong

13  advocacy, their well-prepared materials and their well-

14  presented oral argument.  The matter is now right for

15  disposition.

16        The following constitutes the Court's findings of

17  fact and conclusions of law pursuant to Federal Rule of

18  Bankruptcy Procedure 7052 as incorporated by Federal Rule of

19  Bankruptcy Procedure 9014.  Court has jurisdiction pursuant

20  to 28 USC 1334 and the standing order of reference of the

21  Eastern District Of Pennsylvania as the matter arises in and

22  or is related to a case under the Bankruptcy Code.

23        Venue is proper in this district pursuant to 28

24  USC 1408 and 1409.  The matter presented by the motion is a

25  core matter pursuant to 28 USC Section 157(b).  To the extent

 1  that the matter is deemed non-core and/or the Court is
 2  without constitutional authority to render a final decision
 3  on the motion, the following constitutes the Court's report
 4  and recommendation in accordance with 28 USC Section 157(c).
 5          Pursuant to the motion, the Movant seeks dismissal
 6  of the claims against the Trustee because the claims against
 7  the Trustee are barred by the sale order and the claims
 8  against the Trustee are mooted by the sale closing.
 9          In response, the Respondent argues that the motion
10  to dismiss is not a proper vehicle to assert res judicata and
11  the motion cannot insulate the Trustee from his duty to
12  separate and marshal non-estate assets and his duty to
13  account to Rembrandt.
14          Based on the record before the Court presented in
15  the complaint and reviewed in connection with the motion to
16  dismiss and the response, together with the review of the
17  docket in the adversary proceeding and the docket in the main
18  bankruptcy case taken as a whole, the Court recites the
19  following facts taken as true for purposes of resolving the
20  motion only.
21          Unless otherwise stated, the facts are taken from
22  the complaint, which is found at Adversary Docket No. 1.
23          The complaint nominally seeks a declaratory
24  judgment and an injunction against various defendants,
25  including the Chapter 11 Trustee, the Debtors, SeeCubic, Inc,

1   SCI, SeeCubic BV, SCBV, Hawk Investments, Limited, and the

2   CEO of SCI and SCBV personally.  Chapter 11 Trustee is the

3   only movant here.

4          Upon further review of the complaint, there are

5   five counts enumerated.  Count 1 is the only count directed

6   at the Trustee and only seeks an injunction/order.  There is

7   no prayerful relief associated with Count 1.

8          However, when read in conjunction with the

9   complaint as a whole, the relief sought related to the

10  Trustee appears to seek a finding that, one, the Rembrandt

11  property is embedded within the Debtor's assets; two, an

12  injunction preventing the sale of the Debtor's assets until

13  the Trustee has determined what assets are Rembrandt and

14  removed therefrom; three, an order requiring the Trustee to

15  remove Rembrandt assets from the Debtor's assets; and four,

16  an order requiring the Trustee to transfer source codes to

17  Rembrandt pursuant to Section 365(n) of the Bankruptcy Code.

18         There does not appear to be any request for

19  monetary damages asserted against the Trustee.

20         Moreover, this motion only relates to the count

21  directed at the Trustee.  The Court does not address the

22  other counts directed at the other parties since those

23  parties have not answered or otherwise moved.

24         However, the Court questions whether it would have

25  constitutional authority to enter judgments in the bilateral

1  litigation between two non-estate parties.

2          Factually, the complaint recites a significant

3  history of litigation between Rembrandt and the Debtors,

4  which predated the appointment of the Trustee.  The complaint

5  further details actions that were taken by the Trustee in

6  order to prevent certain parties, including those that are

7  named as defendants herein from exploiting certain of the

8  Debtor's technology, which may have also included technology

9  of Rembrandt.

10         Finally, the complaint details the actions

11  undertaken by the Trustee in resolving disputes with certain

12  of the other named defendants, namely Hawk, SCI, SCBV, and

13  the resultant entry of the sale procedures order and the sale

14  order.

15         The settlement order, the bid procedures order,

16  and the sale order were all approved by the Bankruptcy Court

17  after hotly contested issues in very specific orders.  Those

18  orders are presently the subject of pending appeals before

19  United States District Judge Gallagher at Case Numbers 24-

20  6397, 24-6498, 24-6618, and 25-751.

21         The Court takes judicial notice of the following

22  items from the main bankruptcy case.  In connection with the

23  objections raised by Rembrandt to the Trustee's proposed

24  bidding procedures, the Trustee and Rembrandt amended the

25  sale offering documents presale to specifically identify

1   Rembrandt's assertion of its ownership rights at Docket No.

2   810.

3         The Court entered an order approving the sale of

4   substantially all of the Debtors assets to SCI over the

5   objection of Rembrandt at Docket No. 876.  In that order, the

6   Court found that the sale was in the best interest of the

7   estate and further found that SCI was a buyer in good faith

8   for purposes thee sale transaction at Paragraph 7.

9         The sale order also had a limitation or a

10  preservation of Rembrandt's rights to pursue litigation

11  against parties violating their intellectual property at

12  Paragraph 5.

13        The Court approved the sale and specifically the

14  terms of the APA, which would govern the sale.  Section 3.4

15  of the APA, which is attached as an exhibit to the sale order

16  contains the following acknowledgment.  The buyers

17  acknowledge that certain intellectual property may be subject

18  to superior rights of Rembrandt as licensor and that the

19  sellers, the Trustee, cannot transfer any interest in the

20  transferred assets that is not owned by the sellers.

21        Further, Section 1.2(j) of the APA contains a

22  specific exclusion that items that are subject to a Rembrandt

23  license are excluded assets and are not within the definition

24  of transferred assets for purposes of the sale transaction.

25        Finally, the sale order is supported by an opinion

1  of this Court, Docket No. 916, in which the Court relates the

2  history and the resolution of the objections that were

3  previously raised by Rembrandt to the settlement motion, to

4  the bid procedures motion, and to the sale motion.

5          Of particular note is the objection raised by

6  Rembrandt seeking a prior determination that the Trustee is

7  prevented from selling any assets which are owned by

8  Rembrandt.

9          Importantly, in the opinion that was issued in

10 support of a sale, the Court made very clear, "Rembrandt

11 asserts it . . . has intellectual property that may not be

12 transferred to SeeCubic.  To the extent those rights exist,

13 they are excluded under the APA."  That's at Docket No. 916,

14 Page 21.

15          Therefore, in the ultimate determination by the

16 Court, Che court has already concluded that the APA, which

17 was approved by the sale order, does not transfer any

18 Rembrandt-owned assets.

19          Based on the following facts, the Court takes up

20 the motion to dismiss.  Federal Rule of Civil Procedure 12

21 (b)(6) incorporated and made applicable to adversary

22 proceedings by Federal Rule of Bankruptcy Procedure 7012(b)

23 requires dismissal of a complaint for "failure to state a

24 claim upon which relief can be granted."

25          When faced with a motion to dismiss for failure to

1 state a claim, the Court must review the complaint to

2 determine whether there are sufficient factual matters

3 alleged, which, if true, could state a claim for relief that

4 is plausible on its face.

5        Bell Atlantic Corp versus Twombly, 550 U.S. 544 at

6 Page 540 from 2007, and Ashcroft v. Iqbal, 556 U.S. 662 at

7 678, 679 from 2009.

8        The Court must assume that all of the facts pled

9 are true and draw any inferences in favor of the plaintiff to

10 determine whether the complaint alleges a plausible claim for

11 relief.  See, Suiter versus University of Pennsylvania, 923

12 F.3d 320 at 325 from the Third Circuit in 2019.

13        While the complaint need not recite the legal

14 elements of each cause of action per se, the complaint must

15 nonetheless plausibly allege facts which would support all of

16 the relevant elements of a particular cause of action pledge.

17 See, generally, 2, Morris Federal Practice, Section 12.34,

18 Clause 4(a) and the cases that are collective therein.

19        On a motion to dismiss, the party seeking

20 dismissal bears the burden of showing that there is no claim

21 stated.  Kehr Packages Inc. v. Fidelcor, Inc., 926 F.2d. 1406

22 at Page 1409 from the Third Circuit at 1991.

23        In considering a motion to dismiss, the Court is

24 constrained to review only the facts alleged in the

25 complaint.  The Court may not generally consider evidentiary

1 submissions outside of the pleadings.  One exception is of

2 particular note here.

3 　　　　The Court may consider facts that are subject to

4 that are subject to judicial notice, including docket events

5 of judicial proceedings.  Southern Cross Overseas Agencies,

6 Inc. v. Wah Kwong Shipping Group, Limited, 181 F.3d 410 at

7 Pages 426 and 427 from the Third Circuit in 1999, which holds

8 that a court may take judicial notice of public record,

9 including judicial proceedings, and thus a court can take

10 judicial notice of a court's opinion for the existence of the

11 opinion and its statements, but not for the facts presented

12 therein.

13 　　　　With these general principles in mind, the Court

14 reviews the counts that are plead against the Trustee in the

15 complaint.  As noted, the only count directed at the Trustee

16 is Count 1, and it nominally seeks a finding that Rembrandt

17 property is embedded within the Debtor's assets, an

18 injunction preventing the sale of the Debtor's assets until

19 the Trustee has determined what assets are Rembrandt and

20 removed therefrom, an order requiring the Trustee to remove

21 Rembrandt assets from the Debtor's assets, and an order

22 requiring the Trustee to transfer source codes to Rembrandt

23 pursuant to 365(n) of the Bankruptcy Code.

24 　　　　The Trustee suggests that the principles of res

25 judicata and/or claim for seclusion bar the claims asserted

1   against the Trustee in the complaint as a matter of law.

2   Prior to addressing that, the Court takes up the issue of

3   whether or not Section 365(n) of the Bankruptcy Code is

4   applicable.  Given that there has not yet been a rejection of

5   a license, that section is not applicable, and the Court

6   cannot make an advisory opinion as to whether the obligations

7   arise under 365(n) until such time as there is an order

8   seeking rejection of that license.

9           With respect to the application of res judicata

10  and claim preclusion, it can be determined on a motion to

11  dismiss from the face of the complaint or from facts that are

12  subject to judicial notice.  See Davis versus Wells Fargo at

13  824 F.3d 333 at Pages 341 to 344 from the Third Circuit in

14  2016, holding that the face of a complaint demonstrated that

15  material facts were identical to the first action, so the

16  district court properly dismissed it under 12(b)(6) of the

17  Federal Rules of Civil Procedure based on claim preclusion.

18          See also Day versus Moscow, 955 F.2d 807 at PG&E

19  811 from the Second Circuit in 1992, which dismissed the

20  complaint based on the affirmative defense of res judicata.

21  Giragosian versus Ryan, 547 F.3d 59 at Page 66 from the First

22  Circuit in 2008, permitting the reliance on an earlier

23  judgment for purposes of determining res judicata without

24  converting the motion to dismiss to a motion for summary

25  judgment.

1          And see also Buck versus Thomas M. Cooley Law

2     School, 957 F.3d 812 at page 816 from the Sixth Circuit in

3     2010.

4          The United States Court of Appeals for the Third

5     Circuit has articulated the principles applicable to the

6     application of res judicata or collateral estoppel.  Claim

7     preclusion requires a showing that there has been a final

8     judgment on the merits in a prior suit involving the same

9     claim and the same parties or their privities.  That's from

10    The United States versus 5 Unlabeled Boxes, 572 F.3d, 169 at

11    173, Third Circuit, 2009.  Citations omitted.

12         Further, collateral estoppel, which is also known

13    as issue preclusion, requires a previous determination that,

14    one, the identical issue was previously adjudicated, the

15    issue was actually litigated, the previous determination was

16    necessary to the prior decision, and the party being

17    precluded from relitigating had the full opportunity to

18    present in the prior action.  The United States v. Five

19    Unlabeled Boxes, 572 F.3d 169 at Page 173, and citations are

20    otherwise omitted.

21         Like in Five Unlabeled Boxes, the parties here use

22    the term res judicata and collateral estoppel nearly

23    interchangeably, but the Court will use the term res judicata

24    since it encompasses both claim and issue preclusion.

25         The complaint details the actions that were

1    undertaken by the Trustee in resolving the disputes with

2    certain of the other defendants, namely Auk, SCI and SCBV and

3    the resulted bid procedures and sale procedures which

4    resulted in court orders.

5            The Court takes judicial notice of the sale order

6    approving the sale of substantially all of the Debtors assets

7    over the objection of Rembrandt at Docket No. 876 as well as

8    the opinion that was entered by the Bankruptcy Court at

9    Docket No. 916.

10           The Court reiterated the history and the

11   resolution of the objections that were raised by Rembrandt to

12   the settlement motion, to the bid procedures motion, and to

13   the sale motion.

14           Of particular note is the Court's disposition of

15   the objection filed to the bid procedures order and renewed

16   at the sale order whereby Rembrandt sought, one, a

17   requirement that the Trustee marshal non-estate assets and an

18   assertion that the sale should not be approved because the

19   purchasing parties were violating the TRO that was issued in

20   Case Number 23-57, which has since been dismissed and the TRO

21   has since expired.

22           A comparison of the parties and the issues raised

23   in the disposition of the settlement order, the bid

24   procedures order, and the sale order with the relief that is

25   sought against the Trustee in Count 1 makes the application

1  of res judicata immediately apparent.

2        Undisputably, Rembrandt and the Trustee were both

3  parties to the prior determination in the main bankruptcy

4  case and are two of the parties in this adversary proceeding.

5        In this adversary proceeding, Rembrandt seeks an

6  injunction preventing the sale of the Debtor's assets and an

7  order requiring the Trustee to remove any Rembrandt assets

8  from the Debtor's assets prior to sale.  Again, those were

9  identical issues raised and addressed in connection with the

10  disposition of the bid procedures order and the sale order.

11        Even further, the issue was plainly addressed in

12  the sale order.  Sale orders specifically approved the APA.

13  See Paragraph 3 of the sale order.  Section 3.4 of the APA,

14  which is attached as an exhibit to the sale order, contains a

15  very clear and plain acknowledgment.

16        Buyers acknowledge that certain intellectual

17  property may be subject to superior rights of Rembrandt as

18  licensor and the sellers cannot transfer any assets in the

19  transferred assets that is not owned by the sellers.  Section

20  1.2(j) of the APA contains a specific exclusion that items

21  that are subject to a Rembrandt license are excluded assets

22  and are not within the definition of transferred assets for

23  purposes of the sale transaction.

24        Further, in the opinion the Court directly

25  addressed the objection repeatedly raised by Rembrandt, which

1  sought a prior determination that the Trustee is prevented

2  from selling any assets that are owned by Rembrandt.

3  Importantly, in the opinion issued in support of the sale,

4  the Court made very clear, Rembrandt asserts it has

5  intellectual property that may not be transferred to

6  SeeCubic.

7         To the extent those rights exist, they are

8  excluded under the APA.  See Document 916 at Page 21.

9  Therefore, in the ultimate determination by the Court, the

10  Court has already concluded that the APA, which was approved

11  by the sale order, does not transfer any Rembrandt owned

12  assets.

13         In addition to the orders entered by the

14  bankruptcy court, which the Court takes judicial notice of,

15  the Court also takes judicial notice of these entries in the

16  main bankruptcy case that suggests that the sale closed,

17  although the Court does not rely on the mootness as the basis

18  for the current disposition here.

19         So whether we are talking about claim preclusion

20  or issue preclusion as subsets of res judicata, the identity

21  of the parties, the identity of the claims and issues

22  elements of res judicata are clearly met.  Bankruptcy Court's

23  determination in overruling Rembrandt's request from

24  marshalling exclusion sought here, as in the bid procedures

25  order and the sale order, were also necessary for the Court's

1   prior determinations, so that element, too, is met.

2           Therefore, the only remaining question is whether

3   the adjustments are final for purposes of the application of

4   res judicata.  Court recognizes that Rembrandt is a party to

5   various appeals pursuant to Part VIII of the Federal Rules of

6   Bankruptcy Procedure, which are presently pending before The

7   United States Bankruptcy Judge Gallagher, namely No. 24-397,

8   which relates to the denial of the motion for reconsideration

9   of the settlement order, Case No. 24-6498, which relates to

10  the entry of the bidding procedures order, Case No. 24-6617,

11  which relates to the entry of the sale order.  And those

12  three appeals have all been fully briefed, as well as Case

13  No. 25-751, which relates to the order denying the motion to

14  stay pending appeal, which briefing is currently underway.

15          Federal court judgments can be a basis for

16  preclusion, despite pending or future appeals.  See Huron

17  Holding Company versus Lincoln Mine Operating Company 312

18  U.S. 183 at page 189 from 1941, noting that an appeal does

19  not "detract from the decisiveness and finality of a

20  judgment."  See also generally restatements second of

21  judgment, Section 13, Comment F, and 18 in Moore's Federal

22  Practice Civil, Section 131.03.

23          Since the pending appeals do not prevent the Court

24  from relying on the bidding procedures order and the sale

25  order for res judicata purposes in this instance, that

1  element, too, is met.

2          For all of these reasons, the Court concludes that

3  based on the face of the complaint and judicial notice taken

4  of the prior entries in the main bankruptcy cases highlighted

5  herein, claims asserted by Rembrandt against the Trustee in

6  Count 1 or otherwise throughout the complaint are barred by

7  the doctrine of res judicata.  And as a result, Count 1

8  specifically and any claims asserted against the Trustee are

9  hereby dismissed.

10          The Court otherwise reserves the right to amend

11  and supplement this opinion as permitted by Local Rule 8003-1

12  and an appropriate order will issue.  Parties have any

13  further questions?

14          MR. COREN:  No, sir.  Thank you.

15          MR. MICHAELS:  Thanks, Your Honor.

16          THE CLERK:  We are at -- sorry.

17          THE COURT:  Yes, I'm sorry.

18          MR. MICHAELS:  Your Honor, as stated earlier,

19  Rembrandt has sought at all times to reduce the amount of

20  litigation, and it feels like this decision, although I

21  understand it and in a position to, obviously, have to accept

22  it, just breeds the potential for more litigation.  I think

23  as you -- to quote yourself, you were saying, well, if the

24  Trustees already transferred the assets, you know, sue him

25  for that transfer.  And of course, this motion was filed on

1    December 4th before that transfer had occurred.

2                 But you also mentioned your willingness to

3    facilitate mediation.  I personally believe that would be

4    helpful.  I have good amount of success with mediation.  I

5    think it would be productive if -- they now that Stream has

6    access to patent counsel, if we were to sit in a room and go

7    through.

8                 And I do this all the time, which would normally

9    be an audit procedure that takes 15 minutes to a few hours.

10   And if the other party is willing to agree, we could

11   hopefully resolve our differences here.  But if there's a

12   constructive way to do that, I'd like to explore.

13                THE COURT:  If the parties are willing to take the

14   benefit of our Court mediation program, you're more than

15   happy to have that discussion, and let us know, and we can go

16   through that process.  We can go through the order process.

17                I did that a lot in practice before I came on the

18   bench, so I'm happy to help facilitate that if there are

19   parties that are -- if we can find somebody who's willing to

20   do it.  If you're not able to find somebody who's willing to

21   do it, I would be willing to discuss with you all whether you

22   would find it appropriate if we had a settlement conference

23   including with me.  But that's a discussion that I think you

24   all have to have first, and then we can talk about what the

25   appropriate next steps are.

1     I did hear Mr. Coren say they anticipate to be

2   filing another complaint. I don't know if that's going to be

3   the right avenue, but I certainly welcome that if the parties

4   want to have that discussion, and I'm happy to try and

5   facilitate that.

6     MR. COREN: Appreciate that, Your Honor. And I do

7   believe until we file that, which I advise the Court we will

8   file, it'd be premature to consider it. I think we'll try to

9   do that in due course. We'll try to accelerate it. And then

10  once we do that, we can take a step back and look at the

11  landscape and see whether some new resolution makes sense.

12    THE COURT: You have a lot of appeals going on,

13  and I know that there's other things coming down the pipe. I

14  know we got another one in -- got another issue that we're

15  going to be taking up, you know, shortly, so I understand.

16    MR. COREN: Thank you, Your Honor. Are we meeting

17  right now?

18    THE COURT: Well, so that's what I was going to

19  suggest. So I have 1:30. My staff hasn't obviously taken a

20  break, which I would like to give them the opportunity to do.

21  As those of you that are local know, this isn't the best area

22  for things that are local to get something to eat at, but we

23  can come back in an hour or shorter depending on what you all

24  want.

25    I will say this. I don't know how long we expect

1  this afternoon to take.  And just so you have the benefit of

2  my thinking and my schedule, I can probably go till about --

3          Barbetta (phonetic), what do we think?  5:00-5:30?

4  That's probably about the max.  And I'll have -- I'll just

5  have to let the marshals downstairs know.

6          So I don't know if you all think we can resolve --

7  we can get through all the witnesses that you need to get

8  through this afternoon.

9          MR. SWICK:  I don't think that -- no.  If we take

10 an hour break and then come back for argument and witnesses,

11 I don't -- I don't think it'll be that quick.

12         THE COURT:  Okay.  How many witnesses do you

13 anticipate calling?  I did notice on your witness list that

14 there were several, but I --

15         MR. SWICK:  Yeah, all those witnesses were

16 actually going to call.

17         THE COURT:  Okay.

18         MR. SWICK:  Yeah.

19         THE COURT:  Mr. Coren?

20         MR. COREN:  We're going to call one that's on

21 their witness list --

22         THE COURT:  Okay.

23         MR. COREN:  -- so that and the Trustee.  And we

24 have submitted already the Trustee's testimony by

25 declaration.  I don't know if Your Honor has seen it yet or

141

1   not.

2            THE COURT:  I did see it.

3            MR. COREN:  And, of course, we'll supplement it

4   just a touch and be available for cross-examination.  They

5   have it since we filed it some point last week, so that will

6   accelerate it a little bit, I think.

7            THE COURT:  Okay.  Why don't we plan on this?  Why

8   don't we plan on coming back at -- 2:30 is less than an hour,

9   shortly less than an hour.  It's 1:30 -- I have 1:40 right

10  now, 1:37.

11           MR. COREN:  Your Honor, since it looks like we're

12  not going to finish, perhaps we take the hour, and I don't

13  think that ten minutes is going to matter whether we finish

14  today.

15           THE COURT:  That's fine.  Like I said, I'm going

16  to have a hard stop at --

17           MR. SWICK:  Oh, yeah, yeah, yeah.  I understand.

18  Unless you --

19           MR. COREN:  I think, too, we can see on the

20  first -- how late we start and how long goes.  And we could

21  also just, like, end at 5:00.  If we're going to have to

22  readjourn anyway, we have to readjourn, so there's no reason

23  to press late and all that.

24           THE COURT:  Here's what I'm going to do.  Do you

25  all -- are you all planning -- I know Mr. Michaels is

1    leaving, but are you all hanging out?

2            MR. SWICK:  I had a 6:30 flight, which is just not

3    going to happen.  So I'll just book that in the hour and fix

4    that and stay another night.

5            THE COURT:  Okay.  I have the morning tomorrow,

6    but I have to be done by 12:00.  So and I can start -- my

7    staff will not love me.  I can start as early as you want.

8            MR. SWICK:  I don't -- I don't think we're going

9    to need, like, ten hours.  I think we -- if we get started at

10   9:00/9:30, we're going to be done by noon tomorrow.  With

11   that -- we'll see how fast it goes --

12           THE COURT:  Okay.

13           MR. SWICK:  -- when we --

14           MR. COREN:  I think that's likely.

15           THE COURT:  All right.  So why don't we do this?

16   Why don't we plan on coming back at 2:45?  We'll go until

17   5:30 tonight --

18           MR. COREN:  Okay.

19           THE COURT:  -- with the expectation that we can

20   use the morning as needed.  I do strongly suggest to the

21   parties, if you want to proffer your direct testimony, you

22   can do that.  It does streamline it a little bit.  If you

23   want to put your witness on and go through direct the

24   proverbial old school way, we can do that, too.  It just

25   takes a little longer.

1              MR. SWICK:  Yeah, I mean, we haven't been allowed

2     to put a witness on in, like, many, many hearings.  I really

3     do want to put my witness on --

4              THE COURT:  Okay.

5              MR. SWICK:  -- and go through it, but we will be

6     as efficient as possible.  I promise you, Your Honor.

7              THE COURT:  Okay.

8              MR. SWICK:  I totally understand.

9              THE COURT:  All right.  Well, I thank the parties,

10    for their hard work to date, and I'll look forward to seeing

11    you at 02:45.

12             MR. SWICK:  Thank you.

13             (Off the record at 1:39 p.m.)

14             (On the record at 2:45 p.m.)

15             THE BAILIFF:  All rise.

16             THE COURT:  Okay.  So I think we are here on the

17    application of Visual Semiconductor for administrative claim.

18    I did have the opportunity to review the various materials,

19    including the motion at Docket 966, the opposition at 982,

20    and the reply at 991.

21             Are there any other matters that the Court should

22    be aware of before proceeding?  Okay.

23             I'll leave it to you.  I don't need opening

24    statements, but if you want to use, you know, the openings --

25    if you want to use time on an opening statement, be my guest.

 1  | But I think we can jump right into the testimony, given that,

 2  | I mean, I generally understand the issues,

 3  |          MR. SWICK:  Yeah.  I would -- I would love to do

 4  | it, but we're running a little late on time.  And I -- Mr. --

 5  | our first witness lives in Nevada, so I don't want him to

 6  | have to stay late tomorrow.  So I'll just go right into it.

 7  |          THE COURT:  That's fine.

 8  |          MR. SWICK:  And we can argue later today or

 9  | tomorrow if we have time.

10  |          THE COURT:  That's fine.

11  |          MR. SWICK:  All right.  We'd like to call Charles

12  | Bud Robertson to the stand, Your Honor.

13  |          THE COURT:  Okay.  Now, I do see Ms. Maneen is on

14  | the phone.

15  |          MR. SWICK:  Okay.  Yes, yeah.  She would be the

16  | next witness probably --

17  |          THE COURT:  Okay.  I also know Mr. Homony is on

18  | your witness list and their witness list.  I'm assuming that

19  | you'll just take him when they call him?

20  |          MR. SWICK:  I think that's right.

21  |          THE COURT:  Okay.

22  |          MR. SWICK:  Like, I don't really -- as long as --

23  | the only concern is can you ask questions outside of the

24  | scope of the declaration that we want to make him our

25  | witness, but we can just do it all at once.  We don't have to

 1   do it twice.

 2           MR. COREN:  And I don't -- I don't press that

 3   objection.  He can go outside the scope.  He's the Trustee.

 4   Ask him whatever YOU want.  I mean, we do the --

 5           THE COURT:  That was my view, too, Mr. Coren,

 6   so --

 7           MR. COREN:  We do the declaration just to speed it

 8   up, but --

 9           THE COURT:  Understood.

10           MR. COREN:  -- you know, he can go outside, and

11   perhaps I'll have follow-up outside of it.

12           THE COURT:  Understood.

13           MR. COREN:  Okay.

14           MR. SWICK:  All right.  That's fine.

15           (Witness sworn)

16           MR. COREN:  Yeah.  I just wanted to ask, Your

17   Honor.  Since I got papers all over the place, are we -- are

18   you All right with us examining from counsel table?

19           THE COURT:  I am.  Except for the -- well, I guess

20   the witness who's on the phone should be able to see you.

21   But if for some reason they can't see you --

22           MR. COREN:  I'll try to move this way.

23           THE COURT:  -- you may need to be --

24           MR. COREN:  Yeah.

25           THE COURT:  -- closer to the camera.

1          MR. COREN:  Okay.

2          THE COURT:  But otherwise, that's fine.

3          MR. COREN:  Appreciate that.  Thank you.

4          THE COURT:  Mr. Swick, same thing for you.  If

5    you're more comfortable at counsel table, be my guest.

6          MR. SWICK:  I've been sitting all day, Your Honor.

7    I'll stand.

8          THE COURT:  Understood.  All right.

9          THE CLERK:  Name.

10         THE WITNESS:  Charles M. Robertson,

11   R-O-B-E-R-T-S-O-N.  10 Via Visione, Unit 201, Henderson,

12   Nevada 89011.

13         THE CLERK:  Thank you.

14         THE COURT:  Good afternoon, Mr. Robertson.

15         THE WITNESS:  Good afternoon.

16   DIRECT EXAMINATION

17   BY MR. SWICK:

18   Q    Good afternoon, Mr. Robertson.  I just want to clear it

19   up right now because I'm trying to refer to you as Bud at

20   some point.  Could you give your full name and your nickname?

21   A    My legal name is Charles M. Robertson.  I go by the

22   nickname Bud.  I have professionally for all my adult life.

23   Q    All right.  What is your current occupation?

24   A    I'm VP of operations for Visual Semiconductor, Inc.

25   Q    All right.  What did you do before working for -- we'll

short it -- Visual Semiconductor, I'll shorten it to VSI.

What did you do before working for VSI?

A    I worked with Stream TV Networks since its founding in,

2009.

Q    All right.  Now before that, just give a very brief

overview of your, you know, employment, occupational history.

A    Out of college I went to work into the film and

television industry.  I worked as a producer for about 25

years doing a variety of tasks in the film production arena.

Q    Like writing, producing, assistant directing?

A    A lot of assistant directing, some writing, producing,

coordinating, editing.  Yeah.

Q    All right.  When did you meet Mr. Mathu Rajan?

A    I met Mr. Rajan in 2008 through a mutual friend for a

special project that dovetailed into the entertainment

industry.

Q    Okay.  Could you go into a little bit more detail

about, you know, starting to work with Mr. Rajan and Stream

and how that came about?

A    Yes, I was introduced to Mr. Rajan in May of 2008.  We

worked on a special project where he was exploring the

potential to get into film distribution in certain global

ethnic markets.  And that's a project that we pursued for

most of 2008.

And then he made it pretty clear he wanted to go into

1  technology sector that had certain barriers to entry, as

2  opposed to just content creation where everybody's making

3  movies and there's not a lot of barriers to entry.  So he

4  formed Stream TV, and I joined him at the founding of Stream

5  TV in 2009.

6  Q     All right.  Well, I don't think we actually talked

7  about it yet today.  Could you just talk about what Stream TV

8  is and what it did?

9  A     Stream was founded to develop an advanced imaging

10 technology.  Mathu had this crazy idea that maybe we could do

11 3D but without glasses.  And there must be somebody working

12 on that technology somewhere in the world.  So we began this

13 global search to see what technologies were out there versus

14 growing something homegrown.  Could we license something?

15     We came across the Philips Technology, which was very,

16 very nascent at that time in 2009.  But Mathu saw that with

17 the right amount of development effort, that that could

18 actually be a good path to a product that the world would

19 accept.

20     So we spent the better part of a decade really working

21 on that technology and part of the reason it took so long as

22 we had to wait for the rest of the industry to catch up and

23 providing panels that were sufficient quality that the 3D

24 would work.  So this was -- you know, HD was pretty brand new

25 at that point, and it wasn't really until 4K came around that

 1  we got to a place where we felt that the technology could

 2  work.

 3       So I was largely doing business development at that

 4  point, showing prototype units to Hollywood content creators,

 5  up to Amazon, device makers.  We were really trying to build

 6  a whole global ecosystem that included the content creation,

 7  the manufacturing and the distribution.

 8  Q    All right.  So did Stream actually make TVs that were

 9  3D?

10  A    We did.  I wouldn't call them TVs.  They were TV size.

11  They were monitors.  So a TV has a tuner that you can pull in

12  some outside programming.  This was a closed system.  But it

13  was a 65-inch display.  It's the size of a television.

14       And we produced several thousand of those units and

15  sold them to digital signage companies, mostly in the

16  commercial space.  These weren't items that people bought for

17  their homes, but there were lots of business applications for

18  them.  And we had customers in Asia that bought hundreds, if

19  not thousands and other customers and one in the U.S. that

20  bought several hundred.  So, you know, there are several

21  thousand of those units that are out in the world.

22  Q    All right.  Well, it sounds like things are pretty

23  promising for a while.  So let's -- short -- little bit of a

24  short time frame here.  So I want to go -- let's talk about

25  the -- so blowing -- going and making TVs.  And then we -- I

1  know there's litigation before the bankruptcy.  So let's

2  talk -- let's go through that phase, and we'll go from

3  litigation to the bankruptcy.

4  A     Okay.  Actually, 2020 was a really good year and a

5  horrible year for Stream.  We had been working with a company

6  called Bosch (phonetic) in Germany.  They're a supplier of

7  automotive components.  I personally negotiated a $3 mill

8  development deal with Bosch to create an instrument cluster.

9  So your speedometer and your tachometer and all that would be

10  digital in glasses free 3D.  So we secured that contract in

11  March of 2020.

12       At the same time, we've been working with Google on a

13  project.  Google wanted to create a video teleconferencing

14  solution that they could use for people who wanted to do, you

15  know, basically 3D Skype, right, that you could use for

16  business and personal.  And so we spent the better part of --

17  well, the back half of 2019 and a good chunk of 2020, working

18  on that, and I was involved in the weekly meetings with the

19  Google engineers and the Stream engineers on that.

20       And oddly enough, the same day -- and I remember

21  because it's St. Patrick's Day.  The same day we signed the

22  Bosch contract is when Google sent an email saying, okay, if

23  this prototype that you're delivering pans out, we'd like to

24  take 10,000 units in 2021, and that would have been about a

25  $20 million deal at $2,000 apiece.

1    So things were looking pretty good there, but also in

2  March 2020, that's when the pandemic hit, and we had a

3  product that you had to be able to see with your own eyes.

4  So we could no longer take it to customers; we could no

5  longer take it to investors; we could no longer take it to

6  device manufacturers or strategic partners.  We were pretty

7  well shut down with the business development side of things.

8    Luckily, we had already -- the Google project was

9  running, and the Bosch project was running.  So we had a

10 couple of projects that we could continue to go with.  And --

11 but we were really kind of running on fumes.  And that was

12 right about the same time that the secured lenders of Stream

13 made a move to seize the technology.

14 Q    Well, let's talk about that right there.  That's why

15 I'm kind of getting at into this litigation.  Also want to

16 note for the record, I have still not seen this TV, and I'm

17 kind of salty about it.  So I'd really like to see this

18 technology because it sounds really cool.  But let's talk

19 about the secured lender.  Who is the secured lender?  And

20 give us the background as to how that transaction happened

21 and what happened in 2020 regarding that?

22 A    Well, in the early days of Stream --

23    MR. COREN:  Sorry.  Excuse me.  I'm having -- I

24 can hear the witness, but I can't hear you.

25    MR. SWICK:  Oh, then I'll just have to --

```
 1              MR. COREN:  Yeah, I don't whether the mic's --
 2              MR. SWICK:  It's not coming through the mic.
 3              MR. COREN:  I'm not hearing anything through the
 4   mic.
 5              THE COURT:  You want to pull it closer?
 6              MR. SWICK:  Sure.
 7              MR. COREN:  Sorry about that.
 8              MR. SWICK:  That's fine.
 9              THE COURT:  Is it coming through?  Okay.  We can
10   hear it.
11              MR. SWICK:  He can come through, that's for sure.
12              THE COURT:  Yep.
13              MR. SWICK:  Okay.  Yeah, yeah.  Okay.
14              THE COURT:  So just try and speak into the
15   microphone as best you can.
16              MR. SWICK:  Will do, Your Honor.
17              THE COURT:  I have -- I've been told I have a
18   booming voice, so it's easier for me to just yell into the
19   microphone.
20              MR. SWICK:  I prefer to yell (inaudible).
21              THE COURT:  My voice doesn't boom so much anymore,
22   so --
23              MR. SWICK:  Yeah, let me restate the question.
24   BY MR. SWICK:
25   Q    So you talked about a secured Creditor, 2020 pandemic.
```

1   We'll talk about the secured Creditor, who it was, how much

2   the secured loan was for, and then what happened in 2020.

3   A     So in the early days of Stream, we took investment in

4   the form of debt from two key Creditors.  One was SLS

5   Holdings run by Shad Stastney who put in about $6 million,

6   and then another group Hawk Investment Holdings Limited out

7   of the UK, Jersey Island.

8        And Hawk put in about 39 million over 18 notes from

9   2012-ish until 2019, I think.  So between the two there was

10  about $45 million in secured debt, and SLS was the senior

11  lender and Hawk was junior in that position.

12  Q     All right.  I'll have more questions on this.  I'm just

13  going to call all of those parties, like, the Hawk parties.

14  And including that, too, I think it's fair to say we'll call

15  SeeCubic Delaware when we get to it as part of the Hawk

16  parties, as well.

17       Okay.  So the Hawk parties have a big, secured loan,

18  45-ish million bucks.  What did they do in 2020 that you

19  referenced earlier?

20  A     Well, before 2020, in 2018 -- if I can add, in 2018,

21  Stream was finding it difficult to bring in new investment

22  because there was this heavy debt sitting there.  So Stream

23  negotiated with both of the secured lenders to execute

24  conversion agreements where Stream raised capital that

25  equaled the capital that they had put in that they would be

1  converted on a dollar for dollar basis, with the terms that

2  the new investors were putting in.

3       So they signed equity -- or debt to equity conversion

4  agreements in January of 2018, and that's what allowed Stream

5  to sort of break that log jam and start to bring in capital

6  in 2018 and 2019 as we were preparing to go to market.

7  Q    All right.  There should be a witness binder over there

8  for you.  Can you grab that?

9  A    Thank you.

10  Q    All right.  Let's please turn to Exhibit No. 37.

11  A    Which one?

12  Q    37.  Sorry.

13  A    There another binder?  This only goes through T-25.

14  Q    Do you have Visual Semiconductor's binder?

15  A    No.  This is the Trustee's binder.

16       MR. SWICK:  Well, I don't want to put his on.

17  I'll put mine on.

18       MR. COREN:  Well, speed things up.

19       THE WITNESS:  This is the Trustee's exhibit, also.

20       MR. SWICK:  All right.  Here you go.

21       THE COURT:  Let's put it this way.  I know I

22  have -- I know I have a set, but -- yeah, that's --

23       THE WITNESS:  Okay.  I'm sorry.  Did you say 37?

24       MR. SWICK:  37.

25       THE WITNESS:  Okay.  I'm there.

```
 1   BY MR. SWICK:
 2   Q    All right.  Do you recognize this document?
 3   A    I do.
 4   Q    What is it?
 5   A    This is the conversion agreement that was signed by
 6   Hawk Investment Holdings.  I'll just call them Hawk.
 7   Q    Okay.  So you've looked at this before?  You're
 8   familiar with it?
 9   A    Very familiar, yes.
10   Q    Is it a true and accurate copy of it?
11   A    It appears to be, other than the court stamp at the top
12   and the exhibit stamp at the bottom.
13   Q    All right.  Good.  All right.  Now, let's turn to
14   Exhibit 38.
15   A    Okay.
16   Q    All right.  What is this document?
17   A    This is the amendment to the Hawk conversion agreement
18   that was executed a little over a year later.
19   Q    And why -- why was it amended?
20   A    The initial conversion agreement in January of 2018
21   accommodated or considered that there would be -- oh, I
22   apologize that's my phone in my backpack, which I forgot to
23   turn the ringer off at lunch.
24   Q    Beautiful ring.
25          THE WITNESS:  Just hit the slide button, John.
```

1    And if you hand it to me, I'll turn the ringer off so that we

2    don't have that happen again.  I apologize.

3               THE COURT:  And give your phone back to Mr.

4    Thompson --

5               THE WITNESS:  Yes.

6               THE COURT:  -- of course.

7               THE WITNESS:  Thanks.

8    BY MR. SWICK:

9    Q     Okay.  So just I'm going to restate that question right

10   there.  Why -- why -- so it's amending the last agreement.

11   So conversion agreement, amending last conversion, but why

12   was the original conversion agreement being amended?

13   A     So the agreement of January 2018 accommodated ten notes

14   from Hawk.  Hawk, as I said, did 18 loans over the course of

15   many years.  And at the time of the conversion agreement in

16   2018, there were only 10 loans that have been made, and it

17   reflects notes 1 through 10.

18         By the time we got a year later into April of 2019,

19   there were two more loans that had been made with the

20   likelihood that there would be some additional ones.

21         So an amendment was agreed to that Notes 11 and 12 are

22   also convertible now, and any future funding that Hawk

23   provides, those will also be convertible.  So that we wanted

24   to address the known additions plus allow for runway that

25   there would probably be some additional funding.

1  Q      Okay.  And so these two, these are to fully convert

2  Hawk.  And then to explain how the conversion would work, how

3  could they get converted under these conversion agreements?

4  A      So it's pretty simple.  It's based on the ACR, which is

5  the actual cash received.  So there might be, let's say, a $5

6  million note.  They're mostly in pounds, but let's use

7  dollars.  So there's a $5 million note and Hawk would say,

8  I'm going to take some prepaid interest.  So although the

9  face value of the note is 5 million, I'm only going to give

10 you 4.5 million.  I'm taking half a million in interest

11 upfront.  Your ACR, the cash you received, is 4.5 million.

12        So this agreement said, we're only going to look at the

13 actual cash you receive, not the face value of the note.  And

14 when you raise 4.5 million from some other source, you can

15 convert the Hawk 4.5 million to equity, and the equity will

16 get will be a match for whatever the new money got.  So if

17 you raise 4.5 million, and you gave them that for a dollar a

18 share where they got -- they invested 4 and a half million,

19 and they got 4 and a half million shares, you give Hawk 4 and

20 a half million shares, too, and their debt is gone.

21        So it was going to be a dollar for dollar based on

22 whatever the new money was coming in.

23 Q      Okay.  So the amount of money that Stream actually

24 received, that's the number.  And then other -- if other

25 money equaled that in equity, then Hawks would be converted

1  from a secured loan into equity; is that right?

2  A      Correct.  And that conversion would be at Stream's sole

3  discretion.  Stream would, at some point, notify Hawk we've

4  raised new money, and the new money was raised under these

5  terms.  And here's a notice that you've been converted.

6        And then according to the agreement, my understanding

7  anyway, is that Hawk might be able to argue about how much

8  equity they should receive and exactly what were the terms.

9  There might be a little bit of haggling on what the equity

10 distribution was.  But the extinguishment of the debt, that

11 happens on notice from Stream that it had -- had brought in

12 new investment.

13        MR. SWICK:  Okay.  And so, Your Honor, I looked at

14 your procedures, and you said you want to get -- admit

15 exhibits at the end.  I don't think we're going to have a lot

16 of exhibit issues.  But happy to -- I'd like to get these

17 admitted.  We could do it at the end, but I'm a little bit

18 worried that, for example, witness steps down, and there's --

19 I messed something up on the direct and didn't lay a proper

20 foundation.  There's an objection, and my -- now my witness

21 is not here anymore.

22        What is the best way to do to -- to go through and

23 admit these exhibits, I guess?

24        MR. COREN:  I think I can solve that problem

25 having gotten them in advance, looked at them, and told

```
 1   counsel there was only one I had a question with, and we

 2   haven't addressed that one.  So at the end of their

 3   presentation, they want to offer all in to evidence, I'll

 4   have no objection with the exception of that one, which we

 5   can talk about.

 6               THE COURT:  Do you want to tell me what one that

 7   is?

 8               MR. COREN:  I don't remember the number, but it

 9   was a supplemental declaration from Suby Joseph filed in

10   connection with the reply brief.

11               THE COURT:  Okay.

12               MR. COREN:  It is -- what number?  32.

13               THE COURT:  Okay.

14               MR. COREN:  Other than that, we'll have no

15   objection.

16               OTHE COURT:  Okay.  All right.  Does that satisfy

17   you, Counsel?  Satisfy you --

18               MR. SWICK:  That's great.  That's super easy.

19               THE COURT:  All right.  I appreciate that the

20   parties have had the opportunity to talk.  I also -- and I'll

21   just say this.  I appreciate that you all went through and

22   did a joint exhibit on the Court's form.  It's actually

23   extremely helpful.  So thank you both in doing that.

24   I appreciate it.

25   BY MR. SWICK:
```

Q     Okay.  So we actually went down a little bit of a
rabbit hole there.  I said, what did the Hawk parties do in
2020 -- the Hawk parties, and you referred back to the 2018
conversion and all that.

      So let's go back to 2020.  What did these Hawk parties
do that was not good for Stream and that you were talking
about?

A     Well, initially, SLS said that it was -- it was not
going to honor the conversion agreement, and it wanted to
call in the note.  And we at Stream didn't have the $6
million to repay the note plus the interest, which
probably -- I don't know at that time was, you know, at least
7 or 8 million total.

      And Mr. Stastney, who was the head of SLS and the
senior secured lender, who was also at that time, the CFO of
Stream and the vice chairman of Stream's board of directors,
he resigned from Stream, and he filed a foreclosure action in
Superior Court in March of 2020

Q     Okay.  Let's talk about that.  The foreclosure action,
how did -- how did this play out?

A     Stream filed its objection, of course, citing the
conversion agreement.  And the judge there said that based on
the docket calendar schedule, that it was not likely to be
heard until 14 months later, so June of 2021 was likely when
the hearing would start.

1   Q      Okay.  Now I'm getting a little confused.  Wasn't there
2   an omnibus agreement that's been mentioned hundreds of times
3   in these cases?  Is that part of what you're talking about,
4   or is that different?
5   A      Well, that -- well, that's the next step.
6   Q      Okay.
7   A.     So in March of 2020, the foreclosure -- foreclosure
8   action was filed.  Mr. Stastney had been telling a variety of
9   people at Stream TV, you know, the assets are now mine.  I
10  have foreclosed; they're mine.
11         And I had a variety of colleagues telling me, I guess,
12  Shad's our new boss now.  And I said, no, I don't think
13  anything's been adjudicated.  It's only been -- it's only
14  been filed.  And so there was a lot of pressure, I think, on
15  Mr. Stastney to get the assets that he wanted to get.
16  And we had pressure from Hawk Investments that we should
17  expand the board of directors, that their feeling was that
18  Mathu Rajan had too much control over Stream TV, and
19  convinced Mathu to expand the board of directors.
20         We expanded the board by three seats.  And, no, I'm
21  sorry, four seats.  There were four directors that were added
22  expanding the board to five.  I'm sorry.  I'm going to back
23  up.  It is three seats, expanding the board to five because
24  we had two -- two directors already.
25  Q      Okay.  How does that relate to the omnibus agreement?

1  Get us where we're going.

2  A    So the new Board members were appointed, and in a May

3  4th, 2020, board meeting, the three new members of the board

4  said, you know, what we really need to do is, we can't afford

5  this -- this litigation that's coming our way.  We really

6  should settle with the Creditors.  Let's form a resolution

7  committee.  And we nominate ourselves.

8      So these two new guys, they're going to be the

9  committee, all opposed.  And Mathu and the current director

10 said, well, hang on, we've just started this and already

11 you're talking about settling.  We should talk about this.

12 And they said, too bad, so sad, we outvote you three to two.

13 We're forming the committee.

14     And so they formed themselves as a committee, and then

15 two days later they handed in a signed omnibus agreement that

16 was -- I don't know -- 30-40 pages that basically said,

17 because there's debt and you don't know how to pay the debt,

18 we're just going to give all the assets to the secured

19 lenders, and that's going to settle it.

20 Q    Okay.  So trying to shortcut a little bit.  These three

21 new directors, I think it's safe to say that they were Hawk

22 party related directors, not Mathu Rajan camp directors?

23 A    Well, there was quite a bit of litigation and

24 discussion about the level of independence of these new

25 directors, but we -- we know for sure that Kevin Golub

1   (phonetic) admitted on the record and otherwise that he was

2   representative of Hawk, and he was happy to represent Hawk on

3   the board.

4   Q    Okay.

5   A    So we know that for sure at least one of them was there

6   specifically as his representative.

7   Q    All right.  So we get the omnibus agreement.  What

8   happens next?

9   A    So the omnibus agreement is signed May 6th.  The

10  agreement basically says, we're going to form a new company,

11  and this new company is going to take possession of all of

12  Stream's assets.  That was May.  In June, SeeCubic, Inc. was

13  formed and SeeCubic, Inc. was that new company that was going

14  to take all the assets.  And it began seizing assets wherever

15  it could get its hands on those assets.

16      We immediately challenged the validity of the board

17  resolution and the ability of the board to transfer all the

18  company's assets because Stream's charter had a specific

19  provision in it that said that in order for there to be a

20  transfer of all or substantially all of the company's assets,

21  a vote of the Class B voting shareholders would be required

22  to approve it.

23      And they said, in this case, because the company is

24  essentially insolvent, we don't think the charter counts.

25  You don't need that vote.  We're taking the things anyway.

1   Q      So there was not a vote by the Class B shareholders to

2   approve?

3   A      There was never one called --

4   Q      Okay.

5   A      -- and never one taken and never one approved, correct.

6   Q      All right.  So I think you just said you did file

7   something in court and challenged it.  Could you -- let's get

8   through that, if we can?

9   A      Yeah, it became clear by August that they were -- that

10  SeeCubic Inc, now that it was up and operating but operated

11  by the secured lenders, Hawk and SLS and Mr. Stastney, they

12  were making a move to take Streams bonding equipment in

13  China.  And we had been copied with a power of attorney

14  letter.  They were trying to empower someone in China to

15  operate on their behalf.

16       So Stream filed a motion, filed a complaint in the

17  Chancery Court of Delaware, seeking injunctive relief and

18  basically blocking them from taking the assets and SeeCubic

19  counterclaimed seeking injunctive relief against Stream that

20  Stream would not challenge the omnibus agreement.

21  Q      What was the result of those waring pleadings right

22  there?

23  A      It was very -- what's the word?  Not contracted, but

24  expansive litigation.  So there were really three steps.  The

25  first one was -- well, right at the start, Vice Chancellor

```
 1  Laster said, well, there's a certain equity component here at
 2  Stream.  You're not allowed to raise any more money into your
 3  bank account.  You have what you have; make do with that.
 4  That was in September of 2020.
 5       There was a couple of months of briefing and discovery.
 6  In December of 2020, Vice Chancellor Laster issued a
 7  preliminary injunction order, and he said, based on the way
 8  things are going, I think it's likely I'm going to find in
 9  favor of SeeCubic, Inc.  So Stream TV, you're no longer
10  allowed to challenge the omnibus agreement outside of this
11  courtroom.  This is where you talk about it.  You have to
12  surrender all your -- you have to surrender your assets
13  pursuant to the agreement.  And if the -- if I find later
14  that the agreement is not valid, then you'll get your stuff
15  back.
16       So on December 8th of 2020, Stream had to surrender its
17  bank accounts, its trademarks, its physical assets, its IP,
18  its stock shares over its international subsidiaries,
19  everything had to go, and Stream was left with nothing but
20  about $16 million in trade debt, which was not being assumed
21  in the omnibus agreement.
22  Q    Okay.  So I'm going to try to jumpstart this a little
23  bit.  So there was an appeal --
24            MR. SWICK:  I'm going to be a little bit leading
25  here, Your Honor, just to kind of go quicker.
```

1  BY MR. SWICK:

2  Q     There was an appeal of that order, and you

3  eventually -- the Delaware -- just give the gist of what the

4  Delaware Supreme Court did in regards to that appeal.

5  A     Sure.  A summary judgment was issued the following

6  November.  So it took another 11 months before we got from

7  the preliminary to the summary judgment.  Stream appealed to

8  the Delaware Supreme Court in December of 2021.  There was

9  oral argument in April.

10       And in June, the Delaware Supreme Court ruled that

11 Stream's charter had been violated and that the omnibus

12 agreement was void ab initio, and it was reversed and

13 remanded to the Vice Chancellor to unwind what he had done 18

14 months earlier.

15 Q     Got you.  So for -- it's reversed, but the underlying

16 order was voided, right?

17 A     Yes, correct.

18 Q     Okay.

19 A     Vacated, yeah.

20 Q     Now, it's been 18 months.  Stream, Mathu Rajan, they

21 have not had control of Stream's assets, and Stream was not

22 operating, right?

23 A     Well --

24 Q     They weren't making TVs.

25 A     Yeah.  Correct.  Stream had no technology with which to

1  operate.  It was operating in terms of pursuing its legal

2  recourses and it was maintaining minimal staff, who had the

3  institutional knowledge of people that did not go with the

4  technology that stayed at Stream.  But Stream wasn't allowed

5  to use its own name or have a bank account, so.

6  Q    Okay.  The Delaware Supreme Court then says, all right,

7  give the stuff back.  Let Stream work again.  All right.

8  Just -- did the stuff get given back?  What happened after

9  that?

10  A    Very little came back.  The primary argument from

11  SeeCubic, Inc. was, well, hey, we've had the things for a

12  year and a half; you know, we've improved them and why -- we

13  shouldn't have to give back something that is better than it

14  was when we got it.  And that argument went on for months.

15      Vice Chancellor Laster ultimately said, you know what,

16  you're arguing that it's not that you can't give them back,

17  it's that you don't want to because they've been improved.

18  You're entitled to unjust enrichment if you can prove that,

19  in fact, Stream was unjustly enriched, but you need to give

20  the stuff back.

21  Q    Were -- was -- were the Hawk parties ever found a

22  contempt of court for not giving the stuff back after the

23  Delaware Supreme Court case?

24  A    They were.  I believe it was early October, beginning

25  of October 2022.  And how that came about was that finally

1  Vice Chancellor Laster said, you know, it occurs to me you're

2  arguing how hard it is to separate the assets and you don't

3  want to give the stuff back, but it looks like a big part of

4  what Stream owns are its international subsidiaries.

5       And they took possession by transferring the stock of

6  Technovative -- a thousand shares of Technovative.  You can

7  just send the shares back and then Stream at least has all of

8  its international subsidiaries.  That's easy.  Do that.

9  Let's start there.

10       And what happened was Hawk and SLS and Shad Stastney as

11  the Head of SeeCubic, Inc., they orchestrated a transfer

12  where they transferred the shares back to Stream, but at the

13  same breath, Hawk issued a proxy rights notice saying, oh, by

14  the way, I have proxy rights to both those shares because I'm

15  a secured lender, and I want to put SeeCubic back in charge.

16       So it was this 360 where we gave it back but instantly

17  yanked it back, and Vice Chancellor Laster said that's not

18  what I meant.  I said that Stream had the right to have its

19  assets to have a chance to pay you back, and if you don't get

20  your assets back, then how can you pay them back?  So they

21  were held in contempt.

22            MR. COREN:  If I may just lodge an objection.  I

23  haven't objected because I view this by way of background,

24  but this witness really is not competent to testify as to

25  what or why courts did what they did.

1      There are decisions which describe all this.  If

2   they wanted to put that into evidence, this witness is

3   nothing but hearsay and his opinion.  But so far, I viewed it

4   as background, but I think to the extent we're going to do

5   more of that, it's not appropriate.

6      MR. SWICK:  It's absolutely foundational and

7   relevant to this administrative claim what they were doing

8   that were -- the administrative claim we're talking about.

9   And he's -- I actually don't need opinions as to why judges

10  did it.  The judges do what they did.  We're doing that as

11  far as background, and we can send a list of docket numbers

12  from the state courts, if Your Honor would like, but that

13  sounds like an awful way to spend time.

14      But we can -- we're happy to plow through this.

15  And we're actually almost right to the bankruptcy, and then

16  we're not talking about other court's orders.

17      But Your Honor, okay, I can just ask for his

18  understanding of it.  I don't need his opinion of it, and I

19  think the Court can sift that out.

20      MR. COREN:  There's an easier way.  I hate to

21  help.  But there's an easier way, and that's just based on

22  whatever happened in the Court, what did you do?  And we

23  don't need to decide what the Court did and why.

24      THE COURT:  I think that's what Mr. Swick just

25  said.  He'll -- he'll just rephrase it to what's his

1  understanding.

2          MR. SWICK:  Yeah.

3          THE COURT:  Okay.

4  BY MR. SWICK:

5  Q     All right.  I forgot where we were.  Do you remember

6  where we were?

7  A      Contempt of court.

8  Q     Okay.  So there was a -- there was a contempt of court

9  order.  All right.  Long story short, I know Stream

10  eventually filed for bankruptcy.  We'll talk about that.

11         But between this, I know there were some de minimis

12  assets that were returned, but there were definitely some

13  things that were never returned prior to or during the

14  bankruptcy.  What were those main things?

15  A     I would say the biggest thing is a multimillion-dollar

16  optical bonding machine that was titled in Stream.  Stream

17  bought that machine, paid for it, deployed it in Asia for the

18  production of those several thousand displays that we

19  mentioned earlier.

20         And then Stream had disassembled that machine to move

21  it into another facility because the equipment manager or

22  equipment manufacturer that we were using was too expensive.

23  Q     Right.

24  A     And that equipment was in storage ready to be moved

25  and -- and deployed somewhere.

1  Q    All right.  So on that bonding machine before we go to

2  the other things, was that pretty important for Stream to

3  operate that bonding machine?

4  A    It was very important, yeah.  That was the

5  multimillion-dollar machine that bonds a lens onto a normal

6  2D panel, and that's what gives the 3D effect.  Was it the

7  only way for stream to go to market?  No, there are other

8  ways that you can do the bonding, but that investment had

9  been made, that equipment had been tested.  And it was the

10 easy path toward production.

11 Q    All right.  Were there any -- what else was never

12 returned to Stream that was -- and without going to every,

13 like, little trinket or whatever, just the main things that

14 were necessary for Stream to operate?

15 A    All of the demonstrator units for phones and tablets

16 and PC monitors and laptops, there were a variety of

17 different products that had samples that were surrendered to

18 SeeCubic, Inc. and never returned because they were

19 "improved" and withheld.

20 Q    Okay.  So you've been -- let's say you get -- you get

21 the -- you have a court ruling from the Delaware Superior

22 Court they should get the stuff.  They don't get it.  And I

23 know there was a bankruptcy.  So what led to the bankruptcy?

24 A    The primary issue for Stream was that nobody was going

25 to invest in a company that didn't have its assets back.  The

1    court ruled -- the Supreme Court ruled in June of 2022,

2    you're right, the assets should never have been taken.  And

3    we had -- we've been working to secure investments so that we

4    could get back into business.

5         The pandemic is mostly over by that point.  We have

6    customers that have been waiting patiently for the ability to

7    order products again, but they can see -- everybody is

8    looking -- that we don't have our assets back yet and the

9    litigation is continuing.  So Stream is pretty much

10   uninvestable.

11        And after nine months of trying to get its assets back,

12   Stream filed for Chapter 11 protection in the hopes that

13   maybe a turnover action would finally get the assets back in,

14   so the company could get back up and running and give it a

15   chance to reorganize with some protection from the secured

16   Creditors and a chance to really take a look at the

17   conversion of the Hawk debt, which was the most significant

18   thing on the books because after the Supreme Court decision,

19   we did an accounting of all the money that had been raised

20   from January 2018 to date and we determined that Hawk was

21   converted, and Stream issued conversion notices to Hawk

22   saying you are no longer debt; your equity.  And here's why

23   and how, and Hawk was challenging that.

24   Q    Okay.  A little bit to unpack here.  So was it just

25   Stream that infused equity, or who infused the equity into

1 │ Stream that, one, gives money through equity and then, two,

2 │ converted the Hawk notes down?

3 │ A    Well, we're talking about an extended period.  So

4 │ the --

5 │ Q    Rough picture.  I don't need --

6 │ A    Yes.  I would -- there's many, many investors who put

7 │ money directly into Stream in 2018, 2019, some in 2020.  That

8 │ was a tough year, as I said.

9 │      And then subsequent to that, Mathu Rajan had formed

10 │ another company because we weren't allowed to do business

11 │ under the Stream name during that injunction period.  And so

12 │ Mathu Rajan kept the Stream team together, and through a

13 │ stock purchase agreement similar to what VSI has, this other

14 │ company, Visual Technology Innovations, kept the Stream team

15 │ together and acquired equity in Stream and made payments for

16 │ the Stream staff and other expenses on Stream's behalf.

17 │ Q    Okay.  So I was worried -- sorry.  I got little

18 │ placeholders here in my own brain.  So Stream/VSI -- or

19 │ Stream's opinion prior to the bankruptcy was that Hawk had

20 │ been fully converted to equity?

21 │ A    Correct.  Based on money it took indirectly.

22 │ Q    They weren't (inaudible) yet.  Okay.  Now we got my

23 │ client, Visual Semiconductor.  Where did this thing come

24 │ from?  Why was it formed?

25 │ A    Well, VSI was formed in April of 2022, right about the

1  time that the Delaware Supreme Court oral argument was taking

2  place.  And Stream felt very confident that it was going to

3  prevail and that it would finally get its assets back.  And

4  VSI was formed as an entity primarily to support Stream

5  through the process of getting back into business.

6       And one of the things -- knowing that Hawk was close to

7  being converted, we wanted to have VSI as an investor in the

8  Stream to really make sure there was a surplus of investment

9  for the Hawk conversion.

10 Q    So VSI is formed really to go find money and put it

11 into Stream to fully convert Hawk.  That's the primary

12 purpose the VSI was formed.

13 A    Yes, I'd say that's one of the primary purposes.  The

14 other purpose was that for Stream to be able to execute on

15 its purchase orders, it was going to need some financial

16 assistance, supply chain financing and other things that it

17 was unlikely to be able to get on its own, given its

18 five-year history of litigation and other such things,

19 whereas VSI as a new entity could support Stream in its

20 effort to get to market.

21 Q    But VSI was never going to try to make a bunch of money

22 on this stuff.  It was really just basically taking in cost

23 and just working to give Stream a way to operate if it got

24 its assets back.

25             MR. COREN:  Objection.  Leading.

```
 1              THE COURT:  Sustained.  I mean, I think you can --
 2              MR. SWICK:  I got it, yeah.
 3              THE COURT:  -- you can re-ask.
 4              MR. SWICK:  Yeah.
 5   BY MR. SWICK:
 6   Q    All right.  So was VSI ever profitable on its own
 7   right?
 8   A    No, it was not.
 9   Q    Okay.  And would you say that it could have maybe been
10   profitable -- Actually, that will be leading to you.  Let's
11   just -- we're fine.
12        All right.  So besides the -- I guess you're -- I think
13   you're referring to like a distributor agreement that was --
14   actually, let's go back to this.  Was anything ever done
15   under this arrangement to do the purchase financing, any of
16   that?  Did VSI ever, like, do one of those contracts?
17   A    There is a distribution agreement that was entered into
18   at the March 2023, just after the petition date for the
19   bankruptcy.  The discussion had started on that arrangement
20   earlier -- I would say probably in January -- but the
21   agreement wasn't actually signed until the March.
22        But the idea with that agreement is that VSI would go
23   out and basically backstop Stream with its customers on
24   getting production done, and it would take a 10 percent fee
25   for doing that.
```

176

1    Q    Okay.  Was that a very profitable arrangement for VSI

2    to do that?

3    A    It never got to that point.  It wasn't going to be a

4    huge profit center because it was -- you know, we were going

5    to -- VSI would largely recover its costs for doing all that

6    support work and, yeah, there was some margin in there.  But

7    because of the litigation chaos and the bankruptcy, no

8    production was ever able to restart.  The bonding machine

9    still sits, I assume, in a warehouse somewhere.

10   Q    Yeah, so no money was exchanged.  VSI did not make any

11   money on this distributor agreement or this arrangement

12   because it never happened.

13   A    No.  Correct.

14   Q    Okay.  Anything else that VSI did purpose-wise -- and

15   really, through the bankruptcy, like, did it do anything

16   else?  Has it done anything else?

17   A    Well, one of the biggest things that it did was in July

18   of 2023,  Stream was nearing the end of its period of

19   exclusivity to propose a plan over the organization, and VSI

20   offered to sponsor that plan.  So that plan was filed on July

21   13th in this court with VSI willing to put up $35 million in

22   funding for a plan that would include primarily pursuit of

23   debt to equity conversion of the secured Creditors and then

24   reasonable return to all of the unsecured Creditors.

25   Q    Okay.  The thought process there was -- well, so, yeah,

```
 1   I guess the understanding for Stream was that Hawk would have
 2   been fully converted and that $35 million would go and that
 3   be some return for unsecured Creditors.  That's leading, I
 4   know, but I'm trying to go a little bit quicker.
 5        Okay.  All right.  That plan never happened, right?
 6   A    No.  Correct.
 7   Q    Okay.  So I'll -- the -- there's still litigation
 8   continued in the bankruptcy?
 9   A    Oh, yes.
10   Q    Okay.  So if earlier -- Mr. Victor had talked earlier
11   today, he testified several times that Stream never made
12   anything, it never did anything, it was not -- totally not
13   operational.  Why was Stream when -- when -- Mr. Victor came
14   in way later, look at -- kind of step through that, but why
15   was Stream not able to make TVs or do anything during the
16   bankruptcy and right before it?
17   A    Well, one of the primary reasons is we never got that
18   bonding machine back.  So that would have made it
19   significantly easier to go into production as opposed to
20   having to bring in third-party vendors to do it.  The
21   purchase orders that were secured by VSI for the benefit of
22   Stream and then back-to-back purchase orders that were given
23   to Stream -- so Stream had 138 million in purchase orders by
24   the April, a month in -- less than a month into the
25   bankruptcy.
```

1    The validity of those purchase orders was challenged by

2  the Hawk parties who were saying that Stream was just making

3  up customers and that there was no market for it and that no

4  way for Stream to fulfill those orders.  And that's what VSI

5  was attempting to do with backstop Stream so that it could

6  fulfill those orders.

7  Q    Okay.  Were you involved in getting those purchase

8  orders?

9  A    I was not personally involved in obtaining them, but I

10  was aware of them.  I saw them come through as they were

11  obtained.

12  Q    Did you ever talk to any people and counterparties to

13  those purchase orders?

14  A    I -- no, I spoke to the salesman who secured them, but

15  I did not speak to the customers myself.

16  Q    What's your understanding -- what's your understanding

17  what's your understanding about the validity of those

18  purchase orders?

19         MR. COREN:  Objection.  His opinion or

20  understanding about the validity of purchase orders that he

21  was not involved in or didn't speak to anyone is irrelevant,

22  and the Court may recall that this Court has already

23  addressed those purchase orders, and I believe found them to

24  be illusory and a sham.

25         THE COURT:  I'll let him answer.

1           THE WITNESS:  Well, my understanding on the

2    smaller of the two purchase orders, I believe it to be very

3    valid because the order was placed by Stream's biggest

4    customer of those several thousand units that were ordered

5    before.  So this was a customer who had already bought more

6    than a thousand, maybe as many as 2,000 units over in Asia,

7    and had been hounding us for a long time when can I get more?

8           And then when he saw that we won in the Supreme

9    Court, then the discussions picked up again.  And by the time

10   early in the bankruptcy, he said, great, I would like to give

11   you an order.  Can you take an order now?  And we said, Yes,

12   we can.

13          So I can absolutely speak to that one purchase

14   order because I dealt with the CEO of that company.  I was

15   directly involved in issuing him the content licenses that

16   allowed him to make content for the screens that he had

17   previously purchased.  I spoke on a regular basis with the

18   salesman who said when are we going to be able to get him

19   more product; he's running out.

20          So I can speak without a doubt that that is a real

21   purchase order from a real customer who has a strong desire

22   to buy product.

23   BY MR. SWICK:

24   Q    So they'd actually paid Stream before for these --

25   A    Oh, yes.

1  Q      Okay.  What's the name of that entity?

2  A      Marvel Digital was the name of the company.  He was

3  operating under a new company now called SyStar (phonetic)

4  Limited.

5  Q      It's not Marvel like Wolverine Marvel?

6  A      No, no, no.

7  Q      Okay.  So different Marvel.  Okay.  Okay.  So we're --

8  let's -- bankruptcy has been filed.  All right.  Just 10,000

9  foot overview.  What's going on between when the bankruptcy

10  is filed and then to about the time that Mr. Homony is

11  appointed?  So he's appointed, I think, in January of 2024.

12  So just give us your overview of that period.

13  A      Yeah, I would say the biggest thing that happened in

14  that window -- and this really goes back to you asked me why

15  didn't Stream get into production.  From the time that the

16  litigation in the Chancery Court was put on hold by the

17  bankruptcy, SeeCubic Inc. was really aggressive in their

18  actions to make sure that we did not regain operational

19  control of the Dutch subsidiary where the R&D work is done,

20  where the optical lenses are designed, where the rendering

21  code is developed.

22        So we did have a product engineering team in Silicon

23  Valley, but the heart of the engineering was in The

24  Netherlands.  And as soon as the bankruptcy started, SeeCubic

25  Inc. made a move over in The Netherlands to replace Mathu

1 Rajan as the director and install Shad Stastney as the

2 controlling Director over in The Netherlands.

3      And that -- and it resulted in the hearing in June,

4 three months into the bankruptcy. In that June hearing, they

5 succeeded in having Mathu Rajan removed and an independent

6 director put in because the -- and I was there in person at

7 that trial, so I heard it directly.

8 Q      This is The Netherlands?

9 A      The Netherlands. Correct. And I was there because I

10 had been the CEO of that Dutch entity, SeeCubic B.V. For two

11 years, I was the CEO, right up until the omnibus agreement,

12 arrested control away from Stream. So they succeeded in

13 having Mathu Rajan removed, an independent director was

14 appointed.

15      After less than a month, the independent director

16 realized, gee, this is way too contentious for me. He

17 resigned and another hearing took place. And in the

18 subsequent hearing, Shad Stastney was appointed the sole

19 director of the Dutch entities. And there are several of

20 them.

21      So at that point -- well, really, not at that point,

22 all year long, the Dutch team had said, we don't know who to

23 listen to. Mr. Stastney says, I'm in charge. Mr. Rajan

24 says, no, look, I'm in charge. The Delaware Supreme Court

25 said you have to listen to us. And our Dutch team, who we'd

1   worked with for ten years, said, we don't know who to

2   believe; we're not lawyers; we'll wait until a Dutch court

3   tells us what to do.

4        And so they sat on their hands for the beginning of the

5   bankruptcy, and then ultimately the Dutch court appointed Mr.

6   Stastney.  And from that point in September of 2020, we had

7   no ability to direct our international subsidiaries.  So even

8   if we'd gotten the bonding machine back, we didn't have other

9   parts of the package that we really needed to get to market

10  because the Hawk parties, as you call them, were interfering

11  in our ability to operate.

12  Q    Okay.  So just to summarize, it sounds like basically

13  from when the omnibus agreement, which -- what year was that

14  you said?

15  A    That was May of 2020.

16  Q    So really, Stream didn't have what -- didn't have the

17  ability to really operate starting right then and it carried

18  all the way over until the Chapter 11 Trustee was appointed

19  and through that?

20  A    Yeah, I would say that's correct.  The core team was

21  kept together in the hopes that eventually the legal

22  situation would align properly, and we could get back into

23  business under the Stream banner.

24  Q    All right.  So let's go back and talk a little bit more

25  about you.  How -- who were you employed by during this time,

1  like, so 2021 up until the bankruptcy?

2  A    Well, I was a -- I was a Stream W-2 employee until

3  December of 2020 when the preliminary injunction said Stream

4  can't have its own bank accounts and it can't operate under

5  its own name.  So at that point, nobody was an employee of

6  Stream anymore.

7       Mathu Rajan said, you know, if you're not going with

8  the bad guys, if you want to stay here and fight the good

9  fight, which we believe that we're going to ultimately win,

10  I'll find a way to retain you for the benefit of Stream.

11  Let's -- Stream needs to keep fighting for its stuff, and you

12  have institutional knowledge.

13       So I was paid as a contract employee by a couple of

14  different entities that were controlled by Mathu Rajan over

15  those years from January of 2021 until well into 2024.

16  Q    Okay.  But, like, when the bankruptcy started, who were

17  you employed by?

18  A    When this bankruptcy started in March -- well, my

19  employer was Stream TV.

20  Q    Right.  Yeah.  Okay.

21  A    Third parties were paying me, but -- but I was employed

22  by Stream as a contract employee to do work for the benefit

23  of Stream all the way until, you know, well into 2024.

24  Q    Got you.  And so Stream has no way to generate its own

25  money, right?

1  A     That's correct.

2  Q     Okay.  And so, yes, there's third parties out there

3  that are infusing money.  Did they know that part of the

4  money that they're using to pay you on behalf of Stream?

5  A     Did the --

6  Q     Like --

7  A     Who are they when you say --

8  Q     Yeah, like, Mathu Rajan, I guess, was raising money to

9  pay you.  Did -- was that open and everybody know what was

10  going on?

11  A     Oh, yes.

12  Q     Okay.  And so now and let's talk about this little

13  mechanism right here that -- well, actually, let -- let me

14  wait on that.  Let's -- let's go to this.  Let's -- let's

15  talk about -- okay.  So Mr. Homony gets appointed January

16  2024, I think.

17  A     Correct.

18  Q     How did how did that start?  Let's -- let's talk about

19  your -- your relationship and these other contract employees

20  of Stream.  How did that work with Mr. Homony?

21  A     Well, we had decided that it would be best if there was

22  a single point of contact between the Trustee, and the Stream

23  team for purposes of clarity, to make sure that the

24  communication was clear, things didn't fall through the

25  cracks, unless, of course, he wanted to direct us, you know,

1   directly and individually.  Of course, we were all open to

2   that.  But primarily, Nicole Maneen was that conduit for the

3   communication.

4       And we were initially a little bit concerned -- of

5   course, there's a new boss.  And so what is he going to say

6   about Stream?  Does he understand what we've been through,

7   what we've fought for, what we have on the line, what it can

8   be, what we've lost and how we can get it back?  All of those

9   questions were our concern.  And we were relieved that at the

10  start, Mr. Homony seemed to be really on board with the good

11  fight, I guess I should say, and really bringing Stream back

12  to a good resolution.

13  Q    All right.  Actually, I do want to put a pin in that

14  because I kind of skipped through chronological order.  What

15  I want to go back to is -- I just stopped mid subject.  I

16  want to go back to this funding arrangement that Stream had

17  had.

18       All right.  So how -- how -- okay.  Stream, obviously,

19  brought in a bunch of money to fund this case through, like,

20  through -- even after the Chapter 11 Trustee was -- how was

21  the how was Stream getting this money?

22  A    Well, I would say from -- from the start of this

23  bankruptcy and actually several months beforehand, VSI was

24  funding all of Stream's expenses.  It was --

25  Q    Why was VSI funding Stream's expenses?

1   A    Well, it was twofold.  Primarily, to make sure --

2   because Stream had issued conversion notices to the Hawk

3   parties in October of 2022 and Hawk had rejected them and had

4   claimed that even, I think, one or two notes were not

5   convertible, and therefore, a few million dollars needed to

6   be raised by Stream anyway.  VSI wanted to make sure that it

7   put additional investment into Stream that would more than

8   cover whatever the conversion and repayment obligations would

9   be.

10  Q    Right.  And so why did Stream want to convert Hawk?  I

11  think it's a pretty simple question?

12  A    Well, yeah, I'll -- I'll answer it.  But obviously, if

13  you have, you know, 100-plus million of secured debt with the

14  interest that's owed on it, that's a huge drain on a company;

15  it's a huge drain on the estate.  But if for 39 million of

16  actual cash received, you can convert $100 million worth of

17  debt or I think at that point they were claiming -- Hawk was

18  claiming it was $150 million with all the interest over ten

19  years.  If you can take 150 million worth of debt, but by

20  raising 39 million you can convert it to equity, that's a no

21  brainer for the path forward for the company.

22  Q    So you know Hawk was claiming 100 whatever.  How much

23  money did Hawk actually put into Stream?

24  A    Thirty-nine million was the actual cash --

25  Q    Okay.  Thirty-nine --

1   A      -- received over --

2   Q      -- million was the actual number?

3   A      Correct.

4   Q      Okay.  And so -- gosh, I got to recap.  I'm so sorry.

5   So you thought -- Stream thought Hawk was (inaudible) for

6   before the bankruptcy, but then Stream did need money in the

7   bankruptcy to function, try to get a plan.  But just to make

8   sure all Hawk was converted, they had no more arguments

9   whatsoever.  That's why this -- that's why VSI was investing

10  as equity at the time as opposed to a loan?

11  A      Correct.

12  Q      Okay.  All right.  So now -- so what about was the

13  amount of money that Stream/VSI thought that would certainly

14  make it to where Hawk had no arguments that it had not been

15  converted?

16  A      We assume that it was probably around 5 million.  We

17  weren't 100 percent sure what the argument was going to be

18  and whether certain investments that Stream had raised might

19  for some reason be discounted in some way.  So we -- we had

20  set our sights on, you know, at least 5 million.

21  Q      Okay.  We're going to go back to this binder.  Let's go

22  to Exhibit VSI 22.

23  A      Okay.

24  Q      What is this document?

25  A      This is a stock purchase agreement where VSI is

1    acquiring roughly $1.4 million worth of equity in Stream.

2    Q    So this -- we'll do --look at Exhibit Number 26.

3    A    Okay.

4    Q    What is that document?

5    A    26 is another stock purchase agreement where VSI is

6    acquiring additional equity in Stream.

7    Q    All right.  And let's look at Exhibit Number 27.  What

8    is that?

9         Like, hold on one second.  I'm sorry.  Hold on.  Let's

10   start over here.  All right.  Let -- I'm sorry.  Let's start

11   at Exhibit 22.

12        You got it?

13   A    Oh, I'm sorry.  Yes.  I'm 22.  Yeah.

14   Q    Oh, I'm sorry.  I was ready for you.

15   A    Oh

16   Q    All right.  What is Exhibit Number 22?

17   A    So I'm sorry.  What's your question?

18   Q    What is Exhibit Number 22?

19   A    Exhibit 22 is a stock purchase agreement where VSI is

20   agreeing to purchase shares in Stream for -- equity for $1.4

21   million.

22   Q    All right.  And to go a little bit quick since these

23   exhibits are going to be admitted anyway, so let's just talk

24   about the stock purchase.  What are these stock purchase

25   agreements do?

1   A     These -- essentially, they -- they allow for VSI to buy

2   equity in stream for fixed aggregate amounts with the

3   mechanism being that VSI would pay Stream expenses for the

4   benefit of Stream and then acquire equity that it would

5   accumulate by periodic reporting against those stock purchase

6   agreements.

7   Q     And once again, the equity is to convert Hawk.  So it's

8   for a specific amount, right?  Like, there wasn't going to be

9   an unending equity investment in the Stream from VSI?

10  A     Correct.  And I would just point out that this

11  particular agreement, why it is such a specific number, is

12  that this was tied to -- this agreement is dated February

13  27th of 2023.  And there was a calculation done by Stream on

14  certain amount of expenses that have been paid

15  pre-petitioned.  So this was meant to offset a particular

16  batch of expenses.

17  Q     Okay.  So how many subscription agreements were there?

18  A     There were three pre-petition expenses --

19  Q     Yeah.

20  A     -- or purchase agreements, and then two post-petition

21  ones that I can recall.

22  Q     What are the two post-petition ones?

23  A     Post-petition, there was -- they were both in July of

24  2023.  One was for $2 million.  This is right at the time

25  that VSI is offering to sponsor Streams plan of

1  reorganization.

2  Q    Right.

3  A    So there's a $35 million stock purchase agreement,

4  which is intended to support the reorganization plan.  And

5  then there was one a couple of days later in the amount of $2

6  million which was meant to support Stream during the period

7  prior to an up through plan confirmation and to basically

8  kind of make sure there was a surplus in the conversion of

9  Hawk.

10 Q    All right.  So that -- that was -- let's -- so I kind

11 of do two categories.  We got the $35 million one.  But that

12 was never triggered, right, because there was no plan?  There

13 was no --

14          MR. COREN:  Object to leading the witness.  We're

15 getting in the areas which may be important.

16 BY MR. SWICK:

17 Q    Okay.  There's a $35 million stock purchase agreement,

18 right?

19 A    There is a 35 million --

20 Q    What's was its purpose?

21 A    Its purpose was to support the plan or reorganization

22 that was filed.

23          MR. COREN:  Object to this witness testifying

24 about the purpose of an agreement that he's not a party to.

25          MR. SWICK:  I think he testified that he was aware

1   of the arrangements, so if I can parse that through.

2            THE COURT:  Yeah, I think his foundation has been

3   laid, I would say.

4   BY MR. SWICK:

5   Q    Okay.  So you are familiar with all these agreements,

6   correct?

7   A    I was.  I work closely with Stream's counsel on the

8   plan of reorganization, providing all of the historical and

9   factual background that went into the disclosure statement.

10  Q    Okay.  And so was money ever drawn down on the $35

11  million?

12  A    Not that I'm aware of, no.

13  Q    Okay.  So you have these other stock purchase

14  agreements, right?  Were -- were all those fully drawn down

15  on?

16  A    Yes.  By -- by the end of November of 2023, the three

17  pre-petition agreements and the $2 million July one, all of

18  those totaled 5.7 million, and I think we went a little over.

19  Q    Okay.  So prior to the Trustee even getting appointed,

20  there was no more subscription agreement governing any amount

21  of money being transferred from VSI to Stream?

22  A    Other than the $35 million to support the plan, no, not

23  that I'm aware of.

24  Q    Okay.

25  A    Not that I'm aware of.

1  Q      Let's go back to the process.  Was there a process that

2  was followed regarding how this transfer of money and shares

3  went through -- went across?

4  A      There was.  And I have to say it was -- at the

5  beginning, it was not very well organized.  So the -- in the

6  pre-petition time period, the assumption was that when the

7  subscription agreement was -- was fulfilled, that VSI had

8  spent enough money on Stream, that at that point there would

9  be an accounting, and we would call that agreement done.

10         But as we got into the bankruptcy, bankruptcy counsel

11  advised us that, you know, your monthly operating reports

12  have to reflect the fact that VSI is making payments on

13  behalf of the Debtor.  And so a couple of months into the

14  bankruptcy in June, Stream prepared proper accounting, sent

15  it to VSI saying, okay, here's -- here's all the things that

16  you paid on our behalf.

17         And then VSI issued three periodic reports that covered

18  the first half of 2021 pre-petition, another report for the

19  second half of 2022 pre-petition and a half of the -- or most

20  of the first quarter report that covered January through

21  March pre-petition.  So those three reports were generated by

22  Stream provided to VSI, Dan Rink (phonetic) at VSI then sent

23  requests for the equity distribution.  And then that was, you

24  know, I think, in June, and it really took a few months

25  before Stream really was tracking and accounting things

1    properly.

2    Q     Okay.  Let's -- let's go to page -- well, you say that,

3    but this looks like a pretty formal process.  I mean, look at

4    Exhibit 30 for me.

5    A     31?

6    Q     Just 30.

7    A     Oh, 30.  Okay.  Yeah, I'm there.

8    Q     All right.  What is this document?

9    A     This is a request from VSI for the issuance of equity

10   for the first post-petition month, partial month.

11   Q     All right.  Let's take -- look at Page 2 of this

12   document.  What is that?

13   A     Page 2 is -- I recognize this format.  This was

14   generated by Suby Joseph, a Stream TV accountant, where he

15   tracked all the expenses that were paid by VSI in the

16   reporting period.  This is what he would have provided to VSI

17   saying, this is what you've paid on our behalf.

18   Q     And were you involved in this process?  Did you get

19   these reports?

20   A     Yes.  I would see these accounting reports from Suby

21   before they went to VSI, and he and I would review them to

22   make sure that everything on there had actually been paid,

23   and that they were for the benefit of the stream.

24   Q     All right.  You on behalf of Stream look at these, okay

25   them, gets sent to Dan.

1    A    Correct.

2    Q    But I guess, the way I look at that, that's Stream

3    saying, hey, we got money, can we go and apply this to one of

4    the subscription agreements; is that right?

5    A    Yes, correct.

6    Q    Okay.  Then this from -- from Dan.  All right.  All

7    right.  That's VSI saying, yes, that's cool.  You -- you can

8    have the equity, and we'll take the equity, right?

9    A    Correct.

10   Q    Okay.  And then Stream would give it the equitor

11   (phonetic) or the Creditor or whatever.  All right.  And so

12   we have Exhibit -- let's see.  There's -- oh, so Exhibit 30

13   is actually several of these letters, right?

14   A    It appears to be the case, yes.  Each letter is for a

15   different calendar month --

16   Q    Okay.

17   A    -- consecutive.

18   Q    So why was it important to have all this papered up?

19   A    Well, number one, we wanted to -- at Stream, we wanted

20   to confirm that investment had been received, that these

21   stock purchase agreements, which were evidence of investment

22   had been fulfilled.  And by generating expense reports

23   saying, okay, these are Stream expenses that you paid and

24   then having the reciprocal demand for equity was really just

25   laying the foundation that the stock purchase agreements were

 1  valid and had been implemented and executed in parts.

 2  Q    Did the Hawk party litigation and all that have

 3  anything to do with it?

 4  A    Well, yeah, because we knew that the Hawk parties, had

 5  already challenged the documentation that had been presented,

 6  in October of 2022.  And so Stream -- both Stream and VSI

 7  wanted to be especially careful to be very specific in the

 8  documentation of how the transaction was going.

 9  Q    So it's very important, essentially, to have this thing

10  documented correctly?

11  A    Correct.  And I should point out that Dan Rink, who

12  made the demands for VSI, he was not a Stream employee.  He

13  was strictly VSI.

14  Q    Okay.  Okay.  Let's go back to where I put that pin.

15  Mr. Homony gets appointed here.  So you just testified all

16  these subscription agreements, all this arrangement, that

17  all -- it'd been used up.  There weren't any other

18  subscription agreements.  Is that what you testified about?

19  A    Not that I know of.

20  Q    Okay.

21  A    Correct.

22  Q    So he get -- let's go back to -- you mentioned briefly,

23  you have your -- I think you said -- I'm not trying to put

24  words in the witness' mouth that you were hopeful.  Let's

25  talk about that.  January, February, March while you're being

1   employed by the Stream and at Mr. Homony direction.

2   A      Yeah.  I'm sorry.  What --

3   Q      Ten-thousand-foot overview.  Like, how -- what was

4   going on?

5   A      Well, my understanding from his appointment was that he

6   had certain primary directives from the Court, which was to

7   ascertain the validity of the purchase orders, secure the

8   return of the assets, determine the status of the

9   conversion -- the debt conversion, and generally operate the

10  company.  And so one of the first projects we got was a huge

11  project.

12  Q      Hold on.  Let me do a little bit more foundation --

13  A      Okay.

14  Q      here.  You did mention earlier that Ms. Maneen was the

15  primary contact.  Have you -- did Mr. Homony know of your

16  existence when -- when he was brought on board?  How did he

17  know that you were a Stream employee?

18  A      Mr. Homony was brought on board middle of January-ish.

19  I don't remember the exact date, but Stream had a payroll

20  date that we generally were paid on or about the 7th and the

21  22nd of the month.  And so he was aware that payroll was

22  coming due and Ms. Maneen provided him a list of what the

23  payroll obligation was.

24          And my understanding from Ms. Maneen was that it was a

25  detailed list of the various people and the amounts that

1  needed to be paid.

2  Q     And then --

3  A     So he would have known that I was a Stream employee

4  based on the list that she provided.

5  Q     Okay.  And since we're here, how did that get paid?

6  A     Well, in mid-January, the Trustee had not yet set up a

7  DIP account with him in control.  So the only DIP account

8  that Stream TV had was an account that Mathu Rajan was the

9  signatory for.  And so the Trustee authorized Mr. Rajan to

10  release payroll, which he did.  So I got paid by Stream

11  through the DIP account under Mr. Rajan's control in January.

12  Q     Okay.  And I want to come back to how you're paid and

13  more about it.  But now let's go back to -- you started

14  mentioning big projects that you're working on.  What was --

15  actually, let me back up even more.  So -- so did you ever

16  talk to Mr. Homony?

17  A     I had very little interaction with Mr. Homony.  I don't

18  know that I ever spoke to him.  Well, I take that back.  I

19  was probably on one or two Zoom calls where -- where he was

20  there, but there really wasn't much interaction there.  There

21  was a little bit of email interaction, but as I said, it was

22  almost exclusively through Ms. Maneen, who --

23  Q     Yeah.

24  A     -- who got from him what projects needed to be done.

25  And then I won't say she delegated, but to a certain degree,

1    she did.  She would say, okay, well, that's in Bud

2    Robertson's purview.  Bud, this is what we need to provide

3    for the Trustee, Suby Joseph.  He needs these accounting

4    things.  Can you run these reports?

5         So she pulled from the various departments what

6    information was needed.  And if he said jump, we asked her

7    how high does he want us to jump.

8    Q    All right.  Now -- so now we know how the chain of

9    command is working.  Ms. Maneen is the point of contact with

10   the Trustee.  Trustee tells her what he needs.  And what does

11   he need and what are you doing for Mr. Homony during this

12   time?

13   A    Well, one of the biggest projects was the Hawk

14   conversion.  As I said earlier, that -- that was probably the

15   biggest albatross around the neck of Stream TV.  Is this $150

16   million debt or is it no debt, but equity?  That's a make or

17   break on where the company's future lies.

18        And so we provided some information to the Trustee on

19   the conversion, and the word that I got back through Ms.

20   Maneen was, Alex (phonetic), he wants --

21             MR. COREN:  Objection to the word he got back from

22   somebody.

23             THE WITNESS:  The direction I got from Ms. Maneen

24   was that what was initially provided -- oh, sorry.  There was

25   an objection.  I shouldn't talk.

```
 1              THE COURT:  I'm going to -- I'm going to overrule
 2   the objection --
 3              MR. SWICK:  Yeah.
 4              THE COURT:  -- for the time being, but -- yeah,
 5   proceed.  If -- if we start going too much further -- I mean,
 6   Ms. Maneen is going to testify, so I'm trying to shortcut
 7   this given that we've been -- we're going pretty (inaudible).
 8              MR. SWICK:  Yeah, I'm with you.  I'm with you,
 9   Your Honor.  I'm trying to --
10              THE WITNESS:  I'll try to talk faster too.
11              MR. SWICK:  Yeah.
12              THE WITNESS:  So it was --
13              THE COURT:  Not to talk faster, but --
14              THE WITNESS:  It was a very large accounting
15   project that had several iterations, and there were four of
16   us, maybe five, that worked on the Hawk conversion creating
17   many hundreds of pages, maybe -- I would say, maybe even a
18   couple thousand pages of documentation to the penny of every
19   dollar that Stream raised starting from January of 2018,
20   proof of wire receipts, bank statements, did the money come
21   in, how did it come in, what's the underlying stock purchase
22   agreement that showed it was an investment, what were the
23   terms of that investment, was that money spent for the
24   benefit of Stream or did Mathu Rajan buy a yacht in the, you
25   know, in Mediterranean, right?
```

1    So we had to show that the money came in for

2    Stream, that it was actually received, that it was spent on

3    Stream expenses, vendor invoices, all of that to the penny

4    for several years, and that's what we did for weekends and

5    evenings even for weeks and weeks.

6    BY MR. SWICK:

7    Q    All right.  So that's conversion.  What else did you

8    work on?

9    A    I supported the request for the return of the assets

10   because I was the one from an operational standpoint that had

11   been tracking what assets had been surrendered, and what

12   assets minimally had been returned, which things were still

13   outstanding, and where in the world were they, to the best of

14   my knowledge.  So I'd been tracking that information.  I

15   provided that to Ms. Maneen so that the Trustee could, pursue

16   the return of the assets.

17   Q    All right.  So trying to figure out how to convert,

18   trying to figure out how to get the assets.  What are some

19   other buckets of work that you were working on?

20   A    One area that wasn't my primary responsibility, but I

21   jumped in when it -- as an executive of Stream, I -- I always

22   tried to monitor everything that was going on.  And if I saw

23   something going off the rails, I would jump in.

24        And so a couple of times, I had to jump in with regard

25   to the, royalty reporting requirement for Phillips.  Our

1  license agreement required that we file quarterly reports

2  telling them how much we've sold so they could charge us the

3  appropriate royalty amount.

4      So I had to step in shortly after the Trustee was

5  appointed, number one, to educate him on what the requirement

6  was because we've been trying to get that information from

7  Mr. Stastney, who was not providing it as the director of the

8  Dutch subsidiary.  He was obliged to do that, and he was

9  ignoring that responsibility.  So I worked with the Trustee

10 to get that information and file the Q4 report, which was due

11 in January.

12     And then I had to get involved again in September when

13 the first and second quarter reporting requirements were not

14 handled and Phillips sent a breach notice saying that they

15 were going to cancel the license if we didn't --

16 Q    Okay.

17 A    -- take care of that.

18 Q    We have an exhibit on that.  So let's look at that.

19 Let me find it.

20            MR. COREN:  I'm sorry.  What are we looking for?

21            MR. SWICK:  The September of 2024 email.

22            MR. COREN:  2024.  We don't have that on ours.

23 Wait, here's -- VSI 9?

24            MR. SWICK:  Yeah, it's going to be early.  That's

25 right.  That's why I skipped over it.  Well, let me see real

1   quick.  Yeah, it's VSI Exhibit No. 9.

2              THE WITNESS:  Sorry, my binder's coming apart

3   here.  Did you say 9?

4              MR. SWICK:  Yeah.

5              THE WITNESS:  Okay.  Okay, I'm there.

6   BY MR. SWICK:

7   Q    All right.  So we don't need to start at the top.

8   Let's start at the bottom.  Actually, just take a look at it.

9   I don't want to redo the whole thing in the interest of time.

10  Just take a look at the whole email, then we'll talk about

11  it.  You know what it is?

12  A    I'm very familiar with this.  Yes.

13  Q    Okay.  What is what is this exchange here?  And what is

14  the date?

15  A    The date of this is September 10th, 2024.  The thread

16  actually starts earlier on the 9th of September.

17  Q    Just go ahead and summarize the thread.

18  A    So Suby Joseph notified me that that Stream had

19  received a breach notice for failure to report the royalties.

20  So I wrote to the Trustee, and I said, we have this quarterly

21  obligation.  You helped provide the numbers in January for

22  Q4, the previous year, but we missed April for Q1, and now

23  we've missed July for Q2, and we're two months late.

24          And essentially, if you don't get sales data from The

25  Netherlands, then Phillips is within their right to cancel

1   the contract.  And if that happens, the Stream technology is

2   worth zero, and you don't want that happening on your watch.

3   Q     Okay.  And so Suby is Stream, you're employed by who at

4   this time?

5   A     Stream.

6   Q     Okay.  And this -- yeah.  Your email was with Stream

7   Acquisition Group.  Right?  That's your email on here?

8   A     Correct.  That -- yeah.  Because we were unable to use

9   the domain, which was being controlled in The Netherlands, we

10  formed this alternative Stream domain for email use.  Yeah.

11  Q     Okay.  I'm going to risk getting into this top email.

12  Okay.  What is this top email from Bill Homony back to you,

13  sir?

14  A     Well, the -- that response comes from -- part of my --

15  part of my email said, look, I know SeeCubic BV is under a

16  TRO, and they're not supposed to be using the Stream

17  technology, but we know because it's a small industry, you

18  hear things, we know that they've sold some samples.  And in

19  fact, they admitted that they were selling some samples.

20        We need correct sales data.  We can't give Phillips,

21  wrong data because worse than filing no report is filing a

22  false report.  So even though SeeCubic BV is under a TRO, you

23  got to get real data so that we can file this.

24        And so his response was don't worry about the TRO.  I

25  took care of it.  It's no longer in effect.  Here are the

1  numbers, for the report.  Please have Suby file a report.
2  Q     What is your understanding of this TRO that he's
3  talking about?
4  A     Well, my understanding is that the enjoined parties,
5  which were not just SeeCubic Inc. and Hawk, but also our own
6  subsidiary, SeeCubic BV, the reason why they were enjoined is
7  because they were under the control of SeeCubic Inc.
8  director, and SeeCubic BV was allowed to make units for
9  Phillips.
10      I'm sorry.  They could use the Phillips IP to make
11  units if it was for the benefit of Stream because Stream held
12  the license.  SeeCubic BV does not have a Phillips license,
13  just like SeeCubic BV did not have a Rembrandt license, but
14  SeeCubic BV could make products using the Rembrandt
15  technology if it's for the benefit of Stream.
16      What we know about these units is SeeCubic BV was
17  making those units for the benefit of SeeCubic Inc., not for
18  the benefit of Stream.  So they were technically violating
19  the license, and that's why there was a restraining order
20  that included them because they were not allowed to do
21  anything that would quote affect Stream's license.
22      And by selling products without a license affects
23  Stream's license.  So they were enjoined from doing that, and
24  I was concerned that they were being allowed to make and sell
25  product for the benefit of Shad Stastney and SeeCubic Inc. in

1   violation of the Phillips license.

2        But at the same time, I didn't want to say, well, let's

3   just file zeros because then at least we won't be in trouble

4   with Phillips, but now we're lying about whether units were

5   actually made.  And as I said, it's a small industry.  People

6   knew that SeeCubic BV had delivered units to Hyundai Mobis

7   for a mobile project, an automotive project.

8   Q    Okay.  And Trustee says here the TRO is no longer in

9   effect.  I'm just talking what's filed on the docket.  Didn't

10  the TRO get upped by the Judge Coleman or Judge Chan multiple

11  times after the 9019 was agreed to?

12  A    It was extended four or five times all the way until

13  February of 2025.  So it was -- it was still on the docket

14  and listed as effective at the time of this email and after.

15  Q    Okay.  So my violations were going on, and the Trustee

16  knows it, but that's what the email says.  All right.  Let's

17  go back to you.  Let's talk about what happened in this.

18  So I think, you know, you were hopeful with Mr. Homony.

19  Let's just talk about January, February, March.  How many

20  hours do you think you spent working for Stream during

21  January, February, March?

22  A    Well, I wish I could say it was a 40-hour week, but as

23  I said, we did evenings and weekends on the conversion

24  project alone, so it's hundreds of hours.

25  Q    Okay.  And all the subcontract employees, I don't know

1  exact, but just ballpark.  Is everybody working as hard as

2  you?  That is probably the best way to put it.

3  A     Yeah.  Yeah.  I was managing that project, and

4  reporting to Ms. Maneen on how it was going.  And I farmed

5  out, you know, bank statements went to Amanda Gonzalez.  Her

6  job was to go through and mark up the bank statements, and

7  Sarah Brewer was doing some stuff, and Suby Joseph was doing

8  another chunk.

9       And each of them were feeding into me, and I was

10 creating the master spreadsheet and tracking all of these

11 many hundreds of pages of supporting data as we built out a

12 whole, folder structure on box in the cloud.  So that way the

13 Trustee and his team would be able to go note by note and see

14 what investment had come into Stream, how it was applied, and

15 applicable to retire or extinguish Hawk note one, Hawk note

16 two, Hawk note three.

17 Q     And where was Mr. Rajon during all this?  He's thrown

18 out.  Right?  He's no longer in control.  We got the Trustee.

19 A     He was not really involved in any of this.  He was

20 doing VSI things, working on, you know, raising funds for VSI

21 so that VSI could continue in its support thing.  But once

22 the Trustee was appointed, he basically said, you guys don't

23 look to me anymore.  I'm not in charge.  The Trustee will

24 give direction.

25      And he thought it was a great idea that Nicole was the

1  point person that -- because she had been primary

2  administrative assistant to him over all that time, and so

3  she knew all the moving parts and who was responsible for

4  what.  So she was a logical choice to facilitate that.

5  Q    Did you do work for anybody besides Mr. Homony?  Let's

6  just start with these three months right here, January,

7  February, March.

8  A    You mean for Mr. Homony or for Stream?

9  Q    Did you do any work -- you definitely did work for Mr.

10  Homony.  You've testified about that.

11  A    Yep.

12  Q    And Stream.  Right?  Did you do work for anybody else

13  during that time?

14  A    I had a handful of calls with -- VSI had acquired, or

15  was in the process of acquiring, a hologram technology, which

16  has nothing to do with the Stream technology, and being the

17  operations guy for Stream, I had a handful of calls with the

18  founder of that technology, who wanted to know how things

19  were going with Stream in the bankruptcy and how that was

20  going to impact the acquisition.  So I, you know, I was

21  probably wearing a Stream hat and a VSI hat both when I

22  talked to that guy.

23  Q    So earlier I said, what was -- what did VSI do, and we

24  talked about two things.  We said, we said supporting Stream

25  and that's distributor agreement.  You mentioned something

1  about hologram.  Like, just talk about that real quick.  And

2  is that -- so VSI, this hologram and what is that?

3  A     Well, VSI's sort of stated mission is to bring advanced

4  imaging technologies to a global market.  And the UltraD

5  technology of -- I think it's the first time I've used that

6  word today, but the technology of Stream TV which we had

7  trademarked UltraD, that was the crown jewel in VSI's plan to

8  go to market.

9        But VSI, having watched how long Stream had been in

10 litigation, was exploring other potential technologies that

11 it could also bring to market.  And it encountered this

12 hologram technology, pre-petition.  I think the discussion

13 started before Stream was in bankruptcy.

14 Q     So to your knowledge, does VSI do anything else besides

15 these three buckets that we've now talked about?  So hologram

16 technology has nothing to do with Stream.  Distributor

17 agreement and trying to make sure Stream gets off the ground,

18 is there anything else?

19 A     Not that I'm aware of.

20 Q     Okay.  So how -- let's get -- no.  So okay.  So let's

21 keep going down a little bit of the time line here.  So you

22 did a whole bunch of work.  You only worked for Mr. Homony.

23 How many hours did you say you were -- let's talk about

24 percentages.  What's the percentage that you did with

25 hologram stuff for VSI versus the amount of work you were

1  doing for string?

2  A     Handful of phone calls versus hundreds of hours.

3  Ninety nine point nine percent of my time was on Stream

4  things.

5  Q    Okay.  All right.  So then let's keep that.  So then --

6  all right.  So we have January, February.

7  Let's talk about March.  What happened in March?

8  A     In March, there was a meeting with Ms. Maneen and Mr.

9  Rajan and Stream's bankruptcy counsel, Lewis Brisbois.  I

10  don't know if they were still the bankruptcy counsel at that

11  point.  I suppose maybe not.

12      But there was a meeting in Philadelphia to show him the

13  technology and sort of talk about how things were going to

14  proceed.  I was not there, so I can't talk about the content

15  of that.  I just know that the that the meeting happened.

16  And Ms. Maneen, following the meeting, looped me into some

17  communication, where getting the return on the assets had

18  become a priority now and in particular the bonding machine.

19      So we had attempted to get the bonding machine back

20  from SeeCubic BV.  There's a warehouse in China where the

21  bonding equipment is held.  During the time that we didn't

22  have possession due to the omnibus agreement, the equipment

23  was put in the name -- and I'm not saying it was titled, but

24  the warehouse lease was in the name of our Dutch subsidiary.

25      And so they were refusing to release the equipment

1  saying, you know, until somebody tells us we have to do it.

2  And it seemed like, from the communication that I saw with

3  Patrick Toon, whose name was mentioned before, he was a

4  manager over at the Dutch subsidiary, SeeCubic BV, that that

5  equipment was finally going to get released, and Ms. Maneen

6  was put in charge of facilitating the return of that

7  equipment.  That was mid-March, I believe.

8  Q     Who put her in charge of getting that equipment?

9  A     The Trustee did.

10  Q     Okay.  All right.  So I I'll just keep going.  Well,

11  actually, let's put a pin in that.  We're going to come back

12  to that.  So there's employees -- you're a contract employee.

13  Right?

14  A     Correct.

15  Q     Okay.  And you got paid -- how often did you get paid?

16  A     I invoiced -- I invoiced twice a month.  I got paid

17  sporadically, periodically.

18  Q     All right.  So since once Mr. Homony was appointed,

19  let's just -- let's just keep it through March right now.

20  We'll get to those stuff later.  How are you paid during that

21  period of time?

22  A     In -- at the January, I got my -- just before the

23  Trustee was appointed, I got paid one check on time from

24  Stream.  After Mr. Homony's appointment, I got paid another

25  check in mid to late January, from the Mathu Rajan controlled

1  bank account after he received authorization and direction

2  from the Trustee to pay.

3       And then by February, the Trustee had set up his own

4  DIP account for Stream, and Stream had -- Mathu Rajan had

5  moved the funds from the account that he controlled over into

6  the account that the Trustee controlled.

7  Q    All those funds, this is what you're aware of, came

8  from the VSI that were now in the Stream account under the

9  control of Mr. Homony.

10 A    Correct.

11 Q    Okay.  The Stream was still not producing anything or

12 generating any revenue?

13 A    Stream had no revenue.  Correct.

14 Q    Okay.  And was that -- was it just a DIP account or did

15 Mr. Homony ask for more money in addition to what just came

16 over with the DIP account?

17 A    Well, I know that VSI was asked to fund payroll, which

18 it did twice in February for each of the February 8th payment

19 and the February 22nd.  I might be off by a day or so.  It

20 depends on how long it takes to hit an individual account.  I

21 got paid on the 8th and the 22nd.

22 Q    Okay.  Let's go to -- let's go to Exhibit No. 1.

23 A    Which number?

24 Q    No. 1.

25 A    1.  Okay.

1    Q    This is our initial motion for administrative expense.

2    Okay.  I'm on Page 3 of 8.  Like, click on the top of the

3    style from the case.

4    A    Okay.

5    Q    All right.  Now this is our motion for administrative

6    expenses.  Have you looked at this?

7    A    Yes.  I've seen this.

8    Q    Okay.  Are you familiar with this chart that I'm

9    looking at right now?

10   A    Yes.

11   Q    Okay.  Now, just explain this chart to us.  What is

12   this?

13   A    This is a list of all the Stream related expenses paid

14   on behalf of Stream by VSI that were not otherwise covered by

15   the VSI demands for equity, which the last equity demand from

16   VSI came in December for the month of November 2023.

17   Q    Right.  Well, what you said is almost true.  Right?

18   Because isn't -- didn't you find there was an accounting

19   error and how much that we are alleging as our administrative

20   claim?

21   A    I did.  Correct.  So as I was reviewing this after the

22   filing, I wanted to make sure that this amount was correct.

23   And so I spoke to Suby Joseph about the basis for the

24   calculations, and it's my understanding that this table was

25   based on payments made by VSI commencing October 6th of 2023,

1  whereas VSI had already demanded and received equity for

2  payments through November 30.

3  Q     Okay.

4  A     So there's actually seven week overlap.  There's seven

5  weeks of expenses in this table.

6  Q     It should not be here.

7  A     That should not be --

8  Q     How much money is that?

9  A     Looking at the letters from Dan Rink on the cash that

10 was spent in October, November, and prorating October by

11 three quarters, it's about $150,000.

12 Q     Okay.  Sorry.  The administrative claim, I think, is

13 like $1,200,000.  It just needs to be reduced by $150,000.

14 We have to do that calculation.

15 A     Yeah.  It should be closer to $1,100,000, I believe.

16 Q     Just a second.  All right.  Go to Exhibit No. 31,

17 please.

18 A     Okay.

19 Q     All right.  I'm on paragraph 18 and 19, can you turn to

20 that?  Actually, before you do that, let me ask you this

21 question.

22       All right.  So the money is coming in from VSI going to

23 Mr. Homony.  That's what you testified about.  And Mr. Homony

24 is making payments for the estate.  What is Mr. Homony

25 spending money on?  Are you aware of that?

1   A    Well, certainly payroll because I received two checks

2   directly from him and his TriState DIP account.  There --

3   what is -- what is he spending money on or --

4   Q    VSI is giving -- putting money in and VSI money is

5   getting spent by Mr. Homony.  What's getting spent?  You're

6   familiar with how the Stream and the operations, like, what

7   is the money that --

8   A    Well, I can -- I can tell you what Stream was spending

9   money on prior to the Trustee's appointment and money that

10  VSI put in for those expenses.  And, you know, I can surmise

11  that the Trustee continued to pay those types of items, but I

12  don't have access to his account to know what he paid.

13  Q    Well, you just said you're --

14          THE COURT:  I think he just said he had no idea

15  what --

16          MR. SWICK:  I'm going to rehabilitate him.

17          THE COURT:  I don't know if you can rehabilitate

18  your own witness.

19  BY MR. SWICK:

20  Q    Well, we originally when we went through the motion for

21  a minute, there's a chart.  Right?  It had all these expenses

22  that were paid out post-petition by Mr. Homony.  And you said

23  you were familiar with that chart.  So you had an -- you were

24  able to calculate out what actually was spent.  Right?

25  A    Well, what I said is those are -- those are items that

1  were spent that were paid by VSI for Stream's benefit that

2  benefited the estate and were paid by VSI.  Those weren't

3  things that were paid by Mr. Homony.

4  Q    Okay.  so --

5  A    That's where you're losing me because I don't know what

6  Mr. Homony paid.

7  Q    Okay.  But you know that --

8  A    Other than me.

9  Q    But you know what was getting paid for on behalf of the

10 estate after Mr. Homony is appointed?

11 A    Correct.

12 Q    Okay.  So that's what we're talking about.  So VSI is

13 putting money in and it's going out because Suby set those --

14 those are part of the reports, but this is different.  So you

15 have -- so what I'm saying is, so you do know.  All right?

16 So --

17 A    Yeah.  There's insurance.  There's U.S. Trustee fees.

18 There's a little bit of travel-related to the customer

19 maintenance and the purchase orders.  There's the contractor

20 employees.  There's the contractor health benefits.  There's

21 storage for inventory because of the -- I didn't detail, but

22 one of the minimal things that were returned by SeeCubic Inc.

23 when they were required to return things that they did hand

24 over some inventory that was -- that they had held that those

25 screens were several years old by that point.

916

216

1  Q    Okay.  So VSI paid for U.S. Trustee fees.  You're --

2  A    That's right.  Yes.

3  Q    Storage facilities, employees, insurance?

4  A    Yes.  Business insurance and health insurance.

5  Q    And none of that was covered by a subscription

6  agreement.  Right?

7         MR. COREN:  Objection.

8  BY MR. SWICK:

9  Q    Was any of that covered by a subscription agreement?

10  This is all after November of 2023.

11         MR. COREN:  Your Honor, he's testifying.

12         THE WITNESS:  I know what you're asking, but the

13  subscription agreement merely says that VSI is going to buy

14  equity in VSI, in Stream, and it's going to pay a certain

15  amount of money.  So if you're asking me were there available

16  subscription agreements to backstop the payments that VSI

17  continued to make, that's your question.  The answer is no.

18  BY MR. SWICK:

19  Q    That was my question.  Very not well -- on the back.

20  All right.  I mean, there's another exhibit we need to get

21  to.  Exhibit 53, way at the back.  Are you there?

22  A    I'm there.

23  Q    Okay.  So I'm looking at the third entry down.  Can you

24  just -- I don't want you to read a whole bunch, but I just

25  want you to read what this is.

1    A     The fourth entry down or the third?

2    Q     Correct.  Yeah.  February 8, the fourth one down.

3    Sorry.

4    A     Okay.  Fedwire Credit via TriState Capital Bank with an

5    account number, BO William Homony, Philadelphia, PA.

6    Q     And what is this for?

7    A     This is a wire payment of my invoice that was due on

8    February 7th.

9    Q     Okay.  So and -- so Mr. Homony got money from VSI and

10   paid you this salary because you're a subcontractor you're a

11   contract employee for Stream.

12          THE COURT:  I'm really trying to help you out, but

13   you got to be a little bit more careful with the leading

14   question.

15          MR. SWICK:  Sorry.  You're right.

16          THE COURT:  I mean, he's going to keep objecting.

17   So --

18          MR. SWICK:  Yeah.  Yeah.  If it is -- I'm sorry.

19   I'm also trying to do the time.  I'm almost --

20          THE COURT:  I understand.  But --

21          MR. SWICK:  All right.  Yep.

22   BY MR. SWICK:

23   Q     All right.  So well, so Mr. Homony paid you this

24   amount?

25   A     That's correct.

```
 1   Q     Because you were -- well, why did he give you the

 2   amount?

 3   A     Because I performed services for Stream.  I submitted

 4   an invoice.  Invoices were generally paid twice a month, and

 5   that's when my invoice for -- that would have been for

 6   services in the back half of January.

 7   Q     Okay.  You've already testified that you've got a whole

 8   bunch of -- you did a whole bunch of work for stream at the

 9   direction of Mr. Homony.  All right?  And we were really

10   talking about this January to March time frame.  All right.

11   So something happened in late -- what happened in late March,

12   and then how does this relationship go from there?

13   A     I was assisting Ms. Maneen in obtaining the return of

14   the bonding equipment.  One of the things that I had been

15   tasked with was coordinating with -- we had some Stream

16   contract employees in China, and they were exploring

17   insurance options to make sure that the bonding equipment

18   would stay insured during its transportation and setup.

19         We had arranged with Systar International, the customer

20   that put up the purchase order, they were going to provide

21   warehouse space where we could install the bonding equipment,

22   and we could get it up and running bonding for third parties

23   and making a bonding fee from these other customers.

24         So the chance to generate some revenue just by putting

25   the bonding equipment to work, but the secured creditors had
```

1  said that they wanted to make sure the equipment was insured,

2  and we have a variety of things to do to meet those needs.

3  So I was assisting with exploring insurance options, and then

4  I was notified by Ms. Maneen that the whole bonding equipment

5  return had stopped.

6  Q    Why did it stop?

7  A    It stopped because the Trustee was concerned about

8  transportation costs and wanted VSI to provide an

9  unrestricted DIP loan in the amount of $5,000,000 before he

10  would entertain moving the equipment.

11  Q    Okay.  And did VSI -- was VSI amenable to giving a

12  $5,000,000 DIP loan?

13  A    No.  We were not.

14  Q    Okay.  Okay then.  So that communication gets out, and

15  what happened after that?

16  A    The equipment stayed where it was.  I didn't see any

17  more requests come to me for identification of additional

18  assets or assistance with procuring their return.  There was

19  not a whole lot of direction on things to do.

20  Q    You are aware of this 9019 agreement.  Correct?  Until

21  earlier in the --

22  A    Yes.

23  Q    Okay.  You're aware of that to your own personal

24  knowledge, not through just this procedure?

25  A    I attended all the hearings via Zoom.  I read the

 1   documents as they were filed.  Yes.

 2   Q    Okay.  And so it looks like the Trustee decided to go a

 3   different direction.  Is that a fair way to say it?

 4   A    Yes.  Correct.

 5   Q    Okay.  How did you feel about that once you learned --

 6   when did you learn about it actually?  Let's start there.

 7   A    Following the March meeting, Ms. Maneen was very

 8   enthusiastic about the support that we were going to get,

 9   finally, as a Stream team with the Trustee.

10        We thought maybe the Trustee can get done what Mathu

11   Rajan couldn't because at least he's an agent of the Court.

12   And so we were very optimistic that Stream would finally get

13   back its assets and be able to execute on the purchase

14   orders.  And that's actually one thing that you didn't ask me

15   about.  But one of the things that we did --

16             MR. COREN:  Objection, Your Honor.  He's supposed

17   to answer questions he's asked about.

18             THE COURT:  I don't know.  I mean, he can -- he's

19   testifying, so it's open on cross.  You can finish your

20   answer.

21             THE WITNESS:  One of the -- and this leads into

22   where I was answering your question is that the Trustee had

23   asked us to get confirmation that the purchase orders that

24   had been issued in early 2023 were still valid in 2024, and

25   we had done that.

1    So we were hopeful that having just gotten renewed

2    confirmations that the orders were real, that we were finally

3    going to do that.  So we were blindsided and, you know, we

4    felt betrayed that, you know, here we've fought so hard to

5    keep the company together and to get customers and get back

6    to market.  We've seen -- my greatest joy was showing people

7    this technology.  I'm sorry, Adam, you've never had a chance

8    to see it, but it's magical.  And people's jaws drop open and

9    they say, how do you do that?

10    And I was very excited that we -- it looked like

11    there was a path forward for the company and then the rug was

12    pulled out from under us when there was a deal to just

13    liquidate the company rather than try to save it.

14    BY MR. SWICK:

15    Q    All right.  So you talked right before this about --

16    well, actually, let's just finish this line right here.

17    Okay?  So all right.  So you learned about -- you know

18    about -- when you learned -- so you said March is when you

19    learned that.  And then it looks -- there was this email in

20    the September of 2024.  So what were you doing between March

21    and September of 2024?

22    A    Well, I wouldn't say that I learned about the 9019 in

23    March because that wasn't signed until the beginning of May.

24    So in March, it became clear that the push to get the assets

25    back was now on a back burner.

1       But it was really in May that we saw the draft of the

2   settlement agreement, and we realized that the Trustee was

3   now on a path to liquidate the company rather than save it.

4   I know that VSI continued to work on arranging funding to

5   support its own plan since the Stream plan of reorganization

6   hadn't, you know, gotten any traction and that was now eight

7   months old or whatever.  So I was just basically standing by

8   in support of anything that could help save the company.

9   Q     So were you ever fired?

10  A     No.

11  Q     Like, formally?  Were you fired?

12  A     No.

13  Q     Informally?

14  A     No.

15  Q     Was there any communication with you whatsoever as to

16  what your role was going to be basically post-March?

17  A     No.  In fact, the Trustee was still communicating with

18  me in September about the license with Phillips and --

19  Q     Okay.  So when did you consider that you were no longer

20  working for Mr. Homony and Stream?

21  A     I would say it's right around September.  VSI had, at

22  the Trustee's request, VSI had procured proof of funds.  It

23  was about $170,000,000 proof of funds, because the Trustee,

24  it was my understanding anyway, that the Trustee had

25  communicated that any sort of plan that would replace the --

1   you know, if you want to save the company and not liquidate

2   it, then you're going to need a plan that pays the secured

3   creditors, you know, a hundred cents on the dollar or

4   something close.  So this is -- your $35,000,000 plan is not

5   going to fly.  You're going to need something considerably

6   higher.

7        And so VSI got that $170,000,000 proof of funds, and

8   was engaged with the Trustee about a possible plan.  And my

9   understanding is that there was a meeting arranged by VSI

10  where the Trustee was able to meet the anchor investor of

11  Stream.

12       But ultimately, that path was rejected.  And at that

13  point, it was clear that Stream was going to be liquidated.

14  There was no chance of reorganization under the Trustee, and

15  there's no company to work for at that point.

16  Q    And you're kind of in this netherworld through

17  September, and then when you sent that the email that we put

18  in there, we talked about earlier, and that's your same

19  thought was really when you -- when you considered it to be

20  over?

21  A    That -- correct.

22  Q    Okay.  And then what did you do after that?  Who are

23  you -- who did you get employed by?

24  A    Well, I went back to Mathu Rajan, who I've been working

25  with since, you know, on and off since 2008, mostly on, and

1  said clearly there's nothing for me to do at Stream, you

2  know, what can I do now as a -- as a full-time guy at VSI to

3  help with operations?

4  Q    Did you have interactions with VSI between March of

5  2024 and September of 2024.

6  A    Well, sure.  I've, you know, I've known Mathu Rajan for

7  a long time, and he would make me aware of what VSI was

8  trying to do to, you know, help with Stream.  And I was

9  following along with all the, you know, all of the Court

10 activities and things like that.

11 Q    Okay.  Let's go ahead -- you talked about expenses

12 between January and March.  Okay?  So before the Trustee came

13 on board, we talked about this whole subscription agreements

14 and the whole process, right, where VSI would ask -- Stream

15 would ask VSI, all that stuff that we talked over.

16 A    Okay.

17 Q    Was any of that procedure going on after Mr. Homony was

18 appointed?

19 A    Not that I'm aware of.  No.

20 Q    So not that -- you're not aware of Mr. Homony ever

21 saying, hey.  Can I give VSI equity for this money?

22 A    Not that I'm aware of.  No.

23 Q    Are you aware of VSI ever saying, you know, let's do

24 this equity thing?  Did they ever say that?

25 A    Not that I'm aware of, no.  It usually would have been

1  prompted by Stream issuing an expense thing, but I don't

2  believe Suby Joseph was ever directed to do that.

3  Q    Okay.  Let me go back to -- why did -- why did -- so if

4  all the stock purchase and all that had ended before the

5  Trustee got appointed, why was VSI funding Stream?

6  A    Well, if Stream is dissolved, then everything that we

7  work to build is lost.  So VSI's goal was to save Stream and

8  enable it to reorganize through the bankruptcy.  And when the

9  Trustee was appointed, clearly, there was -- it's just a

10  different situation at that point, you know.

11      So we wanted to make sure that the institutional

12  knowledge was retained.  The Trustee clearly had a need to

13  get all the knowledge about what happened on the fundraising

14  to explore the conversion.  He needed to know about the

15  licensing obligations.  He needed to know about the location

16  of the assets and what they were and where they were.  You

17  know, he needed to know about the customer relationships and

18  that sort of thing.

19  Q    Got you.  Okay.  And then something just came to my

20  mind.  You mentioned like a later plan letter of funds.  Did

21  VSI submit a plan at some point?  I know you said there's a

22  plan sponsor thing back in 2023.  Was there a later document?

23  A    Yeah.  VSI did submit its own plan, proposed plan of

24  reorganization, shortly before the sale.  I don't remember

25  the -- when that was filed.

1    Q     Would you read that plan?  I think a disclosure

2    statement was probably followed with it.  Would you read

3    that?

4    A     I'm sure that I did, but there was so much going on

5    with the, you know, the impending sale that I don't know that

6    I can speak much to that.

7    Q     I see.  Yeah.  I mean, do you have any idea if VSI had

8    an administrative claim listed in the disclosure statement?

9          MR. COREN:  Sorry.  Can I hear that?  I'm having a

10   tough time hearing you.

11   BY MR. SWICK:

12   Q     If you write a disclosure statement, I'm asking if you

13   recall whether or not Stream or VSI alleged an administrative

14   claim in that disclosure statement.

15   A     I don't recall whether there was one or not.

16   Q     Okay.  What I do know -- well, never mind.  It's fine.

17   All right.

18         MR. SWICK:  No more questions, Your Honor, for

19   this witness.  Thank you for your patience with the leading

20   questions.

21         THE COURT:  Mr. Robertson, we've been going about

22   an hour.  Are you okay to continue?

23         THE WITNESS:  I'm totally great.  I got to fly

24   home at 10 o'clock, so I'm hoping that --

25         THE COURT:  I don't think Mr. Coren is going to go

```
 1   till 10 o'clock.  No worries.

 2            MR. COREN:  No, but I was going to request five

 3   minutes.

 4            THE COURT:  That's fine.  You want to do that.

 5   Okay.  That's fine.

 6            THE WITNESS:  I'm okay.

 7            THE COURT:  You can stand down, Mr. Robertson,

 8   during the break, you're not to discuss your testimony with

 9   anyone.

10            THE WITNESS:  Okay.  If it's only five minutes,

11   can I sit in the comfy chair?

12            THE COURT:  You can.

13            MR. COREN:  I may need eight, but let's shoot for

14   five.

15            THE COURT:  All right, we'll come back at 4:50.

16            (Off the record at 4:41 p.m.)

17            (On the record at 4:53 p.m.)

18            THE COURT:  Please be seated.

19            MR. SWICK:  If I may, Your Honor.

20            THE COURT:  Yeah.

21            (Mr. Swick not near microphone)

22            THE COURT:  Hang on.  I can't -- I can't hear you

23   both.  So will you think you're finished with Mr. Robertson

24   tonight or no?

25            MR. SWICK:  No, Judge, I wouldn't come close.
```

1          THE COURT:  Okay.

2          MR. SWICK:  His testimony was a lot longer than I

3   thought.  Covered a lot of areas.  I'm going to be with --

4          THE COURT:  Okay.  Well, the difficulty -- the

5   difficulty that at least that I see with that is we can try

6   and look for some available dates.  But he's under oath, and

7   he won't be able to speak to anybody for however long this

8   goes.  So is there a way that you can finish him tomorrow?

9          MR. SWICK:  Yes.

10          THE COURT:  Oh, okay.

11          MR. SWICK:  If we wanted to do that --

12          THE COURT:  Okay.  I'm a little bit worried about

13   having, you know -- well, he's got a flight tonight.

14          MR. SWICK:  Are you on Southwest?

15          THE WITNESS:  No.  But if I'm going to have to fly

16   back on another time, then what's the difference in changing

17   a flight?

18          THE COURT:  You can stay --

19          MR. SWICK:  Look, I'm okay with it either way.  I

20   can finish him by noon tomorrow, certainly, or I -- you know,

21   Your Honor just admonishes everybody, don't talk, that's

22   enough for me.

23          THE COURT:  Go ahead, Mr. Swick.  I didn't hear

24   exactly what you said.  I'm sorry.  But my suggestion would

25   be we do Mr. -- Ms. Shaw (phonetic) has a little surgery

1  tomorrow morning, so she can't be here.  Get him in a -- can

2  you stay another night, or do you --

3          THE WITNESS:  No.

4          THE COURT:  Did you say you'd rather fly back than

5  a --

6          THE WITNESS:  No.  I said, I guess, while I'm

7  here, I'd rather just stay another night and wrap up in the

8  morning.  I'll just change my flight to tomorrow, whatever

9  that entails, rather than go through the hassle of the cross

10 country flight again.

11         THE COURT:  I'm just trying to be respectful of

12 you know?  I don't want to have any not that not that I have

13 any reason to think otherwise.  Yeah.  But it's very

14 difficult, right, when you have a person who is obviously

15 involved in the business and your client and you're saying I

16 can't talk to him for God knows how long.  So I'm just trying

17 to be thoughtful about that.

18         I'm happy to take a witness out of order.  Right?

19 And you'll just be under an admonition that you can't discuss

20 your testimony with anyone.

21         (Overlapping voices)

22         THE WITNESS:  Overnight then for two weeks or

23 whatever it is.

24         THE COURT:  Right.  That's what I'm a little

25 bit -- and my schedule is I mean, unless you want to do it

1  Wednesday or you know, or someday really limited next week,

2  then I'm gone for two weeks, unfortunately.  Okay.

3         MR. SWICK:  Well, let's -- if you don't mind,

4  we'll do Raf, him tomorrow morning, and you won't talk to me

5  or to Matthew or anybody tonight.  Okay.  All right.

6         THE COURT:  So, Mr. Robertson, I appreciate, you

7  being here, but I am going to ask you -- give you the

8  instruction not to speak with anyone about your testimony --

9         THE WITNESS:  Understood

10        THE COURT:  -- prior to we come back tomorrow, and

11 you'll remain under oath in the morning.  Thank you.  All

12 right.  You're going to be done in 30 minutes?

13        MALE VOICE:  Five minutes, I heard?

14        MR. SWICK:  Five minutes.  Five, ten minutes.

15 Yeah.  There's not much.

16        MALE VOICE:  And thank you, Your Honor.  I have

17 the emergency root canal and a chipped tooth.  So as much as

18 that's better than this --

19        THE COURT:  I was going to say, which sounds more

20 enjoyable to you.

21        (Witness sworn)

22        THE WITNESS:  My name is Rafael Zahralddin, and

23 it's spelled R-A-F-A-E-L, last name, Z-A-H-R-A-L-D-D-I-N.

24        THE CLERK:  And can you please state your address

25 for the record?

```
 1              THE WITNESS:  601 Old Kennett Road, Wilmington,
 2   Delaware 19807 is my home address.  Would you like the
 3   business address too?
 4              THE CLERK:  (Inaudible).
 5              THE WITNESS:  Okay.
 6   DIRECT EXAMINATION
 7   BY MR. SWICK:
 8   Q     Good evening.  Good evening now.  Yes.  All right.  Mr.
 9   Zahralddin, remind me one more time how to pronounce --
10   A     Zahralddin.
11   Q     Zahralddin.  I'm going to I'm going to --
12   A     It's like horseshoe.  You get near the post, we'll be
13   okay.
14   Q     Okay.  Zahralddin.  Known you for 20 years through the
15   AVI (phonetic) list.  I still can't do it.  Okay.  Should be
16   a witness binder somewhere.  It's Exhibit No. 21.
17   A     Okay.  Same binder that you were just using?  Okay.
18   Q     Let's start by just a little bit of background.  Like,
19   what do you do for a living?
20   A     I'm a lawyer, primarily bankruptcy commercial
21   litigation, and I was Debtor's counsel of record along with
22   few other lawyers from Lewis Brisbois Bisgaard & Smith here
23   in this case.
24   Q     Okay.  So you're very familiar with the Debtor, VSI,
25   Mathu Rajon, and everything that's gone on in this case.
```

1  A     Yes.  I can say I've reached my Stream saturation point

2  several months ago.

3  Q    All right.  Good.  Well, I'm still -- I'm still there.

4  So, you know, here we are.  All right.  So, obviously so,

5  you're aware that a Chapter 11 Trustee was appointed in the

6  case?

7  A     I am.

8  Q    Okay.  After he was appointed, what was your role?

9  What did you -- what's kind of -- what was your -- what was

10 your role?

11 A     Well, I saw my role and so my firm's is trying to be a

12 facilitator.  We had someone new coming into the case, very

13 complex case.  We spoke to Mr. Vagnoni.  We spoke to Mr.

14 George, the other folks from Obermayer, a little bit with Mr.

15 Coren, but primarily in the beginning, we wanted to kind of

16 coordinate things.

17      We knew there was a complicated legal proceeding

18 underneath all of this prior to state court, and there had

19 been -- I mean, we had a TRO, and even though the Third

20 Circuit says you don't need evidentiary hearings for TRO, I

21 would estimate that we had over eight days of hearings just

22 dealing with the TRO, and then we had to bifurcate some of

23 the other issues that were coming up because this was a long

24 and difficult litigation.

25 Q    I use the term chaos, but yeah, your description --

1   A     I believe that's Vice Chancellor Laster's (phonetic)

2   term.

3   Q     Yeah.

4   A     He called it litigation chaos, and it was endemic to

5   the fact that you had two parties, both set up with insiders

6   who desperately wanted the technology because Mr. Stastney

7   was the CFO.  Everyone keeps forgetting that he was a board

8   member, a vice chair of the board, and a CFO.

9   Q     All right.  So before Mr. Homony's appointment, the

10  Debtor -- tell me about the Debtor's operations.

11  A     Well, we had tried over time to bring over employees

12  and to effectuate two purchase orders.  We had been working

13  with the folks at VSI who we had a lot of investors, a lot

14  of -- I would call it a true venture capital investment

15  because you had folks that were industry folks who also were

16  bringing in money.  So their board was a combination of money

17  and expertise.

18        And probably more so than before under Stream because

19  Stream was really more of a combination of angels and super

20  angels who didn't have a lot of industry expertise.  They

21  were financiers.  So we've been working with them.  We tried

22  off -- out of the gate to -- we felt that, well, at least

23  with some folks with some bankruptcy experience, they would

24  be respecting of the stay.

25        The first bankruptcy had a problem with it in the sense

```
 1   that there had been a preliminary injunction in place, and
 2   Judge Owens believed or felt that, you know what, this needs
 3   to play out there.  Now whether I agree or disagree with
 4   that, Judge Wall certainly disagreed that there were several
 5   cases that he had where he said no.  Chancery does their gig.
 6   We do our gig, but that was really Judge Owens' issue.
 7        And she even said even after the involuntary was filed,
 8   I mean, she was, I think, upset because she felt it was, you
 9   know, it's just -- I just saw you guys couple weeks ago.  Now
10   there's more people in here.  But she even said, look.
11   Let this play out.  Once you're done with Chancery, you can
12   come back here.
13        And then what ended up happening in this case is we
14   felt, okay, there's already been a determination by the
15   highest court in the State of Delaware.  The assets are
16   supposed to come back.  Combined with the automatic stay,
17   there shouldn't be any more of this nonsense.
18        And so we struggled with that issue because the
19   litigation button didn't get turned off on the other side.
20   We tried to bring a couple of motions into play.  One to deal
21   with, just -- again and Judge Coleman even said, look.  She
22   told counsel to the Hawk parties, just because he asked for
23   permission, meaning me, Debtor's counsel, doesn't mean
24   there's something he's doing that's wrong.  You always, in
25   the excess of caution, try to get approval from the Court
```

1   because the consequences could be different.

2        So we tried to get employees over.  We tried to get the

3   financing done through the equity conversions for the dual

4   reasons already discussed on the record of effectuating the

5   conversion agreements, but also because we were told by the

6   Hawk parties that any sort of motion for DIP financing that

7   was unsecured, unless it was unsecured, was going to get a

8   full on assault, and we're going to be challenged.  We had to

9   kind of pick our poison as to which litigation we were going

10  to have to deal with.

11  Q    Okay.

12  A    Hold on.  Then the last piece of it was that some of

13  these motions, particularly the stay enforcement and the --

14  which had to go into a mediation -- and the employee motion

15  inexplicably got put into something called the abeyance,

16  which I have in 30 years never encountered.  And I believe it

17  was a product of Ms. Godfrey's retirement.

18        She and the judge kind of put things onto the side.

19  Ms. Godfrey was kind of out the door, and it was months

20  probably -- if we filed in the spring, it was early fall

21  before we actually had court time to hear stay relief -- I

22  mean, sorry, stay enforcement employee and the way we're

23  going to finance the case and get in front of her.

24        And she finally said, look.  I think this is ordinary

25  course.  If you want me to say it's ordinary course, and I

 1  said, yes, ma'am.  Tell me it's ordinary course.  In the

 2  interim, though, we also filed the plan and disclosure

 3  statement.

 4  Q    And so you're -- but you are familiar, too, with how

 5  the Debtor was being funded?

 6  A    Yes.

 7  Q    Okay.  How did that happen?

 8  A    The Debtor was being funded --

 9       (Overlapping voices)

10  A    -- just through subscription agreements.  And we had

11  Bennett Fisher who is probably six or seven years elder in

12  Texas, handled all of our operating reports.  They had a

13  discrepancy.  That's one of the things that led to the --

14  they're called, you know, the Judge Coleman's opinion was --

15  and the fact that Mr. Rajan had leukemia during this time

16  period.

17       So there was a funding mechanism through subscription

18  agreements, and that's the way things are getting funded.

19  They were reflected, but on the wrong spot of our operating

20  reports, which led to the 2004, and then we corrected them

21  and we filed them.

22  Q    Can you take a look at that exhibit now, Exhibit 21?

23  A    Yes.  I'm familiar with what -- I looked at it earlier.

24  Q    What is this document?

25  A    It's just an email request for Mr. Homony, and he asked

1   about Stream TV funding.  I believe he was trying to figure

2   out, if you look at the other pieces, his original email

3   asked, is there a formal funding mechanism currently taking

4   place with BCI?  Seems we'll need funds to cover upcoming

5   costs, including the 100K owed to BMC, which in this case is

6   the claims and noticing agent.

7          And I wrote, yes.  There is a subscription agreement

8   open for shares.  We understand the shares are likely to be

9   extinguished.  The shares are key to pushing the conversion

10  agreements in the surplus.  Let me find out where things are,

11  I'll revert back to you.  And this is, again, January 17th.

12  And I'm not sure if Leslie Baskin had come in yet for VSI or

13  not, but I had frequently received calls from Ms., you know,

14  Obermayer and from and from Mr. Homony asking for help to

15  kind of piece things together.

16         And we'd packaged some things together that might be

17  useful for them, you know, the issues with the employment

18  agreement and violations of that and stuff with the TRO.  But

19  we also tried to get over things more practical like this, so

20  they knew they could email me.  And we spent a lot of time

21  trying to help.

22  Q     But you say here, let me find out where things are, and

23  I will revert back to you.  Did you know where the

24  subscription agreements and all that stuff --

25  A     No.  I would have had to call Mr. Rink, who was really

1  the gatekeeper at VSI with that.  He worked with a couple

2  other people on a -- we had a -- at my insistence, I told VSI

3  they had to get counsel.  They had originally had Akerman

4  help them during the plan process, have a separate board

5  committee to deal with the plan writing process and

6  negotiating process so that Mr. Rajan and whatever baggage he

7  had would not be getting in the way of the -- of the

8  restructuring and anything we filed.

9       Fair or unfair, whatever that was, it was an issue, and

10  we diffused it by putting in this committee.  And that is

11  where I became familiar with how we were going to structure

12  this and we gave it some effort that way.

13  Q    And you said the shares are key to pushing the

14  conversion agreements into surplus.  What did you mean by

15  that?

16  A    Well, we had been -- again, I was no longer Debtor's

17  counsel.  I'm not receiving information about Stream.

18  Q    No man's land.

19  A    Yeah.  I'm in no man's land, but I am trying to help.

20  So I was really just making a phone call to find out where

21  things were.

22  Q    Did you ever find out where things are and get back to

23  Mr. Homony?

24  A    If I did, I looked for -- I looked for emails.  I did

25  read the pleadings.  I don't know if other folks are able to

1  find emails.  But more than likely, I probably called Mr.

2  Homony and, you know, told him whatever Dan had told me.  And

3  at that point, I just don't -- I just don't know.

4  I mean, it just -- I wasn't counsel at that point.

5  Q    Okay.  So you don't -- you just don't remember?

6  A    No.

7  Q    You don't remember --

8  A    No.  I'm positive I would have sent him to Dan, to Dan

9  Rink.

10  Q    Okay.  But you were not aware of actually the final

11  status of these -- the status at that time.

12  A    Yeah.  So I'd had enough unpaid bills at that point

13  too.

14  Q    Yeah.  I understand that.  Okay.  We're going to --

15  we're going to go really quick here.

16  A    Okay.

17  Q    Earlier testimonies, there's this meeting on March 7th

18  or in the middle of March.  They talked about, and you

19  think -- you said that you were -- the witness before said

20  that you attended this meeting with Mr. Homony.  Do you

21  recall that?

22  A    I do.

23  Q    Okay.  What was that?  Just give me a quick summary of

24  that meeting.

25  A    I was literally begged by Mr. Vagnoni to please come to

1   the meeting because I had lots of information.  Thought it'd

2   be very helpful.  A meeting that started with Mr. Homony

3   sitting down.  I think Mr. Coren was on Zoom.  He wasn't

4   present, or maybe he was a little bit lagging in time.

5        But Mr. George, Mr. Vagnoni, Mr. Homony was there, Mr.

6   Rajan, Ms. Maneen.  First thing Mr. Homony said was, you guys

7   have been victim of a civil conspiracy.  Okay.

8        And then we went to talk about what had happened.  The

9   fact that Mr. Coren's role would be to be someone who was

10  special counsel for the purpose of lender liability, and we

11  had lenders here who may have overstepped.

12       They did have the benefit of a lot of the information

13  we had forwarded over and over again to them, you know,

14  after, you know, different conversations to facilitate

15  things.  And then we did a demonstration of the TV, showed

16  the technology.  I mean, we -- I mean, I was -- I don't know

17  anything about the technology TV.  I've got as much, you

18  know, knowledge as just seeing it visually because I'm not an

19  engineer.

20  Q    Must be nice.  Someone's seen it.

21  A    But after that, Mr. Homony said, look.  What can we do

22  to help here?  It was an amicable meeting.  There was some

23  discussion of the risks attendant with the other parties in

24  the litigation.  But at the end of the meeting, of course,

25  Mr. Coren wasn't there to hear this because he had been on

 1   TV, so to speak.  Mr. Homony and Mr. Vagnoni and Mr. George

 2   said, look, we're going to do everything we can to try to get

 3   you paid.  Thank you for all your help.  And then I went off

 4   on my way.

 5          MR. SWICK:  No further questions, Your Honor.

 6          THE COURT:  Mr. Coren?

 7   CROSS EXAMINATION

 8   BY MR. COREN:

 9   Q    You mentioned a prior bankruptcy in Delaware, and it

10   was the judge was Judge Karen Owens.  Correct?

11   A    I did.

12   Q    And you mentioned she made some comment to you about

13   come back at some other point in time.  Do you recall that

14   testimony?

15   A    I did.

16   Q    Yeah.  Well, that -- she dismissed that bankruptcy as a

17   bad faith filing.  Did she not?

18   A    Yes.  Bad faith filing has a different nomenclature

19   than you're trying to imply.

20   Q    I didn't imply anything.  The question is, isn't it

21   true that the Bankruptcy Court in Delaware dismissed the

22   voluntary bankruptcy that you were involved in as a bad faith

23   filing?  Yes or no?

24   A    Involved in?  Sure.  I was involved in.

25   Q    Yes or no?

242

```
 1   A     I just said yes.  I was involved in.  Not as Debtor's
 2   counsel, though.
 3   Q     And then, shortly thereafter, there was another
 4   involuntary that you were involved.
 5   A     Nope.  Was not involved in.  I simply showed up to give
 6   testimony as to the funding piece of it because I represented
 7   the funder.
 8   Q     Who'd you represent?
 9   A     VTI.  And their underlying funder, which was not Mr.
10   Rajan.
11   Q     And who are the parties to that involuntary -- who
12   filed the involuntary?
13   A     Rembrandt and two members of the Creditors Committee.
14   Q     And that was dismissed as a bad faith filing.  Correct?
15   A     Yes.  That's the nomenclature.
16   Q     That's not a good thing to be dismissed for bad faith,
17   is it?  You call it nomenclature.  It's pretty bad, isn't it?
18   A     There's a variety of different reasons, but they do not
19   connote fraud, which is what you have stated in papers
20   before, Mr. Coren.
21   Q     So that -- how many matters you've been involved in
22   have been dismissed as bad faith filings?
23   A     Involved in?  Two in my life.
24   Q     We agree it's not a good thing.
25   A     No.  It's not a good thing to have an involuntary.  But
```

943

1    for the reasons that were stated before --

2    Q    You've answered my question, sir.

3    A    Well, that's fine.  Thank you for acknowledging I was

4    finished with my answer.

5    Q    Now, you said the Debtor was funded through

6    subscription agreements.  Do you recall that testimony?

7    A    Yes.

8    Q    And what that meant is that there were subscription

9    agreements, and VSI made payments, and in return received

10   Stream shares.  Correct?

11   A    Yes.  Correct.

12   Q    And that funding arrangement was never approved by the

13   Bankruptcy Court.  Correct?

14   A    Incorrect.

15   Q    Can you point to an order approving that arrangement?

16   A    The judge indicated that that was an ordinary course

17   action that did not require.

18   Q    Sir --

19   A    There is none.

20            THE COURT:  I think he was answering your

21   question, but you can ask a follow-up question.  Just let him

22   complete his answer first, please.

23            THE WITNESS:  Can you repeat the question, Mr.

24   Coren?

25   BY MR. COREN:

1   Q     Can you point to any order in which the Bankruptcy

2   Court held that that funding arrangement was ordinary course

3   and okay?  Any order?

4   A     The judge -- no.  There's no order.

5   Q     And as a matter of fact, you read the judge's opinion

6   removing Mr. Rajan on an appointing the Trustee.  You read it

7   carefully, didn't you?

8   A     I did.

9   Q     And you recall that court was critical of that funding

10  arrangement in that opinion?

11  A     She may have been.

12  Q     You don't remember?

13  A     I don't remember because I don't have it in front of

14  me.  Would you like to point it out for me?  Because I can

15  agree with you if it's in there.  You can find it.

16  Q     Now, as a matter of fact, in December of 2023, the U.S.

17  Trustee was concerned about the funding arrangement and

18  wanted information under oath.  Correct?

19  A     Incorrect.  You want me to be exact?  That's incorrect.

20  Q     Did the U.S. Trustee file a request for a 2004

21  examination relating to the funding arrangement?

22  A     Not just related to the funding arrangement.

23  Q     Relating to the funding arrangement and other matters?

24  A     Yes.

25  Q     And isn't it correct that in December of 2023, amended

1  operating reports were filed for every period during the

2  bankruptcy.  Correct?

3  A     Yes.

4  Q     And in those amended operating reports filed in

5  December of 2023, the Debtor disclosed the funding

6  arrangement, the stock purchase agreements, and how much was

7  paid in accordance with those stock purchase agreements.

8  A     Incorrect.

9           MR. THOMPSON:  Objection; failure to lay a

10 foundation.

11          THE WITNESS:  Incorrect.

12 BY MR. COREN:

13 Q     What was incorrect about that?

14 A     Your statement was incorrect.  You want to repeat it?

15 You can repeat it, and I'll answer.

16 Q     Yeah.  Did the amended operating reports filed in

17 December of 2023 enclose the letters identifying the amount

18 of expenses paid and the stock to be issued in return?  Did

19 they do that?

20 A     They were in prior operating reports.  They were in the

21 wrong place.  They were in the wrong place.  That was the

22 entire rationale for the 2004.

23 Q     Is it correct that the letters that we're referring to,

24 which are in the book, I believe there are perhaps nine of

25 them that were filed in December of 2023, each one is a

1    letter from VSI identifying how much was spent.  It had a

2    spreadsheet attached to it and told how much Stream shares it

3    was entitled to.  Is that true?

4    A    You'd have to show it to me because that responsibility

5    was given to Bennett Fisher in my Texas office.

6    Q    And you didn't review it before it was filed?

7    A    It was signed by -- it was signed by counsel of record

8    Bennett Fisher, who was pro hac'd in and given that

9    responsibility because he has a lower rate than me, and

10   therefore, it was more appropriate to finish up the operating

11   reports.

12   Q    Did you review them, yes or no, before they were filed?

13   A    I don't believe that I was responsible or reviewed them

14   before I filed.  There were two partners looking at those at

15   that time.  Myself and Vince Alexander were on top of the

16   case.  Mr. Alexander is the head of our bankruptcy

17   department.  But I did review them before the 2004 exam.

18   Q    Take a look at VSI Exhibit 21 that you were asked

19   about.

20   A    Yes.  21?  The emails?

21   Q    Yes.

22   A    Okay.

23   Q    You told the Trustee -- he asked you whether or not

24   there was a funding mechanism currently in place with VSI.

25   A    Yes.  I responded yes.

1   Q     Right.  And your response has been read into the

2   record.  You wrote, yes.  There is a subscription agreement

3   open for shares.  They understand the shares are likely to be

4   extinguished.  The shares are key to pushing the conversion

5   agreements into surplus.

6   A     Correct.

7   Q     And there you were referring to the talk relationship

8   and the effort to convert their security interest into

9   equity.  Correct?

10  A     Correct.  There were three -- there were three

11  conversion parties, Hawk, SLS and then a subsidiary of a

12  larger company, Hawk and SLS reneged on their

13  responsibilities.  I think it was Qualcomm.  I think it was

14  Qualcomm or a subsidiary of Qualcomm.  They fully converted.

15  Q     Were you aware of all the subscription agreements that

16  existed?

17  A     Was I aware of them?  Again, I can't be aware of

18  everything in it.  I knew that they existed.  I knew that we

19  had certain mechanisms.  I'm not sure if I was tracking them

20  because that was more appropriate for Bennett, for Mr. Fisher

21  to do.  But, yes, I was aware they were out there, which is

22  why my email says I need to go and check on them.  And the

23  person to check on them with would be Mr. Rink.

24  Q     Sir, did you ever read any of the subscription

25  agreements?

248

1  A     Yes.  I did look at a couple subscription agreements.

2  Q     How many were entered into post-petition?

3  A     I'd have to look at the record.  I mean, I would

4  imagine there may have been two or three possibly.

5  Q     How about four?  Is that possible?

6  A     Possible.  Again, I don't have the record in front of

7  me.

8  Q     Now, can we agree that you never sent an email back to

9  Mr. Homony to tell him that there was no longer a funding

10  arrangement in place, meaning pay expenses and return for

11  shares.  You never did that.  Correct?

12  A     I have no idea, but I looked for one and could not find

13  one.  So that's what I'm telling you.  I looked for one.  I

14  couldn't find one.  So my assumption is I did not send

15  another email.

16  Q     Do you have any memory of sending one that you now

17  can't find?

18  A     No.  I do not have a memory of that email.  I read and

19  send thousands of emails on a daily basis.

20  Q     Are you telling this court under oath that you called

21  up Mr. Homony and you told him that that funding arrangement

22  was no longer in place?

23         MR. THOMPSON:  Objection; mischaracterizes his

24  testimony.

25         MR. COREN:  It doesn't just characterize the

1  testimony.

2          THE WITNESS:  Yeah.  Completely.

3  BY MR. COREN:

4  Q    Well, I thought your testimony was a little wishy washy

5  on the subject.

6          MR. THOMPSON:  Objection.  Argumentative.

7          THE COURT:  Okay.  I mean, I agree.  He's

8  testified.  I have his testimony here.  I understand what he

9  said.

10  BY MR. COREN:

11  Q    Okay.  Now, do you have a memory of addressing the

12  specific issue that you told Mr. Homony you would follow-up

13  on?  Do you have a memory of discussing it with Mr. Rink?

14  Yes or no?

15  A    Yes.

16  Q    Do you have any writings back and forth with Mr. Rink

17  on the subject that you could find?

18  A    No.  No.  I would have normally, with any one of these

19  issues, I would have called -- if I knew it was -- if I

20  knew --

21  Q    I don't want to know what you would have done.  I want

22  to know what you remember doing.  Do you remember having a

23  discussion --

24  A    I remember with any question, I would go to Nicole

25  Maneen first because she was the designated point person,

```
 1  number one.  Number two, if I knew someone had specific
 2  responsibility, I would shortcut that by calling the person
 3  saying, like Mr. Rink, give Bill a call.  There was -- I
 4  mean, this was the -- it was a friendly mechanism.  I had no
 5  obligation to follow-up on any of this, but I was very
 6  helpful to the rest of your team over there.  Okay?
 7  That's -- and that's what I remember.  I don't -- I didn't
 8  have these specific file.  I don't even -- I just don't -- we
 9  just don't have them.  I don't have a recollection.  No.
10  Q    You've been monitoring the bankruptcy proceeding
11  because you have a $3,000,000 claim that the Trustee objected
12  to.  Correct?
13  A    That the Chapter 11 Trustee objected to.  Right?  The
14  U.S. Trustee signed a stipulation saying they would not
15  object and they were satisfied with their review.  Yes.  I'm
16  fully aware of the objection, Mr. Coren.
17  Q    My question was you've been monitoring the bankruptcy
18  proceeding, especially since the Chapter 11 Trustee is --
19  A    No.  Mr. Coren --
20  Q    Can I finish the question, please?
21           THE COURT:  Let him finish the question.
22           THE WITNESS:  Okay.  Sorry.  I'll let him finish.
23  BY MR. COREN:
24  Q    Objected to your fee application.
25  A    And I'm going to tell you that no.  Jonathan Preziosi,
```

251

1    Migna Wang, and Scott Cousins, since you guys have

2    essentially made me a witness, they're the ones monitoring it

3    right now.

4    Q    Are you or your firm representing any of the parties in

5    this case right now?

6    A    Representing other parties in this case.

7    Q    Any of the parties?  VSI?

8    A    No.

9    Q    Rembrandt?

10   A    No.

11   Q    Let me direct your attention to -- do you have do you

12   have our book of exhibits up there?  I'm not sure if it's in

13   their book or not.  But --

14            (Background conversation)

15   BY MR. COREN:

16   Q    Exhibit 25.  Do you do you have that up there, sir?

17            MR. THOMPSON:  Steve, could you repeat the

18   exhibit, please?

19            MR. COREN:  25.

20   BY MR. COREN:

21   Q    First question is, did you ever read that objection?  I

22   guess you have to look at it to answer that question.  Was

23   filed on June 18th, 2024, more than six months after the

24   Trustee was appointed.

25   A    I don't think I have much familiarity, if any, with

1   this.  It may have been something I looked at, but I don't

2   really -- like I said, I don't really look at these on a

3   regular basis.  I don't have a recollection of it.

4   Q     One way or the other?

5   A     One way or the other.  Yeah.

6   Q     And let me ask you -- and that's fair.  I'm not going

7   to take you through it if you're -- if you have no memory of

8   it.

9   A     Yeah.

10  Q     Did you ever find out after your email communication

11  with the Trustee, did you ever find out the status of the --

12  of the funding arrangement, if any, between VSI and Stream?

13  Did you ever find out?

14  A     No.  I didn't have -- I don't think I had -- I don't

15  think I pursued it past getting it over into somebody else's

16  hands, and I don't think I had a recollection of whether at

17  what level -- I think that there -- the real question was

18  going to be, was there any money left in an existing

19  agreement?  And I did not have the knowledge of that status.

20  Q     And you don't know what new counsel -- or strike that.

21        You don't know what counsel for VSI told this court on

22  June 18, 2024, as to the funding arrangement.

23  A     No.  I just wasn't following it.  Apologize.

24  Q     Now, you mentioned something about the Trustee having

25  some concern about purchase orders.  Do you recall that?

1    A     About having concern on the purchase orders.  I don't

2    know if I said that.

3    Q     Did you ask me about purchase orders?

4    A     I think we discussed the purchase orders.  Yes.

5    Q     Those purchase orders were addressed in the opinion

6    removing Mr. Rajan and appointing the Chapter 11 Trustee.  Do

7    you recall that?

8    A     I do.

9    Q     And there was a serious question raised by the Court as

10   to whether or not those purchase orders were phony.  Do you

11   remember that?

12   A     Yeah.  I believe the opinion past Mr. Homony was

13   investigating the purchase orders.

14   Q     You don't recall any suggestion in the opinion as to

15   whether or not those purchase orders were phony?

16   A     Well, there wasn't any evidence to suggest that other

17   than --

18   Q     My question was, do you remember anything in the

19   opinion that --

20   A     I do remember, yes.  I do remember a conclusory set of

21   statements, which then led to the fact that that Judge

22   Coleman didn't have enough information and wanted

23   specifically this to be a task for the Chapter 11 Trustee,

24   which is to investigate the purchase order.  That is in the

25   opinion.  I know that.

1  Q      Did you personally investigate the purchase orders?

2  A      Yes, I did.

3  Q      And who'd you speak with?

4  A      I spoke to the CEO, I'm trying to remember his first

5  name now, of Southern Telecom, which purchased both Polaroid

6  and Brookstone out of -- was it Brookstone?  You know, the

7  gadget company, out of bankruptcy.

8          We had several -- Ms. Alexander and I had several

9  conversations with them on Zoom because we're in still kind

10 of pandemic.

11 Q      Who did you speak to?

12              MR. THOMPSON:  Objection, Your Honor.

13              THE COURT:  He's answering your question.

14              MR. SWICK:  Well, it's going a lot farther than

15 giving --

16              MR. THOMPSON:  Excuse me, Your Honor.  He can't

17 dictate his testimony.

18              THE COURT:  He's answering your question.

19              THE WITNESS:  Yes.  Are you going to ask me who we

20 talked to?  CEO, I believe we also had one of the head of

21 marketing.  The company, Southern Telecom, they have offices

22 in Brooklyn, and they had originally started with

23 manufacturing in Asia of plasticware, things of that nature.

24              With the acquisitions during the bankruptcy,

25 they're now fully electronics, which is kind of the natural

1  progression for some companies that do distribution out of

2  Chinese manufacturing.  And they have offices in Brooklyn and

3  Bentonville next to Papa Walmart.  So they have joint

4  marketing with Target and with Walmart.

5          And we got on the phone.  We discussed TVs.  They

6  were -- they were begging me when will the Bankruptcy Court

7  do something.  And I said, well, Christmas isn't -- I mean,

8  that's too short.  And they said, the heck with Christmas.

9  Super Bowl is when we want to have X number of TVs out.

10         So this was a specialty TV that was right up their

11  alley.  They wanted to get that done, and, yes, I spoke to

12  them.  Again, we didn't go up and meet them because it was

13  still kind of pandemic-y, but we had two different

14  conversations.  One with, well, by myself, one with Vince

15  Alexander from my office who's the head of our bankruptcy

16  group at that time.

17         The only person I didn't speak to because of the

18  time difference, but had multiple communications with Systar

19  because we needed to get all kinds of information from them

20  through the mediation with Judge Mayer because the secured

21  creditors during the mediation, they were asking for things

22  like insurance and, you know, you know, how are you going to

23  get this equipment from point A to point B because Systar had

24  offered to house the equipment for free, and they had gotten

25  a warehouse for that purpose so that they could also start --

```
 1  put fulfilling some of the time slots for the bonding
 2  machine.
 3            So, yes, I had extensive conversations with one
 4  group and then reams of communications with the other.
 5  So I had not -- and Mr. Caponi (phonetic) tried to challenge
 6  that here in court and failed on that issue.  So I did speak
 7  to those purchase orders.
 8            Now, I don't know what anyone else has done --
 9            MR. SWICK:  Your Honor, I think he's done
10  answering my question.
11            THE COURT:  Well, I think he's done answering the
12  question.  Got it.  Answered that question.
13  BY MR. COREN:
14  Q    Whose name were the purchase orders in?  Who were they
15  to benefit of?
16  A    Well, they were -- if you ask me benefit of Stream and
17  VSI.
18  Q    They were in the name of VSI, were they not?
19  A    That that's not the question you asked me, Mr. Coren.
20  Goose has got to do the same thing as the gander here.  You
21  asked me who are their benefit for.  They specifically
22  mentioned Stream.  Third party beneficiaries are a construct
23  in contract law.
24  It was a distributorship agreement.  You're distributing for
25  someone.  So I answered your question.
```

1  Q     Okay.  Let's talk about that distributorship agreement.

2  That's Exhibit Trustee 30 in your book.

3  A     Yes.  Okay.

4  Q     Why don't you pull that out?

5  A     Is it in in your book or my book?

6  Q     My book.  The Trustee.  Should be right up there.  Is

7  that the exclusive distribution agreement you're referring

8  to?

9  A     Yeah.  I believe it is, but we did have a final that we

10 attached as an exhibit and supplement to the plan and

11 disclosure statement that we filed.

12 Q     Now this, exclusive distribution agreement is dated

13 March 31st, 2023.  Correct?

14 A     Yes.

15 Q     And that's post-petition.  Correct?

16 A     Correct.

17 Q     Can you point to any court order approving this

18 agreement?  Yes or no?

19 A     No.

20 Q     Did you submit this agreement and request approval of

21 the Bankruptcy Court?  Yes or no?

22 A     Yes.

23 Q     When?

24 A     When we filed our plan of disclosure statement.

25 Q     When.

958

1    A      There's there -- just I'd say the judge asked us to

2    please do something other than litigation in the case.  So we

3    worked hard to make sure we had a plan and disclosure

4    statement, and we added this in our settlement with Rembrandt

5    as part of a package because our thought process was the way

6    to get this done, especially with the two purchase orders,

7    was to have an operational plan, one where we were able to

8    pay the secured creditors back with money from operations.

9          If indeed the secured creditors, as they promised me at

10   that time, just wanted to get out of the way and get paid,

11   then it became, no.  We just want to get paid in a lump sum.

12   Then it went back to, no.  We just want the assets.

13         So as part of this process, just like a lot of other

14   contracts that are signed, that are plan support agreements

15   or otherwise, they get approved at some point, but you want

16   to try to amass consensus to get to a plan.  It's a basic

17   part of reorganization.

18   Q      Are you aware there are no prices in this agreement?

19   A      As I stated, we were putting together the pieces for a

20   plan and disclosure statement so that we could --

21   Q.     It's really confusing.  Do you know whether there's

22   prices --

23   A      I'd have to look at it.  I mean, I'm sure there's not

24   or he wouldn't be asking me.

25   Q      Well, turn to Exhibit A, page 15 of 19, I think answers

1   the question.

2   A    So in this particular one, and I have no idea whether

3   this was attached to our plan or not.  Okay?

4   Q    You still haven't looked at it yet to answer.

5   A    I'm trying to get to it.  You said it's Exhibit A?

6   Q    Yes, sir.

7   A    Okay.

8   Q    Page 15 of 19.

9   A    Okay.  Well, that just gives you products.  Territory.

10  Facts.  Okay.  So I'm not sure if -- because I'm doing this

11  from memory.  I don't know if the pricing is somewhere else.

12  It does reference 4.2 price says it's in sale purchase.  It

13  says the initial prices are listed in Exhibit A and it's not

14  in there.  So either there was a reference in the purchase

15  orders or there was another document.  I can't explain to you

16  why that was there.

17  Q    So there are no products listed in the agreement and no

18  prices listed in the post-petition agreement.  Correct?

19  A    Except for we had two purchase orders that had

20  specific --

21  Q    That's yes or no.

22  A    I think I answered it already.

23       THE COURT:  That's not right because I can see

24  that there's product listed.  There's no pricing.

25       THE WITNESS:  Yeah.  There's no pricing.

 1            THE COURT:  I got it.  I get the point.  You know,
 2    I'm trying to be respectful folks of my staff who I've
 3    already, you know we've gone way longer than I thought we
 4    have and so --
 5            THE WITNESS:  That's just because Mr. Coren likes
 6    me.  But we'll wait for the rest of those questions.
 7            MR. COREN:  Give me one minute.
 8            THE COURT:  Okay.
 9            MR. COREN:  Okay.  Nothing further.
10            THE COURT:  Okay.  Any redirect?
11            MR. THOMPSON:  Your Honor, only briefly, and I
12    promise to be very brief and respect of your staff and Your
13    Honor.  First and I'd ask, the witness to please be as brief
14    as possible in answering these questions.
15    REDIRECT EXAMINATION
16    BY MR. THOMPSON:
17    Q    Mr. Coren raised with you the ordinary course order
18    that was received with respect to payments and the
19    application to pay wages.  Would you care to elaborate where
20    Mr. Coren did not allow you to do so?
21    A    The judge essentially threw up her hand to say, do you
22    want me to say this is ordinary?  And I said I would because
23    we're lacking in court time.  She then had her courtroom
24    deputy, Ms. Godfrey, call me, and she told me that the three
25    things were up that day, which I believe was the employee --

1  other three things, there was employee and the -- and the

2  equity mechanism.  She said, we're going to take those off

3  because those are ordinary course.  That's the instruction I

4  got from the Court.

5  Q    Thank you.  Second, do you recall the questions from

6  Mr. Coren with respect to the so-called bad case bad faith

7  filing dismissals.

8  A    Yeah.

9  Q    You didn't get an opportunity to finish your answer,

10  did you?

11  A    Yes.  Bad faith does not mean fraud.  I mean, it's a

12  legal question, but it's --  bad faith just means that there

13  may not have been a FOIA filed.  There are variety of

14  different reasons that you have a bad faith ruling.

15  Q    Thank you.

16  A    That there's an existing litigation that's being -- I

17  mean, there's a million different reasons.

18  Q    Thank you.  Do you recall testimony with respect to the

19  early March?  I think it was the March 7th meeting that you

20  attended with the Trustee and his counsel.

21  A    Yeah.

22  Q    I think you testified words to the effect of Mr. Homony

23  at the start of the meeting opened with an explanation about

24  Stream TV and its principals being the, quote, victims of a

25  civil conspiracy.  Is that correct?

262

1   A       That's correct.  That's correct.

2   Q       You heard that for yourself?

3   A       I did.  Mr. Homony was being very cooperative.  He was

4   trying to sort out this issue that was going on, and he had

5   had the benefit of his counsel and all the materials we'd

6   sent over.  He'd also had the benefit of the opinion and

7   everything else.

8           So, you know, we took that as -- I took it as he was

9   trying to help, and it was a positive, along with all the

10  other calls I had from Mr. Vagnoni and other folks that they

11  were trying to make a go of this.

12  Q       Were -- was anyone else in the room, expressing similar

13  sentiments with respect to what had happened in the case of

14  this --

15  A       I think Mr. George and Mr. Coren were worried about the

16  litigation aspects of it.  I think Mr. Homony was trying to

17  figure out how he could make this work because I think it was

18  an operational issue, and Mr. Homony maybe was more familiar

19  with liquidations.  I mean, there wasn't -- it was not a

20  unfriendly room.

21  Q       You recall the testimony that you gave with respect to

22  Exhibit 21 regarding your emails with the Trustee and the so

23  called current subscription agreement?

24  A       Yeah.

25  Q       Is it your understanding that the current subscription

1  agreement stayed in place for purposes of the now newly

2  appointed Chapter 11 Trust?

3          MR. COREN:  I don't think we've covered that

4  subject.

5          MR. THOMPSON:  I'm sorry, Your Honor.  I thought

6  that was his question.

7          THE COURT:  No.  I think his question was whether

8  or not the agreements were there.  I don't think he was

9  making a distinction about who had the right to exercise.

10          MR. THOMPSON:  Forgive me, Your Honor.  I

11  misunderstood then.

12          THE WITNESS:  I wouldn't know either one of those

13  questions.

14  BY MR. THOMPSON:

15  Q    Mr. Coren raised your firm's fee application.  Do you

16  remember that?

17  A    Yes.

18  Q    Is there a pending objection to your firm's fee

19  application?

20  A    There is.

21  Q    What's your understanding of the basis for that fee

22  objection?

23  A    It's the same basis that was asserted by Skadden and

24  Cale Gates, with an unfounded accusation that we were somehow

25  both VSI and the Debtor's lawyer, and we're therefore

1  conflicted.

2      And without having to give any individual objections to

3  a fee that we should just have everything to scorch, we

4  bought a vexatious litigation counter to that, and Cale Gates

5  and Skadden both signed a stipulation of withdrawing their

6  objection.

7      And then, we had another stipulation.  We were trying

8  to get to a mediation -- I mean, not a mediation, a global

9  resolution on the case.  And then, of course, the opinion

10  came out, which discouraged any of that mediation.

11  Q     Did that -- did that objection include a claim or an

12  allegation that you failed to make disclosures?

13  A     Yes.  Yes.

14  Q     And can you characterize what that specific allegation

15  was?

16           THE COURT:  I'm going to deal with the objections

17  separately.

18           MR. THOMPSON:  Fine, Your Honor.

19  BY MR. THOMPSON:

20  Q     Who filed that objection?

21  A     That was Mr. Homony's counsel.  Mr. Coren.

22  Q.    Specifically.

23  A     Mr. Coren, specifically.  Yeah.

24  Q     To your knowledge, was Mr. Coren retained for that

25  purpose?

```
 1   A      No.  He was not.

 2   Q      Okay.  Thank you.

 3              THE COURT:  Any recross, Mr. Coren?

 4              MR. COREN:  No, Your Honor.

 5              THE COURT:  Okay.  Thank you very much, Mr. --

 6              THE WITNESS:  No, thank you.

 7              THE COURT:  I know I've always seen your name, but

 8   Zahralddin.  Right?

 9              THE WITNESS:  Yes, sir.

10              THE COURT:  Thank you very much.

11              THE WITNESS:  No.  No.  Thank you, sir.

12              THE COURT:  Okay.  Here's what we're going to do

13   for tomorrow.  We're finishing Mr. Robertson.  Period.  Get

14   it all in.  We'll start at 9:00, and we're done at noon.  I

15   mean, I really -- I unfortunately, I don't have any other --

16   I don't have any other time unless we want to go into

17   Wednesday, because I have other hearings tomorrow in the

18   afternoon that I can't move.  So we're going to finish him

19   tomorrow.

20              The one thing I will stress for the parties is I

21   know why we're here, which is an application for

22   administrative expense.  And I know you have a burden, and I

23   know what the what the issue is.  It's proof of benefit to

24   the estate for preservation of the estate.  I really suggest

25   that the parties focus on that issue because there hasn't
```

1  been a lot of focus on that, at least to my hearing, in the

2  last three hours.

3          So I would really suggest that we streamline this

4  and focus in on why we're here.  I understand there's lots of

5  litigation among the parties, and they all have -- and you

6  all have issues among yourselves about larger issues at play.

7  I get it.  We're not going to solve all of the world's

8  problems tomorrow, but we are going to resolve at least this

9  motion.

10          So I really -- Mr. Robertson's going to be done

11  tomorrow, and so I just stress that for the parties.  And

12  then we'll have to understand exactly how much time you think

13  you're going to need and how quick we're going to need it so

14  that I can get you all filled in with the remaining witnesses

15  that you think you may have.  Okay?  So use the time

16  overnight to at least hopefully talk about it, and, we can

17  start tomorrow at 9:00 a.m.  Okay?  We'll stand and recess

18  till tomorrow at 9:00 a.m. or the call of the clerk,

19  whichever is earlier.

20          (Proceedings concluded at 5:42 p.m.)

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3
             I certify that the foregoing is a correct
 4
    transcript from the electronic sound recording of the
 5
    proceedings in the above-entitled matter to the best of my
 6
    knowledge and ability.
 7

 8
    /s/ Wendy K. Sawyer                 April 17, 2025
 9

10  Wendy K. Sawyer, CDLT

11  Certified Court Transcriptionist

12  For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

In re:                                          : Chapter 11

Stream TV Networks, Inc. and Technovative Media,
Inc.                                            : Bankruptcy 23–10763–djb

        Debtor(s)

### *NOTICE OF FILING OF TRANSCRIPT*
### *AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on April 14, 2025 was filed on April 17, 2025.

The following deadlines apply:

The parties have until 4/24/25 (seven (7) calendar days from the date of filing of the transcript) to file with the court a Notice of Intent to request Redaction of this transcript. The deadline for filing a request for redaction is 5/8/25 (21 days from the date of filing of the transcript).

If a Request for redaction is filed, the redacted transcript is due 5/19/25 (31 days from the date of filing of the transcript).

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 7/16/25 (90 calendar days from the date of filing of the transcript) unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (contact the court for contact information) or you may view the document at the clerk's office public terminal.

For the Court

Date: 4/17/25                                   Timothy B. McGrath
                                                Clerk of Court

                                                By:Christopher Caruso
                                                        Deputy Clerk

969

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                          | . | Chapter 11 |
|--------------------------|---|------------|
| IN RE:                   | . |            |
|                          | . | Case No. 23-10763(DJB) |
| STREAM TV NETWORKS, INC., | . |            |
| et al,                   | . | 900 Market Street |
|                          | . | Philadelphia, Pennsylvania 19107 |
|            Debtors.      | . |            |
| . . . . . . . . . . . . . . . | | Tuesday, April 15, 2025 |

TRANSCRIPT OF CONTINUED HEARING RE:
MOTION OF VISUAL SEMICONDUCTOR, INC. FOR ALLOWANCE OF
ADMINISTRATIVE EXPENSE CLAIM
BEFORE THE HONORABLE DEREK J. BAKER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Rafael X. Zahralddin, Esq.
                            LEWIS, BRISBOIS, BISGAARD
                             & SMITH, LLP
                            500 Delaware Avenue, Suite 700
                            Wilmington, Delaware 19801

For the Chapter 11
Trustee:                    Steven M. Coren, Esq.
                            COREN & RESS, P.C.
                            Two Commerce Street, Suite 3900
                            2001 Market Street
                            Philadelphia, Pennsylvania 19103

                            Michael D. Vagnoni, Esq.
                            OBERMAYER, REBMANN, MAXWELL
                             & HIPPEL, LLP
                            1500 Market Square, Suite 3400
                            Philadelphia, Pennsylvania 19102

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Court Personnel

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)


For Rembrandt 3D Holding,
Ltd.:                          Andrew Peter DeMarco, Esq.
                               DEVLIN LAW FIRM, LLC
                               1526 Gilpin Avenue
                               Wilmington, Delaware 19806


                               Christopher A. Michaels, Esq.
                               BROWN AND MICHAELS, P.C.
                               118 North Tioga Street
                               Ithaca, New York 14850


For SSG Advisors, LLC:         Jeffrey Kurtzman, Esq.
                               KURTZMAN STEADY, LLC
                               555 City Avenue, Suite 480
                               Bala Cynwyd, Pennsylvania 19004


For Visual Semiconductor,
Inc.:                          Randall Adam Swick, Esq.
                               AKERMAN, LLP
                               500 West 5th Street
                               Austin, Texas 78701


                               John H. Thompson, Esq.
                               AKERMAN, LLP
                               750 9th Street NW, Suite 750
                               Washington, D.C. 20001

<u>INDEX</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE MOVANT | | | | |
| CHARLES (BUD) ROBERTSON | | 4 | 55 | |
|     By The Court | 48 | | | |

```
 1              (Continued from 4/14/2025)

 2              (Proceedings commence at 9:02 a.m.)

 3              (Call to order of the Court)

 4                 THE COURT:  Good morning.  All right.  Good

 5     morning, everyone.  We're back on the record in the Stream TV

 6     related matters.  I think we're going to continue with the

 7     examination of Mr. Robertson.  So you can retake the stand,

 8     sir, please.  No problem.  Get yourself situated.  Okay.

 9                 THE WITNESS:  Thank you.

10          CHARLES (BUD) ROBERTSON, WITNESS FOR MOVANT VISUAL

11            SEMICONDUCTOR, INC., PREVIOUSLY SWORN, RESUMES STAND

12                 THE COURT:  Mr. Robertson, just a reminder that

13     you're still under oath.  And I assume that you have complied

14     with the instruction I gave you yesterday.

15                 THE WITNESS:  I have, Your Honor.

16                 THE COURT:  Thank you very much.

17                 All right.  Mr. Coren, you may proceed.

18                 MR. COREN:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20     BY MR. COREN:

21     Q    Good morning, Mr. Robertson.

22     A    Good morning.

23     Q    Do you recall yesterday you testified that -- well,

24     strike that.  Let me step back.

25          Do you recall that the trustee, Mr. Homony, was
```

1   appointed in early January of 2024?

2   A    I do.

3   Q    Now you testified that, for the months of January,

4   February, and March 2024, after Mr. Homony was appointed,

5   that 99 percent of your time was on Stream matters.  Do you

6   recall that testimony?

7   A    I do.

8   Q    Sir, that testimony was false, wasn't it?

9   A    No.

10  Q    Isn't it true, sir, that, from the appointment of

11  William A. Homony, in his capacity as Chapter 11 Trustee for

12  Stream in January 2024, until November 22, 2024, you provided

13  contract services to Stream, and I quote, "on an occasional

14  basis"?  That's the truth, isn't it?

15  A    I provided services --

16       MR. SWICK:  Objection, Your Honor.  This

17  mischaracterizes the witness' testimony from yesterday.  He

18  testified yesterday, from January to March, 99 percent of his

19  work was for Stream.  He just said -- he said until November

20  of 2024.

21       MR. COREN:  I said --

22       MR. SWICK:  That's not what he testified to.

23  BY MR. COREN:

24  Q    I said the truth, is it not, sir, that, from when the

25  trustee was appointed until January 22, 2024, you provided

1    contract services to Stream only on an occasional basis.

2    That's the truth, correct?

3             MR. SWICK:  Wait.  Objection.

4             THE COURT:  I --

5             MR. SWICK:  It's a different than what he asked the

6    first time.

7             THE COURT:  I think that is a different -- I

8    thought you said November of --

9             MR. SWICK:  He said November of 2024.

10             MR. COREN:  I did.

11             MR. SWICK:  Okay.

12             MR. COREN:  I did.

13    BY MR. COREN:

14    Q    From point A, when the trustee is appointed --

15    A    Right.

16    Q    -- until November 22, 2024, that's a period of ten

17    months.  Whatever that period is, you provided services to

18    Stream only on an occasional basis, correct?

19    A    I provided services to Stream for 99 percent of my time

20    from January through, I would say probably April.  And then I

21    provided occasional services for Stream beyond that.  And the

22    services I provided for VSI were for the benefit of Stream,

23    with VSI attempting to provide support for a plan that would

24    support Stream.

25    Q    Sir, turn to Trustee Exhibit 31, which is in your

1    binder.

2    A    The -- the small binder or the big binder?

3    Q    Oh, I think it's in the small binder.

4         MR. SWICK:  All right.

5         THE COURT:  The small binder.

6         MR. SWICK:  I've got to object, limited objection.

7    Okay.  Stop a minute.  All right?  We had a status conference

8    with this Court.  All right?  Mr. Coren said he wanted all

9    exhibits exchanged in paper ahead of time.  He's been

10   practicing for 45 years, he doesn't want to do cross by

11   surprise.  We all agreed and we exchanged exhibits and filed

12   an exhibit list with this Court on Friday.  But I said I

13   don't have the emails with me, I didn't print them all out.

14   We agreed to exchanged witnesses by end of business, I think

15   it was five o'clock on Friday.

16        I sent my witnesses in before five o'clock; Mr.

17   Coren did not.  I said hey, man, you didn't do what you said

18   you were supposed to do.  He sends his witness list over.

19        Then, on Sunday, when I'm coming -- I'm at Midway,

20   the Chicago Airport, late afternoon, I get multiple emails

21   from Mr. Coren, add all this stuff to my exhibit list.  One

22   of them is a document for Nicole Maneen, who -- this is not

23   an issue now because she's not testifying, but she wouldn't

24   have had that in paper, and Mr. Coren said we can't do

25   electronic exhibits because (indiscernible) so here we are,

1    we finish yesterday.  And at 7:15 last night, I get another

2    email from Mr. Coren, add Exhibit Number 31 to our exhibit

3    list.

4            I acknowledge this was filed on the docket.  This

5    is Mr. Robertson's declaration.  And if it's used for

6    specific rebuttal purposes, which it sounds like it is, then

7    I -- that's fine.  But I just object to the entire -- like we

8    had rules for this game, everybody would be on a level

9    playing field, and they have not been abided to.

10            MR. COREN:  Judge, I --

11            THE COURT:  What's the reason for the exhibit?

12            MR. COREN:  It's cross-examine to impeach testimony

13    that I heard for the first time yesterday.

14            THE COURT:  I think that's rebuttal -- I think

15    that's a rebuttal exhibit.

16            MR. SWICK:  And I do not object on that basis.

17            THE COURT:  Okay.

18            MR. SWICK:  But if we have like a fifty-page

19    exhibit or something like -- just --

20            MR. COREN:  That's the only reason for it.

21            THE COURT:  All right.  That was my -- that was my

22    understanding when I looked at the title of what he was going

23    to ask him about, but --

24            MR. COREN:  Yeah.

25            THE COURT:  But I understand.

```
 1              We're going to have to have some discussions at the

 2      end of this witness' testimony about how we were going to

 3      proceed --

 4              MR. SWICK:  Yeah, I --

 5              THE COURT:  -- because I thought we had a different

 6      arrangement that I think we all blew through yesterday, so

 7      we'll work that out, right.

 8              MR. SWICK:  All right.

 9      BY MR. COREN:

10      Q    Sir, do you recognize this exhibit?

11      A    I'm sorry.  What exhibit?

12      Q    Trustee Exhibit 31 in the small binder.

13      A    31.  Okay.  Hang on there's --

14              THE COURT:  Was that added to the book, Mr. Coren?

15      Okay.

16              MR. COREN:  Yeah, we added it this morning.

17              THE COURT:  Hang on.  There's a new clip.

18      BY MR. COREN:

19      Q    Do you have it, sir?

20      A    I do.

21      Q    And this is your declaration under penalty of perjury,

22      correct?

23      A    It appears to be so.

24      Q    And this was submitted by you on November 22, 2024, and

25      filed with this Court, correct?
```

10

```
 1   A    I can't see the filing date, but --

 2   Q    Go to the last page, you'll see the date on the --

 3   A    Okay.  I signed it on November 22, correct.

 4   Q    Of 2024.

 5   A    Yes, correct.

 6   Q    All right.  Now I'm directing you to the last sentence,

 7   part of the last sentence in Paragraph 1, where you swore

 8   under penalty of perjury that:

 9              "From the appointment of William A. Homony, in his

10              capacity as Chapter 11 Trustee, in January 2024

11              until the present, I have provided contract

12              services to Stream on an occasional basis."

13        That's what you said, right?

14   A    That's what it says, correct.

15   Q    Is that true?

16   A    That is true.

17   Q    And as far as you're concerned, your testimony that your

18   99 percent of your time for a period of 4 months was for

19   Stream, that doesn't conflict with your language "on an

20   occasional basis."  Is that your testimony?

21   A    It does not, correct.  And the reason it does not

22   conflict --

23   Q    I -- you've answered my question.

24              THE COURT:  He doesn't have a question pending.

25              THE WITNESS:  Okay.
```

```
 1                 THE COURT:  If you want -- your counsel can ask you

 2      clarifying questions.

 3      BY MR. COREN:

 4      Q    Now, sir, can we agree that, for most of 2024, you

 5      provided executive consulting services to Visual

 6      Semiconductor, Inc., in assisting in its efforts to develop a

 7      plan of reorganization that will enable Stream to

 8      successfully reorganize and exit the bankruptcy?  Is that

 9      true, sir?

10      A    That is true.

11      Q    Do you know what happened to that plan of reorganization

12      filed by VSI?

13      A    I believe it's on the docket and waiting -- it was never

14      -- there was never any finalization of the plan, as far as I

15      know.  The sale occurred shortly after, and I believe the

16      plan is there should the sale be reversed on appeal, I

17      imagine.  I don't know.

18      Q    That plan was withdrawn, wasn't it?

19      A    Not that I'm aware of.

20      Q    Do you know -- do you know, one way or another?

21      A    I --

22      Q    I mean, the docket will show us.

23      A    That's why I say "not that I'm aware of."  I don't know.

24           (Pause in proceedings)

25      Q    Now do you recall, sir, that you identified, I think, a
```

```
 1    few stock purchase agreements between VSI and Stream?  Do you

 2    recall that?

 3    A    I do.

 4    Q    And pursuant to those stock purchase agreements, as you

 5    understood it, VSI was going to make payments on behalf of

 6    Stream and, in return, was going to receive shares of Stream,

 7    correct?

 8    A    That's correct.

 9    Q    Now you testified on direct that there were only two

10    stock purchase agreements entered into pre-petition, meaning

11    after the bankruptcy filing.  Do you recall that testimony?

12    A    I do.

13    Q    Now that testimony was mistaken, was it not?

14    A    Not that I'm aware of.

15    Q    You're not aware that there were actually four stock

16    purchase agreements entered into post-petition?

17    A    That would be a surprise to me.

18    Q    That would be a surprise to you?  All right.

19         So let's pull out -- we're going to find the same

20    agreements in two places:  The trustee book, they're Trustee

21    Exhibits 7 through 13, and they're in the VSI book at 22

22    through 28.

23              THE COURT:  And they're the exact same documents?

24              MR. COREN:  Same, should be the exact same

25    documents.
```

```
 1              THE WITNESS:  I have the trustee binder in front of
 2      me.
 3      BY MR. COREN:
 4      Q    Whichever one is easier --
 5      A    Yeah.
 6      Q    -- just pull it out.  Do you have the trustee?
 7      A    That -- that's the one I have, yeah.
 8      Q    Okay.  Then go to T-7 through T-13.
 9      A    Okay.
10      Q    Let me know when you're ready.
11      A    Yeah.  These rings are a little bit wonky.  Hang on.
12      That's 7.  Okay.  I am on 7, T-7.
13      Q    All right.  So T-7, can we agree, is the stock purchase
14      agreement dated February 27, 2023?  Is that correct?
15      A    That's correct.
16      Q    And that has a purchase price of 1,427,355, correct?
17      A    Correct.
18      Q    Turn to T-8.
19      A    Okay.
20      Q    That is a stock purchase agreement also dated February
21      27, 2023, and that has a purchase price of $1,525,275,
22      correct?
23      A    That's correct.
24      Q    Turn to T-9, a stock purchase agreement dated March 10,
25      2023, for $750,000, correct?
```

```
 1    A    Correct.

 2    Q    Now you recall that the petition date, meaning the

 3    bankruptcy, was filed on march 15, five days after this stock

 4    purchase agreement was entered into, correct?

 5    A    Correct.

 6    Q    Let's turn to Exhibit T-10.

 7    A    Okay.

 8    Q    That's a stock purchase agreement dated July 6th, 2023,

 9    for $35 million, correct?

10    A    Correct.

11    Q    Turn to Exhibit T-11.

12    A    Okay.

13    Q    A stock purchase agreement dated July 10, 2023, for $2

14    million, correct?

15    A    That's correct.

16    Q    So that's two post-petition stock purchase agreements,

17    correct?

18    A    Right.  Those are the two that I'm aware of and that I

19    referenced yesterday.

20    Q    Okay.  Turn to the next exhibit, Trustee 12, a stock

21    purchase agreement dated September 11, 2023, for $5 million,

22    correct?

23         (Pause in proceedings)

24    A    Correct.

25    Q    Okay.
```

```
 1    Q    Turn to T-13.  I'm sorry.  Which one -- I -- we did 12,

 2    which was September 11, '23, for 5 million.

 3         Turn to 13.

 4    A    Okay.

 5    Q    Also September 11, 2023, for 5 million, correct?

 6    A    Is this the same document?

 7         (Pause in proceedings)

 8    Q    Well, if you look at the top, you'll see -- if you look

 9    at 11, it's very -- there's a number one at the top, and

10    then, you look at 12, there's a number two at the top.  There

11    were two agreements for $5 million entered into on that day.

12    Do you see that, sir?

13    A    I do see that the header is different, yes, correct.

14    Q    Okay.  So now I've shown you there were four post-

15    petition stock purchase agreements, correct?

16    A    I see that.  I had not -- was not aware of these

17    September agreements previously.

18    Q    Okay.

19    A    Okay.

20    Q    Now you testified that the thirty-five-million-dollar

21    stock purchase agreement had nothing -- that was solely to

22    support, I think your words, "VSI's plan of reorganization."

23    Do you remember that testimony?

24    A    With the small correction that it wasn't VSI's plan; it

25    was Stream's plan with VSI as a sponsor.  But yes, VSI was
```

 1    going to sponsor Stream's plan during its exclusivity period

 2    in July, correct.

 3    Q    Well, and I think you testified it was never used,

 4    right?

 5    A    The -- the plan was never heard, correct.

 6    Q    I don't mean the plan.  The stock purchase agreement.

 7    A    Oh, yes, as far as I know.  That was not its purpose.

 8    Its purpose was to support the plan.

 9    Q    Well, in fact, there were at least $35,000 worth of

10    payments attributed to that stock purchase agreement, were

11    there not?

12    A    There should not have been.

13    Q    There should not have been.

14    A    Yeah, I don't know why there would have been, that

15    wasn't its purpose.

16    Q    Okay.

17         (Pause in proceedings)

18    Q    Turn to, in the VSI book --

19    A    Okay.  That one I don't have.

20    Q    It's not up there?

21         THE COURT:  Yeah, the big one there.

22         (Pause in proceedings)

23         THE WITNESS:  Okay.

24    BY MR. COREN:

25    Q    VSI Exhibit 29 is an email dated December 22, from Suby

1    Joseph to Dan Rink of VSI, with a copy to Mr. Rajan.  And the

2    subject is "Updated Issuance of Stream TV Shares to VSI."

3         And I want you to turn to the last page of that exhibit.

4    A    Okay.

5    Q    And the last line of the last page, you will see the

6    date of the stock purchase agreement, 6 July '23.  Do you see

7    that?

8    A    I do.

9    Q    And the amount, 35 million.  That confirms the thirty-

10   five-million-dollar stock purchase agreement, correct?

11   A    Correct.

12   Q    Total funds spent 32,783, correct?

13   A    That's what this document says, but that's incorrect.

14   Q    Well, then it says shares issued so far 21,855, correct?

15   A    That's what it says, but that's also incorrect.

16   Q    And the last one, it says 34,967,217 balance to be spent

17   as of November 30, 2023, correct?

18   A    That's what it says, but that information is incorrect.

19   Q    Now what role dud Suby Joseph play at the company?

20   A    Suby Joseph was in the finance department.  He had been

21   VP of Finance.  I don't know whether, at that time, that was

22   still his title, but I assume that it was.

23   Q    Okay.  You weren't in the finance department, were you?

24   A    I was not, no.

25   Q    All right.  And the email is sent to Dan Rink.  What

1    role did Mr. Rink play, who did he work for?

2    A    Mr. Rink was business affairs for VSI.

3    Q    Is this the first time you're seeing this email?

4    A    It's not the first time I'm seeing this email, no.

5    Q    Okay.  When did you see it?

6    A    Probably -- probably when it was -- was it an exhibit to

7    either the trustee's objection, perhaps?

8    Q    Okay.

9    A    Yeah, I think that's when I would have seen it.

10    Q    Now ...

11    (Pause in proceedings)

12    Q    Now you recall testifying, sir, that the stock purchase

13    agreements were fully drawn as of November 2023.  Do you

14    recall that testimony?

15    A    Yeah, I do.

16    Q    Now I've just shown you two stock purchase agreements

17    that you didn't know existed, correct?

18    A    That's correct.

19    Q    Now they weren't dully drawn, were they?

20    A    I don't believe that that would be the case, no.

21    Q    Meaning yes, they were not fully drawn.  I -- sorry, bad

22    question with a double-negative.

23    (Laughter)

24    Q    Let's clean that question up, since somebody may want to

25    read it later, and grade my skills.

1      Can we agree that, as of November 2023, $10 million

2    worth of stock purchase agreements that you were unaware of

3    were not fully drawn?

4    A    Correct.

5    Q    Okay.

6         (Pause in proceedings)

7    Q    Let's pull out, if you would, VSI Exhibit 30.

8    A    Okay.

9         MR. COREN:  And just for the Court's reference,

10    these are also contained in Trustee Exhibits 15 through 23,

11    except the trustee's exhibits have the full operating report,

12    and these documents are the last two pages of each one; yet,

13    in the VSI exhibit lists, it only includes these two pages.

14    So that one is easier to look at, so we're going to look at

15    that one.

16    BY MR. COREN:

17    Q    Do you have VSI 30 in front of you?

18    A    I do.

19    Q    And if we look through VSI 30 -- well, let's take a look

20    at the first.

21         The first letter is dated December 7, 2023, from Daniel

22    Rank at VSI to Thomas Park at Stream.  This letter indicates

23    that Mr. Park was the Chief Financial Officer.  Is that

24    correct?

25    A    Correct.

```
1    Q    And you can see in all of these letters stamps at the

2    top to show you that there actually part of filings in the

3    Bankruptcy Court.  Do you see that?

4    A    I do, yes.

5    Q    Were you aware, sir, that these filings were taking

6    place in December of 2023, while there was a motion pending

7    to dismiss the bankruptcy or appoint a Chapter 11 Trustee;

8    were you aware of that?

9    A    Yeah.  That motion was filed like the week after the

10   bankruptcy, so there was always -- this bankruptcy has always

11   been under threat of that.

12   Q    Were you aware these updated operating reports were

13   filed?

14   A    These, not specifically, but vaguely, yes, that -- that

15   there was a process to get the reports amended because, as

16   Mr. Zahralddin said yesterday, that some of the numbers were

17   put in the wrong in the places and that the reports needed to

18   be amended, and our bankruptcy counsel, Stream's bankruptcy

19   counsel, was working with the U.S. Trustee to get them

20   squared away.  And I imagine this is part of that process

21   because it was right around that time that that was

22   happening.

23   Q    Let's look at the first one.

24        So this is a letter dated December 7, and it says:

25             "Enclosed please find a summary of expenses paid by
```

1          VSI on behalf of Stream from March 16 to March 31,

2          2023, and the expenses totaled 85,161.53."

3     Correct?

4   A    Yes.

5   Q    And then it indicates that:

6          "Pursuant to the stock purchase agreement, Stream

7          should issue 56,774 shares of its Class A common

8          stock to VSI."

9     Correct?

10  A    Correct.

11  Q    And each one of these letters is in the same format,

12  where it identifies an amount of expenses and the amount of

13  shares and -- expenses paid by VSI and shares to be issued by

14  Stream, correct?

15  A    Correct.

16     (Pause in proceedings)

17  Q    I apologize for not having done this in advance, but

18  let's see if we can do it now.  I want to -- can we take a

19  look at -- and we don't need to do it to the penny.  But I

20  want to just add up -- well, strike that.

21     Before we do it, can we agree that these letters

22  identifying expenses and requesting stock in return cover the

23  filing date through -- now let's see the last -- through

24  November 2023?

25  A    Yeah, correct, through November 30, 2023.

```
 1    Q    Okay.  So I'm going to --

 2    A    By "filing date," you mean petition date.

 3    Q    Yes.  Good point.

 4         Do you have a piece of paper up there where you can

 5    write on or no?

 6              MR. COREN:  May I approach and hand him a --

 7    A    There's a yellow pad there, I don't know if I can use

 8    that.

 9              THE COURT:  You can give him a pad, but --

10              MR. COREN:  I'm --

11              THE COURT:  -- if you want him to do math --

12              MR. COREN:  Yeah, I was going to --

13              THE COURT:  -- (indiscernible) --

14              MR. COREN:  I was going to --

15              THE COURT:  -- probably do math.  We're only here

16    until noon --

17              MR. COREN:  Right.

18              THE COURT:  -- I'm told -- I think I can -- I think

19    I can do the math.

20              MR. COREN:  Then let's not -- let's just --

21              THE COURT:  Okay.

22              MR. COREN:  Let's just go through it quickly and

23    not do that.  I think we can all add the numbers up.  All

24    right.  Let's just look through it very quickly.

25    BY MR. COREN:
```

23

```
 1    Q    The first one is 85,000, correct?

 2    A    Correct.

 3    Q    Next one is 331,000, correct?

 4    A    Correct.  That's about four twenty --

 5    Q    So now we're at about four thirty ish.

 6         The next one is 200,000, right?

 7    A    Correct.

 8    Q    So now we're in the 600,000 range.

 9    A    Yep.

10    Q    The next one is two forty-three and change.

11    A    Correct.

12    Q    So we're six, we're in the eight fifty range.

13         The next one is approximately 200,000, right?

14    A    Correct.

15    Q    So we're at about a million fifty.

16         The next one is two hundred and fifty, plus a couple-

17    thousand-dollar deposit, a million fifty.  We're at a million

18    four.

19    A    A million three.

20              THE COURT:  A million three.

21              MR. COREN:  Oh, there you go.

22         (Laughter)

23              THE COURT:  For those who are following along.

24              MR. COREN:  I was going to say I flunked math, but

25    I'm not sure I did.
```

1    BY MR. COREN:

2    Q    We're going to add 235,000.  Where are we?  You're

3    better at this than I am.

4    A    That's a million five fifty.

5    Q    We go to the next one, we got forty-five and thirty,

6    about 75,000.

7    A    Yeah.

8    Q    A million seven ish?

9    A    Okay.

10          THE COURT:  You round like my daughters.

11       (Laughter)

12    BY MR. COREN:

13    Q    Go to the next one, that's seventy-one, eighty-six, add

14    eighty-six to that.  A million eight ish?

15    A    Okay.

16    Q    Okay.  So, based on these submissions, a million eight

17    was paid by VSI in return for Stream shares post-petition

18    through November 30, 2023, correct?

19    A    Rough math, I would say correct.

20    Q    All right.  And I showed you there were $10 million of

21    stock purchase agreements that you were unaware of, correct?

22    A    That's correct.

23    Q    Well, this 2 million didn't satisfy those 10 million of

24    stock purchase agreements, did it?

25    A    If those 10 million -- those two additional stock

1    purchase agreements were there and valid, yeah.  These -- I

2    was aware of these payments.  These payments were credited

3    against the 2 million that I was aware of, and that's what

4    depleted the available stock purchase agreements.

5    Q    All right.

6    A    I was not aware of the other two.

7    Q    The other 10 million, you weren't aware of.

8    A    The other two agreements, correct.

9    Q    Which add to $10 million, right?

10   A    Correct.

11        (Pause in proceedings)

12   Q    Were you monitoring the filings in the bankruptcy case?

13   A    I was.

14   Q    Did you have -- or did you try to read them all?

15   A    "Try" is probably a fair word.  I did not read them all.

16   I would say I skimmed them all and I read many.

17   Q    Okay.  Fair.

18        Turn to Trustee Exhibit 25.

19        (Pause in proceedings)

20   Q    And let me know when you have it.

21   A    25.  Okay.

22   Q    Now this was filed on -- you'll see the filing at the

23   top -- June 18, 2024?

24   A    Oh, you know what?  I'm sorry.  I'm on the -- I'm on VSI

25   25.

26

```
 1    Q    Oh --

 2    A    Let me go back to the other binder.

 3         (Pause in proceedings)

 4    A    Okay.  I'm there.

 5    Q    All right.  And this was an objection filed by VSI to a

 6    motion that Trustee Homony had filed, correct?

 7    A    Correct.

 8    Q    And who was counsel for VSI at the time?  Same counsel

 9    that's here today for VSI?

10    A    There was a change in counsel around that time.  I

11    didn't -- let me see who submitted this.

12    Q    Turn to Page 28.

13    A    Correct.  That's Akerman, yes.

14    Q    Right.  So it's the same lawyers who were in this

15    courtroom yesterday and today, correct?

16    A    Correct.  Two -- two of them, yes, correct.

17    Q    Okay.  Now did -- you read this, correct?

18    A    Yeah, it's a -- almost a year ago.  I -- I'm sure that I

19    did at the time.  I -- there's been 1,000 docket entries, so

20    I don't remember everything specifically in this one, but I'm

21    sure ...

22    Q    Now you testified on direct that, as far as you were

23    aware, the stock purchase agreements had been fulfilled

24    before the trustee was appointed.  Do you recall that?

25    A    I do.
```

1    Q    And let's turn to Paragraph 15 of this submission by

2    VSI.

3    A    Okay.

4    Q    And I'm looking at the last sentence, and I'll read it

5    into the record, "For the next six weeks" -- let's just set

6    the context.  You can see it's -- relates to the appointment

7    of the trustee, that's how it leads in the very beginning of

8    the paragraph.  And then we skip to the last sentence.  It

9    says:

10            "For the next six weeks, Mr. Rajan and Mrs. Maneen

11            provided contract employee data to the trustee to

12            make him aware of ongoing operations" --

13            "obligations" -- "ongoing obligations.  The trustee

14            facilitated Stream's direct payment of those

15            contractor employees, issuing payments on or about

16            January 17, 2024, February 8, 2024, and February

17            22, 2024, using funds received by Stream from VSI,

18            pursuant to the additional stock purchase

19            agreements not yet fulfilled."

20        Do you see that?

21    A    I see that.

22    Q    Are you learning that for the first time here today,

23    sir?

24    A    I have no recollection of that statement being made.

25    Q    So you're learning it for the first time today?

```
 1    A    I -- I am.

 2    Q    Now let's turn to Paragraph 19.

 3              "When Stream depleted the funds on hand from VSI in

 4              early March 2024, VSI sent additional funds,

 5              pursuant to its stock purchase agreement with

 6              Stream."

 7         Do you see that, sir?

 8    A    I see that.

 9    Q    Are you learning for the first time, here today, that,

10    in March, additional funds were sent pursuant to the stock

11    purchase agreement with Stream?

12    A    I am.  That was not the arrangement that I was aware of.

13    Q    Okay.  Turn to Paragraph 32.

14    A    Okay.

15    Q    You'll see:

16              "There is no doubt that Stream lacks the capital

17              resources to adequately market its technology,

18              commence production, finance its supply chain, or

19              fulfill customer purchase orders.  Accordingly, a

20              distributor willing to fund those requirements of

21              revenue generation, taking equity in exchange for

22              what is, in essence, debtor-in-possession financing

23              is invaluable to these estates."

24         Do you see that reference?

25    A    I do.
```

```
 1    Q    And was that your understanding, that VSI was taking

 2    equity in exchange for what is, in essence, debtor-in-

 3    possession financing?

 4    A    No, that was not my understanding.

 5    Q    Are you learning that for the first time, here today?

 6    A    Yes.

 7    Q    Turn to Paragraph 35.

 8    A    Okay.

 9    Q         "Since the January 5, 2024 Bankruptcy Court order

10              restricting his authority, Mr. Rajan has not taken

11              any action, nor allowed or directed VSI or any

12              Stream contract employee to take any action that

13              would obligate the debtors in any way without

14              authority or court approval."

15         Do you see that reference?

16    A    I do.

17    Q    Were you aware, sir, that VSI has filed a motion in this

18    case, which we're here about today, seeking to impose an

19    obligation, an administrative claim obligation, on the debtor

20    north of a million dollars?  That's why we're here, right?

21    A    Correct.

22    Q    Yet, in June of 2024, VSI told the Bankruptcy Court that

23    no action would be taken that would obligate the debtors in

24    any way without authority or court approval.  Do you see that

25    reference, sir?
```

```
1    A    I do.

2              MR. SWICK:  Objection, Your Honor.  That

3    mischaracterizes the exact language.  It said they have not

4    filed, and he just said it says they will not file,

5    different.

6              THE COURT:  No.  It says would:

7              "-- not take any action that would obligate the

8              debtors in any way without court authority" --

9              "without authority or court approval."

10             That's what he said.

11             MR. SWICK:  "-- has not taken ... nor allowed," all

12   past tense.

13             MR. COREN:  Well, that's as of June --

14             THE COURT:  As of June.

15             MR. COREN:  -- 024.

16             THE COURT:  Right.

17             MR. SWICK:  As of June.  All right.

18             THE COURT:  Okay.

19             MR. SWICK:  Okay.  That's fine.

20             THE COURT:  Yeah.

21             MR. SWICK:  That's past tense, as of June.

22             THE COURT:  Right.

23   BY MR. COREN:

24   Q    Well, how many of these alleged administrative expenses

25   that VSI seeks were incurred before June 18 of 2024?
```

```
 1    A    I can't answer that.

 2              MR. SWICK:  Hold on, I have to object.  I -- we

 3    filed our motion for an administrative expense claim after

 4    June, after the date of this pleading.

 5              THE COURT:  I understand.

 6              MR. SWICK:  Okay.  That's fine.

 7              THE COURT:  I understand the question he's asking.

 8              MR. SWICK:  I gotcha, I gotcha.

 9              THE COURT:  I got it.

10              MR. SWICK:  All right.  Thank you, Your Honor.

11    BY MR. COREN:

12    Q    Sir, you can't answer the question, of the 1.2 million,

13    which was reduced yesterday by 150,000, how much of that was

14    incurred before June 18, 2024; you have no idea?

15    A    I could do some rough path and we could look at the

16    number of months and assuming that all months were roughly

17    equal, but that's not -- I'm not the finance guy, as I said.

18    But there was a monthly burn rate for the Stream team and

19    associated expenses.

20         And as I stated yesterday, I learned from Mr. Joseph

21    that the -- that the total administrative claim commenced --

22    his calculations commenced on October 6th, 2023 and went

23    through the end of September 2024, and that the partial

24    October 2023 and the November 2023 had already been covered

25    by the letters from Dan Rink, and so that those seven weeks
```

1   should not have been part of the VSI claim.  So shaving off

2   that one fifty comes off of the front end, so the VSI claim

3   reduced by one fifty, by my rough calculations -- not being

4   the finance guy -- would have started December 1 and gone

5   through September -- December 1, 2023, and gone through

6   September 2024, so --

7   Q    Well, if it's an equal burn, sir, the overwhelming

8   majority of it had been incurred by June 18, 2024, correct?

9   A    Well, let's see.  December, January, February, March,

10  April, May, June, July, August, September, that's ten months.

11  And December, January, February, March, April, May, June, so

12  yeah, I would say 70 percent, roughly.

13  Q    Now are you aware of any filing or any email or any

14  piece of paper which told the trustee that, as far as VSI was

15  concerned, it was making payments for which it would seek an

16  administrative expense obligation?  Are you aware of any

17  piece of paper that told that to anyone before VSI filed this

18  motion?

19  A    I am not aware of any written communication, no.

20  Q    And can we agree that the first written communication

21  was the filing of the VSI motion that we're here about today?

22  A    No, we cannot agree because I don't know what exists in

23  the universe that I'm not aware of.

24  Q    Fair enough.

25       As far as you're aware, the first disclosure that VSI

1    would seek an administrative claim was the filing of this

2    motion, correct?

3    A    The first written -- how do I say that?  The first

4    documented request for administrative claim that I saw was

5    this filing.  Is that fair?

6    Q    And you never saw an email to the trustee that told

7    them, as far as VSI was concerned, it was making payments for

8    which it would seek an administrative claim.  You've never

9    seen a piece of paper like that, have you?

10   A    No.  But I was not in direct communication, as I said,

11   for most of that.

12   Q    Let's pull out the VSI 1, which was its motion for

13   allowance of an administrative expense claim.

14   A    Okay.

15   Q    When was the first time you saw this chart on page --

16   I'm sorry -- on Page 3 of 8?

17   A    I might have seen a pre-filing copy before the filing

18   was made, or I might have just seen it when it was filed.  I

19   -- I don't remember.  It -- it's probable that somebody asked

20   me to take a look and see -- no.  You know what?  No, because

21   only after the filing did I look at the number and ask where

22   the number came from and discovered that it -- the

23   calculation started too early.  So I don't think I saw this

24   table until it was filed.

25   Q    When did you -- did you tell someone after you looked at

34

```
 1    it that you thought there was a mistake in it?

 2    A    I did, but only -- I would say I didn't really discovery

 3    that until I knew that I was coming here, a hearing date was

 4    set, and I wanted to make sure I understood what everything

 5    was, and then I explored it.  And then that's when I told

 6    counsel hey, there's a mistake in -- in Mr. Joseph's

 7    calculations.  And he said well, you should just, yo9u know,

 8    identify that right away, if -- if you believe it's an error,

 9    say so.  And I do think it's an error and I said so.

10    Q    Okay.  You didn't play any role in preparing it,

11    correct?

12    A    No.

13    Q    And you didn't review all of the underlying

14    documentation that perhaps could support it, did you?

15    A    I did just prior to coming here, to understand what's in

16    the claim.  I skimmed it; I can't say that I --

17    Q    Well --

18    A    -- studied it in detail.

19    Q    -- what is it you skimmed?

20    A    Mr. Joseph prepared a fairly extensive Excel spreadsheet

21    that he said he had taken from various bank statements and

22    had been capturing all this data, and said these are -- these

23    are the transactions, these are the categories, this is what

24    totals 1.288 million.  And that's when I said oh, I can see

25    you've got expenses in October and November, should be --
```

1    those should not have been in there.

2    Q    So did that Excel spreadsheet identify on an expense-by-

3    expense basis?

4    A    It was -- yes, it was a line item detail.

5    Q    Did it identify what the expense was, the date of the

6    expense, the amount of the expense?

7    A    Absolutely the date and the amount.  Descriptions were

8    sometimes a little vague.  But when you see, you know, for

9    example, storage every month, here's the same vendor getting

10   paid the same amount on a monthly basis.  Some entries might

11   have some detail and some entries might not, but --

12   Q    Was that -- did you look at it in Excel or was it

13   printed on a piece -- on paper?

14   A    Oh, it was a digital file, yeah, Excel.

15   Q    All right.  And do you recall -- I mean, I'm not great

16   at -- how would you describe it?  How -- can you tell how

17   many pages it was, how many lines, how many cells?

18   A    Mr. Joseph's Excel spreadsheets are very infuriating

19   because they will be a thousand columns wide, and they become

20   extremely difficult to print until you start, you know,

21   hiding columns and figuring out how to format it, but,

22   consequently, there's a lot of detail there.

23   Q    Have you ever seen a printed version of it?

24   A    No.

25   Q    Then can we agree that that Excel spreadsheet with all

36

1   that information is nowhere in VSI's exhibit materials?

2   A    I don't know.  I would have to study -- I think it's

3   likely not, as I said, because it's a big, unwieldy

4   spreadsheet.

5        MR. COREN:  Well, I'm told that I'm mistaken on my

6   question because my colleague has it, so I don't want to

7   mislead.

8        MR. SWICK:  I think we provided it electronically,

9   so you could take --

10       MR. COREN:  And --

11       MR. SWICK:  -- a look at it.

12       MR. COREN:  Yeah.  And it's not in the book, it's

13   not offered into evidence, but we have it.

14       MR. SWICK:  It was an attachment to one of the

15   exhibits, I don't know which one it is right now, but we

16   couldn't print it, so we had to provide it electronically.

17       MR. COREN:  Is it going into evidence?

18       MR. SWICK:  Well, it's -- nothing has gone into

19   evidence --

20       MR. COREN:  No, no.  But I mean is it going to be

21   offered to the Court?

22       MR. SWICK:  I am unsure right now because I don't

23   have to make that determination.  But it is part of our

24   exhibit list and provided electronically, so that everybody

25   can look at it.

```
 1                    THE COURT:  Well, I don't have it, but --

 2                    MR. COREN:  I'm sorry, I didn't --

 3                    THE COURT:  I don't have it.

 4                    MR. COREN:  Yes.

 5                    THE COURT:  But I don't know if I need it until

 6        it's offered.

 7                    MR. SWICK:  Yeah.

 8                    MR. COREN:  I --

 9                    THE COURT:  I got it.

10                    MR. COREN:  Understood.

11                    MR. SWICK:  Did you get a U drive from our vendor,

12        which was -- that's where that would be.

13                    THE COURT:  Mr. Barbetta, did we get that?  No.

14                    THE COURT OFFICER:  Not that I'm aware of.

15                    MR. SWICK:  Well, then I'll -- we'll provide it if

16        we need, if the Court --

17                    MR. COREN:  Okay.  And I apologize because I didn't

18        realize that and I'm going to study it a little bit later.

19        But let me ask this question.

20                    THE COURT:  You only got him until noon, so I hope

21        you can study fast.

22                    MR. COREN:  Noon with this witness.

23           (Laughter)

24                    MR. COREN:  Noon with -- I got it.

25                    THE COURT:  Yeah, we'll move along.
```

1    BY MR. COREN:

2    Q    Let me ask you this.

3            THE COURT:  Hang on, before you ask a question.

4        (Court and court personnel confer)

5            MR. SWICK:  That's my co-counsel --

6            MR. COREN:  Oh, okay.

7            MR. SWICK:  -- from yesterday, yeah.

8            THE COURT:  Okay.  I have to be -- I have to be --

9    in accordance with the Judicial Conference policy, I can't

10   allow broadcasting of witness testimony to anyone that's not

11   --

12           MR. SWICK:  Oh --

13           THE COURT:  -- a party, so --

14           MR. SWICK:  That is a serious -- no, I understand.

15       (Participants confer)

16           THE COURT:  That's why I'm stopping.

17           MR. SWICK:  I know, 100 percent.  Yeah.

18   BY MR. COREN:

19   Q    Okay.  Let's just look at some broad categories in the

20   chart.  The payroll total is $812,000, correct?

21   A    Yes.

22   Q    Well, the actual total, if we add the two columns, with

23   the pre-trustee and post-trustee is 916,000 of payroll-

24   related expenses, correct?

25   A    I see -- I see that, yes.

1    Q    How many contract employees fall within that payroll,

2    how many were there?

3         (Pause in proceedings)

4    A    Five U.S. that I can think of off the top of my head,

5    and there was a team in Asia that was doing customer liaison,

6    supply chain, and other Asia development work.

7    Q    Customer liaison, supply chain, things like that.  When

8    was the last time Stream manufactured anything?

9    A    Those several thousand unit -- well, we were

10   manufacturing samples, but I assume you're referring to

11   product.

12   Q    Well, no.  I -- it was a broad question.  When was the

13   last time that Stream manufactured anything?

14   A    It would have been December -- well, let's say November

15   of 2020, just before the assets were taken away.

16   Q    So, from November -- from 2020, November, December 2020,

17   through today, Stream never manufactured anything, did it?

18   A    That's correct.

19   Q    From that same time period, did Stream sell anything?

20   A    Stream had an ongoing sales effort, and it secured two

21   purchase orders from those customers --

22   Q    My --

23   A    -- so that's a sale.  It secured a purchase order,

24   that's a sale.

25   Q    Well, did it receive -- did it get paid a penny on those

1  purchase orders, one penny?

2  A    It was unable to deliver on those purchase orders, so

3  no, it did not.

4  Q    Well, it didn't have the ability to manufacture whatever

5  was covered by those purchase orders, did it?

6  A    Because its --

7  Q    It's a yes or a no.

8  A    -- (indiscernible) was never returned, no.

9  Q    Another bad question.

10      You can agree that it did not have the ability to

11  fulfill those purchase orders, correct?

12  A    It did not.

13  Q    And how much did Stream spend that it wants to charge

14  the estate for sales-related activities going on at a --

15  during the period of time when Stream had no ability to

16  manufacture or sell anything?  How much was allocated to

17  that?

18  A    I don't know.

19  Q    Well, as a matter of fact, all of it is allocated to an

20  activity for which Stream could not manufacture, sell, or

21  monetize one penny, correct?

22  A    I object to the -- the nature of the question because --

23          THE COURT:  Well, just answer the question if you

24  can; and, if you can't, you can't.

25          THE WITNESS:  I can't answer the question.

```
 1    BY MR. COREN:
 2    Q     You can't answer the question?
 3    A     No.
 4    Q     Uh-huh.  How much was spent for failed liaison
 5    activities around the world for which a bill is being
 6    submitted to the estate?
 7    A     I don't know.
 8    Q     All right.  What were the other so-called "employees"
 9    doing, which adds up to $900,000?
10    A     Well, as I stated earlier, that period is post
11    appointment of the Chapter 11 Trustee.  That was the
12    extensive accounting work to support the conversion of the
13    Hawk debt into equity.  It was maintenance of customer and
14    business relationships that -- that we had developed and kept
15    alive during the period that the assets were wrongfully taken
16    and keeping those customers at the table, as it were --
17    Q     Well, what --
18    A     -- so that Stream --
19    Q     What -- how much was spent to keep customers at the
20    table where it had been a period of four years since Stream
21    was able to manufacture or sell anything?  How much is being
22    charged to the estate to keep --
23    A     You've --
24    Q     -- customers --
25    A     You've already --
```

```
 1    Q    -- at the table?

 2    A    -- asked me that and I don't know.

 3              MR. SWICK:  Objection.  Asked and answered.

 4    Q    What else is within the 916,000?  Give me -- tell us

 5    some other employees and what they were doing.

 6    A    I can't speak for what other employees were doing.

 7    Generally, I know that we were engaged in maintaining the

 8    relationships and -- and doing whatever the trustee asked us

 9    to and making sure that the licenses remained in effect that

10    were the foundation of the Stream technology.  And we were

11    taking care of storage for certain Stream inventory, paying

12    insurance.

13    Q    What inventory did Stream have?

14    A    Stream had some remaining inventory, unsold inventory,

15    of the sixty-five-inch displays, one of the few things --

16    well, one of the few categories in which anything was

17    actually returned to Stream.  So there were displays over in

18    London that were returned and there are a few displays in

19    Silicon Valley.  I -- I think those are the two storage --

20    there may be something in Asia, too.

21    Q    During this time period, while the trustee was in place

22    was VSI out trying to raise money from investors?

23    A    I believe that it was.

24    Q    And who was doing that for VSI?

25    A    Primarily Mathu Rajan is my understanding, maybe
```

43

1    exclusively Mathu Rajan.  I don't know.  I was not involved

2    in the --

3    Q    Was Mr. Rajan being paid anything during that period of

4    time for which a bill has now been submitted to the estate?

5    A    I don't understand your question.

6    Q    Well, in all these -- this one point -- 1,288,511.01,

7    which is on this exhibit, does any of that relate to payments

8    made to Mr. Rajan?

9    A    I don't believe that it does.  I -- there might have

10   been one payment at the very beginning of the trustee's

11   appointment.  But I remember looking at the employee

12   breakdown on that spreadsheet and I don't think there was

13   more than one for Mathu Rajan --

14   Q    Uh-huh.

15   A    -- and that was probably right at the beginning.

16   Q    Are there any other payments in this chart that relate

17   to raising money on behalf of VSI?

18   A    Not that I'm aware of, no.

19   Q    If I were to ask you to identify each of the employees

20   that were part of this payroll by name, could you do it?

21   A    Not with a hundred percent certainty, but probably

22   relatively reliably.  I mean, we're -- the Stream team was

23   not a big team.  So I -- I can't remember exactly who's on

24   the spreadsheet and who's accounted for in what, but I can

25   tell you, generally, who the people were.

1    Q    The Stream team.  How many people on the Stream team

2    were also on the VSI team?

3    A    Now?  All of them.

4    Q    No.  During the period of time that this administrative

5    claim covers, how many of the people on the Stream team were

6    also on the VSI team?

7    A    I believe only Mrs. Maneen.

8    Q    Well, you were on the VSI team, weren't you?

9    A    Well, was I contracted to work for VSI?  No.  Was I

10   supportive of what VSI was doing to support Stream, yes.  I

11   mean, I don't know what you really mean by the "team."  As

12   far as I was concerned, VSI's primary mission was to support

13   Stream in the bankruptcy and help it reorganize.

14   Q    You recall I read your declaration?

15   A    Yes.

16   Q    From Paragraph 3:

17              "For most of 2024, I provided executive consulting

18              services to VSI, assisting in its efforts to

19              develop a plan of reorganization that will enable

20              Stream to successfully reorganize and exit the

21              bankruptcy."

22         You were on the VSI team, were you not?

23   A    Yeah.  I wasn't being paid by VSI to do VSI --

24              MR. SWICK:  Objection.  This is asked and answer.

25   This was the first part of the questions of the cross.  He's

1    explained many times who he worked for, the time period he

2    worked for, the January and March stuff.  Like I don't --

3    we're just right back where we started.  These have already

4    been asked.

5            THE COURT:  Well, I have some questions that I'm

6    going to ask after cross, so --

7            MR. SWICK:  Okay.

8            THE COURT:  Go ahead.

9    BY MR. COREN:

10   Q    Do you recall -- and I quoted it from your testimony --

11   you testified you wore two hats, a Stream hat and a VSI had.

12   Do you recall that?

13   A    I do.

14           (Pause in proceedings)

15   Q    Let me ask you this.  At what point did it become clear

16   to you that the trustee -- well, strike that.

17           When did you first learn that the trustee had reached an

18   agreement, a settlement agreement with Hawk that would be

19   submitted to the Court for approval; when did you learn that?

20   A    Well, the agreement was signed and filed on May 6th of

21   2024, I think.  It might have been when it was filed,

22   although I have this kind of vague recollection that maybe --

23   I don't know if -- if an unsigned copy was circulated ahead -

24   - a few days ahead of time or something like that, or maybe

25   there was a conversation, I don't remember.  But for sure, I

1    saw it when it was filed.

2    Q    Right.  And does the May 6, 2024 time frame seem about

3    right?

4    A    Yes.

5    Q    Now you certainly knew, at that time, that the trustee

6    had reached an agreement that was going to result in not a

7    reorganization of Stream, but the sale of all of Stream's

8    assets.  You knew that as of May 6th, 2024, right?

9    A    Correct.

10   Q    How many -- how much of the alleged administrative

11   expense claim relates to expenses after May 6, 2024, when you

12   knew the trustee had reached an agreement to sell all the

13   assets?

14   A    Yeah, we'd have to do the same rough math that we did

15   earlier, right?  So, if the -- if the burn rate is roughly

16   equal, then, you know, December, January, February, March,

17   April, the beginning of May, 50 percent?

18   Q    Did you --

19   A    Roughly.

20   Q    Did you review all of the objections filed by VSI to all

21   of the motions filed by the trustee?

22   A    I'm sure that I at least skimmed them at some point.

23   Usually, I tried to keep up on things as they were being

24   filed, but I didn't always do that and I didn't always read

25   them.

```
 1    Q    And so you're aware that VSI was filing objections to

 2    the trustee's efforts to consummate the sale agreement and

 3    sell the assets at the same time that VSI is allegedly

 4    incurring expenses the estate should pay?

 5    A    Correct.  Because Stream felt that the secured debt had

 6    been converted and the settlement agreement acknowledged 180

 7    million of debt, which was going to bury the company, and we

 8    didn't believe that that was just.

 9         (Pause in proceedings)

10              MR. COREN:  Can I have two minutes?  I'm finishing

11    up, Your Honor.

12              THE COURT:  Absolutely.

13              MR. COREN:  Just to consult.

14              THE COURT:  Do you need a break, Mr. Robertson?

15              THE WITNESS:  No, I'm good.  I need a refill.

16    Thank you.

17         (Pause in proceedings)

18    BY MR. COREN:

19    Q    I think you mentioned this earlier, but I just want to

20    confirm it.  This plan that got filed and perhaps was

21    withdrawn, or perhaps not -- the docket will tell us -- the

22    proponent of that plan was VSI.

23    A    There were two plans.  Which one are you speaking of?

24    Q    Well, did -- when was the first one proposed?

25    A    July 13th was the Stream proposed plan during Stream's
```

1    exclusivity window, with VSI as a plan sponsor, that was

2    filed on July 13th.

3        And then there was another plan that was a VSI proposed

4    and sponsored plan that was -- that Stream did not

5    participate in because its exclusivity time had passed.  That

6    VSI plan was filed, I don't know, November, December of 2023.

7    I don't remember the time frame.  And that was a much larger

8    plan.

9    Q    And what was VSI going to get out of it if the plan went

10   through?

11   A    I believe that both plans were similar, in that VSI was

12   going to acquire a hundred percent of the stock of the

13   reorganized debtor in exchange for funding the plan.

14   Q    So VSI would end up, effectively, owning all the assets.

15   A    Correct.

16           MR. COREN:  Nothing further.

17           THE COURT:  Okay.  Mr. Robertson, I have a couple

18   of questions.

19                           EXAMINATION

20   BY THE COURT:

21   Q    So I'm trying to make sure I have this clear for my

22   notes.  So I think you indicated that you ceased being an

23   employee of Stream in December of 2020?

24   A    Correct.

25   Q    Like a W-2 employee.

1    A    Yes, correct.

2    Q    Okay.  So, since that time, how has the relationship

3    been with Stream.  You referred to yourself as a "contract

4    employee."  Can you give me a little bit of color around what

5    that meant in your mind?

6    A    Yeah.  Primarily, it meant that I went 1099, instead of

7    W-2.  I, at that point, began invoicing for (indiscernible)

8    executive services.

9    Q    You're -- can I -- can you -- it's really hard to hear

10   you, just get --

11   A    Okay.  Yeah.  Well, I like to look at who I'm talking

12   to.

13   Q    I understand.

14   A    So, because Stream was unable to pay directly due to the

15   Chancery Court action and Stream being un-investable, but

16   Mathu Rajan wanting to retain the institutional knowledge of

17   the key people, he said I'm going to form a new entity, you

18   keep doing the Stream stuff, the new entity is going to be

19   supportive of Stream, and we'll pay you for your Stream

20   services, keep the -- you know, the customers are -- we spent

21   a long time, a decade, building relationships for business

22   development and customer relationships.  And -- and I know

23   I'm straying a little bit.  But we continued to keep all

24   those people at the table because we really had something

25   revolutionary in this technology.

1       And so I would invoice the third party that Mathu Rajan

2    controlled, and I would get paid periodically.  And candidly,

3    not all my invoices were paid.  When he was able to raise

4    money for that purpose, we got paid enough to sort of limp

5    by.

6       But I have 25 years in the movie business, and movies

7    come and go, and this was -- this is really exciting.  This

8    is like saying hey, here's color TV, imagine this.  I got to

9    do that for years, to show people this is what's coming.  And

10   you can see the light in their eyes.  It -- that's why

11   there's so much fighting going on is this is really

12   transformative for the company that can finally get it to

13   market.

14      So I continued to invoice, Visual Technology Innovation

15   was one company.  There was some brief mention about Stream

16   going into a prior bankruptcy, and -- and VTI was the

17   proposed -- well, it never even got to the plan stage, but --

18   but we did bring in our big VTI investor, you know, Mathu

19   brought the VTI investor in to say here's how Stream can get

20   reorganized and funded.  But that bankruptcy was dismissed to

21   go back to Chancery Court and finish up there.  And then,

22   ultimately, the Delaware Supreme Court said no, no, Stream

23   should get its assets back.  It was right about that time

24   that VSI was founded and has continued to fund the Stream

25   operations.

1    Q    So do you have an independent contractor agreement with
2    Stream or with somebody else?
3    A    I have an oral agreement with Mathu Rajan that goes
4    back, even though there have been different companies that I
5    invoiced.  I haven't had a written contract employment
6    agreement.
7    Q    All right.  Are you aware, is there an employee sharing
8    agreement or a support services agreement between Stream and
9    VSI or VTI or anything like that?
10   A    There may have been with -- related to the July plan,
11   but I don't remember it was -- the disclosure statement had a
12   hundred plus pages.
13   Q    Okay.
14   A    I'm not aware that there's a specific sharing agreement
15   or --
16   Q    Were you ever an officer of Stream?
17   A    No.
18   Q    Okay.  And I think I have in my notes that you're
19   presenting the Vice President of Operations for VSI.
20   A    Yeah, I've always been an operations guy.
21   Q    Okay.  When did you become the Vice President of
22   Operations for VSI, if you can recall?
23   A    Well, right around September of 2024, when it became --
24   VSI was really lobbying to support a plan of reorganization.
25   The plan was filed in July of 2023.  When the trustee came

1    onboard, even though the 9019 settlement agreement had been

2    signed, VSI was still saying hey, we'll support a plan of --

3    you don't have to dissolve the company, the company can

4    reorganize.

5        And what I -- my understanding was the trustee said hey,

6    I've already promised the Hawk parties that they're going to

7    get significant -- you know, they're going to get the assets,

8    so, if they're not going to get the assets, you got to come

9    up with a lot of money and you got to pay them a hundred

10   cents on the dollar, if you do that, then there's room for

11   discussion on a reorganization.

12       So, all through the summer, Mathu Rajan was working to

13   raise more money to pay off his secured creditors, even

14   though he felt that they didn't deserve to be paid off.  The

15   settlement agreement had already awarded their claim or

16   whatever the word is.

17   Q    Uh-huh.

18   A    So I -- I know that VSI was able to get a proof of funds

19   from Merrill Lynch from an anchor investor for 170 million,

20   and that was what VSI believed would allow the trustee to

21   engage in some good faith negotiation about a plan instead of

22   a dissolution or a 363 sale.  So, all through the summer of

23   2024, VSI was encouraged that there was a possibility of a

24   plan.

25       But by September, it became clear that there was no hope

53

```
 1    for that and that the sale was moving forward, no matter
 2    what.  And by that point, we said well, there's no hope for
 3    Stream.  I was hopeful Stream was still going to reorganize
 4    all the way through the summer.  So I -- there's no actual
 5    date, but I would say after -- after the trustee instructed
 6    Suby to file the royalty reports for Phillips and then said,
 7    you know, give me -- give me the portal information, I don't
 8    want you guys doing it, I'll take everything from here, it
 9    was clear that he was done with anything from us and ...
10    Q    All right.  So I want to -- I think you had discussed
11    that one of the projects that you were doing in the first
12    quarter of 2024 for the trustee was -- I think you called it
13    the "subscription project," or confirming that Hawk had been
14    --
15    A    Oh, the conversion.
16    Q    -- fully converted.
17    A    Conversion, yeah.
18    Q    The conversion project.
19    A    Correct.
20    Q    Excuse me.
21    A    Yeah.
22    Q    Okay.
23    A    And that -- that had been ongoing --
24    Q    Yeah.  So let me --
25    A    -- for years.
```

54

```
 1    Q    Let me ask the question.

 2    A    I'm sorry.

 3    Q    Who specifically asked you to perform that and when?

 4    A    I got the direction from Mrs. Maneen.

 5    Q    Okay.  And when was that?

 6    A    I can't say exactly.  I think it was not too long after

 7    the trustee's appointment, so I would -- I'd say it was maybe

 8    late January, and we probably worked on it all through

 9    February, although it might have been later.  It might have

10    been after their meeting in early March, and maybe we did it

11    all through the month of March.  It was about a month long or

12    so project.

13    Q    Okay.  Was there work product that was prepared related

14    to that?

15    A    It was all digital, but yes.

16    Q    Okay.

17    A    We set up files on Box, there were hundreds of

18    documents, thousands of documents, probably.

19    Q    And who was that provided to and when?

20    A    That was provided to the trustee, I can't say when.  Ms.

21    Maneen would know, she's the one who sent the link.

22         THE COURT:  All right.  Thank you very much.  Those

23    are the only questions I had.

24         THE WITNESS:  Okay.

25         THE COURT:  Do you have redirect, Mr. Swick?
```

1    MR. SWICK:  I do, but I would love a little like

2  two-, three-minute break to use the restroom.

3    THE COURT:  That's fine.

4    MR. SWICK:  Okay.

5    THE COURT:  All right.  We will stand in recess

6  until 10:25.

7    MR. SWICK:  Thank you, Your Honor.

8    (Recess taken at 10:17 a.m.)

9    (Proceedings resume at 10:26 a.m.)

10    (Call to order of the Court)

11    (Witness resumes stand)

12    THE COURT:  Please be seated.  Okay.  Mr. Swick.

13                      REDIRECT EXAMINATION

14  BY MR. SWICK:

15  Q    All right.  Good morning, Mr. Robertson.

16  A    Good morning.

17  Q    All right.  Let's just jump right into the Trustee's

18  Exhibit Number 31.  That was your declaration.

19  A    Okay.

20  Q    All right.  We'll go -- let's just start from the top.

21  Let's go to Paragraph Number 1.  All right.  You were asked a

22  question about the last sentence of that paragraph, which is,

23  essentially, that:

24          "In January of 2024 until present, I provided

25          contracts services to Stream on an occasional

56

```
 1              basis."

 2         Did I read that correctly?

 3    A    You did.

 4    Q    Okay.  So, for the entirety of the period from January

 5    of 2024, until Mr. Homony was appointed, is that a correct

 6    statement?

 7    A    Yes.

 8    Q    Okay.  Would you characterize your work for mis -- for

 9    Stream from January just to March, through the end of March,

10    as occasional or full time?

11    A    That was full time.

12    Q    Okay.  Let's turn to Paragraph Number 3?

13    A    Which number?

14    Q    Paragraph Number 3.

15              MR. SWICK:  I'll try to be louder today, Your

16    Honor.

17              THE WITNESS:  Okay.

18    BY MR. SWICK:

19    Q    Once again:

20              "For most of 2024, I provided executive consulting

21              services to Visual Semiconductor."

22         If you're looking at all of the year of 2024, is that a

23    correct statement?

24    A    Yes.

25    Q    Okay.  But from January up to March, is that a correct
```

1    statement?

2    A    Certainly, yeah.

3    Q    January to March -- go ahead.

4    A    Certainly, I was full time services for Stream the first

5    quarter of the year.

6    Q    Okay.  But then, after that, you did provide some

7    executive consulting services to Visual Semiconductor.

8    A    Yeah, related to a potential plan of reorganization,

9    again, for VSI to support Stream, to save Stream.

10   Q    Okay.  (indiscernible) talk into the microphone.  Let's

11   look at Trustee's Exhibits Number 12 and 13.

12        (Pause in proceedings)

13   A    Okay.  I'm on Number 12.

14   Q    All right.  Put a thumb on 12 and put a thumb on 13.

15   We're going to look at these two things.

16   A    Okay.

17   Q    Okay.  Look at the top of Exhibit Number 12, the Stream

18   TV stock purchase agreement.  Can you read to me what comes

19   after that at the very top?

20   A    "VSI 230911-1."

21   Q    All right.  Now thumb over to Exhibit Number 13.  Same

22   thing, at the top, please read to me what it says after it.

23   A    "Stock Purchase Agreement, VSI 230911-2."

24   Q    All right.  What are the date of these two agreements?

25   A    The first one is September 11, 2023.  It's the same date

58

```
 1    for both agreements.
 2    Q    All right.  Now let's go to the signature page of each.
 3         (Pause in proceedings)
 4    A    Okay.
 5    Q    Have you got them both?
 6    A    I do.
 7    Q    All right.  Look at the signatures, do they look -- how
 8    do they look like?
 9    A    I don't understand your question.
10    Q    In other words, do the signatures all look similar?
11    A    Yes, they do.
12    Q    Identical?
13    A    They -- I'm not a handwriting expert, but the --
14    Q    No.  It's just your opinion.
15    A    Yeah, they're very, very close.
16    Q    All right.  And when I go through these, it's actually
17    the exact same -- let me see here -- the exact same document.
18    The headings, lines, they're all the same.  Do you see
19    anything different than I do?
20    A    Do you mean between the documents a whole?
21    Q    Right.
22    A    Well, it -- the recitals appear to be the same.  Yeah, I
23    -- I'm sure that --
24    Q    They're both for the same amount, as well?
25    A    Yeah.  It looks like the only difference is the header.
```

```
 1    Q    Okay.  So do you think it's -- and you already testified
 2    that you have no idea, you've never seen this document
 3    before.
 4    A    I was not aware that these one or two existed.
 5    Q    Okay.  So -- but just looking at the two documents, so
 6    like it's def -- is it a possibility that it's just two
 7    different versions of the same document, especially when you
 8    look at the heading, the 230911-1 versus 230911-2?
 9    A    It's possible.
10    Q    And you were very involved, from all of your testimony
11    that you've already given, in this conversion process of
12    stock purchase agreements, et cetera, right?
13    A    Can you ask the question again, please?
14    Q    Well, the stock -- we've talked about the stock purchase
15    agreements.  We've talked about the process to convert money,
16    et cetera.  So you were knowledge -- you also testified that
17    you work with Suby on requests from Stream to VSI to get
18    stock.
19    A    Oh, yes, correct.
20    Q    Okay.  And in everything that you've reviewed, you've
21    never seen these two subscription agreements.
22    A    No.
23    Q    Have you seen anything corresponding, requests for
24    equity or communications between Stream and VSI with --
25    regarding these stock -- these agreements?
```

 1    A    No.  Everything originated with Suby Joseph.  Suby would

 2    do the calculation for stream on its expenses, VSI would

 3    confirm and ask for equity.  The last communication I saw was

 4    in December of 2023, when Suby sent all those monthly

 5    accountings, which, as I said, I think related to cleanup to

 6    satisfy the U.S. Trustee on what the relationship was and

 7    what the specific expenses that had been made and what the

 8    equity issuance -- issuances were.  And then Dan Rink

 9    received those accountings from Stream and then requested the

10    equity from VSI.

11        I assume there was an equity issuance that followed

12    that, although I don't know.

13    Q    So, when VSI gave -- previously -- or prior to Mr.

14    Homony being appointment, when the subscription agreements we

15    talked about yesterday (indiscernible) VSI gave money, did

16    they automatically get stock back just because they gave

17    money?

18    A    No.  There was a process.

19    Q    Okay.  Was it -- are you aware of any of that process

20    after Mr. Homony was appointed?

21    A    I'm not aware of it, no.

22    Q    Okay.

23        (Pause in proceedings)

24    Q    All right.  Would you turn -- it's a little confusing,

25    sorry -- to the other book, VSI Exhibit Number 29.

```
1    A    Which one?  I'm sorry.

2    Q    29.  Suby's spreadsheet.

3    A    Okay.

4    Q    All right.  Turn to that second page.

5              THE COURT:  I'm sorry.  Which exhibit number?

6              MR. SWICK:  29.

7              THE COURT:  29.  Okay.  Second page?

8              MR. SWICK:  Yep.

9    BY MR. SWICK:

10   Q    Is that the spreadsheet that you talked about earlier?

11   A    We talked about Page 3.

12   Q    Then that's the one I'm talking about.

13   A    Okay.

14   Q    This one.

15   A    Oh, the second page, second attachment page, yes.

16   Q    Yeah, yeah, yeah.

17   A    With the blue, yes.

18   Q    Okay.  So there were some comments about there was, you

19   know, money drawn down on that thirty-five-million-dollar

20   stock purchase agreement reflected here, and I think you said

21   that was incorrect.  So would you explain why you -- that is

22   incorrect?

23   A    Well, the process was that Suby Joseph would look at the

24   Stream expenses, he would say this is what's spent, and he

25   would send something to VSI on what VSI should issue against.
```

1    Suby was making the assumption that these assumptions could

2    be charged against the thirty-five-million-dollar stock

3    purchase agreement.  But that was not the case because that

4    stock purchase agreement was intended explicitly to support

5    the plan of reorganization.  So, even though Suby, on behalf

6    of Stream, would have said hey, here's some expenses that you

7    guys paid and we want to give you equity against this

8    agreement, VSI would have had to request and approved it, if

9    that's in fact --

10   Q    So was this equity requested by Stream for this $35,000,

11   or whatever it was?

12   A    Stream never requested equity.

13   Q    Did VSI ever --

14          MR. COREN:  Objection, Your Honor.  Foundation.  I

15   don't think he has any firsthand knowledge about anything.

16          THE COURT:  Well, you asked him about it on cross,

17   so I think it's fair game.

18          MR. SWICK:  And he testified that he --

19          THE COURT:  I think it's fair game.  I got it.  I

20   think it's fair game.

21          THE WITNESS:  I think you misspoke.  I think you

22   meant to say by VSI.

23          MR. SWICK:  Correct.

24          THE WITNESS:  Okay.  To my knowledge, the last

25   request for equity by VSI were in those letters from Dan

1    Rink.

2    BY MR. SWICK:

3    Q    Okay.  So we didn't have one of those letters from Dan

4    Rink covering these expenses.

5    A    Well, the thing about the Dan Rink letters that I see is

6    that he doesn't reference a specific stock purchase

7    agreement, so it -- it could be that -- well, I don't know.

8    Based on my rough calculations and reviewing prior to this,

9    it appeared to me that that last letter from Dan Rink

10   exhausted what I thought were the only available notes.

11   Q    Right.  But you don't know anything about those other

12   notes, we've already talked about that.  But from --

13   A    Correct.

14   Q    -- the other notes that you know about and were involved

15   with, those were all exhausted by Dan Rink's letters about

16   this $35,000 or whatever.

17   A    Yeah, I -- I can't say because I'm not the accountant,

18   to know exactly where the dollars were --

19   Q    Okay.

20   A    -- but I -- I know that, because I was directly involved

21   at -- with the drafting of the plan and the disclosure

22   statement in July, that that thirty-five-million-dollar stock

23   purchase agreement was never intended to be anything other

24   than plan support.  So there should not have been any draw

25   against it, there should have been no request for equity

  1    against that note -- I mean that stock purchase agreement.

  2    Q    Just a second.

  3         (Pause in proceedings)

  4    Q    Let's go to Trustee's Exhibit Number 25.

  5         (Pause in proceedings)

  6    A    Okay.

  7    Q    All right.  And so this is Visual Semiconductor's

  8    objection to a motion by the trustee for -- to enforce the

  9    stay and turn over property.  Is that right?

 10    A    That is correct.

 11    Q    All right.  So were you -- and you're -- at the time, do

 12    you recall anything about the trustee's motion and objection

 13    -- and VSI's objection that was filed?

 14    A    Can you repeat the question?

 15    Q    Well --

 16         THE COURT:  Hang on one second, please.

 17         MR. SWICK:  Yeah.

 18         (Court and court personnel confer)

 19         THE COURT:  Never mind.  Go ahead.  You can

 20    continue.  It's someone from chambers.  Excuse me.

 21    BY MR. SWICK:

 22    Q    Did you know that these documents were filed, is

 23    probably the best answer -- the best question.

 24    A    Yeah, I saw them as they came across, or, you know,

 25    shortly after, I'm sure.

1    Q    So this is an objection of VSI.  Did you know that the

2    motion for this was withdrawn, does that ring a bell?

3    A    Oh, yes, this objection was withdrawn.

4    Q    No, no, no.

5    A    Oh --

6    Q    This objection was --

7    A    Oh --

8    Q    -- filed and then the motion was withdrawn.

9    A    Correct.

10   Q    Okay.  Do you know why that motion was withdrawn or

11   what's your understanding about that?

12   A    My recollection is that this objection, among other

13   things, claimed that some of the supporting documents in the

14   trustee's original motion were suspect and that VSI was

15   seeking discovery to find out the source of the documents and

16   the validity of the documents in the accusing motion.

17   Q    Okay.  And didn't this motion ask for sanctions against

18   VSI?

19   A    I believe that it did, yes.

20   Q    Okay.  And then it was withdrawn, right?

21   A    Yeah, VSI -- yeah, VSI opposed it and, ultimately, it

22   was withdrawn, correct.

23   Q    Okay.

24        (Pause in proceedings)

25   Q    Did you have any -- did you work with me, counsel, to

1    draft this document?

2    A    The objection?  I believe I provided some input for you.

3    Q    Okay.  Well, let's go to -- let's go to Paragraph 15.

4         (Participants confer)

5    A    Paragraph 15.  Okay.

6    Q    Yeah.  So you talked about this last sentence that, in

7    summary, says that, after the trustee was appointed, VSI

8    facilitated to go on -- further draw down the subscription

9    agreements, right?

10   A    That's what it says, yes.

11   Q    Okay.  What is the understanding that the money that

12   actually transpired -- sorry.

13        What is your understanding of the funds that went after

14   the trustee was put on, now that you've looked at all these

15   documents you prepared for this hearing, and gone through it

16   all, very detailed?

17   A    That's a very --

18   Q    It was terrible.

19   A    That's too broad of a question.  I'm sorry.

20   Q    All right.  All right.  Were there stock agreements not

21   yet fulfilled by the time the trustee was appointed?

22   A    It appears that there were two additional five-million-

23   dollar agreements, if those are accurate agreements, that

24   were not part of anything that -- in my back-of-a-napkin

25   calculations I had done, and it could have been open for

1     that.

2     Q    But not that you know of.

3     A    Yeah.

4     Q    Except for what you just saw in the exhibits, right?

5     A    Yeah.

6     Q    Okay.

7          (Pause in proceedings)

8     Q    All right.  Let's go to Paragraph 32.

9     A    Okay.

10    Q    All right.  So the question -- the last sentence at the

11    end of the paragraph, all right, says:

12              "A distributor willing to fund requirements of

13               revenue generation is invaluable to the estates."

14          Is that a correct statement?

15    A    Absolutely.

16    Q    Okay.  Did VSI do that before the trustee was appointed?

17    A    Yes.

18    Q    Okay.  Did VSI do that after the trustee was appointed?

19    A    (No verbal response)

20    Q    Did VSI take -- let me rephrase the question.

21          Did VSI take equity for funds advanced after the trustee

22    was appointed?

23    A    Not that I'm aware of.

24    Q    Okay.  Go to Paragraph 35.

25    A    Okay.

1    Q    Once again, this is the exact same sentence that Mr.

2    Coren asked you about.  It says:

3            "-- Mr. Rajan has not taken any action, nor allowed

4            or directed VSI or Stream contract employee to take

5            any action that would obligate the debtors in any

6            way without authority or court approval."

7        You've talked a lot about what you did January to March

8    and after for Stream.  Did Mr. Rajan direct you to do any of

9    that work?

10    A    No.

11    Q    Who directed you to do the work?

12    A    I took my direction from Ms. Maneen, who was reporting

13    to the trustee.

14    Q    Thank you.

15        Mr. Coren asked you if you -- there were any

16    communications that you knew about where VSI was requesting

17    an administrative claim with Mr. Homony, and I believe you

18    said that there were none that you're aware of.  Is that

19    right?

20    A    Correct.

21    Q    Are there any communications that you're aware of where

22    Stream or VSI said hey, for all this money that VSI is

23    getting, we're going to give equity?

24    A    No.

25    Q    Okay.  Sorry.  I wrote down the exhibits I wanted to

```
1    reference, I just didn't write down which -- whose exhibits

2    they were, so --

3    A    No problem.

4         (Pause in proceedings)

5    Q    All right.  Let's go to VSI's Exhibit Number 1.

6    A    Did you say Exhibit 1?

7    Q    Yes.

8    A    Okay.

9         THE COURT:  I know it's difficult, but do try to

10   speak into the microphone, please.

11        MR. SWICK:  I'm -- for some reason, it's impossible

12   for me to do it, so I'll keep trying.

13        (Laughter)

14   BY MR. SWICK:

15   Q    Okay.  So we talked about this Paragraph Number 3, that

16   the admin claim was 1.288, right?  Do you remember that?

17   A    Yes.

18   Q    And I know, just to shortcut things, you've talked about

19   how it needs to be reduced by your calculations.

20        He asked about the amount of employee claims, right?

21   How -- just give an off-the-cuff, what's the percentage of

22   employee claims that compromises this number?

23   A    Are you asking me what's the percentage of 900,000 over

24   1.2?

25   Q    Well, we have -- it's like 1.28 minus one fifty.  Like
```

1    of that -- whatever that number is because I can't even do

2    that math in my head because I'm a liberal arts major, but

3    like just --

4    A    Well, I don't know if you would take the nine fifty off

5    and then still say 9.2 because there's probably some overlap

6    there.

7    Q    Right.

8    A    So I think you just -- running with these numbers, it

9    looks like it's 70, 75 percent.

10   Q    Okay.  And you said you could probably tell all the

11   employees.  Let me go to -- Let's go to Exhibit Number 48.

12        (Pause in proceedings)

13   Q    Do you know what this document is?

14   A    I have not seen it before, but I see that it's a

15   TriState Capital bank account, Mr. Homony.  So this would

16   appear to be the Stream TV Networks' DIP account that was

17   opened by the trustee after his appointment.

18   Q    Yeah, so, just looking at it says, trustee checking --

19   it says "Checking Account, Trustee Checking."  Do you see

20   that?

21   A    I do see that, yes.

22   Q    All right.  Then you look down and you see credits.  And

23   it says "incoming wire from Visual Semiconductor, Inc."  Do

24   you see that?

25   A    I see two entries, yes.

1    Q    All right.  Then can you go to Page 3?

2    A    Okay.

3    Q    Do you rec -- do you these outgoing wires to?  Do you

4    recognize any of those names?

5    A    I recognize all of them.

6    Q    Well, who are these people?  Who are these individuals?

7    A    So Sara Brewer is on the content team.

8         Anna Ventures (phonetic), I believe -- well, I'm not --

9    I'm not going to say because I don't know exactly.

10        Mrs. Maneen we've talked about, she was Mathu's chief

11   administrative assistant and the primary contact for the

12   trustee for all the Stream stuff.

13        Charles M. Robertson is me.

14        Suby Joseph we talked about for accounting.

15        Amanda Van Oddin (phonetic) provided services as an

16   admin assistant; she managed all the corporate filing,

17   company filings, so the Box account and organizing all the

18   files that were provided for the trustee, that was in her

19   purview.

20        Matt J.J. Lowe (phonetic), he's our primary sales person

21   who secured the customer order and -- and involved in supply

22   chain, and everything, soup to nuts, in Asia, he's the

23   primary guy.

24        And then it looks like it's -- you know, then it just

25   repeats for the second payment of the month.

1   Q    Thank you.

2        Can you glean from this why these people were paid by

3   the trustee?

4   A    Why they were paid by the trustee?

5   Q    Right.

6   A    Well, yeah, I can tell you that -- that, even though

7   Sara Brewer was on the content team, she was drafted for the

8   -- the accounting project because it was so massive to go

9   through six or seven years worth of documents, so I assigned

10  her a lot of that work.

11  Q    (Indiscernible)

12  A    Nicole, Nicole Maneen, we already talked about.  You

13  know, my role.  Suby was -- was finance, he was heavily

14  involved in that accounting project, too.  Amanda was a lot

15  of document retrieval and organization.

16       And again, Matt Lowe, the company had taken these

17  purchase orders in -- in end of March and April of 2023.  We

18  had gotten renewal confirmations in November of 2023.  The

19  customers had been asking hey, when are you guys, you know,

20  going to be able to deliver on these, we know that you're

21  going through your legal things, but we'd like to be

22  planning, is there any -- you know, obviously, we're not

23  going to make Black Friday this year, what do things look

24  like for 2024, so there was maintenance there.  And then,

25  when the trustee came onboard, he requested that we get, yet

73

```
 1    again, renewals, even though we had renewed the purchase

 2    orders in November.  And I think we got renewals again in

 3    February, if I remember.  So that was in Matt's area.

 4    Q    So they're employees by Stream being directed by the

 5    trustee.

 6    A    Yeah.  That -- that's the handful of -- even though I

 7    say Matt Lowe is the -- the China guy, he's -- he splits his

 8    time between Silicon Valley and Asia, so he's really part of

 9    the U.S. team, getting paid with the U.S. group.

10    Q    So this is for February.  During February, were these --

11    as far as you know, were all these employees working full

12    time for Mr. Homony and Stream?

13    A    Amanda Gonzales was part time for Stream.  She had --

14    she had gone part time.  But -- but those part-time efforts,

15    she was an evening person, she has a day job at the bank,

16    because the bankruptcy and the uncertainty of things, she

17    needed to get a full-time employment.  But she was too

18    valuable as the custodian of all the corporate records that

19    we kept her on part time.

20    Q    Okay.  There was a line of questions earlier about

21    keeping up customers and purchase orders when Stream hadn't

22    been able to produce.  We've obviously had a whole bunch of

23    testimony, we don't need more testimony as to why they

24    couldn't produce.

25         But why were they still keeping in contact with
```

1    customers and dealing with purchase orders?

2    A    Well, that's the thing that -- when I -- when I said I

3    object to the nature of the question, it was really that

4    somebody who understands sales in consumer electronics,

5    nobody expects that you're going to deliver your products

6    next month.  And these are relationships that we built over a

7    decade.  We had shown them early prototypes, we showed them

8    improvements.  And this is interesting, you're almost there,

9    let us know when you're there, this is going to be nice for

10   our product line.  And you keep working, you keep going back,

11   and it's you're building this relationship.  These are people

12   that we know for eight, ten years, right?

13        Lenovo is a perfect example.  We did a special project

14   for Lenovo just before the bankruptcy.  Lenovo has been

15   contacting us every month for four years, saying are you

16   there yet, are you there yet, are you there yet, should we be

17   looking somewhere else.  And amazingly, they haven't gone

18   with another solution.  Maybe not amazingly because nobody

19   has anything that looks any good.  And I'm amazed that Apple

20   and Samsung haven't already come out with something that's

21   better, but they haven't.  This is the best mousetrap that's

22   out there.

23        And you have to work those relationships, you have to --

24   you have to give them hope that it's not hopeless.  And Matt

25   Lowe has been able to do that because he has these long-term

```
 1    relationships.  So that's a process.  You have to -- you have
 2    to keep them from going somewhere else, and that requires
 3    maintenance.
 4    Q    And so why was Stream unable to fulfill these purchase
 5    orders?
 6    A    Well, it was a combination of things.
 7    Q    Short version, we've already talked about the
 8    bankruptcy.
 9    A    Yeah.  Yeah.  Well, there was no funding with which to
10    do it, and the bonding equipment, the primary physical asset
11    of Stream was held hostage and never returned.
12    Q    I'm sorry.  In your testimony earlier -- I just want to
13    make sure it's right -- that Stream was entitled to this
14    equipment to fulfill these purchase orders, they just didn't
15    have it.
16    A    Yeah.  Stream purchased it, it held title, and it was
17    being held in a China warehouse with the lease being under
18    SeeCubic B.V., which was Stream's subsidiary.  But Stream's
19    subsidiary was being controlled by the stalking horse's CEO,
20    and they were unwilling to release the equipment.
21    Q    And if you got the -- if Stream got the equipment back,
22    it would be able to fulfill the purchase orders.
23    A    That would have been the primary step.  There was still
24    some engineering work to do, but Stream had engineers
25    standing by in Silicon Valley.  But until you had the bonding
```

1    equipment, there was no point.

2    Q    Okay.

3         (Pause in proceedings)

4    Q    You said a little bit about -- I just want to hit on it

5    once again.  So employees were clearly a big chunk of the

6    amount of money.  All right.  But what -- there were other

7    expenses, right?

8    A    There were.

9    Q    Okay.  And what were those other expenses that VSI

10   funded to Stream and Stream paid?

11   A    Well, small clarification because you're saying "VSI

12   funded to Stream and Stream paid."  VSI paid directly a lot

13   of these expenses and --

14   Q    Well, let's -- hold on.  Let's break that down a second.

15   Let's talk about the time frame.  There's a -- when -- let's

16   start here.  You just said there were two different things.

17        At some point, VSI was finding Stream through Mr. Homony

18   and Mr. Homony was paying it out.  And it sounds like what

19   you just said is VSI started paying it at a different time.

20   Walk through that.

21   A    No, that's not correct.

22   Q    Okay.

23   A    So --

24   Q    You tell me how I'm wrong.

25   A    So, if you look at the letters from Dan Rink, in some of

1      those letters, he says we paid these expenses directly, and

2      then there's also money we spent to Stream, A plus B equals

3      the amount, right?  So, even back in 2023, sometimes VSI

4      funded Stream directly for certain payments, and sometimes

5      paid those directly and wanted credit for those direct

6      payments.

7           After the trustee was appointed, certain monies were

8      paid to the trustee's account to Stream directly; i.e., these

9      --

10     Q    (Indiscernible) bank account (indiscernible)

11     A    -- payrolls, right?  We just looked at the check

12     register.  So we can see in that bank statement -- sorry --

13     that certain monies were paid to Stream directly and then

14     disbursed.  But VSI also paid directly a number of things.

15          So some of those direct payments for the benefit of

16     Stream would have been the storage in Silicon Valley, the

17     storage in the U.K., the storage in Asia where certain assets

18     were held.

19          It would be payments to the U.S. Trustee.  I believe VSI

20     paid the U.S. Trustee directly for Stream.

21          Insurance, business insurance, until the trustee -- the

22     renewal came up -- I think the renewal came up earlier this

23     year, and the trustee informed me that he was going to cancel

24     the policy and do something different.  But until that

25     cancellation just a couple of months ago, I think a couple of

```
 1   months ago, VSI was paying the monthly business insurance for

 2   Stream.

 3        Those are the ones I can think of off the top of my

 4   head.

 5        And then, of course, with employee -- contract employee

 6   salaries, there was also the attendant healthcare.

 7   Q    Right.  Okay.

 8   A    So that's what makes up -- I think the reason that

 9   number is so big is it's not just what was paid to the

10   people; it was for the health insurance that went with those

11   people.

12             MR. SWICK:  Okay.  So I'm trying to head this off

13   and be finished, Your Honor.  All right?

14   BY MR. SWICK:

15   Q    So we talked about January through March.  Things

16   changed after that.

17        All right.  Let's go back to your declaration, which is

18   Trustee's Exhibit Number 31.  It's the -- probably the loose

19   one.

20   A    Yep.

21   Q    All right.  Let's go to Paragraph 3.

22   A    3?

23   Q    Yes.

24   A    Okay.

25   Q    Do you -- so it's -- for most of 2024, you provided
```

1    executive consulting services to VSI and relating to a plan

2    of reorganization.  Is that a true and correct statement?

3    A    Yes, I would say so.

4    Q    When did you start working on that -- this -- in 2004,

5    when did you start working on a plan of reorganization?

6    A    I would say that it was probably -- probably right

7    around May ish --

8    Q    Okay.

9    A    -- because that -- that would -- it might have been

10   June, but I think it was after the fail -- not "fail," sorry

11   -- after the 9019 settlement motion was filed.  It might have

12   even been after the motion was approved in June.  But I -- it

13   was probably after the motion was approved because I think

14   that the thinking among Stream was there's so much evidence

15   that Hawk had been converted, there's no way that a

16   settlement that just grants them 180 million in debt, when a

17   mountain of evidence had been provided that the notes, number

18   one, could be converted on a note-for-note basis, so it

19   didn't even have to be all 18.  Even if the first 15 were

20   converted, then the debtor would have been -- I don't know --

21   maybe 10 million.  You know, clearly, it was not 180 million.

22   So I think the thinking was, in May, there's no way this

23   settlement agreement gets approved, that's not in the best

24   interests of the estate, how can it be, there's a mountain of

25   evidence that we put together.

1     So I think, probably in early June, when the settlement

2     was approved, that's when VSI said okay, let's -- maybe we

3     need to put in our own plan before the assets are actually

4     sold and say there is a better way, if these guys, the Hawk

5     parties want their money and they want to -- they want to get

6     paid, rather than take the assets that we build with blood,

7     sweat, and tears for a decade, so be it.  And so that's when

8     we -- again, the idea was to save Stream from dissolution.

9     Q    All right.  Okay.  So -- but not during January to March

10    --

11    Q    Oh, no.

12    Q    -- (indiscernible) doing this.

13    A    No.

14    Q    Okay.  And that's when you were performing -- you were

15    getting instructed directly, through Ms. Maneen, from the

16    trustee.

17    A    Yeah, I was -- I was vaguely aware that there were

18    conversations between Mathu Rajan and the trustee about

19    possible plans, but the numbers were much smaller, right?  I

20    think the number that -- that I had heard was, you know,

21    something like ten or 15 million because the idea was, if

22    Hawk is completely converted, then you really only have 20

23    million of -- of unsecured debt, and if which you could pay

24    the unsecured creditors 50 cents on the dollar after several

25    years of chaos, maybe the unsecured creditors would approve a

1   plan at 50 cents.  So I think the thinking was the number

2   didn't need to be a huge number.

3   Q    Okay.  And so I know we talked about was the plan

4   withdrawn or whatever.  Obviously, the plan didn't go into

5   effect, right (indiscernible) but do you remember how much

6   that plan was for?

7   A    The second --

8   Q    The second one.

9   A    The VSI plan --

10  Q    Right.

11  A    -- in 2024?

12  Q    Yeah.

13  A    I think it was north of 200 million.

14  Q    Do you know --

15  A    But I don't --

16  Q    Well, do you know --

17  A    I don't remember --

18  Q    -- was VSI --

19  A    -- the number.

20  Q    -- going to provide the money or were they going to get

21  it from somebody else?

22  A    VSI, to my knowledge, had an anchor investor that was

23  going to fund the plan.

24  Q    Okay.  And so withdrawn or whatever.  So I think you

25  testified (indiscernible) just kind of make sure.  Were there

1    discussions with the trustee entertaining such a plan?

2    A    In the summertime, I know that VSI had objected to the

3    retention of SSG and --

4    Q    Do you know why they objected to SSG's retention?

5    A    Yeah.  SSG had previously been retained by the Hawk

6    parties to sell the same assets while we were in Chancery

7    Court, so that was pre-petition, so they were already

8    familiar with the assets.  And so, even though the Delaware

9    Court said --

10   Q    Part of the --

11   A    -- return them --

12   Q    Yeah.

13   A    -- yeah, the Hawk parties -- well, Hawk counsel notified

14   Stream that they would be selling the assets instead of

15   returning them.

16   Q    Right.

17   A    And the Vice Chancellor had to stop that and SSG

18   withdrew at that point.

19   Q    You totally just threw me off track of what I was --

20        (Laughter)

21           THE COURT:  Well, you asked him the question.

22   BY MR. SWICK:

23   Q    Do you remember the question that I asked before when --

24   A    You -- you asked me if I knew why SSG -- why -- why VSI

25   had opposed --

```
1    Q    Right.

2    A    -- SSG.

3    Q    The question before that one.  You don't remember?

4    A    Sorry, I don't.

5    Q    Okay.  Oh, I -- all right.  I got it.

6         So -- all right.  So like -- and I don't know -- so my

7    thinking -- I just want to know were there -- did the trustee

8    entertain VSI's plan?  Yes -- just yes or no on that because

9    I don't want --

10   A    No.

11   Q    No.

12        Were there discussions about the plan?

13   A    My understanding was that, if VSI withdrew --

14             MR. COREN:  Objection, Your Honor, to his

15   understanding.  I think he said he's had no interaction with

16   the trustee, so --

17             MR. SWICK:  Well, no, this goes directly to what he

18   did, when he did it.

19             THE COURT:  He can have an understanding without

20   necessarily -- he's not relating a communication that was

21   told to somebody else.  He can describe a general

22   understanding.

23             THE WITNESS:  My understanding was that VSI had

24   obtained a hundred-and-seventy-million-dollar proof of funds

25   because the -- again, my understanding was the trustee said
```

1    that VSI would need a significant payment to the secured

2    creditors in order to even entertain a plan, so VSI obtained

3    a hundred-and-seventy-million-dollar proof of funds, and was

4    objecting to the SSG component of the proposed sale, and --

5    and that, if VSI withdrew its objection, then the trustee

6    would engage --

7    BY MR. SWICK:

8    Q    No, no.  Don't go into all --

9    A    Okay.

10   Q    I just -- yeah.

11   A    Sorry.

12   Q    Well, I guess I have to let you answer, but I --

13   A    Well --

14   Q    Yeah.

15   A    Yeah, so that was my --

16   Q    (Indiscernible)

17   A    That was my understanding, was that, if VSI withdrew its

18   objection, then there could be some good faith discussion

19   about the plan.

20   Q    Okay.  And was there any good faith discussion about the

21   plan?

22   A    I don't believe there was.

23   Q    Did the trustee meet with the financial advisor?  I'm

24   sorry.  That's a really terrible way to phrase that.

25        You mentioned that there was a -- VSI was getting the

1    amount from another group, an investor group.  Do you know if

2    the trustee ever talked to that investor group?

3    A    Right.  I believe I testified yesterday that there was a

4    face-to-face meeting between the trustee and VSI's lead

5    investor.

6            MR. SWICK:  Okay.  Just let me -- just give me one

7    second, Your Honor.  I'm probably done.

8            THE COURT:  That's fine.

9        (Pause in proceedings)

10   BY MR. SWICK:

11   Q    Okay.  When the trust -- once the trustee was appointed

12   in -- January of 2024, I think is what we've been saying?

13   A    Yes, correct.

14   Q    Okay.  Do you recall anything about the trustee's

15   appointment order and what he was directed to do in that

16   order?

17   A    Yeah, I do.  My understanding was there were --

18   obviously, operate the company, you know, as opposed to Mathu

19   Rajan, but to -- my recollection is to investigate the

20   purchase orders and the status of the conversion of the

21   secured creditors were probably the primary two things.

22   There might have been more, but I don't -- I seem to recall

23   those being specifically mentioned, but I could be wrong.

24   Q    Okay.  So -- and he -- right.  He did that, he made his

25   own business judgment, that's fine.  We're not going into all

```
 1    of that.
 2          But you know -- so we're talking about these purchase
 3    orders and customer liaisons.  Who directed the work for that
 4    to  -- who directed all that work to take place, well, after
 5    Mr. Homony was appointed?
 6    A    Regarding the customer work?
 7    Q    Yeah, customers --
 8    A    Well --
 9    Q    -- and making sure the purchase orders were up to date -
10    -
11    A    Well --
12    Q    -- and reinvestigating the --
13    A    Yeah, so there's -- yeah, there's really two components:
14          So the first was who directed that we reconfirm the
15    customer commitments from the previous year.  My
16    understanding is that that was something that Mr. Homony
17    wanted.  And that, my understanding, comes from discussions
18    with Nicole Maneen.
19    Q    Okay.  So you said you worked all these hours and hours.
20    That was because the trustee asked you to do that.
21    A    Correct.
22          MR. SWICK:  Okay.  No further questions, Your
23    Honor.
24          THE COURT:  Okay.  Thank you.
25          Do you have any recross, Mr. Coren?
```

```
 1                    MR. COREN:  No.

 2                    THE COURT:  Okay.

 3                    MR. COREN:  Thank you.

 4                    THE COURT:  All right.  Thank you very much, Mr.

 5       Robertson, you can step down.

 6                    THE WITNESS:  You're not really letting me go

 7       before noon, are you?

 8                    THE COURT:  I am.

 9            (Laughter)

10            (Witness excused)

11                    THE COURT:  Okay.

12                    MR. SWICK:  We set out -- so Nicole, not just

13       getting into her testimony because we wouldn't finish now and

14       then we have --

15                    THE COURT:  That's what I was -- so I think we can

16       use this time to talk about the remaining logistics.  Have a

17       seat.

18                    So, based on the witness list that I have, I assume

19       we're going to have Ms. Maneen, we're going to have Mr. Rajan

20       and Mr. Homony.

21                    MR. SWICK:  That's correct, Your Honor.

22                    THE COURT:  Is that it?

23                    MR. SWICK:  As far as I know.

24                    THE COURT:  Okay.

25                    MR. SWICK:  They all should be significantly
```

1    shorter, I would think.

2         THE COURT:  Well, so, ordinarily -- right?  My

3    trial practice would be to put you on a chess clock.  And I

4    think, given where we started yesterday and where we are

5    today, I'm going to use that on the next go around.  So I

6    need you to -- you two to talk about how much you -- how much

7    time you think these witnesses are going to be; and, if you

8    can't agree that there's a different allocation, I'm just

9    going to split it 50/50.  Okay?

10        Here is my -- here is my difficulty.

11   Unfortunately, the last week of April, I'm gone, and then I'm

12   at a judicial training the first week of May.  So I -- and I

13   don't have consecutive trial days, so I -- you know, so I

14   really sort of need to know from you all what you need, in

15   terms of the number of days that you're going to need and the

16   like.

17        I can tell you, you know, I can do tomorrow, but

18   I'm guessing, you know, you want to fly home, which is

19   totally fine.

20        MR. SWICK:  I kind of have to.

21        THE COURT:  And -- but after that, it really

22   becomes I can do Monday, I can do Wednesday, and then, you

23   know, I'm -- I can do like the Monday the 28th, and then I'm

24   into May.

25        So I don't want to lose the momentum of getting all

```
 1    of the evidence in that you all want to present, but I -- you

 2    know, I mean, I was a trial lawyer in my prior life, so I

 3    know what it's like to try a case where you try it once and

 4    then wait, you know, six weeks and have to restart, right?

 5              I will tell you that I do keep very good notes, and

 6    so I won't need -- when you bring the new witnesses in, I

 7    won't need to be like reminded of everything Mr. Robertson

 8    testified about or mister -- I'm not -- mister --

 9              MR. SWICK:  We know who you're talking about.

10              THE COURT:  Mr. Zahralddin.  There we go.  So I

11    will have that.

12              But -- so you -- why don't we do this?  We can --

13    you know, if you guys want to take a couple of minutes and

14    talk, and then we can talk about -- right?  Sort of what my -

15    - I mean, I can give you my available dates now and you guys

16    can talk about what's the right thing, or we can have another

17    status conference, you know, tomorrow or Monday or Tuesday --

18    or Wednesday, whatever.  My normal 7 and 11 days are

19    Tuesdays, and my normal 13 days are Thursdays, so I -- those

20    are already booked, I don't -- I can't give you time on those

21    days, unfortunately.

22              MR. SWICK:  What are the weeks that you said you're

23    unavailable again?

24              THE COURT:  I'm not available the last week of

25    April, except for Monday, I'm available that Monday.
```

```
 1                    MR. SWICK:  Is that 4/28?

 2                    THE COURT:  That's 4/28.  And then I'm not

 3         available the following week.

 4                    MR. SWICK:  And then there -- that's the judicial -

 5         -

 6                    THE COURT:  That's the judicial --

 7                    MR. SWICK:  Okay.

 8                    THE COURT:  -- training, yeah.

 9                    MR. SWICK:  There's two weeks before that you're

10         out, too, right?

11                    THE COURT:  No, no.  That's the -- so I'm gone that

12         first week of -- last week of April, first week of May.

13                    MR. SWICK:  Okay.

14             (Court and court personnel confer)

15                    THE COURT:  So avoid April 29 to May 9.

16             (Participants confer)

17                    THE COURT:  Mr. Swick, did you hear me?  Avoid

18         April 29 to May 9, avoid that.

19                    MR. SWICK:  Okay.  And let me just -- I have U.N.

20         Working Group 5 -- in May, let me check that.

21             (Participants confer)

22                    MR. COREN:  Would the day be a full day, Your

23         Honor?

24                    THE COURT:  I can give you a full day.

25                    MR. SWICK:  Yeah, I think we -- I think -- what I
```

```
 1    actually think would be the best is if -- I think we only

 2    need a day, I agree.

 3              THE COURT:  Into the microphone.

 4              MR. SWICK:  Oh, I'm sorry.  What?

 5              THE COURT:  You can sit, but just into the

 6    microphone.

 7              MR. SWICK:  Oh, so -- I don't want I can't do that.

 8        (Laughter)

 9              MR. SWICK:  I think we need a day, but I --

10              THE COURT:  Apparently, you need to be an actor.

11    Talk to Mr. Robertson, he'll put you on TV, right?

12              MR. SWICK:  Yeah.  No.  But I think what would

13    actually be really best is if I could, you know, get home,

14    talk to my wife, and then with Mr. Coren and everybody and

15    make sure the witnesses are available because we need to talk

16    to Mrs. Maneen, Mr. Rajan, and then we can just get with your

17    courtroom staff and just get that on the calendar and get

18    going as soon as we can.

19              THE COURT:  That's fine.

20              MR. SWICK:  I mean, is that okay?  I don't want to

21    -- yeah.

22              MR. COREN:  It's fine.  I think, if we have a full

23    day, that's got to do it.

24              MR. SWICK:  Yes.  Yes.

25              THE COURT:  Well, it will.
```

```
1              MR. SWICK:  Yes.

2              THE COURT:  Because I'm going to put you on a chess

3       clock.

4              MR. COREN:  Fair enough.

5              THE COURT:  So --

6              MR. COREN:  I think, if those are the rules and we

7       start, you know, early, I think that works.

8              MR. SWICK:  Yeah, I totally agree with that.

9              MR. THOMPSON:  Your Honor, this is John Thompson.

10             THE COURT:  And so I will also say this.  I

11      understand Ms. Maneen's personal situation, and I know we

12      already talked about having her participate remotely and I'm

13      not going to change on that.  But I -- all of the other

14      witnesses do need to be here for testimony.

15             MR. SWICK:  Yeah, absolutely.  That's why I just

16      want to make sure.  And if --

17             THE COURT:  Yep.

18             MR. SWICK:  -- Ms. Maneen can be here, she will be

19      here in person --

20             THE COURT:  That would be great.

21             MR. SWICK:  -- (indiscernible)

22             THE COURT:  Okay.

23             MR. COREN:  Why don't we narrow it down?  The 28th

24      or May 12th?

25             THE COURT:  Well, I don't know.  He's got to talk
```

```
 1    his -- he's going to talk to his side, which is fine.

 2              MR. COREN:  All right.

 3              THE COURT:  And that's fine.

 4              MR. SWICK:  Yeah, I just want to make sure

 5    everybody is available before --

 6              THE COURT:  Yeah.

 7              MR. SWICK:  -- I commit.  And I need to talk to my

 8    co-counsel.  I don't want to agree to a date without talking

 9    to --

10              THE COURT:  I understand.

11              MR. SWICK:  Yeah, yeah.

12              THE COURT:  And for Mr. Homony, I'll save you --

13    I'll save you standing up, Mr. Coren.  I'm not going to

14    entertain a motion for a directed verdict, so he's going to

15    put him on.

16              MR. COREN:  Okay.

17              MR. SWICK:  Yeah, yeah.  So I don't need to

18    subpoena anyone.

19              THE COURT:  So you don't need to subpoena him and

20    you don't need to take him out of -- you know, you don't need

21    to take him out of order and put him in yours as an adverse -

22    -

23              MR. SWICK:  And I'll represent to the Court right

24    now that Mr. Rajan will be here, he does not need to be

25    subpoenaed again, either.
```

```
 1              THE COURT:  Well, he's your witness.  If you want
 2      him, I mean, I don't think --
 3              MR. COREN:  Oh, it's his (indiscernible) --
 4              MR. SWICK:  (Indiscernible)
 5              MR. COREN:  -- we need him as well.
 6              MR. SWICK:  Yeah.
 7              THE COURT:  So -- okay.
 8              MR. COREN:  If he goes on in their case, I'll do
 9      what I do and that will be it.
10              THE COURT:  Fine.
11              MR. COREN:  I was going to raise the question,
12      since we're going to finish up, which would include rebuttal
13      or anything.  We have the potential of mister -- we have a
14      declaration from Mr. Homony.  But given how the case has
15      developed, we may have additional direct testimony from Mr.
16      Homony.  Should I just do it live or do we want to do a new
17      declaration or does it matter?
18              THE COURT:  It doesn't mat --
19              MR. COREN:  Declarations save a lot of time.  So,
20      if we're going to be on a time clock, they do save some time.
21              THE COURT:  They do.  But I'll let you all decide
22      how you want --
23              MR. COREN:  But would --
24              THE COURT:  -- to do it.
25              MR. COREN:  -- Your Honor entertain that, if we
```

1   want to do it?

2                THE COURT:  I would entertain that, that's fine.

3                MR. SWICK:  I would not object to that, if he

4   wanted to provide live testimony.

5                MR. COREN:  Okay.  We may do that, we'll think

6   about it.

7                THE COURT:  But you know, so whatever time you --

8   you know, but when I put you on a chess clock, I mean, just

9   to make sure we're all talking about the same thing, whatever

10  time you use in cross-examination -- right?  Goes against

11  your time.

12               MR. COREN:  (Indiscernible)

13               THE COURT:  And whatever time you use in direct

14  goes against your -- right?  You know what I mean?  And --

15               MR. COREN:  Yeah.

16               THE COURT:  -- vice versa, so ...

17               MR. COREN:  The Delaware Chancery rule.

18               THE COURT:  It's the arbitration rule.

19               MR. COREN:  Oh, is it?  They --

20               THE COURT:  Uh-huh.

21               MR. COREN:  They stick to it like by the second and

22  pulled in the middle of a question.

23               THE COURT:  I don't know that I'm that aggressive,

24  but I have found that, in my practice, to be very efficient,

25  so ...

1    If you have -- we will keep these exhibits.  If you

2    have supplemental exhibits that you need to discuss,

3    certainly do that; and, if you need to file a supplemental

4    exhibit list, you can certainly do that.

5    If you're going to file declarations -- if you're

6    going to submit declarations as direct testimony, my only

7    request is that you do it three business days before --

8    MR. COREN:  The next hearing date.

9    THE COURT:  -- the hearing, just so the other side

10   has it and it's filed on the docket and we can sort of deal

11   with it.

12   (Participants confer)

13   MR. THOMPSON:  May I -- Your Honor, may I ask a

14   clarifying question?  Can you hear me?

15   THE COURT:  Absolutely, Mr. Thompson.  That's fine.

16   MR. THOMPSON:  Thank you, Your Honor.

17   I just want to make sure that I understood.  I knew

18   that, from the -- I believe after the 29th interim period to

19   -- through May, you are not available.  But before that, is

20   it correct to say that the Court is available tomorrow,

21   Thursday, and Friday, and then Monday and Wednesday next

22   week, or are those dates -- did I misunderstand?

23   THE COURT:  I am available tomorrow, I'm not

24   available Friday and I'm not available Thursday because I

25   have my 13 list.  So I'm available tomorrow.  I'm available

```
 1    Monday the 21st, I'm available Wednesday the 23rd, and then

 2    I'm available Monday the 28th.

 3              MR. THOMPSON:  Thank you very much, Your Honor.  I

 4    appreciate that.

 5              THE COURT:  You're very welcome.  I know I'm

 6    throwing a lot of information at you.  I tried to get some

 7    homework done last night, so that I would have this

 8    information for you all.

 9              All right.  I think that resolves at least -- you

10    all will get back to me, in terms of if you need one day or

11    more than one day -- I assume it will be one -- and if you're

12    allocating time separately, other than just 50/50.  Okay?

13    And you can just let Mr. Barbetta know that by email and

14    we'll take it from there.

15              I did see that the motion for a 2004 was withdrawn,

16    so thank you for that Mr. Vagnoni.

17              I think, when we last spoke, we still have to deal

18    with the scheduling of the trustee's objection to the Lewis

19    Brisbois fee application.

20              MR. VAGNONI:  Right.

21              THE COURT:  Mr. Vagnoni, did you have any

22    opportunity to talk with the firm at all or ...

23              MR. VAGNONI:  With Lewis Brisbois?

24              THE COURT:  Yes.

25              MR. VAGNONI:  No, Your Honor, we have not.
```

```
1              THE COURT:  Okay.  See if you can get some

2     information from them about scheduling.  It doesn't have to

3     be in connection with this and it doesn't have to be

4     immediate, but I don't want that to languish.

5              MR. VAGNONI:  We will, Your Honor.  We had

6     anticipated that we would present to Your Honor some kind of

7     agreed scheduling order with discovery and the -- and a trial

8     date.

9              THE COURT:  Okay.  Great.

10             Okay.  Is there anything else in connection with

11    the Stream TV matters that we need to handle before you all

12    get back to us on the continued trial date?

13        (No verbal response)

14             THE COURT:  All right.  No?

15             All right.  Well, I thank you all for your time and

16    your hard work.  Let us know when we can do the continued

17    trial date.  And we will stand in recess until 1 p.m. today -

18    -

19             MR. SWICK:  Thank you (indiscernible) Your Honor.

20             THE COURT:  -- (indiscernible) the clerk, whichever

21    is earlier.

22             MR. SWICK:  Thank you for everything.

23             MR. COREN:  Thank you, Your Honor.

24             THE COURT:  You all may be excused.

25             MR. THOMPSON:  Thank you, Your Honor.
```

1    (Proceedings adjourned to a date to be determined)

2    (Concluded at 11:20 a.m.)

3                          * * * * *

4                      CERTIFICATION

5        I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter to the best of my

8    knowledge and ability.

9

10

11

12

13    _____        April 17, 2024

14    Coleen Rand, AAERT Cert. No. 341

15    Certified Court Transcriptionist

16    For Reliable

17

18

19

20

21

22

23

24

25

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:                                                    : Chapter 11

Stream TV Networks, Inc. and Technovative Media,          : Bankruptcy 23–10763–djb
Inc.
             Debtor(s)

*NOTICE OF FILING OF TRANSCRIPT*
*AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on April 15, 2025 was filed on April 17, 2025.

The following deadlines apply:

The parties have until 4/24/25 (seven (7) calendar days from the date of filing of the transcript) to file with the court
a Notice of Intent to request Redaction of this transcript. The deadline for filing a request for redaction is 5/8/25 (21
days from the date of filing of the transcript).

If a Request for redaction is filed, the redacted transcript is due 5/19/25 (31 days from the date of filing of the
transcript).

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the
restriction period, which is 7/16/25 (90 calendar days from the date of filing of the transcript) unless extended by
court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (contact the court for
contact information) or you may view the document at the clerk's office public terminal.

                                                      For the Court


Date: 4/17/25                                         Timothy B. McGrath
                                                      Clerk of Court


                                                      By:Christopher Caruso
                                                               Deputy Clerk

1069

In re:                                          Chapter 11

Stream TV Networks, Inc., *e a*.[1]              Bky Case No. 23-10763 (DJB)
                                                (Jointly Administered)
                Debtors.

---

Please take notice that Akerman    P ("Akerman") and   eif M Clark of   eif M Clark Consulting ("  eif Clark") hereby withdraws as counsel to Visual Semiconductor Inc ("VSI") in the above-captioned case. Attorneys Donald N. David, Mark S.   ichtenstein, R. Adam Swick, and John H. Thompson of Akerman, and   eif Clark   should be removed from all service lists, including the court's electronic notification lists, in the above-captioned case.

Please take further notice that Matthew B.   eisberg,   sq.,   . Anthony DiJiacomo, III,   sq. and   ary Schafkopf,   sq, of   eisberg   aw (collectively, "  eisberg") hereby substitutes their appearances as to VSI in the above-captioned case. Attorneys Matthew B.   eisberg,   . Anthony DiJiacomo, III, and   ary Schafkopf should be added to all service lists, including the court s electronic notification list, in the above-captioned case with the following contact information:

> Matthew B.   eisberg,   sq.
>   . Anthony DiJiacomo, III,   sq.
>   ary Schafkopf,   sq.
> 7 S Morton Avenue
> Morton, PA 1  070
> Telephone:    (610) 6 0-0801
>   acsimile:    (610) 6 0-0880
> mweisberg   weisberglawoffices.com
> adijiacomo   weisberglawoffices.com
> gschafkopf   weisberglawoffices.com

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (40 2) and Technovative Media, Inc. (5015).  The location of  the Debtors' service address is: 200 Chestnut Street, 3rd   loor, Philadelphia, PA 1  103.

814 3571 2

Dated: May 22, 2025

Respectfully submitted,

A    RMAN    P

ISB  R    A

_/s/_ ___da S  c_____

Donald N. David, SBN: 304846
Mark S.  ichtenstein (Admitted  ro  ac  ce)
1251 Avenue of the Americas
37th  loor
New  ork, N   10020
Telephone: (212) 880-3800
 acsimile: (212) 880-8  65
 mail: donald.david  akerman.com
       mark.lichtenstein  akerman.com

-and-

R. Adam Swick (Admitted  ro  ac  ce
500   est 5th Street, Suite 1210
Austin, T    78701
Telephone: (737)    -7103
 acsimile:  (512) 623-6701
 mail: adam.swick  akerman.com

-and-

John H. Thompson  Admitted  ro  ac  ce
750 Ninth Street, N.  . 750
  ashington, D.C. 20001
Telephone: (202) 824-1760
 acsimile:  (202) 3 3-5  5
 mail: john.thompson  akerman.com

-and-

 eif M Clark (Admitted  ro  ac  ce
 eif M Clark Consulting P   C
115 Bonner
Houston, T   77007
Telephone:  (210) 663-5183
 mail: lmclarak   leifmclark.com

**Withdrawing Counsel of Visual Semiconductor Inc**

_/s/ Ma  he____ar_____

Matthew B.   eisberg
 . Anthony DiJiacomo, III
 ary Schafkopf
7 S Morton Avenue
Morton, PA 1  070
Telephone:    (610) 6  0-0801
 acsimile:    (610) 6  0-0880
mweisberg   weisberglawoffices.com
adijiacomo   weisberglawoffices.com
gschafkopf   weisberglawoffices.com

**New Counsel of Record for Visual Semiconductor Inc.**

2

---

I certify that on May 22, 2025, I caused the attached
to be electronically filed with the Clerk, United States
Bankruptcy Court,   astern District of Pennsylvania, by   C   and one copy of the forementioned
document by way of first class mail and/or   C   to those persons listed on the attached service list.

*/s/    da  S  c*
R. Adam Swick

814 3571 2

1072

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | |
| | : | Chapter 11 |
| **Stream TV Networks, Inc.,** *et al.* | : | |
| | : | Bky. Case No. 23-10763 (AMC) |
| **The Debtors.** | : | (Jointly Administered) |

**NOTICE OF WITHDRAW OF MOTION FOR**
**ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM**

TO THE CLERK:

Kindly withdraw Visual Semiconductor, Inc.'s Motion for Allowance of Administrative

Expenses Claim filed on March 4, 2025 (ECF Doc. 966).

Respectfully submitted,

**WEISBERG LAW**

*/s/ L. Anthony DiJiacomo, III*
Matthew B. Weisberg, Esq.
Gary Schafkopf, Esq.
L. Anthony DiJiacomo, III, Esq.
*Attorneys for Visual Semiconductor, Inc.*

1073

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| **Stream TV Networks, Inc.,** *et al.* | : | |
| | : | Bky. Case No. 23-10763 (AMC) |
| **The Debtors.** | : | (Jointly Administered) |

### CERTIFICATE OF SERVICE

I, L. Anthony DiJiacomo, III, Esquire, hereby certify that on this 19th day of June 2025, a true and correct copy of the foregoing Notice of Withdrawal was served on all counsel of record via ECF.

WEISBERG LAW

*/s/ L. Anthony DiJiacomo, III*
Matthew B. Weisberg, Esq.
Gary Schafkopf, Esq.
L. Anthony DiJiacomo, III, Esq.
*Attorneys for Visual Semiconductor, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VISUA  SEMICODUCTOR, INC. | Chapter 11 |
| Plaintiff | Bky No. 23-10763 (DJB) |
| v. | Adv. No.  (DJB) |
| REMBRANDT 3D HO DIN , TD.<br>I  IAM A. HOMONY,<br>INDIVIDUA  Y (AS  ),<br>AND, AS JOHN DOE 2, IN HIS<br>OFFICIA  CAPACITY AS TRUSTEE<br>AND JOHN DOES (MORE FU  Y SET<br>FORTH BE  O  ) | **Jury Trial Demanded**<br><br>**Adversary Proceeding**<br><br>Claims for Relief:<br>1) Declaratory Judgment<br>2) In unction<br>3) Breach of Contract (including Breach of Covenant of  ood Faith and Fair Dealing)<br>4) Un ust Enrichment<br>5) Promissory Estoppel<br>6) Conversion<br>7) Conspiracy Aiding and Abetting |
| Defendants | |

<u>ADVERSARY COMPLAINT</u>

Plaintiff Visual Semiconductor, Inc., by and through its undersigned counsel, Matthew B.

eisberg, Es  uire, hereby files this Adversary Complaint, and VSI avers:

**I.      THE PARTIES**

1.      Plaintiff, Visual Semiconductor, Inc.  ("VSI"), is a registered corporation

organi ed under the laws of   yoming with an office address in   yoming. VSI is head uartered

in Pennsylvania.

2.      Defendant, Rembrandt 3D Holding,   td. ("Rembrandt") is a corporation

organi ed and existing under the laws of the Island of Nevis,   est Indies with a registered

address in the   est Indies.

1

3.      Defendant,    illiam A. Homony ("Homony"), is instant Chapter 11 trustee, sued

both as John Doe, in his official capacity, and individually, as acting            .

**Commented [BR1]:** Shouldn't we identify the John Does here?

## II.      JURISDICTION AND VENUE

4.      Federal Court has  urisdiction pursuant to 28 U.S.C.    1332(a) because the parties

are citi ens of different U.S. States and foreign countries, and the amount in controversy exceeds

$75,000.00, exclusive of interest and costs.

5.      This Honorable bankruptcy Court has  urisdiction over this adversary proceeding

pursuant to 28 U.S.C.    157 and 1334, and the    eneral Order of reference of the United States

District Court for the Eastern District of Pennsylvania.  This Court has supplemental  urisdiction

over the state law claims pursuant to 28 U.S.C.    1357 and    1367, which claims are part of the

same case or controversy, 18 U.S.C.    1836.

6.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

157(b)(2)(A), (H), (K), and (O).

7.      Venue is proper pursuant to 28 U.S.C.    1409 because the adversary proceeding

arises in, and is related to, the above caption  ointly administered bankruptcy estate pending in

the United States Bankruptcy Court of the Eastern District of Pennsylvania.

## III.     BACKGROUND OF THE PARTIES

8.      Plaintiff VSI was founded to develop and commerciali e glasses    free

holographic display technology for use in commercial and consumer markets globally.

9.      Defendant Rembrandt engages in the development and commerciali ation of

advanced display technologies and is the owner of all the assets of Defendant, John Does, 3D

Fusion Corp., a Delaware corporation, and its wholly-owned Dutch subsidiaries, 3D Fusion

Holding B.V. and 3D Fusion EU B.V., Eindhoven, The Netherlands (collectively "3D Fusion").

2

10.    Defendant, John Doe, Stephen K. Blumenthal, is the CEO and sole shareholder of Rembrandt.

11.    Defendant, John Doe, Stream TV Networks, Inc. ("Stream"), is a Delaware corporation and instant debtor.

12.    Stream engages in the business of developing glasses    free 3D display technology. Stream's assets were sold in December 2024 in a contested    363 sale coordinated by Homony.

13.    Defendant, John Doe, SeeCubic, Inc. ("SeeCubic"), is a Delaware corporation with offices in New York.

14.    SeeCubic was founded by Defendants, John Does, Stastney and Morton, in June 2020 for the purpose of receiving the assets and intellectual property of Stream pursuant to a settlement agreement that was later invalidated by the Delaware Supreme Court in June 2022.

15.    Notwithstanding the reversal, SeeCubic ac uired title to the Stream assets through the Homony-brokered    363 sale.

16.    Defendant, John Doe, Shadron   . Stastney ("Stastney"), resides in New Jersey. Stastney was a senior investor and lender of Stream and was also its chief financial officer and vice chairman of its board of directors. Upon information and belief, Stastney is a chief executive of SeeCubic. Upon information and belief, Stastney formed SeeCubic to sei e the assets of Stream.

17.    Stastney settled SEC charges regarding breaches of fiduciary duty in unrelated investments in September 2013, barring Stastney from investment and advisory work for 18 months.  In the Matter of Shadron   . Stastney, United States Securities and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (September 18, 2013) (published).

3

18.    Defendant, John Doe, Hawk Investment Holdings   td. ("Hawk"), is an entity
formed under the laws of    uernsey, United Kingdom Channel Islands. Hawk is the alter ego of
Defendant, John Doe, Morton. Upon information and belief, Morton owns and or controls Hawk
through entities owned and controlled by him, including Defendant, John Doe, Albany Directors
 td. Hawk was Stream's largest secured creditor before transferring its debt to SeeCubic.

19.    Defendant, John Doe, Arthur   eonard Robert "Bob" Morton ("Morton"), upon
information and belief, owns and or controls Hawk through entities owned and controlled by
him, including Albany Directors   td.

20.    The UK Financial Conduct Authority banned all UK banks and brokers from
participating in any take-over activity in which Morton is involved (known as "Cold
Shouldering").

## IV.    OPERATIVE FACTS

### A.  Introduction

21.    In 2024, VSI Rembrandt, with Blumenthal executing as CEO, entered into a
 itigation Funding and Confirmation Agreement ("  FCA") and subse  uent amendments which
entitled VSI to certain rights regarding Rembrandt's litigation, which VSI funded.

22.    Key rights afforded to VSI pursuant to the   FCA and its amendments included
absolute pre-approval of any settlement Rembrandt might wish to consider, and the right to
immediate ownership of or access to Stream's Ultra-D technology if Rembrandt succeeded in
obtaining such ownership or access.

23.    Notwithstanding the   FCA, Blumenthal and Rembrandt negotiated and executed
a settlement agreement ("Settlement").

24.    By executing the settlement agreement without VSI consent, Blumenthal and
Rembrandt breached their agreement with VSI.

4

25. Homony aided and abetted the Rembrandt breach to reach a global settlement that would end federal litigation in which Homony was personally named as a Defendant (accused of patent infringement and misappropriation of trade secrets,         ).

26. Upon information and belief, Homony advocated for the settlement primarily to shield himself and his advisers from the conse uences of an unlawful sale of non-estate assets to a bad-faith "stalking horse bidder."

27. Homony conspired with certain other Defendants to transfer assets of debtors, Stream and Technovative, through a carefully designed scheme that benefited Defendants at the expense of the debtors and other parties in interest.

28. To achieve the li uidation goal, Homony conspired with Stastney, SeeCubic, Hawk, and other parties, Defendants, John Does, to sei e the debtors' assets through a scheme ultimately struck down by the Delaware Supreme Court.

29. Homony awarded his co-conspirators funds, allowed claims and gave them preferential treatment so they could claim legal title to the debtors' assets at virtually no cost.

**B.    Homony's Infringement of Rembrandt's Intellectual Property**

30. Stream's Ultra-D Technology assets incorporate Rembrandt's intellectual property.

31. The Rembrandt IP was not removed nor returned by Homony before he sold Stream's assets to SeeCubic in accordance with a settlement agreement between Stream as the debtor, Hawk as the collateral agent for Stream's secured creditors  and SeeCubic as the stalking horse bidder (approved by Homony).  ("SeeCubic 9019 Settlement").

**C.    LFCA Contract and Subsequent Amendments**

32. ith Homony committed to conducting a   363 sale of Stream's assets despite infringement warnings from Rembrandt, it became clear to VSI and Rembrandt that they had a

5

common interest in preventing the unlawful transfer of Stream's assets to an unlicensed party like SeeCubic, and in protecting Stream's other parties in interest from the actions of Homony.

33.     However, Rembrandt lacked the financial resources necessary.

34.     VSI agreed to provide litigation funding to Rembrandt to pursue legal options in various venues.

35.     On November 5, 2024, Rembrandt and VSI entered into the   FCA whereby VSI would provide litigation funding to Rembrandt to receive certain consideration in return, including the right to guide litigation strategy, among others.

36.     Pursuant to the agreement, litigation funding was paid by VSI to (a) Blumenthal directly for Rembrandt's benefit  and (b) to Brown     Michaels, P.C., Defendant, John Doe, counsel for Rembrandt.

> **Commented [BR2]:** We didn't identify Brown & Michaels as a Defendant earlier. This is the first reference. Should we do so earlier?

37.      hen it became clear that the imminent    363 sale would result in additional legal expenses for Rembrandt, Rembrandt and VSI amended the   FCA ("  FCA Amendment    1") on November 20, 2024, to increase VSI's financial support.

38.     FCA Amendment    1 increased the amount of weekly litigation funding by VSI and also that VSI counsel would draft initial documents for Rembrandt review and subse uent filing-thereby reducing direct litigation costs to Rembrandt.

39.     Pursuant to   FCA Amendment    1, litigation funding was paid by VSI to (a) Blumenthal directly for Rembrandt's benefit  and (b) to Brown     Michaels, P.C., counsel for Rembrandt.

40.     As an alternative to Homony's proposed asset sale, VSI filed a disclosure statement and accompanying plan of reorgani ation for which it was to provide additional reorgani ation funding.

6

41.    The proposed plan would provide recoveries for not only Hawk and SeeCubic but for all of Stream's unsecured creditors as well.

42.    The plan was filed on December 3, 2024.

43.    On December 30, 2024, SeeCubic, Hawk, VSI and Rembrandt amended the FCA a second time (" FCA Amendment   2").

44.    FCA Amendment   2 not only ad usted the amount of VSI financial support again but also changed the payment direction so that litigation funding was paid by VSI directly to Blumenthal for allocation at Rembrandt's sole discretion.

45.    In essence, the   FCA, along with its two amendments, provided that Rembrandt would work exclusively with VSI in connection with the pending litigation against SeeCubic, Stastney, and Homony, with the shared goal of recovering technology wrongfully transferred from Stream.

46.    VSI made litigation funding payments to Rembrandt and its counsel pursuant to the   FCA and its amendments.

47.    Additionally, VSI paid its own counsel to draft and review documents for Rembrandt's benefit.

48.    VSI made these payments with a reasonable expectation that Rembrandt would adhere to the mutually agreed litigation strategy and secure VSI pre-approval before negotiating any settlement.

49.    Rembrandt did not have the authority to conduct settlement negotiations or enter into any settlement agreement without the expressed pre-approval of VSI, which was neither consulted nor solicited by Rembrandt.

   **D.    The Stream Technology and its Dependence on Third-Party Intellectual Property of Philips and Rembrandt**

7

50. Stream was founded in 2009 by Mathu Ra an ("Ra an"), and over the course of several years, the company developed glasses-free 3D technology trademarked Ultra-D .

51. The Ultra-D solution was created around the foundation of technology that Stream licensed from non-party, Koninkli ke Philips N.V. ("Philips"), via a non-exclusive, nontransferable, non-sublicensable basis in 2011.

52. Stream paid for the Philips' license which is held by Defendant, John Doe, Ultra-D Ventures, C.V., a curacao company that was formerly a subsidiary of Stream but is now owned by SeeCubic (following the 363 sale of Stream's assets).

53. Certain engineers employed by Stream through its Netherlands subsidiary, Defendant, John Doe, SeeCubic, B.V. ("SCBV"), had previously worked for Blumenthal.

> **Commented [BR3]:** This is the first time we identify SCBV as a Defendant. Should we do so in the earlier section?

54. During their work-for-hire period, the Stream engineers developed improvements to the Philips technology using a Philips license obtained by Blumenthal.

55. After oining Stream and its subsidiary SCBV in 2011, these engineers incorporated trade secrets and other confidential information developed with Blumenthal into the Ultra-D solution for the benefit of Stream.

56. Stream's executives were unaware that their R D engineers had access or wrongfully appropriated third-party intellectual property until Rembrandt filed a Complaint against Stream in 2017 in the Supreme Court of New York.

**E. The Rembrandt Lawsuit and the Mediated Stastney – Rembrandt Term Sheet**

57. hile attending the Consumer Electronics Show in as Vegas, Nevada, in January 2017, to promote Ultra-D Stream's management and key engineers the Rembrandt New York lawsuit was served.

8

58.     Stream's engineers denied any wrongdoing to Stream management  some of them admitted they had previously worked with Blumenthal to improve Philips technology but exclusively denied that they wrongfully used any proprietary information or were bound by nondisclosure or confidentiality documents.

59.     Other Stream engineers denied even knowing Blumenthal.

60.     Based on the representations of its engineers, Stream defended itself against the Rembrandt New York lawsuit   which was later removed from the Supreme Court of the State of New York to the United States District Court for the Southern District of New York.

61.     Rembrandt and Stream were ordered into mediation whereupon ultimately Blumenthal was authori ed to bind Rembrandt and Stastney similarly on behalf of Stream.

62.     Presented with evidence that Stream's engineers had executed non- disclosure agreements and had shared detailed and proprietary information with Blumenthal during their work-for-hire period, Stastney capitulated to Rembrandt's demands for a general settlement.

63.     On April 9, 2019, the settlement was memoriali ed in a term sheet ("Stastney-Rembrandt term sheet") signed by Stastney, Blumenthal, and the Honorable Magistrate Judge Katharine H. Parker.  .

**F.      The Settlement between Stream and Rembrandt**

64.     At the time the term sheet was executed   and for nearly two years afterwards Stream Management was unaware of the evidence Rembrandt had provided Stastney.

65.     It was not until 2021 that it was learned:  (a) many of Stream's engineers, including some who claimed they did not even know Blumenthal, had signed non-disclosure agreements  (b) Blumenthal had minutes for at least 45 separate engineering meetings with Stream's personnel  (c) Blumenthal possessed significant portions of computer code that predated the formation of SCBV and was used by Stream's engineers in the Ultra-D solution

9

and (d) Blumenthal's claims extended beyond the three Rembrandt patents to include 175 trade secrets ("Rembrandt Trade Secrets").

66.    Stream Management disputed the validity of the term sheet for two years believing Stastney had agreed to an overly generous settlement to increase the chances of foreclosing on Stream as the secured creditor.

67.    Rembrandt sought to enforce the timesheet or resume litigation but its case against Stream was stayed by Stream's February 2021 bankruptcy filing.

68.    Rembrandt approached Stream to renew settlement discussions in May 2021 making it clear that Rembrandt intended to file an adversary proceeding in the Stream bankruptcy if the settlement could not be finali ed.

69.    To avoid the adversary proceeding, Stream negotiated the terms of a long form agreement that effectively mirrored the timesheet.

70.    Final points were discussed and incorporated into a document that the parties intended to submit to the bankruptcy court for approval.

71.    Before the finali ation of the long form agreement, the bankruptcy court dismissed Stream's Chapter 11 case on May 17, 2021.

72.    Nonetheless, the parties completed their negotiations and executed a settlement agreement on May 23, 2021 ("Rembrandt Settlement").

**G.    The Homony Adversary Complaint against Rembrandt and VSI**

73.    On April 30, 2025, Homony filed an adversary complaint against VSI, Rembrandt and Rembrandt's counsel, and Ra an, challenging Rembrandt's bankruptcy claims ("The Homony Complaint").

**H.    The Continuous Attempt by Stream's Alleged Secured Creditors to Secure Stream's Assets**

10

74. On March 26, 2020, S S filed a complaint in Delaware Superior Court seeking to foreclose on all the assets of Stream pursuant to security agreements pledging Stream's assets as collateral for loans provided by S S.

75. Unable to obtain Stream's assets through a uick foreclosure, Stastney, along with three of Stream's directors Defendants, John Doe, Kevin ollop, Asaf ola, and Kr ys tof Kabacinski in early May 2020 to establish a debt resolution committee and entered into a settlement ("Omnibus Agreement") whereby all of Stream's assets would be transferred to Stastney's new company (SeeCubic) while leaving Stream's debt behind.

76. The Omnibus Agreement also gave preferential treatment concerning Stream's shareholders over the founding shareholders.

77. Stream's management denied the validity of the omnibus agreement as it violated the company's charter (prohibiting transfer of the assets without proper approval).

78. Ultimately, on June 15, 2022, the Delaware Supreme Court determined the Omnibus Agreement was void .

**I.** **Seizure of Stream's Assets and Failure to Return Them**

79. In March 2020, Stastney began to sei e Stream's assets immediately upon filing the foreclosure-notifying the third-party custodian of Stream's Silicon Valley computer servers (on which its valuable production code was stored), that he "had foreclosed" and was now the new owner of those assets.

80. He presented a filed copy and was non-ad udicated Superior Court complaint as proof of his ownership and convinced the unsuspecting vendor to block Stream's access to its own computers and transfer control of them to Stastney representatives.

81. hile Stream management contested the validity of the Omnibus Agreement, Stastney, and his co-conspirators, continued to sei e Stream's assets.

11

82.     On August 24, 2020, despite being removed as Stream's directors three months earlier,  ollop and   ola executed a delegation of authority on Stream letterhead purporting to empower a third party to act on behalf of Stream in its China operations for the purpose of transferring Stream's bonding e uipment to SeeCubic.

83.     Kabacinski sent threatening communications to the CEO of Stream's R  D subsidiary, SCBV, related to inventory shipments, alleging fraud and other crimes by those who acted contrary to the (later invalidated) Omnibus Agreement.

84.     On September 8, 2020, Stream sought in unctive relief from the Delaware Court of Chancery to prevent Stastney and SeeCubic from continuing their efforts to sei e Stream's assets.

85.     Despite the mandate from the Delaware Supreme Court, SeeCubic argued that it should not have to return assets that had been "improved" while SeeCubic exercised control over them for the prior eighteen months.  hen Vice Chancellor  aster ordered the assets returned anyway (with the caveat that SeeCubic could pursue un ust enrichment claims later), Hawk engaged Defendant, John Doe, SS  Advisors  C ("SS "), to sell the assets in a UCC Article 9 sale rather than return them to Stream.

86.     SeeCubic, Hawk, and SS  set a sale date and prepared to market the assets in pursuit of the Article 9 sale, which was stopped when Stream was granted in unctive relief.

87.     SeeCubic refused to surrender critical Stream assets, including technology demonstrators, the bonding e uipment, and control of Stream's subsidiaries.

88.     SeeCubic was specifically ordered to surrender control of Stream's subsidiaries by transferring ownership of the Technovative stock shares to Stream.

89.     Stastney, SeeCubic and Hawk executed a scheme which transferred the shares to Stream before Hawk exercised purported proxy rights to sei e control (not ownership) of those

12

shares and appointed Stastney the new director of Technovative, thereby maintaining the status

uo.

90.    Stastney, SeeCubic, and Hawk were held in contempt of court.

**J.    The Rembrandt Amendment between Stream and Rembrandt.**

91.    hile drafting the Stream Plan of Reorgani ation ("POR"), Stream and

Rembrandt began negotiations to amend certain terms of the Rembrandt Settlement.

92.    Over the course of the following month, the parties reached agreement on an

amendment (the "Rembrandt Amendment"), which was executed by Stream and Rembrandt on

August 12, 2023.

93.    All past due cash payments were reset to a schedule tied to confirmation of the

Stream POR, to which Rembrandt served as plan proponent. Nothing in the Rembrandt

Amendment created new or additional obligations for Stream, and all terms tracked with the

proposed Stream POR.

**K.    Stream and Rembrandt Enter into the Licensing Covenant with VSI.**

94.    Stream, Rembrandt, and VSI were not "collusive" as alleged in the Homony

Complaint, but they did have a common goal from June 2023 through January 2024 (and

beyond): protecting the Stream estate and its respective licensors by preventing third parties from

infringing technologies for which they had no license and no legal right to access.

95.    ith the Stream POR on file and ready for consideration by the Court, and with

the Stream Adversary Case initiated to prevent the defendants therein from tortiously interfering

with Stream and infringing the technologies of Rembrandt and Philips, VSI sought to further

cement a relationship with Rembrandt by negotiating supplemental terms to the Rembrandt

Amendment.

13

96.     Those negotiations led to an agreement reached on August 14, 2023 (the
" icensing Covenant").

**PRAYER FOR RELIEF**

HEREFORE, Plaintiff Visual Semiconductor, Inc., respectfully re uests  udgment
against Defendants.

Dated: September 2, 2025                     Respectfully submitted,

                                             s  Mathew  eisberg

                                              EISBER    A
                                             7 S Morton Ave, Morton, PA 19070
                                             (610) 550-8042
                                             www.weisberglawoffices.com
                                             mweisberg  weisberglawoffices.com

14

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al*. | |
| The Debtors. | Bky. Case No. 23-10763 (DJB) |
| | (Jointly Administered) |

## ORDER

   **AND NOW**, this _____ day of _____ 2025, upon consideration Visual Semiconductor, Inc.'s Counsel's Expedited Motion to Withdraw as Counsel with Immediate Interim Stay, and any response thereto, it is hereby **ORDERED** and **DECREED** that Counsels' Motion is **GRANTED**, and the Clerk shall mark all of Plaintiffs' Counsels' – Matthew B. Weisberg and L. Anthony DiJiacomo, III – representation as **TERMINATED**.

   This action is **STAYED** thirty (30) days from the date of entry of this Order for Plaintiffs to retain new counsel.

**BY THE COURT:**

_____
Hon. Derek J. Baker U.S.D.J.

1089

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.* | |
| The Debtors. | Bky. Case No. 23-10763 (DJB) |
| | (Jointly Administered) |

## VISUAL SEMICONDUTOR INC.'S COUNSEL'S EXPEDITED MOTION TO WITHDRAW AS COUNSEL WITH IMMEDIATE INTERIM STAY

Visual Semiconductor, Inc.'s undersigned counsel, Attorneys Matthew B. Weisberg and L. Anthony DiJiacomo, III ("Undersigned Counsel"), hereby bring this Motion for Leave to Withdraw as Counsel for Plaintiff for the following reasons:

1.     This expedited motion for leave to withdraw as counsel is submitted requesting immediate stay.

2.     A similar motion will be contemporaneously submitted in the parallel pending matter.

3.     Counsel additionally submits this motion subject to Rule of Professional Conduct 1.16(a)(1) ("mandatory withdrawal").

4.     Pursuant to Rule of Professional Conduct 1.16(b)(1), a "lawyer may withdraw from representing a client if … withdraw can be accomplished without material adverse effect on the interests of the client." Pa.R.P.C. 1.16(b)(1).

1090

5.      Pursuant to Rule of Professional Conduct 1.16(b)(4), a "lawyer may withdraw from representing a client if … the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement". Pa.R.P.C. 1.16(b)(4).

6.      Pursuant to Rule of Professional Conduct 1.16(b)(6), a "lawyer may withdraw from representing a client if … the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client". Pa.R.P.C. 1.16(b)(6).

7.      Pursuant to Rule of Professional Conduct 1.16(b)(7), a "lawyer may withdraw from representing a client if … other good cause for withdrawal exists." Pa. R.P.C. 1.16(b)(7).

8.      Undersigned Counsel respectfully submits to this Honorable Court that each of the foregoing basis are satisfied here and warrant leave of this Honorable Court for Counsel to withdraw.

9.      Moreover, Undersigned Counsel submits that the attorney-client relationship has suffered irreconcilable differences.

10.     Should this Honorable Court require detailed information, an *ex-parte*, off-the-record conference is requested so that Undersigned Counsel may abide Rule 1.6 (Confidentiality of Information) and Rule 3.3 (Condor Toward the Tribunal).

11.     Undersigned Counsel respectfully requests this Honorable Court grant Visual Semiconductors, Inc. Counsel leave to withdraw as counsel for Visual Semiconductor, Inc.

12.     A copy of this Motion has been sent via email to Visual Semiconductors, Inc. at the last known email addresses provided:

dan.rink@visualsemi.com
mathu.rajan@visualsemi.com
bud.robertson@visualsemi.com

      **WHEREFORE**, Attorneys Matthew B. Weisberg and L. Anthony DiJiacomo, III,

respectfully request this Honorable Court relieve counsel from representation consistent with the

attached proposed Order.

                                   Respectfully Submitted,

                                   **WEISBERG LAW**

                                 */s/ Matthew B. Weisberg*
                                 Matthew B. Weisberg, Esquire
                                 L. Anthony DiJiacomo, III, Esquire
                                 7 South Morton Avenue
                                 Morton, PA   19070
                                 (610) 690-0801
                                 (610) 690-0880 – Fax
                                 mweisberg@weisberglawoffices.com
                                 adijiacomo@weisberglawoffices.com
                                 *Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.* | |
| The Debtors. | Bky. Case No. 23-10763 (DJB) |
| | (Jointly Administered) |

**<u>CERTIFICATE OF SERVICE</u>**

I, Matthew B. Weisberg, Esquire, hereby certify that on this 3rd day of September 2025, a true and correct copy of the foregoing Motion to Withdraw was served via e-filing on all counsel of record and upon all via email:

ANDREW J. BELLI
Coren & Ress, PC
2001 Market Street, Suite 3900
Philadelphia, PA 19103
abelli@kcr-law.com

STEVEN M. COREN
Coren & Ress, P.C.
2001 Market Street
Two Commerce Square, Suite 3900
Philadelphia, PA 19103
scoren@kcr-law.com

EDMOND M. GEORGE
Obermayer Rebmann Maxwell & Hippel, LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
edmond.george@obermayer.com

MICHAEL D. VAGNONI
Obermayer Rebmann Maxwell & Hippel LLP

Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
michael.vagnoni@obermayer.com

**WEISBERG LAW**

*/s/ Matthew B. Weisberg*
Matthew B. Weisberg, Esquire
L. Anthony DiJiacomo, III, Esq.
*Attorneys for Plaintiff*



1526 Gilpin Avenue
Wilmington, Delaware 19806
United States of America
Tel: 302-449-9010
Fax: 302-353-4251
www.devlinlawfirm.com

SEPTEMBER 3, 2025

**VIA ECF**

Honorable Judge Derek J. Baker
United States Bankruptcy Court
Eastern District of Pennsylvania
Robert N.C. Nix Sr. Federal Courthouse
900 Market Street, Suite 204
Philadelphia, PA 19107

  Re: *In re: Stream TV Networks, Inc. and Technovative Media, Inc.,*
    No. 23-10763-djb (LEAD)

Dear Judge Baker,

  We write concerning Visual Semiconductor, Inc's Counsel's Expedited Motion to Withdraw as Counsel (D.I. 1072). Rembrandt 3D Holding Ltd. opposes allowing Mr. Weisberg and his firm from withdrawing.

  The motion claims that the reason for the withdrawal is that Mr. Weisberg and his client have suffered irreconcilable differences. (¶ 9, D.I. 1072.) Yet, just sixteen hours earlier Mr. Weisberg filed an Adversary Complaint in this matter. This questions whether the stated basis for the withdrawal is correct. Moreover, the motion was filed on an expedited basis, but without any explanation why the motion needs be expedited.

  To ensure that no additional time is lost in resolving this matter, we respectfully ask that Mr. Weisberg be compelled to appear on Monday September 8, 2025, during the hearing on the Motion to Approve Compromise under Rule 9019 to explain the basis for his request to withdraw as counsel, and what the reasons are for filing this motion as an expedited motion. Mr. Weisberg owes a duty of candor to this court. If Mr. Weisberg knows that his prior filings were based on fraudulent or inaccurate information, he has an obligation to correct those or disavow his prior filings and Mr. Weisberg should be asked if he is disavowing his prior filings on September 8, 2025.

  We look forward to discussing this further during the September 8 hearing.

DEVLIN LAW FIRM
September 3, 2025
Page 2 of 2

Respectfully submitted,

Andrew DeMarco
*Counsel for Rembrandt 3D Holding Ltd.*

1096

UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FILED

SEP - 5 2025

TIMOTHY McGRATH, CLERK
BY _____ DEP. CLERK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| STREAM TV NETWORKS, INC, et al., | : | Bankruptcy No. 23-10763 (DJB) |
| Debtors. | : |  |
|  | : |  |

### NOTICE OF APPEARANCE AND REQUEST FOR
### SERVICE OF PAPERS PURSUANT TO §1109(b) OF
### THE BANKRUPTCY CODE AND BANKRUPTCY RULES 9010 AND 2002

NOTICE IS HEREBY GIVEN, pursuant to §1109(b) of Title 11 of the United States Code and

Rules 9010 and 2002 of the Federal Rules of Bankruptcy Procedure that Daniel Joseph Rink, Esquire

hereby appears on behalf of Visual Semiconductor, Inc.in the above-captioned Chapter 11 cases.

NOTICE IS FURTHER GIVEN that Daniel Joseph Rink requests that all notices given or

required to be given in the above-captioned case (including, but not limited to, all papers filed and served

in all adversary proceedings in this case, and all notices mailed only to the statutory committees of their

authorized agents and to creditors and equity security holders who file with the Court a request that all

notices be mailed to them) be given to and served upon the following:

Daniel Joseph Rink, Esquire
1017 E. 28th Street
Houston, TX 77009
Telephone: (610) 220-0206
Email: dan.rink@visualsemi.com

NOTICE IF FURTHER GIVEN that the foregoing request includes not only notices and papers referred to in Bankruptcy Rule 2002, but also includes, without limitation, orders and notices of any application, motion petition, pleading, request, complaint or demand, whether formal or informal, whether written or oral, and whether transmitted or conveyed by mail, hand delivery, telephone, telegraph, telex or otherwise, that affect the above-captioned debtor or property of such debtor.

Dated: September 4, 2025                                DANIEL JOSEPH RINK


By: /s/ Daniel Joseph Rink_____
    Daniel Joseph Rink, Esquire (PA #21258)
    1017 E. 28th Street
    Houston, TX 77009
    Telephone: (610) 220-0206
    Email: dan.rink@visualsemi.com

Attorney for Visual Semiconductor, Inc.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (DJB)** |
| | : | **(Jointly Administered)**[1] |
| **Debtors.** | : | |
| | : | |

## ORDER GRANTING TRUSTEE'S MOTION FOR LEAVE TO FILE REPLY IN SUPPORT OF HIS MOTION TO APPROVE SETTLEMENT

**AND NOW,** upon consideration of the Motion of William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" or in conjunction with Stream, the "Debtors"), for Entry of an Order granting (i) Expedited Consideration, Shortened Time and Limited Notice, and (ii) Granting Leave to File the Reply (attached to the Motion: the "Proposed Reply") in Support of the Omnibus Motion for Entry of an Order: (i) Approving a Settlement Agreement (the "Rembrandt Settlement Agreement" or the "Agreement") with Rembrandt 3D Holding Ltd. ("Rembrandt" or, in conjunction with the Trustee, may be generally referred to as "Party" or collectively, as the "Parties") pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a); (ii) Enforcing Defense and Indemnity Obligations of SeeCubic, Inc. ("SeeCubic"); and (iii) Granting Related Relief (the "Motion for Leave"[2]); and the Court having jurisdiction to consider the matters raised in the Motion for Leave pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Leave Motion.

4919-7166-2938 v2

1408 and 1409; and due and proper notice of the Motion for Leave having been provided to the required and necessary parties; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion for Leave; and the Court having held a hearing to consider the relief requested in the Motion for Leave (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion for Leave and at the Hearing establish just cause for the relief granted herein; and the Court having determined that the relief requested is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor; it is hereby **ORDERED** that:

1.    The Motion for Leave is **GRANTED**.

2.    The Proposed Reply is deemed timely filed and adequately served without further filing or service.

3.    The Trustee shall file the Proposed Reply (Exhibit "A" to the Motion for Leave) separately on the docket.

**BY THE COURT:**

Date: September 9, 2025

_____
Honorable Derek J. Baker,
United States Bankruptcy Judge

2

4919-7166-2938 v2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:

Stream TV Networks, Inc., *et al.*[1]

      The Debtors.

Chapter 11
Case No. 23-10763 (DJB)

## NOTICE OF RETIREMENT FROM THE PRACTICE OF LAW

TO THE HONORABLE COURT AND ALL PARTIES OF RECORD:

Pursuant to Rule 219(i) of the Pennsylvania Rules of Disciplinary Enforcement, the

undersigned attorney hereby gives formal notice of retirement from the practice of law,

effective immediately on October 14, 2025.

1. The undersigned, DANIEL JOSEPH RINK, Attorney I.D. No. 21258, has been

admitted to practice before the Supreme Court of Pennsylvania and before this Court.

2. Effective October 14, 2025, the undersigned has elected Retired Status pursuant to Pa.

R.D.E. 219(i), and will no longer engage in the practice of law in any capacity, paid or

unpaid.

3. In accordance with Pennsylvania Rule of Professional Conduct 1.16(d), all clients have

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream
TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address
is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

been notified in writing of the attorney's retirement, given reasonable opportunity to obtain new counsel, and have been provided access to their client files and property.

4. There are no active client trust accounts or IOLTA accounts maintained by the undersigned, and all fiduciary obligations have been concluded in compliance with Rule 1.15 of the Pennsylvania Rules of Professional Conduct.

Accordingly, the undersigned respectfully requests that the Court update its records to reflect this retirement and remove the undersigned as counsel of record in all pending matters effective the date of this notice.

Respectfully submitted,

*Dated: October 14, 2025*

/s/ DANIEL JOSEPH RINK
DANIEL JOSEPH RINK, Esq.
Pennsylvania Attorney I.D. No. 21258
1017 E. 28th Street
Houston, TX 77009
stanrink@aol.com
(610) 220-0206

# CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2025, I served a true and correct copy of the foregoing Notice of Retirement from the Practice of Law upon all counsel of record and interested parties via ECF electronic service and/or first-class mail, in accordance with the applicable Rules of Court.

/s/ DANIEL JOSEPH RINK

Daniel Joseph Rink, Esquire

# UNITED STATES BANKRUPTCY COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:

Stream TV Networks, Inc., et al.[1]

The Debtors.

Chapter 11

Bky. Case No. 23-10763 (DJB) [1]

(Jointly Administered)

## ORDER

AND NOW, this _____ day of _____ 2025, upon consideration Visual

Semiconductor, Inc.'s Counsel's Expedited Motion to Withdraw as Counsel with Immediate

Effect, and any response thereto, it is hereby ORDERED and DECREED that Counsel's Motion

is GRANTED, and the Clerk shall mark Plaintiffs' Counsel's – DANIEL JOSEPH RINK –

representation as TERMINATED.

This action is immediate from the date of entry of this Order.


BY THE COURT:

_____

Hon. Derek J. Baker U.S.D.J.

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

# UNITED STATES BANKRUPTCY COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:

Stream TV Networks, Inc., *et al.*[1]

      The Debtors.

Chapter 11

Bky. Case No. 23-10763 (DJB)[1]

Jointly Administered

# VISUAL SEMICONDUCTOR, INC.'S COUNSEL'S EXPEDITED MOTION TO WITHDRAW AS COUNSEL WITH IMMEDIATE EFFECT

Visual Semiconductor, Inc.'s undersigned counsel, Attorney DANIEL JOSEPH RINK ("Undersigned Counsel"), hereby brings this Motion for Leave to Withdraw as Counsel for Plaintiff for the following reasons:

1. This expedited motion for leave to withdraw as Counsel is submitted requesting immediate effect.

2. A similar motion will be contemporaneously submitted in parallel pending matters.

3. Undersigned Counsel additionally submits this motion subject to Rule of Professional Conduct 1.16(a)(1) ("mandatory withdrawal").

4. Pursuant to Rule of Professional Conduct 1.16(b)(1), a "lawyer may withdraw from representing a client if ... withdraw can be accomplished without material adverse effect on the

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

interests of the client." Pa.R.P.C. 1.16(b)(1). Undersigned Counsel recognizes that client Visual Semiconductor, Inc. is already represented by esteemed counsel of record Weisberg Law, and there should be no question that client Visual Semiconductor, Inc. will be more than fully, professionally and adequately represented upon the retirement of Undersigned Counsel.

5. Pursuant to Rule of Professional Conduct 1.16(b)(7), a "lawyer may withdraw from representing a client if ... other good cause for withdrawal exists." Pa. R.P.C. 1.16(b)(7).

6. Undersigned Counsel has noticed the client Visual Semiconductor, Inc., the Court, all Counsel of record and the Pennsylvania Supreme Court's Disciplinary Board and Attorney Registration Office that he has retired from the practice of law as Pennsylvania Attorney Number 21258 effective immediately as of October 14, 2025.

7. Undersigned Counsel respectfully submits to this Honorable Court that each of the foregoing basis are satisfied here and warrant leave of this Honorable Court for Undersigned Counsel to withdraw.

8. Should this Honorable Court require detailed information, an ex-parte, off-the-record conference is requested so that Undersigned Counsel may abide by Rule 1.6 (Confidentiality of Information) and Rule 3.3 (Candor Toward the Tribunal).

9. Undersigned Counsel respectfully requests this Honorable Court grant Visual Semiconductor, Inc.'s Undersigned Counsel leave to withdraw as Counsel for Visual Semiconductor, Inc.

10. A copy of this Motion has been sent via email to Visual Semiconductor, Inc. at the last known email addresses provided:


mathu.rajan@visualsemi.com


bud.robertson@visualsemi.com

WHEREFORE, Attorney DANIEL JOSEPH RINK, respectfully requests this Honorable Court

to relieve Undersigned Counsel from representation consistent with the attached proposed Order.


Respectfully Submitted,


DANIEL JOSEPH RINK
/s/ Daniel Joseph Rink
Daniel Joseph Rink, Esquire
1017 E. 28th Street
Houston, TX 77009
(610) 220-0206
stanrink@aol.com
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of October, 2025, I served a true and correct copy of the

foregoing Notice of Retirement from the Practice of Law upon all counsel of record and

interested parties via ECF electronic service and/or first-class mail, in accordance with the

applicable Rules of Court.


/s/ DANIEL JOSEPH RINK

Daniel Joseph Rink, Esquire